David Y. Wong, Attorney at Law (SBN 105031)
100 Shoreline Highway, Suite 100 B
Mill Valley, CA  94941
Tel: (415) 339-0430
Fax:  (415) 332-8679

Law Office of Marc H. Greenberg
536 Mission Street, Suite 2323
San Francisco, CA  94105
Tel: (415) 442-6611

Attorneys for Defendants William Tull, Daniel Gibby and
Gibby Novelties, LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PAUL MONTWILLO, an individual | CASE NO.  C 07 3947 SI |
| Plaintiff, | |
| vs. | AFFIDAVIT OF WILLIAM TULL IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT |
| WILLIAM TULL; DANIEL GIBBY; GIBBY NOVELTIES, LLC dba ARSENIC & APPLE PIE, a California Limited Liability Corporation and DOES 1 through 20, inclusive, | April 25, 2008<br>9:00 a.m.<br>Judge Illston, Courtroom 10 |
| Defendants. | The Federal Building<br>450 Golden Gate Avenue<br>San Francisco, CA  94102 |
| And Related Counter-Claim of Tull | |
| | Complaint filed:  August 1, 2007 |

The Undersigned, William Tull, does hereby state and declare as follows:

1.     I am one of the Defendants in the above-captioned matter and submit the

following in support of Defendants' Motion for Summary Judgment against the

Complaint of Plaintiff Paul Montwillo;

2.    The following facts are based on my personal knowledge of same, having personally witnessed the events and facts described, except as to those matter stated on information and belief and as to said matters I believe them to be true;

3.    The instant Complaint was filed by Plaintiff Montwillo on August 1, 2007, and seeks damages from myself and the other named Defendants for the alleged infringement of copyrights allegedly owned by Montwillo;

4.    Starting in about 1996, Montwillo began altering the appearance of and cross-dressing Mattel's Barbie Doll line.  Montwillo and other artists displayed their works in a show which I attended.  Out of the initial interest and buzz over the dolls shown, Montwillo and I began producing altered Barbie Dolls, which were named "Trailer Trash Barbie" and displayed and sold in my store, In Jean Ious.

5.    Although the dolls were only moderately popular, the dolls caught the attention of Mattel, Inc., which filed suit against In Jean Ious and Montwillo, then known as "Paul Hansen," for trademark and copyright infringement in this Court, USDC Case No. C97-0012 EFL.   The case against In Jean Ious was settled in March of 1997, with my agreement not to produce, sell or distribute any dolls based on the Barbie and Ken product lines or themes.  I believe the case against Montwillo was settled shortly thereafter along the same terms;

6.    In July of 1997, with the Mattel lawsuit was behind us, Montwillo and I agreed to try making "trailer trash" dolls once again.  We formed a partnership called Arsenic & Apple Pie, and jointly prepared a written partnership agreement, a true and correct copy of which is attached to this Motion as Exhibit 2 to the Declaration of Greenberg.  Under the Agreement, Montwillo was responsible for "Art Direction, Design and Advertising"…, including "product design" and I was responsible for the financial aspects of the business.  The term of the Partnership Agreement was two years, or until a limited liability company was formed;

7.    In April of 1999, Montwillo and I converted our partnership into a limited liability company named Arsenic & Apple Pie, LLC (hereafter "Arsenic").  A true and

correct copy of Arsenic's Operating Agreement is attached to this Affidavit as Exhibit A. Montwillo and I wanted to continue our business in the same manner as the partnership, so we incorporated language taken directly from the now-superseded Partnership Agreement. Montwillo and I were named co-Managing Members, each of us holding a 50% managerial and ownership interest. Montwillo was again responsible for art direction, design and creative aspects of the business, including "...product design and packaging...". I was again responsible for managing and the business;

8. Neither the Partnership Agreement nor the Operating Agreement of Arsenic ever contained language reserving to Montwillo any ownership rights to the intellectual property or copyrights to the trailer trash dolls. Similarly there were never any written agreements or other documents that evidenced any license or temporary grant of a license to use or produce the trailer trash dolls between Arsenic and Montwillo. At no time did I ever discuss, agree, consent to or approve of any license with Montwillo for Arsenic to use his doll designs;

9. I have first-hand knowledge that the five trailer trash dolls that are the subject of this action were conceived, developed and produced entirely during the time that Montwillo and I were in Partnership or were co-members in the Arsenic limited liability company. The Partnership was started in July of 1997 and it was dissolved shortly after the Arsenic LLC was formed. Hence, from July 1997 until July 2004, Montwillo and I were continuously in a business relationship for the purpose of developing, producing and selling Trailer Trash dolls;

10. Montwillo, in his capacity as a member-owner of Arsenic, designed, developed and helped market the first Trailer Trash Doll, called "Trailer Trash Doll". After the initial Doll, Montwillo again working for Arsenic, developed and produced a Blonde Drag Queen and Redhead Drag Queen Doll. These three dolls, as well as two additional concepts that were never produced, were manufactured, developed, financed and distributed by entirely by Arsenic. Financial assistance

1    was provided by me to Arsenic in the form of loans which I made to the

2    Company;

3    11.    Montwillo, as per the Operating Agreement, was also actively involved in the

4    design and artwork of the cardboard package in which each doll was sold.  On

5    the back of each box, appeared a copyright notice on behalf of *Arsenic & Apple*

6    *Pie*, true and correct copies of which are attached to this Motion as Exhibit 3 to

7    the Declaration of Greenberg;

8    12.    From 1999 until about 2003, Arsenic conceived and started development on two

9    additional doll models, a "Talking Pregnant Trailer Trash Doll" and a "Male Mullet

10    Trailer Trash Doll".   Of the two dolls, only the pregnant doll progressed to the

11    prototype stage, however, neither doll went into production due to a lack of funds.

12    After several years of disappointing sales and the absence of any net profits,

13    Arsenic had yet to make a profit and none of the first priority loans I had made to

14    it had been repaid.  Consequently, when the time came to decide whether to lend

15    the company more money to further develop and produce the additional dolls,

16    Montwillo and I elected to put both projects on hold indefinitely;

17    13.    In or about 2003, I learned for that Montwillo had filed a Petition in bankruptcy in

18    March of 2002.  Arsenic's Operating Agreement provided that the Company

19    would wind up and dissolve in the event of a triggering event, one of which was

20    defined as a member filing a petition in bankruptcy (Section 8.3).  Arsenic was

21    thus forced to windup and dissolve as per its Operating Agreement.  The

22    dissolution and windup was initiated in June of 2004, and the Company was

23    formally dissolved on July 12, 2004;

24    14.    At the time of the decision to windup and dissolve, Arsenic's tangible assets

25    consisted primarily of unsold doll inventory with a book value of $35,763.

26    Arsenic, however, had outstanding liabilities of $88,283, mostly the unpaid loans

27    owed to me.  As stipulated by the Operating Agreement, Arsenic liquidated its

28    assets and offered them for sale to the highest bidder.   No bids or offers were

received.  The debts of the Company were thus paid in order of priority, with third party vendors paid first.  After satisfaction of the Company's third party debts, there was still an additional $70,000 in unpaid loans, so I elected to receive the remaining doll inventory and the intellectual property rights to all five doll designs and concepts in satisfaction of my loans to Arsenic.  With no assets remaining, neither Montwillo nor I received anything in consideration of our member interests in Arsenic upon dissolution;

15.     On July 15, 2004, I sold Daniel Gibby the left-over "trailer trash doll" inventory of Arsenic and their intellectual property rights.   I believe Gibby then transferred the dolls and the intellectual rights to the dolls to Gibby Novelties, LLC, a company he had just formed.  Gibby Novelties, LLC has since sold off the existing trailer trash doll inventory, barely breaking even.  It also further developed and produced two new talking dolls, roughly based on the two abandoned doll concepts acquired from Arsenic, vis-à-vis Tull and Gibby, but with vast differences so as to be entirely distinct and distinguishable;

16.     Throughout the dissolution, Montwillo was notified of the status of the windup and failed to state any objection to same until after the dissolution was complete.  On July 13, 2004, the day after the Company was formally dissolved, Montwillo sent a letter by certified mail to my attorney, David Y. Wong, a true and correct copy of which is attached as Exhibit ___.  In his letter, Montwillo claimed ownership of the copyrights to all five trailer trash dolls and demanded payment for their use;

17.     I have reviewed the attached Memorandum of Points and Authorities in Support of Defendants' Motion for Summary Judgment and attest that any and all supporting facts set forth therein which I have neglected to mention above are, in fact, true and correct, except as to those matters stated on information and belief and as to same I believe them to be true.

1    I hereby declare and affirm under penalty of perjury under the laws of the State of

2    California that the foregoing is true and correct and that if called to testify I could and would do

3    so competently and of my own personal knowledge.

4        Executed this _20_ day of March, 2008, in Mill Valley, California.

5

6

7                                        William Tull

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**EXHIBIT A**

## OPERATING AGREEMENT FOR ARSENIC AND APPLE PIE, LLC

This Operating Agreement is entered into as of this *14th* day
of ~~February~~ *March*, 1999, by William Tull and Paul Montwillo, hereinafter "Members"

A.     The Members desire to form a Limited Liability Company (Company)
under the Beverly-Killea Limited Liability Company Act.

B.     The Members enter into this Operating Agreement in order to form and
provide for the governance of the Company and the conduct of its business and to
specify their relative rights and obligations.

NOW THEREFORE, the Members hereby agree as follows:

DEFINITIONS

The following capitalized terms used in this Agreement have the meanings
specified in the Article or elsewhere in this Agreement and when not so defined shall
have the meanings set forth in California Corporations Code section 17001.

1.1     **"Act"** means the Beverly-Killea Limited Liability Company Act (California
Corporations Code sections 17000-17705), including amendments from time to time.

1.2     "Agreement" means this operating agreement, as originally executed and
as amended from time to time.

1.3    "Articles of Organization" is defined in California Corporations Code section 17001(b) as applied to this Company.

1.4    "Assignee" means a person who has acquired a Member's Economic Interest in the Company, by way of a Transfer in accordance with the terms of this Agreement but who has not become a Member.

1.5    "Assigning Member" means a Member who by means of a Transfer has transferred an Economic Interest in the Company to an Assignee.

1.6    "Capital Account" means, as to any Member, a separate account maintained and adjusted in accordance with Article III, Section 3.3.

1.7    "Capital Contribution" means, with respect to any Member, the amount of the money and the Fair Market Value of any property (other than money) contributed to the Company (net of liabilities secured by such contributed property that the Company is considered to assume or take "subject to" under IRC section 752) in consideration of a Percentage Interest held by such Member.  A Capital Contribution shall not be deemed a loan.

1.8    "Capital Event" means a sale or disposition of any of the Company's capital assets, the receipt of insurance and other proceeds derived from the involuntary conversion of Company property, the receipt of proceeds from a refinancing of Company property, or a similar event with respect to Company property or assets.

1.9    "Code" or "IRC" means the Internal Revenue Code of 1986, as amended, and any successor provision.

1.10    "Company" means the Company named in Article II, Section 2.2.

1.11    "Economic Interest" means a Person's right to share in the income, gains, losses, deductions, credit or similar items of, and to receive distributions from, the Company, but does not include any other rights of a Member, including the right to vote or to participate in management.

1.12    "Encumber" means the act of creating or purporting to create an Encumbrance, whether or not perfected under applicable law.

1.13    "Encumbrance" means, with respect to any Membership Interest, or any element thereof, a mortgage, pledge, security interest, lien, proxy coupled with an interest (other than as contemplated in this Agreement) option, or preferential right to purchase.

1.14    "Fair Market Value" means, with respect to any item of property of the Company, the item's adjusted basis for federal income tax purposes, except as follows:

(a)    The Fair Market Value for any property contributed by a Member to the Company shall be the value of such property, as mutually agreed by the contributing Member and the Company;

(b)    The Fair Market Value of any item of Company property distributed to a Member shall be the value of such item of property on the date of distribution, as mutually agreed by the distributee Member and the Company; and

(c)    Fair Market Value for purposes of Article VIII, Section 8.7 shall be as determined under that section.

1.15    " Initial Member" or Initial Members" means those Persons whose names are set forth in the first sentence of this Agreement.  A reference to an "Initial Member" means any of the Initial Members.

1.16    "Involuntary Transfer" means, with respect to any Membership Interest, or any element thereof, any Transfer or Encumbrance, whether by operation of law, pursuant to court order, foreclosure of a security interest, execution of a judgment or other legal process, or otherwise, including a purported transfer to or from a trustee in bankruptcy, receiver, or assignee for the benefit of creditors.

1.17    "Losses."  See "Profits and Losses."

1.18    "Majority of Members" means a Managing Member or Managing Members whose Percentage Interests represent more than 50 percent of the Percentage Interests of all the Members.

1.19    "Meeting" is defined in Article V, Section 5.2.

1.20    "Member" means an Initial Member or a Person who otherwise acquires a Membership Interest, as permitted under this Agreement, and who remains a Member.

1.21    "Managing Member" means a Member identified herein as a person entitled and having the right to vote or participate in management of the company.

1.22    "Investment Member" means a Member or a person entitled to receive distributions and information concerning the business and affairs of the company as provided for herein.

1.23    "Notice" means a written notice required or permitted under this Agreement.  A notice shall be deemed given or sent when deposited, as certified mail, or for overnight delivery, postage and fees prepaid, in the United States mails; when delivered to Federal Express, United Parcel Service, DHL WorldWide Express, or Airborne Express, for overnight delivery, charges prepaid or charged to the sender's account; when personally delivered to the recipient; when transmitted by electronic means, and such transmission is electronically confirmed as having been successfully transmitted; or when delivered to the home or office of a recipient in the care of a person whom the sender has reason to believe will promptly communicate the notice to the recipient.

1.24    "Percentage Interest" means a fraction, expressed as a percentage, the numerator  of which is the total of a member's Capital Account and the denominator of which is the total of all Capital Accounts of all Members.

1.25    "Person" means an individual, partnership, limited partnership, trust, estate, association, corporations, limited liability company, or other entity, whether domestic or foreign.

1.26    "Profits and Losses" means, for each fiscal year or other period specified in this Agreement, an amount equal to the Company's taxable income or loss for such year or period, determined in accordance with IRC section 703(a).

1.27    "Proxy" has the meaning set forth in the first paragraph of California Corporations code section 17001(ai).  A Proxy may not be transmitted orally.

1.28    "Regulations" ("Reg") means the income tax regulations promulgated by the United States Department of the Treasury and published in the Federal Register for the purpose of interpreting and applying the provisions of the code, as such Regulations may be amended from time to time, including corresponding provisions of applicable successor regulations.

1.29    "Substituted Member" is defined in Article VIII, Section 8.8.

1.30    "Successor in Interest" means an Assignee, a successor of a Person by merger or otherwise by operation of law, or a transferee of all or substantially all of the business or assets of a Person.

1.31    "Transfer" means, with respect to a Membership Interest, or any element

of a Membership Interest, any sale, assignment, gift, Involuntary Transfer, or other disposition of a Membership Interest or any element of such a Membership Interest, directly or indirectly, other than an Encumbrance that is expressly permitted under this Agreement.

1.32    "Triggering Event" is defined in Article VIII, Section 8.3.

1.33    "Vote" means a written consent or approval, a ballot cast at a Meeting, or a voice vote.

1.34    "Voting Interest" means, with respect to a Managing Member, the right to Vote or participate in management and any right to information concerning the business and affairs of the Company provided under the Act, except as limited by the provisions of this Agreement.  A Managing Member's Voting Interest shall be directly proportional to that Managing  Member's Percentage Interest.

## ARTICLE II
ARTICLES OF ORGANIZATION

2.1    Promptly following execution of this Agreement, the Members shall cause Articles of Organization, in the form attached to this Agreement as Exhibit 1, to be filed with the California Secretary of State.

2.2    The name of the Company shall be ARSENIC & APPLE PIE  LLC.

2.3    The principal executive office of the Company shall be at

_____, San Francisco,  California, or such other place or places as may be determined by the Members from time to time:

2.4    The initial agent for service of process on the Company shall be David Y. Wong, Esq. of SMITH & WONG, 100 Shoreline Highway, Suite 295, Mill Valley, California 94941.  A majority of Members may from time to time change the Company's agent for service or process.

2.5    The Company will be formed for the purposes of engaging in the business of any lawful business activity, including the design, manufacture, distribution and sale of dolls and toys.

2.6    The term of existence of the Company shall commence on the effective date of the filing of Articles of Organization with the California Secretary of State, and shall continue until December  31, 2028, unless sooner terminated by the provisions of this Agreement or as provided by law.

2.7    The Managing Members shall be as follows:

**Paul Montwillo** - Manager in charge of Art Direction, Design and Advertising of product line, including but not limited to, corporate identification, product design, packaging, web site design, web site maintenance and print advertising.

**William Tull** - Manager in charge of Administration, business affairs, accounting, distribution, sales and manufacturing.

## ARTICLE III
## CAPITALIZATION

3.1    Each member shall contribute to the capital of the Company as the Member's Capital Contribution the money and property specified in Exhibit "B" to this Agreement.  The Fair Market Vale of each item of contributed property as agreed between the Company and the Member contributing such property is set forth in Exhibit "B".  Unless otherwise agreed in writing by all Members, no Member shall be required to make additional Capital Contributions.

3.2    If a Member fails to make a required Capital Contribution within 30 days after the effective date of this Agreement, that Member's entire Membership Interest shall terminate and that Member shall indemnify and hold the Company and the other Members harmless from any loss, cost, or expense, including reasonable attorney fees caused by the failure to make such Capital Contribution.

3.3    An individual Capital Account shall be maintained for each Member consisting of that Member's Capital Contribution, (1) increased by that Member's share of Profits, (2) decreased by that Member's share of Losses, and (3) adjusted as required in accordance with applicable provisions of the Code and Regulations.

3.4    A Member shall not be entitled to withdraw any part of the Member's Capital Contribution or to receive any distributions, whether of money or property from the Company except as provided in this Agreement.

3.5    No interest shall be paid on funds or property contributed to the capital of the Company or on the balance of a Member's Capital Account.

3.6    A Member shall not be bound by, or be personally liable for, the expenses, liabilities, or obligations of the Company except as otherwise provided in the Act or in this Agreement.

3.7    No Member shall have priority over any other Member, with respect to the return of a Capital Contributions, or distributions or allocations of income, gain, losses, deductions, credits, or items thereof, except as set forth herein below.

3.8    If a Member loans money to the Company, said loan shall bear interest at ~ *ABLE Rates depending upon the origin of the funds* a rate of ____ percentage per annum as of the date the funds are advanced to or on behalf of the Company until paid.

3.9    If a Member loans money to the Company, an individual loan document shall be maintained showing the amount loaned and any payments made thereon.

3.10    If a Member loans money to the Company, a Promissory Note may, but shall not be required to be executed with the amount due with accrued interest *At Variable rates depending upon the origin of the funds* years from the date of the loan, or at such date as may be agreed to at the date of the loan.

3.11    If a Member loans money to the Company, before any profits are

distributed, credited, allocated or paid to any member or the Company, said loan(s) shall be paid back and retired in advance of the due date.  Thereafter, distributions of profits, etc., shall be on the basis of the members' respective interests as set forth on Exhibit "B" hereto.

3.12    As of the date of the formation of this Limited Liability Company and this Operating Agreement, the following  loan(s) made to it by members are recognized and acknowledged:

| Amount | Loan Inception Date | Maturity Date |
|--------|---------------------|---------------|
| See attached schedule | | |

ALLOCATIONS AND DISTRIBUTIONS

4.1  The Profits and Loses of the Company and all items of Company income, gain, loss, deduction, or credit shall be allocated, for the Company book purposes and for tax purposes, to a Member in accordance with the Member's Percentage Interest as set forth on Exhibit "B" hereto.

4.2  If any Member unexpectedly receives any adjustment, allocation, or distribution described in Reg sections 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5), or 1.704-1(b)(2)(ii)(d)(6), items of Company gross income and gain shall be specially allocated to that Member in an amount and manner sufficient to eliminate any deficit balance in the Member's Capital Account created by such adjustment, allocation, or distribution as quickly as possible.  Any special allocation under this Section 4.2 shall be taken into account in computing subsequent allocations of Profits and Losses so that the net amount of allocation of income and loss and all other items shall, to the extent possible, be equal to the net amount that would have been allocated if the unexpected adjustment, allocations, or distribution had not occurred.  The provisions of this Section 4.2 and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Reg sections 1.704-1(b) and 1.704-2 and shall be interpreted and applied in a manner consistent with such Regulations.

4.3  Any unrealized appreciation or unrealized depreciation in the values of Company property distributed in kind to all the Members shall be deemed to be Profits or Losses realized by the Company immediately prior to the distribution of the property and such Profits or Losses shall be allocated to the Members' Capital Accounts in the same proportions as Profits are allocated under Section 4.1.  Any property so

distributed shall be treated as a distribution to the Members to the extent of the Fair Market Value of the property less the amount of any liability secured by and related to the property. Nothing contained in this Agreement is intended to treat or cause such distributions to be treated as sales for value. For the purposes of this Section 4.3, "unrealized appreciation" or "unrealized depreciation" shall mean the difference between the Fair Market Value of such property and the Company's basis for such property.

4.4  In the case of a Transfer of an Economic Interest during any fiscal year, the Assigning Member and Assignee shall each be allocated the Economic Interest's share of Profits or Losses based on the number of days each held the Economic Interest during that fiscal year.

4.5  All cash resulting from the normal business operations of the Company and from a Capital Event shall be distributed among the Members in proportion to their Percentage Interests at such time as the Members may agree after repayment of all outstanding member loans.

4.6  If the proceeds from a sale or other disposition of a Company asset consists of property other than cash, the value of such property shall be as determined by the Members  Such noncash proceeds shall then be allocated among all the Members in proposition to their Percentage Interests.  If such non-cash proceeds are subsequently reduced to cash; such cash shall be distributed to each Member in accordance with Section 4.5

4.7    Notwithstanding any other provisions of this Agreement to the contrary, when there is a distribution in liquidation of the Company, or when any Member's interest is liquidated, all items of income and loss first shall be allocated to the Members; Capital Accounts under this Article IV, and other credits and deductions to the Member's Capital Accounts shall. be made before the final distribution is made. The final distribution to the Members shall be made to the Members to the extent of and in proportion to their positive Capital Account balances.

## ARTICLE V
## MANAGEMENT

5.1    The business of the Company shall be managed by the respective Managers named in Section 2.7, or a successor manager as selected in accordance with Section 5.3.  A Member shall be a manager only during the time the Member is a Member of the Company.  Unless otherwise provided in this Agreement, all final decisions concerning the management of the Company's business shall be made by the Manager.

5.2    The Manager shall serve until the earlier of (1) the Manager's resignation, retirement, death, or disability; (2) the manager's removal by the Members; and (3) the expiration of the manager's term as Manager, if a term has been designated by a Majority of Members.  A new Manger shall be appointed by a Majority of Members on the occurrence of any of the foregoing events.

5.3    Each Manager shall be appointed by a Majority of Members for (a) term expiring with the appointment of a successor, or (b) a term expiring at a definite time specified by a Majority of Members in connection with such an appointment. A Manager who is not also a Member may be removed with or without cause at any time by action of a Majority of Members. A Manager who is a Member may be removed only on the Vote of all other Members and the execution and filing of a Certificate of Amendment of the Articles of Organization of the Company in conformity with Corp C section 17054, if necessary, to provide that the Company is to be managed by Members.

5.4    The Manager, who shall be the President of the Company, shall have the powers and duties described in Section 5.8 hereof and such other powers and duties as may be prescribed in this Agreement or by the Members. Notwithstanding the foregoing, the Manager shall not take any of. the following actions on behalf of the Company unless a Majority of Members has consented to the taking of such action.

(a)    Any act that would make it impossible to carry on the ordinary business of the Company;

(b)    Any confession of a judgment against the Company;

(c)    The dissolution of the Company;

(d)    The disposition of all or a substantial part of the Company's assets not in the ordinary course of business;

Operating Agreement for
Arsenic & Apple Pie, LLC

3004b/Feb99

(e)    The incurring of any debt not in the ordinary course of business;

(f)    A change in the nature of the principal business of the Company;

(g)    The incurring of any contractual obligation or the any capital expenditure with a total cost of more than $ _3 000_ ;

(h)    The filing of a petition in bankruptcy or the entering into of an arrangement among creditors; and

(i)    The entering into, on behalf of the Company, of any transaction constituting a "reorganization" within the meaning of Corp Code §17600.

5.5    The Managing Members shall hold weekly meetings, although decisions may be reached through one or more informal consultations followed by agreement among a Majority of the Managing Members, provided that all Members are consulted (although all Members need not be present during a particular consultation), or by a written consent signed by a Majority of Members.  In the event that Members wish to hold a formal meeting (a "Meeting") for any reason, the following procedure's shall apply:

(1)    Any two Managing Members may call a Meeting of the Managing Members by giving Notice of the time and place of the Meeting at least 48 hours prior to the time for the holding of the Meeting.  The Notice need not specify the purpose of the

meeting, or the location if the Meeting is to be held at the principal executive office of the Company.

(2)     A majority of Managing Members shall constitute a quorum for the transaction of business at any Meeting of the Managing Members.

(3)     The transactions of the Managing Members at any Meeting, however called or noticed, or wherever 'held, shall be as valid as though transacted at a Meeting duly held after call and notice if a quorum is present and if, either before or after the Meeting, each Managing Member not present signs a written waiver of Notice of consent to the holding of the Meeting, or an approval of the minutes of the Meeting.

(4)     Any action required or permitted to be taken by the Managing Members under this Agreement may be taken without a Meeting if a Majority of the Managing Members individually or collectively consent in writing to such action.

(5)     Managing Members may participate in the Meeting through the use of a conference telephone or similar communication equipment, provided that all members participating in the Meeting can hear one another.

(6)     The Managing Members shall keep or cause to be kept with the books and records of the Company full and accurate minutes of all Meetings, Notices, and waivers of Notices of Meetings, and all written consents in lieu of Meetings.

5.6    The Managing Members as such and as managers shall not be entitled to compensation for their services.

5.7    All assets of the Company, whether real or personal shall be held in the name of the Company.

5.8    All funds of the Company shall be deposited in one or more accounts with one or more recognized financial institutions in the name of the Company, at such locations as shall be determined by a Majority of the Managing Members.  Withdrawal from such accounts shall require the signature of the Manager.

5.9    In the event that the Company purchases goods or supplies from another business in which a Managing Member has an ownership interest, the goods or supplies shall be provided to the Company based on the actual cost of the goods or supplies plus ___% for labor and overhead.

ARTICLE VI
ACCOUNTS AND RECORDS

6.1    Complete books of account of the Company's business, in which each Company transaction shall be fully and accurately entered, shall be kept at the Company's principal executive office and shall be open to inspection and copying by each Member or the Member's authorized representatives on reasonable Notice during normal business hours.  The costs of such inspection and copying shall be borne by the

Operating Agreement for
Arsenic & Apple Pie, LLC                     Page 18 of  36

3004b/Feb99

Member.

6.2  Financial books and records of the Company shall be kept on the cash method of accounting, which shall be the method of accounting followed by the Company for federal income tax purposes.  A balance sheet and income statement of the Company shall be prepared promptly following the close of each fiscal year in a manner appropriate to and adequate for the Company's business and for carrying out the provisions of this Agreement.  The fiscal year of the Company shall be January 1 through December 31.

6.3     At all times during the term of existence of the company and beyond that term if a majority of the members deem it necessary, the members shall keep or cause to be kept the books of account referred to in Section 6.2, and the following:

(a)     A current list of the full name and last known business or residence address of each Member, together with the Capital Contribution and the share in Profits and Losses of each Member;

(b)     A copy of the Articles of Organization, as amended;

(c)     Copies of the Company's federal, state, and local income tax or information returns and reports, if any, for the six most recent taxable years;

(d)     Executed counterparts of this Agreement, as amended;

Operating Agreement for
Arsenic & Apple Pie, LLC

3004b/Feb99

(e)    Any powers of attorney under which the Articles of Organization or any amendments thereto were executed;

(f)    Financial statements of the Company for the six most recent fiscal years; and

(g)    The Books and Records of the Company as they relate to the Company's internal affairs for the current and past four fiscal years.

If a Majority of Members deem that any of the foregoing items shall be kept beyond the term of existence of the Company, the deposit of said items shall be as designated by a Majority of Members

6.4    Within 90 days after the end of each taxable year of the Company, the Company shall send to each of the Members all information necessary for the Members to complete their federal and state income tax or information returns, and a copy of the Company's federal, state, and local income tax or information returns for such year.

## MEMBERS AND VOTING

7.1    There shall be two classes of membership. Each Member shall have such rights and/or preferences as those possessed by any other Member as set forth herein. The two classes of membership shall be the Managing Members and the Investment Members. Each Managing Member shall Vote in accordance with the Member's voting allocation as set forth in Exhibit "B" hereto. Each Investment Member

shall have such percentage interest in the Company in proportion to the Member's Percentage Interest as of the governing record date as set forth in Exhibit "B" hereto. Until otherwise changed as provided for herein, the Managing Members and Investment Members of the Company are as follows:

    (A)    Managing Members:

        William Tull   (one vote)

        Paul Montwillo   (one vote)

    (B)    Investment Members:

        None

7.2    Each Managing Member shall Vote in accordance with the Member's Voting allocation as of the governing record date, determined in accordance with Section 7.3. Any action that may or that must be taken by the Members shall be by a majority of the Managing Members, except that the following actions shall require the unanimous Vote of all members, both Managing and Investment:

    (a)    a decision to continue the business of the Company after any event mentioned in Article IX;

    (b)    the transfer of a Membership Interest and the admission of the Assignee as a Member of the Company;

(c)     any amendment of the Articles of Organization or this Agreement; or

(d)     compromise of the obligation of a Member to make a Capital Contribution.

7.2     The record date for determining the Members entitled to Notice of any Meeting, to vote, to receive any distribution, or to exercise any right in respect of any other lawful action, shall be the date set by a Majority of Members, provided that such record date shall not be more than 60, nor less than 10 days prior to the date of the Meeting, nor more than 60 days prior to any other action.

In the absence of any action setting a record date the record date shall be determined in accordance with California Corporations Code section 17104(k).

7.3     At all Meetings of Managing Members, a Member may Vote in person or by Proxy.  Such Proxy shall be filed with any Member before or at the time for the Meeting, and may be filed by facsimile transmission to a Member at the principal executive office of the Company or such other address as may be given by a Majority of Members to the Members for such purposes.

ARTICLE VIII

Operating Agreement for
Arsenic & Apple Pie, LLC

3004b/Feb99

TRANSFERS OF MEMBERSHIP INTERESTS.

8.1    A Member may withdraw from the Company at any time by giving Notice of Withdrawal to all other Members at least 180 calendar days before the effective date of withdrawal. Withdrawal shall not release a Member from any obligations and liabilities under this Agreement accrued or incurred before the effective date of withdrawal.  A withdrawing Member shall divest the Member's entire Membership Interest before the effective date of withdrawal in accordance with the transfer restrictions and option rights set forth below.

8.2    Except as expressly provided in this Agreement, a Member shall not Transfer any part of the Member's Membership Interest in the Company, whether now owned or hereafter acquired, unless (1) the other Members unanimously approve the transferee's admission to the Company as a Member upon such Transfer and (2) the Membership Interest to be transferred, when added to the total for all other Membership Interests transferred in the preceding 12 months, will not cause the termination of the Company unless such Encumbrance has been approved in writing by all the other Members.

Any transfer or Encumbrance or a Membership Interest without such approval shall be void.  Notwithstanding any other provision of this Agreement to the contrary, a Member who is a natural person may transfer all or any portion of his or her Membership Interest to any revocable trust created for the benefit of the Member, or any combination between or amount the Member, the Member's spouse, and the Member's issue; provided that the Member retains a beneficial interest in the trust and all for the Voting Interest included in such Membership Interest.  A transfer of a

Member's entire beneficial interest in such trust or failure to retain such Voting Interest shall be deemed a Transfer of a Membership Interest.

8.3    On the happening of any of the following events (Triggering Events) with respect to a Member, the Company and the other Members shall have the option to purchase all or any portion of the Membership Interest in the Company or such member (Selling Member) at the price and on the terms provided in Section 8.7 of this Agreement:

(a)    the death or incapacity of a Member;

(b)    the bankruptcy of a Member;,

(c)    the winding up and dissolution of a Corporate Member, or merger or other corporate reorganization of a Corporate Member as a result of which the Corporate Member does not survive as an entity;

(d)    the withdrawal of a Member; or

(e)    except for the events stated in Section 8.4, the occurrence of any other event that is, or that would cause, a Transfer in contravention of this Agreement.

Each Member agrees to promptly give Notice of a Triggering Event to all other Members.

8.4    Notwithstanding any other provisions of this Agreement:

If, in connection with the divorce or dissolution of the marriage of a Member, any court issues a decree or order that transfers, confirms, or awards a Membership Interest, or any portion thereof, to that Member's spouse or domestic partner (an Award), then, notwithstanding that such transfer would constitute an unpermitted Transfer under this Agreement, that Member shall have the right to purchase from his or her former spouse or domestic partner the Membership Interest, or portion thereof, that was so transferred, and such former spouse/ partner shall sell the Membership Interest or portion thereof to that Member at the price set forth in Section 8.7 of this Agreement.  If the Member has failed to consummate the purchase within 180 days after the Award (the Expiration Date), the Company and the other Members shall have the option to purchase from the former spouse/partner the Membership Interest or portion thereof pursuant to Section 8.5 of this Agreement; provided that the option period shall commence on the later of (1) the day following the Expiration Date, or (2) the date of actual notice of the Award.

(b)    If, by reason of the death of a spouse/partner of a Member, any portion of a Membership Interest is transferred to a Transferee other than (1) that Member or (2) a trust created for the benefit of that Member (or for the benefit of that Member and any combination between or among the Member and the Member's issue) in which the Member is the sole Trustee and the Member, as trustee or individually possesses all of the Voting Interest included in that Membership Interest, then the Member shall have the right to purchase the Membership Interest or portion thereof  from the estate or other successor of his or her deceased spouse/partner or Transferee of such deceased spouse/partner, and the estate, successor or Transferee shall sell the Membership

Interest or portion thereof at the price set forth in Section 8.7 of this Agreement. If the Member has failed to consummate the purchase within 180 days after the date of death (the Expiration Date), the Company and the other Members shall have the option to purchase from the estate or other successor of the deceased spouse/partner the Membership Interest or portion thereof pursuant to Section 8.5 of this Agreement; provided that the option period shall commence on the later of (1) the day following the Expiration Date, or (2) the date of actual notice of the death.

8.5     On the receipt of Notice by the other Members as contemplated by Section 8.1, and on receipt of actual notice of any Triggering Event, the Company shall have the option, for a period ending 30 calendar days following the determination of the purchase price as provided in Section 8.7, to purchase the Membership Interest in the Company to which the option relates, at the price and on the terms provided in Section 8.7, and the other Members, pro rate in accordance with their prior Membership Interest in the Company, shall then have the option, for a period of 30 days thereafter, to purchase the Membership Interest in the Company not purchased by the Company, on the same terms and conditions as apply to the Company.  If all other Members do not elect to purchase the entire remaining Membership Interest in the Company, then the Members electing to purchase shall have the right, pro rata in accordance with their prior Membership Interest in the Company, to purchase the additional Membership Interest in the Company available for purchase.  The transferee of the Membership Interest in the Company that is not purchased shall hold such Membership Interest in the Company subject to all of the provisions of this Agreement.

8.6     No Member shall participate in any vote or decision in any matter

Operating Agreement for
Arsenic & Apple Pie, LLC

3004b/Feb99

pertaining to the disposition of that Member's Membership Interest in the Company under this Agreement.

8.7    The purchase price of the Membership Interest that is the subject of an option under this Agreement shall be the Fair Market Value of such Membership Interest as determined under this Section 8.7., Each of the selling and purchasing parties shall use his, her, or its best efforts to mutually agree on the Fair Market Value. If the parties are unable to so agree within 30 days of the date on which the option is first exercisable (the Option date), the selling party shall appoint, within 40 days of the Option Date, one appraiser, and the purchasing party shall appoint within 40 days of the Option Date, one appraiser.  The two appraisers shall within a period of five additional days, agree on and appoint within 40 days of the Option Date one appraiser. The two appraisers shall within a period of five additional days, agree on and appoint an additional appraiser.  The three appraisers shall, within 60 days after the appointment of the third appraiser, determine the Fair Market Value of the Membership Interest in writing and submit their report to all the parties.  The Fair Market Value shall be determined by disregarding the appraiser's evaluation that diverges the greatest from each of the other two appraisers; valuations, and the arithmetic mean of the remaining two appraisers' valuations, and the arithmetic mean of the remaining two appraisers' valuations shall be the Fair Market Value.  Each purchasing party shall pay for the services of the appraiser selected by it, plus one-half of the fee charged by the third appraiser.  The option purchase price as so determined shall be payable in cash.

8.8    Except as expressly permitted under Section 8.2., a prospective

transferee (other than an existing Member) of a Membership Interest may be admitted as a Member with respect to such Membership Interest (Substituted Member) only (1) on the unanimous Vote of all the other Members in favor of the prospective transferee's admission as a Member, and (2) on such prospective transferee's executing counterpart of this Agreement as a party hereto.  Any prospective transfer of a Membership Interest shall be deemed an Assignee, and therefore, the owner of only an Economic Interest until such prospective transferee has been admitted as a Substituted Member.

8.9  Any person admitted, to the Company as a Substituted Member shall be subject to all provisions of this Agreement.

8.10   The initial sale of Membership Interest in the Company to the initial Members, has not been qualified or registered under the securities laws of any state, or registered under the Securities Act of 1933, as amended in reliance upon exemptions from the registration provisions of those laws.  No attempt has been made to qualify the offering and sale of Membership Interests to Members under the California Corporate Securities Law of 1968, as amended, also in reliance upon an exemption from the requirement that a permit for issuance of securities be procured.   Notwithstanding any other provision of this Agreement, Membership Interests may not be transferred or Encumbered unless registered or qualified under applicable state and federal securities laws or unless, in the opinion of legal counsel satisfactory to the Company, such qualification or registration is not required.  The Member who desires to transfer a Membership Interest shall be responsible for all legal fees incurred in connection with said opinion.

## ARTICLE IX
## DISSOLUTION AND WINDING UP

9.1     The Company shall be dissolved on the first to occur of the following events:

(a)     The death, incapacity, or withdrawal of a Managing member; or the bankruptcy or corporate dissolution of a Managing member; provided, however, that the remaining Members may, by the Vote of a Majority of Members within 90 days of the happening of that event, Vote to continue the Company, in which case that Company shall not dissolve.  If the remaining Members fail to so Vote, the remaining Members shall wind up the Company.  For purposes of this Paragraph (a), in determining Majority of Members, the Percentage Interest or the Member who has died, becomes incapacitated, withdrawn, or who has become bankrupt or dissolved shall not be taken into account.

(b)     The expiration of the term of existence of the Company.

(c)     The written agreement of all Members to dissolve the Company.

(d)     The sale or other disposition of substantially all of the Company assets.

(e)     Entry of a decree of judicial dissolution pursuant to California Corporations Code section 27351.

9.2     On the dissolution of the Company, the Company shall engage in no

Operating Agreement for
Arsenic & Apple Pie, LLC

3004b/Feb99

further business other than that necessary to wind up the business and affairs of the Company. The Members who have not wrongfully dissolved the Company shall give written Notice of the commencement of winding up by mail to all known creditors and claimants against the Company whose addresses appear in the records of the Company. After paying or adequately providing for the payment of all known debts of the Company (except debts owing to Members) the remaining assets of the Company shall be distributed or applied in the following order of priority:

(a)    To pay the expenses of liquidation.

(b)    To repay outstanding loans to Members. If there are insufficient funds to pay such loans in full, each Member shall be repaid in the ratio that the Member's respective loan, together with interest accrued and unpaid thereon, bears to the total of all such loans from Members, including all interest accrued and unpaid on those loan. Such repayment shall first be credited to unpaid principal and the remainder shall be credited to accrued and unpaid interest.

(c)    Among the Members' in accordance with the provisions of Article IV, Section 4.7.

9.3    Each Member shall look solely to the assets of the Company for the return of the Member's investment, and if the Company property remaining after the payment or discharge of the debts and liabilities of the Company is insufficient to return the investment of any Member, such Member shall have no recourse against any other Members for indemnification, contribution, or reimbursement.

## ARBITRATION

10.1    Any action to enforce or interpret this Agreement or to resolve disputes between the Members or by or against any Member shall be settled by binding arbitration in accordance with the rules of the American Arbitration Association. Arbitration shall be the exclusive dispute resolution process in accordance with the laws of the State of California.  Any party may commence arbitration by sending a written demand for arbitration to the other parties.  Such demand shall set forth the nature of the matter to be resolved by arbitration. Arbitration shall be conducted at San Francisco, California.  the substantive law of the state of California shall be applied by the arbitrator to the resolution of the dispute.  The parties shall share equally all initial costs of arbitration.  The prevailing party shall be entitled to reimbursement of attorney fees, costs, and expenses incurred in connection with the arbitration.  All decisions of the arbitrator shall be final, binding, and conclusive on all parties.  Judgment may be entered upon any such decision in accordance with applicable law in any court having jurisdiction thereof.

## GENERAL PROVISIONS

11.1    This Agreement constitutes. the whole and entire agreement of the parties with respect to the subject matter of this Agreement, and it shall not be modified or amended in any respect except by a written instrument executed by all the parties. This Agreement replaces and supersedes all prior written and oral agreements by and among the Members or any of them.

11.2    This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

11.3    This Agreement shall be construed and enforced in accordance with the internal laws of the State of California. If any provision of this Agreement is determined by any court of competent jurisdiction or arbitrator to be invalid, illegal, or unenforceable to any extent, that provision shall, if possible, be construed as though more narrowly drawn, if a narrower construction would avoid such invalidity, illegality, or unenforcability or, if that is not possible, such provision shall, to the extent of such invalidity, illegality, or Unenforcability, be severed, and the remaining provisions of this Agreement shall remain in effect.

11.4    This Agreement shall be binding on and inure to the benefit of the parties and their heirs, personal representatives, and permitted successors and assigns.

11.5    Whenever used in this Agreement, the singular shall include the plural, the plural shall include the singular, and the neuter gender shall include the male and female as well as a trust, firm, company, or corporation, all as the context and meaning of this Agreement may require.

11.6    The parties to this Agreement shall promptly execute and deliver any and all additional documents, instruments, notices, and other assurances, and shall do any and all other acts and things, reasonably necessary in connection with the performance

of their respective obligations under this Agreement and to carry out the intent of the parties.

11.7    Except as provided in this Agreement, no provision of this Agreement shall be construed to limit in any manner the Members in the carrying on of their own respective businesses or activities.

11.8    Except as provided in this Agreement, no provision of this Agreement shall be construed to constitute a Member, in the Member's capacity as such, the agent of any other Member.

11.9    Each Member represents and warrants to the other Members that the Member has the capacity and authority to enter into this Agreement.

11.10    The article, section, and paragraph titles and headings contained in this Agreement are inserted as a matter of convenience and for each of reference only an shall be disregarded for all other purposes, including the construction or enforcement of this Agreement or any of its provisions.

11.11    This Agreement may be altered, amended, or repealed only by a writing signed by all of the Members.

11.12    Time is of the essence of every provision of this Agreement that

Operating Agreement for
Arsenic & Apple Pie, LLC

3004b/Feb99

specifies a time for performance.

11.13    This Agreement is made solely for the benefit of the parties to this Agreement and their respective permitted successors and assigns, and no other person or entity shall have or acquire any right by virtue of this Agreement.

11.14    The Members intend the Company to be a limited liability company under the Act.  No member shall take any action inconsistent with the express intent of the parties to this agreement.

## EXECUTION CLAUSE

IN WITNESS WHEREOF, the parties have executed or caused to be executed this Agreement on the day and year first above written.

Date: 5/3/00                          _____
                                       William Tull, Managing Member

Date: 5/4/00                          _____
                                       Paul Montwillo, Managing Member

## SPOUSAL/DOMESTIC PARTNER CONSENT

The undersigned are the spouse(s) of the foregoing members and acknowledge(s) that she/he/they have read the foregoing Agreement dated _March 14, 1999_ and understand its provisions. The undersigned are aware that by the provisions of the Agreement, she/he/they have agreed to sell or transfer all their Membership Interest in the Company, including any community property interest or quasi-community property interest, in accordance with he terms and provisions of the Agreement.  The undersigned hereby expressly approve(s) of and agree(s) to be bound by the provisions of the Agreement in its entirety, including, but not limited to, those provisions relating to the sale and transfer of Membership Interests and the restrictions thereon. If the undersigned predeceases a member while the member owns any Membership Interest in the Company, she/he/they hereby agree(s) not to devise or bequeath whatever community property interest or quasi community property interest she/he/they may have in the Company in contravention of the Agreement.

Dated: _5/4/05_                                         _____
                                                                        (Signature)

Dated: _5/3/00_                                         _____
                                                                        (Signature)

Operating Agreement for
Arsenic & Apple Pie, LLC

Page 35 of 36

3004b/Feb99

## EXHIBIT "B"

## CAPITAL CONTRIBUTION AND PERCENTAGE OWNERSHIP

1.  William Tull, Managing Member          Percentage:   50%

2.  Paul Montwillo, Managing Member       Percentage"   50%


## MANAGING MEMBER VOTING ALLOCATIONS:

1.  William Tull, Managing Member          One Vote

2.  Paul Montwillo, Managing Member       One Vote

Initials

( *W.T* )          *[signature]*
W.Tull          P. Montwillo

Operating Agreement for
Arsenic & Apple Pie, LLC          Page 36 of  36

3004b/Feb99