STEPHEN A. SOMMERS, SBN 225742
Sommers Law Group
870 Market Street, Ste. 1142
San Francisco, CA 94102
(415) 839-8569 (Telephone)
(415) 956-0878 (Fax)
ssommers@sommerslaw.com

Attorney for Plaintiff & Counter-
defendant Paul Montwillo

UNITED STATES DISTRICT COURT

FOR NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PAUL MONTWILLO, an individual; | Case No. C 07 3947 SI |
| Plaintiff, | |
| vs. | PLAINTIFF/COUNTER-DEFENDANT PAUL MONTWILLO'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT AND AGAINST COUNTER-CLAIMANT WILLIAM TULL'S COUNTERCLAIMS; MEMORANDUM OF POINTS AND AUTHORITIES |
| WILLIAM TULL, an individual; DANIEL GIBBY, and individual; GIBBY NOVELTIES, LLC dba ARSENIC & APPLE PIE, a California limited liability company; and DOES 1-100, inclusive, | |
| Defendants. | **Date:** **April 4, 2008** <br> **Time:** **9:00 a.m.** <br> **Court:** **10, 19th Floor** <br> **Judge:** **Honorable Susan Illston** |
| WILLIAM TULL, an individual; | Complaint Filed:     August 1, 2007 <br> Counterclaim Filed:   January 11, 2008 |
| Counter-Claimant, | Trial Date:          June 30, 2008 |
| vs. | |
| PAUL MONTWILLO, an individual, and DOES 21 through 30, inclusive, | |
| Counter-Defendants | |

- i -

## NOTICE OF MOTION

TO DEFENDANTS WILLIAM TULL, DANIEL GIBBY, AND GIBBY NOVELTIES, LLC, COUNTER-CLAIMANT WILLIAM TULL AND THEIR ATTORNEYS OF RECORD:

NOTICE IS HEREBY GIVEN that on April 4, 2008, at 9:00 a.m., or as soon thereafter as counsel may be heard by the above-entitled Court, located in Courtroom 10, 11th Floor, 450 Golden Gate Avenue, San Francisco, California, 94102, plaintiff and counterclaim-defendant Paul Montwillo will and hereby does move the Court for summary judgment on the ground that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law for his claim for copyright infringement and dismissal of all counterclaims on the basis that: (1) there is no factual dispute that Montwillo is the original author of the subject artwork, has retained ownership, and each of the three defendants have infringed on his exclusive rights are valid owner of the copyrights through distribution; (2) Tull's counterclaim for conversion must fail since Montwillo is the valid owner of the copyrights and since the matter is preempted by federal law; (3) Tull's counterclaim for breach of contract must fail since Montwillo is not seeking to enforce a contractual right, Tull has not filed a motion for arbitration, and Tull must use the arbitration clause to resolve all contract disputes; and (4) Tull's counterclaim for breach of covenant of good faith and fair dealing and fiduciary duty must fail since the claim is unintelligible on the face of the pleading.

This motion is based upon this Notice of Motion and Motion, the accompanying Memorandum of Points and Authorities, the declarations of Paul Montwillo and Stephen Sommers, all pleadings and papers on file in this action, and upon such other matters as may be presented to the Court at the time of the hearing.

Date: March 21, 2008

SOMMERS LAW GROUP

[signature]

Stephen Sommers
Attorney for Plaintiff/
Counterclaim-defendant
Paul Montwillo

SOMMERS LAW GROUP

## MEMORANDUM OF POINTS AND AUTHORITIES

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................ v.

I.    INTRODUCTION ............................................................................ 1

II.   FACTUAL BACKGROUND ............................................................ 1

III.  RELEVANT SECTIONS OF THE OPERATING AGREEMENT .... 10

IV.   DISCUSSION ................................................................................ 14

A.    MONTWILLO SEEKS SUMMARY JUDGMENT ON THE
      ISSUE OF LIABILITY OF COPYRIGHT INFRINGEMENT. .... 14

      1.  Montwillo Owns the Copyrights. ............................................ 15

          a.  The Operating Agreement Does Not Convey Copyrights to AAP. .... 16

          b.  Montwillo Did Not Create the Dolls as Works Made for Hire. .... 20

          c.  Montwillo Did Not Convey His Copyrights as an Operation of Law. .... 20

          d.  Montwillo Did Not Grant an Implied Nonexclusive License. .... 21
              i.    Defendants failed to plead an implied license as a defense. .... 21
              ii.   Any implied license Montwillo may have granted did
                    not extend to   defendants Tull, GN or Gibby. .... 21
              iii.  Montwillo never received any consideration for his copyrights. .... 22
              iv.   Montwillo's contributions to were not "minimal." .... 22

      2.  Defendants Infringed Montwillo's Copyrights. .... 22

      3.  Defendants Infringement Was Willful. .... 23

      4.  Montwillo Elects Statutory Damages Pursuant to Section 504(c)(2). .... 23

      5.  Montwillo Prays for Costs and Attorneys' Fees. .... 24

B.    MONTWILLO SEEKS DISMISSAL OF TULL'S FIRST
      COUNTERCLAIM FOR CONVERSION. .... 24

C.    MONTWILLO SEEKS DISMISSAL OF TULL'S SECOND
      COUNTERCLAIM FOR BREACH OF CONTRACT. .... 24

- iii -

SOMMERS LAW GROUP

D.    MONTWILLO SEEKS DISMISSAL OF TULL'S THIRD
      COUNTERCLAIM FOR BREACH OF COVENANT OF GOOD
      FAITH AND FAIR DEALING AND BREACH OF FIDUCIARY DUTY.          25

V.    CONCLUSION                                                   25

SOMMERS LAW GROUP

Montwillo, et al. v. Tull et al., SF Superior Ct Case No. CGC-05-442352
DECLARATION OF STEPHEN SOMMERS IN SUPPORT OF PAUL MONTWILLO'S MOTION FOR
SUMMARY JUDGEMENT

SOMMERS LAW GROUP

**TABLE OF AUTHORITIES**

**United States Supreme Court Cases**

*Anderson v. Liberty Lobby, Inc.*
477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)    18

*Community for Creative Non-Violence v. Reid*,
490 U.S. 730, 109 S.Ct. 2166, 104 L.Ed2d 811 (1989)    19, 24

*Celotex Corp. v. Catrett*,
477 U.S. 317, 106 S.Ct. 2548, 91 L.ed.2d 265 (1986)    18, 29

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*
475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)    18

**Federal Circuit Decisions**

*Effects Assocs. v. Cohen*,
908 F.2d 555 (9th Cir.1990)    20, 21, 25, 26

*Estate of Hogarth v. Edgar Rice Burroughs, Inc.*
342 F.3d 149 (2d Cir. 2003)    19

*Foad Consulting Group, Inc. v. Azzalino*,
270 F.3d 821 (9th Cir. 2001).    23

*Harris v. Emus Records Corp.*,
734 F.2d 1329 (9th Cir. 1984)    25

*Kepner-Trego, Inc. v. Vroom*,
186 F.3d 283 (2d Cir. 1999), *cert. denied*, 531 U.S. 827 (2000).    27

*Oddo v. Ries*,
743 F.2d 630 (9th Cir. 1984)    25

*Playboy Enterprises v. Dumas*,
53 F.3d 549 (2d Cir.1995)    22

*Schiller & Schmidt v. Nordisco Corporation*,
969 F.2d 410 (7th Cir.1992)    21, 23

*Urantia Foundation v. Maaherra*,
114 F.3d 955 (9th Cir.1997)    22
*Wasco Products, Inc. v. Southwall Technologies, Inc.*,

- v -

435 F.3d 989 (9th Cir. 2006)                                                    25

*Yurman Designs, Inc. v. PAJ, Inc.,*
262 F.3d 101 (2d Cir. 2001)                                                     27

### United States District Court Decisions

*Armento v. The Laser Image,*
950 F.Supp. 719 (W.D.N.C. 1996)                                                 22

*Bieg v. Hovnanian Enterprises, Inc.,*
157 F.Supp.2d 475, 481 (E.D.Pa. 1986)                                           21

*Cassway v. Chelsea Historic Props.,*
1993 WL 64633 (E.D.Pa. Mar. 4, 1993)                                            21

*Collezione Europa U.S.A., Inc. v. Hillsdale House, Ltd.,*
243 F.Supp.2d 444, 452 (M.D.N.C. 2003)                                          19

*Fritz v. Arthur D. Little, Inc.,*
994 F.Supp. 95 (D.Mass. 1996)                                                   25

*Kenbrooke Fabrics v. Soho Fashions,*
690 F.Supp. 298 (S.D.N.Y.1988)                                                  21

*Pamfiloff v. Giant Records,*
794 F.Supp. 933 (N.D.Cal.1992)                                                  22

*Papa's-June Music v. McLean,*
921 F.Supp. 1154 (S.D.N.Y.1996)                                                 21

*Tasini v. New York Times Co.,*
972 F.Supp. 804 (S.D.N.Y.) (2d Cir. 2000)                                       21

### United States Statutes

Copyright Act of 1976, 17 U.S.C. §§ 100, et seq.

Federal Rules of Civil Procedure, Rule 56

### Other Authorities

M. Nimmer & D. Nimmer, *Nimmer on Copyright* (2007)

SOMMERS LAW GROUP

## I.    INTRODUCTION

Plaintiff and Cross-defendant Paul Montwillo ("Montwillo") brings this motion for summary judgment against all defendants on the issue of infringement of five copyrights of original works of visual art.  Montwillo seeks a determination that he is the sole and valid owner of the five copyrights subjects to this litigation.  Montwillo seeks a determination that each defendant William Tull ("Tull"), Daniel Gibby ("Gibby"), and Gibby Novelties, LLC ("GN") willfully infringed Montwillo's valid copyrights.  Montwillo seeks statutory damages under the Copyright Act, costs and attorneys' fees.  Montwillo also brings a motion for summary judgment seeking full dismissal of each of the three counter-claims brought by Defendant William Tull ("Tull").

## II.    FACTUAL BACKGROUND

This case arises from a failed business venture between Tull and Montwillo, Arsenic & Apple Pie, LLC ("AAP").  AAP manufactured and distributed copies of three novelty dolls where were original pieces of art created by Montwillo.  Montwillo also created two other original doll prototypes intended to be produced and distributed.  In 2004, Montwillo registered his five dolls as works of visual art with the Copyright Office.  Shortly after Montwillo registered his copyrights, Tull unilaterally dissolved AAP and sold all of AAP's assets, including Montwillo's copyrighted artwork to himself.  He then sold the same assets to Gibby, his domestic partner.  Gibby, in turn sold the same assets to his company GN.  GN then continued to sell the three existing dolls models, and manufactured and distributed the two additional dolls based on Montwillo's copyrighted artwork.

In approximately 1994, Montwillo was in a Toys-r-Us store and noticed a wig for a 12 inch doll and immediately thought "drag queen."  Montwillo Decl. ¶ 1.  He bought the wig, a Barbie Doll, and made the world's first "Drag Queen Barbie Doll," which was actually a three-dimensional caricature of his friend Brian O'Rourke who often dressed as a "drag queen" for Halloween.  *Ibid.*  Montwillo made the caricature of O'Rourke and gave it to him as a gift.  *Ibid.*

Montwillo's three dimensional caricature of O'Rourke was a big hit with his friends, who in turn encouraged Montwillo to produce others.  Montwillo Decl. ¶ 2.  He did.  *Ibid.*  Montwillo

SOMMERS LAW GROUP

made several other "drag queen" dolls then branched out into a wide-variety of caricature Barbie Dolls.[1] However, at that time, Montwillo's most popular creation was a doll he called "Trailer Trash Barbie." *Ibid.* "Trailer Trash Barbie" was originally created as a pregnant Barbie Doll in denim skirt, smoking a cigarette and holding a pig. *Ibid.* Montwillo made several versions of the "trailer trash" doll, including a pregnant Barbie holding a beer and smoking a cigarette. *Ibid.* As a matching piece to his Trailer Trash Barbie, Montwillo made a male doll who had a "mullet" style hair cut (short in the front and long in the back). *Ibid.*

In the summer of 1996, Montwillo lived with his domestic partner Woody Evans, who at the time was the store manager at In-Jean-ious Active, a store owned by Tull, located in San Francisco on Castro Street near Market Street. Montwillo Decl. ¶ 3. On Montwillo's behalf, Evans displayed some of Montwillo's doll creations at In-Jean-ious Active. *Ibid.* Montwillo's dolls created such a stir with customers that Evans asked Montwillo to make some to sell during the 1996 Christmas holiday season. *Ibid.* Montwillo did so. *Ibid.* In addition to attracting some sales, the dolls also attracted the attention of Mattel, Inc., the producer of Barbie Doll. *Ibid.* Mattel filed a lawsuit against Montwillo (for privacy concerns, Montwillo used the name Paul Hansen, Hansen being his mother's maiden name) and In-Jean-ious Active. *Ibid.* Mattel's lawsuit generated media interest in Montwillo's dolls. *Id.*, Exh. A. Montwillo and In-Jean-ious eventually settled with Mattel by promising not to sell any dolls packaged in the color pink or using the word "Barbie." *Ibid.* Otherwise, Montwillo was free to create parody Barbie Dolls in pink boxes, but not to sell any. *Ibid.*

Undeterred by the restrictions contained in the settlement agreement, in 1997 Tull and Montwillo entered into a partnership to create and distribute Montwillo's dolls. Montwillo Decl. ¶ 4. In the fall of 1998, Tull and Montwillo converted the partnership into a limited liability

---

[1] For example, Montwillo produced a caricature of "Carrie," the central character played by Sissy Spacek in the classic 1976 horror film of the same name directed by Brian DePalma and written by Stephen King. Montwillo Decl. ¶ 2. On the political-side, Montwillo also created a caricature doll of then San Francisco mayor Willie Brown. *Ibid.* Montwillo also created caricatures of other classic American cultural icons, such Grant Wood's famous 1930 painting American Gothic of a farm couple standing in front a white house, with Barbie as the wife. *Ibid.*

company, and registered it with the State of California as Arsenic & Apple Pie, L.L.C. ("AAP").
*Ibid.* At some time soon thereafter, the two men, with the assistance of Tull's attorney David
Wong, entered into negotiations over the new company's Operating Agreement ("Operating
Agreement"). *Ibid.* Several drafts were edited before the final version was executed in May
2000. *Ibid.* During the negotiations, Montwillo removed from the Operating Agreement any
language that would transfer his rights to the intellectual property of his dolls to AAP. *Ibid.* The
end result being that the final Operating Agreement, which was drafted by Wong, is silent with
regards to ownership of intellectual property. *Id.*, Exh. B.

By the terms of the Operating Agreement, Tull and Montwillo are the only members and
have equal status. Montwillo Decl. ¶ 4, Exh. B. The Operating Agreement provides that both
men equally contribute 50% of the initial start-up capital - $2,500 each ($5,000 total). Montwillo
Decl. ¶ 5. Further, the Operating Agreement provides that each member have 50% ownership
and control. *Ibid.* Indeed, both men equally contributed initial capital investment in the amount
of $2,500 each[2]. *Ibid.*

The Operating Agreement further provides that the both men would be "managing
members," meaning the two would equally share in the control and day-to-day responsibilities of
operating AAP, but within different scopes of management responsibility. Montwillo Decl. ¶¶
4,5, Exh. B. Montwillo is designated as the "Manager in charge of Art Direction, Design and
Advertising of product line, including but not limited to, corporate identification, product design,
packaging, web site design, web site maintenance and print advertising[;]" and Tull as the
"Manager in charge of Administration, business affairs, accounting, distribution, sales and
manufacturing." Montwillo Decl. ¶ 4, Exh. B, page 9.

The Operating Agreement includes an "integration and entire agreement" clause and at
no time after executing the Operating Agreement did the two men alter the Operating Agreement
or sign any other new written agreement. Montwillo Decl. ¶ 4, Exh. B.

---

[2] Tull loaned Montwillo his $2,500 share so that the two men would enter the agreement as equal
partners financially. Montwillo Decl. ¶ 5.

SOMMERS LAW GROUP

1   At no time did Montwillo have any other relationship with AAP besides being a

2   managing member, specifically Montwillo was never an employee or independent contractor of

3   AAL. Montwillo Decl. ¶ 6; Sommers Decl. ¶¶ 8, 9; Exhs. G, H, (Defendants admit in response to

4   request for admission number 2 Montwillo was not an AAP employee.).

5   Over the course of the next few years, Montwillo tweaked his prior doll designs for the

6   purposes of mass production. Montwillo Decl. ¶ 7. He worked with an overseas manufacturer to

7   develop workable prototypes for the five dolls that are subject to this litigation. *Ibid.* Three of

8   the five prototype dolls were manufactured by AAP – the Red Hair Drag Queen Doll, the Blonde

9   Drag Queen, and the Trailer Trash Doll. *Ibid.* Montwillo also created prototypes for the other

10  two dolls subject to this litigation, but those two dolls were not manufactured by AAP – the

11  Pregnant Doll and the Mullet Doll. *Ibid.*

12  Montwillo also contributed to AAP within the areas of responsibility designated in the

13  Operating Agreement. Montwillo Decl. ¶ 8. Among his other duties, Montwillo designed

14  AAP's product packaging, drafted the content for the packaging, hired a web designer and

15  supervised AAP's website. *Ibid.* Montwillo developed other products, such as watches and t-

16  shirts, some which were produced and some that were not. *Ibid.* Montwillo engaged in

17  marketing and advertising as well. *Ibid.*

18  Tull contributed to AAP within the scope of his designated areas of responsibility as well.

19  Montwillo Decl. ¶ 9. He also loaned AAP funds pursuant to loan sections of the Operating

20  Agreement, but at no time did Tull increase his capital contribution as defined in the Operating

21  Agreement. *Ibid.* Although AAP manufactured and sold many dolls, Montwillo was never paid

22  any proceeds. *Ibid.* All revenues were either poured back into production or used to pay-off

23  Tull's private loans to the company. *Ibid.*

24  Faced with mounting personal debt and no proceeds from AAP, in March 2002,

25  Montwillo filed in pro per a petition for personal bankruptcy under chapter 7. Montwillo Decl. ¶

26  10. Since Montwillo had never made any money from the artwork upon which the dolls were

27  made, Montwillo did not list the artwork in this bankruptcy petition. *Ibid.* The court closed

28  Montwillo's chapter 7 filing, entering the final decree on October 28, 2002. *Ibid.*

SOMMERS LAW GROUP

1    Over a year later, on behalf of Tull, attorney Wong sent Montwillo a letter dated April 7,

2  2003.  Montwillo Decl. ¶ 11, Exh. C.  In this letter, Wong advised Montwillo that since

3  Montwillo filed a petition for bankruptcy, Tull was purchasing Montwillo's membership share

4  for what Tull calculated was the fair market value – one dollar ($1.00).  *Ibid.*  Wong further

5  advised Montwillo that if Montwillo did not contact Tull or himself within 30 days to object,

6  AAP would adopt the $1.00 valuation and execute the purchase.  *Ibid.*

7    Montwillo and Tull entered into negotiations pursuant to the Operating Agreement over

8  the price of Montwillo's membership and reached an oral agreement of $16,000.  Montwillo

9  Decl. ¶ 12.  Tull did not pay that amount.  *Ibid.*  By letter dated May 2, 2003, Montwillo advised

10  Wong that Tull had yet to submit payment of $16,000.  *Id.*, Exh. D.  By letter dated May 31,

11  2003, Wong sent Montwillo a draft purchase agreement.  *Id.*, Exh. E.  The May 31, 2003

12  purchase agreement included Tull purchasing Montwillo's membership rights, physical

13  possession of all prototypes, **and** Montwillo's personal intellectual property rights to the dolls

14  with the following language:

> Included within the terms of the sale of membership interest
> contemplated by this Agreement and subject to the terms and
> conditions of same, are any and all rights, claims, property
> interests, proprietary claims, patent rights or other intellectual
> property rights to two doll concepts which [Seller] has previously
> conceived and developed, identified for purposes of this agreement
> as the:
>> (1) "Pregnant" doll
>> (2) "Mullet" doll
>
> In consideration of the mutual promises herein contained and other
> good and valuable consideration, the receipt and sufficiency of
> which are hereby acknowledged, the parties further agree as
> follows:
>> I.
> Buyer shall receive Seller's entire 50% managing membership
> Interest in Arsenic & Apple Pie, LLC.  The sale and purchase of
> said membership interest shall include, without limitation, all
> property rights, assets, inventory, profits, bonuses, commissions,
> salaries or other forms of distribution or compensation associated
> with said membership interest, **as well as** all claims and rights
> under leases, contracts[,] copyrights, service marks, trademarks,

SOMMERS LAW GROUP

> trade names, trade secrets, and licenses held or asserted by the aforementioned company.
>
> Buyer shall **also** receive physical possession of and all property and intellectual property rights to the "Pregnant" and "Mullet" dolls developed by Seller.

*Ibid.* (bold added).

Over the next month, Montwillo made hand notes on the draft purchase agreement and by letter dated June 30, 2003, Montwillo advised Wong that he is willing to accept the offer of $16,000 provided Tull accept Montwillo's handwritten changes. Montwillo Decl. ¶ 13, Exh. F. Wong redrafted the purchase agreement and it was given to Montwillo for acceptance. *Id.*, Exh. G. The new agreement further reinforced the transfer of Montwillo's copyright to AAP for the price of $16,000 with the following language:

> Included within the terms of sale … are any intellectual rights, claims, property interests, proprietary claims or other intellectual property rights to two doll concepts which Seller has previously conceived and developed, identified for purposes of this agreement as the:
>
> (1) "Pregnant" doll
> (2) "Mullet" doll
>
>                ***
> III.
> In consideration of the sale, transfer and delivery of the Membership Interest and dolls referenced above, Buyer shall pay the sum of Sixteen Thousand Dollars ($16,000.00). Said sum shall be payable … pursuant to the following schedule: … a second payment of five thousand dollars ($5000.00) upon Seller's delivery to Buyer of the prototype of [] the Pregnant doll, and final payment of five thousand dollars ($5000.00) upon Seller's delivery to Buyer of the prototype of [] the Mullet doll.
>
> Seller and Buyer hereby agree to the following delivery and corresponding payment schedule: Seller shall deliver the prototype of the Pregnant doll within 30 days of the execution of this Agreement and buyer shall pay according to the foregoing terms the $5000.00 payment in exchange therefore. Within 30 days after deliver of the prototype of the Pregnant doll, Seller shall deliver the prototype of the Mullet doll …

*Ibid.*

SOMMERS LAW GROUP

1    The agreement was not executed by either party and Tull withdrew the offer. Montwillo

2    Decl. ¶ 14.

3        The next communication Montwillo received from Wong was a letter dated June 23,

4    2004, curiously addressed to both Tull and Montwillo, indicating that Tull had abandoned his

5    attempt to re-purchase Montwillo's membership. Montwillo Decl. ¶ 15, Exh. H. In the letter,

6    Wong advised Montwillo that instead of re-purchasing Montwillo's membership, he was going

7    to simply dissolve AAP. *Ibid.* Wong advised that Tull was able to do so because Tull did not

8    hold a membership meeting with himself within 90 days of learning of Montwillo's bankruptcy

9    petition, and pursuant to section 9.1(a) of the Operating Agreement, AAP automatically

10   dissolves under such circumstances. *Ibid.* Wong also advised Montwillo that Tull elected

11   himself as the Liquidating Manager. *Ibid.*

12       By letter also addressed to both Tull and Montwillo dated July 3, 2004, Wong advised

13   Montwillo **for the first time** that AAP had a claim to the intellectual property rights to the five

14   dolls subject to this litigation. Montwillo Decl. ¶ 16, Exh. I. Wong also advised Montwillo that

15   he "understands that the prototypes of the [Talking Pregnant Trailer Trash Doll and Male Mullet

16   Trailer Trash Doll] may be in the possession of Mr. Montwillo…" He then requested Montwillo

17   return the prototypes to AAP immediately. *Ibid.* Wong also explained to Montwillo that AAP

18   owed Tull $72,216.60 for loans and interest, so "it would seem logical that Mr. Tull receive the

19   remaining inventory with a fair market value of $20,697.61 in partial satisfaction of his

20   outstanding loans to the Company." *Ibid.* Wong further advised Montwillo that "[w]hile the

21   only other assets are the intellectual rights to the dolls and the Company's tradename, it also true

22   that their fair market value is unknown. I thus propose that the intellectual property rights to the

23   dolls, both the models produced and those being developed, and the Arsenic & Apple Pie

24   tradename be valued at a minimum of $52,518.99, and that they be transferred to Mr. Tull in full

25   satisfaction of his loans to the Company." *Ibid.* Finally, Tull suggested that Montwillo find

26   someone else to purchase the inventory and intellectual property within 5 business days with an

27   offer in excess of $84,514.56 or "the Company will have no choice but to find that the inventory

28

and the intangible property rights above will become the sole property of Mr. Tull in exchange for his outstanding loan obligations." *Ibid.*

By letter dated July 8, 2004, Montwillo told Wong that he was exploring his rights, which he intended to assert and defend. Montwillo Decl. ¶ 17, Exh. J.

By letter dated July 13, 2004, Montwillo advised Wong that as an equal managing member of AAP and he did not concede to the dissolution. Montwillo Decl. ¶ 18. Exh. K. Montwillo further advised Wong that "I hold the copyrights to all my designs, not the company." *Ibid.* He then offered to sell an exclusive license to AAP for $10,000 for each of the five dolls. *Ibid.* Montwillo also told Wong that he expected Wong to "act in the best interest of the company. Putting Mr. Tull's well being ahead of the company would surely be considered a conflict of interest." *Ibid.*

By letter dated July 16, 2004, Tull advised Montwillo that AAP was going to execute the dissolution, but he did not tell him when it would happen. Montwillo Decl. ¶ 19, Exh. L.

On July 17, 2004, Tull executed a release of his loans to AAP in exchange for "all product inventory, the intellectual property rights to the product line developed and produced by Arsenic & Apple Pie, LLC **and its members**, its unique and identifiable tradename, the goodwill of the business, and all other assets belonging to the company." Sommers Decl. ¶ 2, Exh. A (bold added). On the same day, Tull executed a bill of sale conveying all the same assets from AAP to himself. Sommers Decl. ¶ 3, Exh. B. Even though just four days prior, Montwillo clearly and unmistakably made claim to the copyrights of the dolls, in the bill of sale, Tull granted a warrantee to himself from AAP that the intellectual rights were "free and clear of any … claims…" *Ibid.*

By letter dated July 20, 2004, Tull responded to Montwillo's July 13, 2004 letter by advising Montwillo that since he declared bankruptcy he had no "grounds upon which to object to the dissolution of the Company." Montwillo Decl. ¶ 20, Exh. M. Wong also advise Montwillo that "[r]egarding the proprietary rights to the doll designs, the Company respectfully disagrees with your claim of ownership. The position of the Copany is that it alone financed the development of each of the designs, therefore, claims sole ownership." *Ibid.* Tull ended his

SOMMERS LAW GROUP

letter with "Finally, as Counsel for the Company, I must demand that you cease and desist using Arsenic & Apple Pie, LLC, name and logo, which are the exclusive property of the Company. Should you refuse to do so, an injunction action will be brought against you by Arsenic & Apple Pie or its liquidating member." *Ibid.*

However, Wong was dishonest with Montwillo. Wong failed to tell Montwillo that on July 15, 2004, two days before Tull dissolved AAP and sold its assets including Montwillo's artwork to himself, he sold all AAP's assets, including the "intellectual property rights to said dolls" to his domestic partner, Gibby. Sommers Decl. ¶ 4, Exh. C. Wong also failed to mention to Montwillo that he also was the attorney of record who on July 9, 2004, registered Gibby Novelties, LLC with Tull listed as the agent for service of process. Sommers Decl. ¶ 5, Exh. D.

After Tull "sold" the inventory of the remaining dolls and the "intellectual property" of all five dolls to defendant Gibby, Gibby transferred the ownership of the physical dolls and the "intellectual property rights" of all five dolls to defendant GN. Sommers Decl. ¶¶ 6, 7, Exhs. E & F (interrogatory number 10). GN, in turn, sold the inventory of dolls individually through its website and to directly to retailers. Sommers Decl. ¶ 10. GN also manufactured and distributed dolls based on the prototypes of the Pregnant and Mullet dolls. Sommers Decl. ¶ 10.

On July 2, 2004, Montwillo registered with the Copyright Office and was issued registrations for "Talking Pregnant Trailer Trash Doll, aka Trash Talking Trixie" registration number VAu 631-337 and "Trailer Trash Roy Doll, aka Bubba, aka Mullet Doll," registration number VAu 631-338. Montwillo Decl. ¶ 21, Exh. N. On July 13, 2004, Montwillo registered with the Copyright Office and was issued registrations for the following dolls (1) "Redhead Drag Queen Doll," registration number VA 1-271-341; (2) "Trailer Trash Doll," registration number VA 1-271-342; and (3) "Blonde Drag Queen Doll," registration number VA 1-271-343. Montwillo Decl., ¶ 21, Exh. O.

In September 2004, Montwillo hired attorney Curtis Smolar to represent him in this matter. Montwillo Decl. ¶ 22. On or about September 22, 2004, Smolar sent a letter to Wong requesting that dissolution procedures immediately cease. *Id.* Exh. P. It was only after this

SOMMERS LAW GROUP

communication did Montwillo learn that Tull had already dissolved AAP and conveyed his copyrights to myself and then to Gibby, and then Gibby to GN. Montwillo Decl. ¶ 22.

## III.    RELEVANT SECTIONS OF THE OPERATING AGREEMENT

### [Section 2.7 – Managing Members Scope of Responsibility]

2.7    The Managing Members shall be as follows:

Paul Montwillo - Manager in charge of Art Direction, Design and Advertising of product line, including but not limited to, corporate identification, product design, packaging, web site design, web site maintenance and print advertising.

William Tull – Manager in charge of Administration, business affairs, accounting, distribution, sales and manufacturing.

### [Section 3.1 – Equal Capital Contribution by Members]

3.1    Each member shall contribute to the capital of the Company as the Member's Capital Contribution the money and property specified in Exhibit "B" to this Agreement.  The Fair Market Vale [sic] of each item of contributing property as agreed between the Company and the Member contributing such property is set forth in Exhibit "B".  Unless otherwise agreed in writing by all Members, no Member shall be required to make additional Capital Contributions.

### [Section 3.4 – Maintenance of Members' Capital Contribution]

3.4   A Member shall not be entitled to withdraw any part of the Member's Capital Contribution or to receive any distributions, whether of money or property from the Company except as provided in this Agreement.

### [Section 3.5 – No Interest Paid on Capital Contribution]

3.5   No interest shall be paid on funds or property contributed to the capital of the Company or on the balance of a Member's Capital Account.

### [Section 3.7 – No Priority of Distribution to Members]

3.7    No Member shall have priority over any other Members, with respect to the return of a Capital Contributions [sic], or

SOMMERS LAW GROUP

distributions or allocations income, gain, losses, deductions, credits, or items thereof, except as set forth herein below.

### [Section 3.8 –Member Loans to Company]

3.8    If a Member loans money to the Company, said loan shall bear interest as variable rates depending upon the origin of the funds [] percentage per annum as of the date the funds were advanced to or on behalf of the Company until paid.

In the above section, Tull handwrite the phrase "variable rates depending upon the origin of the funds." Sommers Decl. ¶ 11.

### [Section 5.1 – Company Management by Management Members]

5.1    The business of the Company shall be managed by the respective Managers named in Section 2.7, or a successor manager as selected in accordance with Section 5.3.

### [Section 7.1 – Distribution of Management Rights and Voting]

7.1    There shall be two classes of membership. Each Member shall have such rights and/or preferences as those possessed by any other Member as set forth herein. The two classes of membership shall be the Managing Members and the Investment Members. Each Managing Member shall Vote in accordance with the Member's voting allocation as set forth in Exhibit "B" hereto. ... Until otherwise changed as provided herein, the Managing Members and Investment Members of the Company are as follows:

(A)    Managing Members:
William Tull (one vote)
Paul Montwillo (one vote)

(B)    Investment Members:
None

### [Section 8.3 – Triggering Events and Option to Purchase Member Share]

8.3    On the happening of any of the following events (Triggering Events) with respect to a Member, the Company and the other Members shall have the option to purchase all of any portion of the Membership Interest in the Company or such member (Selling Member) at the price and on the terms provided in Section 8.7 of this Agreement:

SOMMERS LAW GROUP

\* \* \*

(b)    the bankruptcy of a Member;

\* \* \*

Each Member agrees to promptly give Notice of a Triggering Event to all other Members.

### [Section 8.7 – Establishment of Purchase Price of Member Share]

8.7    The purchase price of the Membership Interest that is the subject of an option under this Agreement shall be the Fair Market Value of such Membership Interest as determined under this Section 8.7., Each [sic] of the selling and purchasing parties shall use his, her, or its best efforts to mutually agree on the Fair Market Value. If the parties are unable to so agree within 30 days of the date on which the option is first exercisable (the Option date), the selling party shall appoint, within 40 days of the Option Date, one appraiser. The two appraisers shall within a period of five additional days, agree on and appoint within 40 days of the Option Date one appraiser. The two appraisers shall within a period of five additional days, agree on and appoint an additional appraiser. The three appraisers shall, within 60 days after the appointment of the third appraiser, determine the Fair Market Value of the Membership Interest in writing and submit their report to all parties.    The Fair Market Value shall be determined by disregarding the appraiser's evaluation that diverges the greatest from each of the other two appraisers; valuations, and the arithmetic mean of the remaining two appraisers' valuations shall be the Fair Market Value. Each purchasing party shall pay for the services of the appraiser selected by it, plus one-half of the fee charged by the third appraiser. The option purchase price as so determined shall be payable in cash.

### [Section 9.1 – Events for Purposes of Dissolution]

9.1    The Company shall be dissolved on the first to occur of the following events:

(a)    The … bankruptcy or corporate dissolution of a Managing member; provided, however, that the remaining Members may, by the Vote of a Majority of Members within 90 days of the happening of that event, Vote to continue the Company, in which case that Company shall not dissolve. If the remaining Members fail to so Vote, the remaining Members shall wind up the Company. For purposes of this Paragraph (a), in determining Majority of Members, the Percentage Interest of the Member …

who has become bankrupt or dissolved shall not be taken into account.

* * *

### [Section 9.2 – Dissolution and Winding-up]

9.2    On the dissolution of the Company, the Company shall engage in no further business other than that necessary to wind up business and affairs of the Company. The Members who have not wrongfully dissolved the Company shall give written Notice of the commencement of winding up by mail to all known creditors and claimants against the Company whose addresses appear in the records of the Company. After paying or adequately providing for the payment of all known debts of the Company (except debts owing to Members) the remaining assets of the Company shall be distributed or applied in the following order of priority:

(a)    To pay the expenses of liquidation.

(b)    To repay outstanding loans to Members. If there are insufficient funds to pay such loans in full, each Member shall be repaid in the ratio that the Member's respective loan, together with interest accrued and unpaid thereon, bears to the total of all such loans from Members, including all interest accrued and unpaid on those loan. Such repayment shall first be credited to unpaid principal and the remainder shall be credited to accrued and unpaid interest.

(c)    Among the Members' in accordance with the provisions of Article IV, Section 4.7

### [Section 11.1 – Integration and Entire Agreement]

11.1    This Agreement constitutes[] the whole and entire agreement of the parties with respect to the subject matter of this Agreement, and it shall not be modified or amended in any respect except by a written instrument executed by all parties.    This Agreement replaces and supersedes all prior written and oral agreements by and among the Members or any of them.

### [Section 11.1 – Amendment Only in Writing]

11.11    This Agreement man be altered, amended, or repealed only by a writing signed by all of the Members.

### [Exhibit B – Capital Contribution and Resulting Allocation of Control]

SOMMERS LAW GROUP

CAPITAL CONTRIBUTION AND
PERCENTAGE OWNERSHIP
1.    William Tull, Managing Member     Percentage: 50%
2.    Paul Montwillo, Managing Member  Percentage[:] 50%

MANAGING MEMBER VOTING ALLOCATIONS:
1.    William Tull, Managing Member     One Vote
2.    Paul Montwillo, Managing Member  One Vote

## IV.    DISCUSSION

### A.    MONTWILLO SEEKS SUMMARY JUDGMENT ON THE ISSUE OF LIABILITY OF COPYRIGHT INFRINGEMENT.

Rule 56(c) of the Federal Rules of Civil Procedure authorizes summary judgment if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The moving party bears the initial burden of demonstrating the basis for the motion and identifying the portions of the pleadings, depositions, answers to interrogatories, affidavits, and admissions on file that establish the absence of a triable issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.ed.2d 265 (1986). If the moving party meets this initial burden, the burden then shifts to the non-moving party to present specific facts showing that there is a genuine issue for trial. Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586-87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The non-movant's bare assertions, standing alone, are insufficient to create a material issue of fact and defeat a motion for summary judgment. *Id.* at 247- 48. An issue of fact is material if, under the substantive law of the case, resolution of the factual dispute might affect the case's outcome. *Anderson,* 477 U.S. at 248. Factual disputes are genuine if they "properly can be resolved in favor of either party." *Id.* at 205. Thus, a genuine issue for trial exists if the non-movant presents evidence from which a reasonable jury, viewing the evidence in the light most favorable to that party, could resolve the material issue in his or her favor. *Id.* "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-50 (internal citations omitted).

Subdivisions (a) and (b) of Rule 56 of the Federal Rules of Civil Procedure authorize a motion for summary judgment "upon all or any part" of a claim by a claimant or a defending party. FRCP Rule 56(a) & (b). In addition, subdivision (d) deals with the situation in which the motion does not lead to a judgment on the entire case but only terminates further contest as to a portion of the litigation. Subdivision (c) provides "summary judgment, interlocutory in character, may be rendered on the issue of liability alone although there is a genuine issue as to the amount of damages." FRCP Rule 56(c). To the event this Court finds that no dispute of material fact that Montwillo is the valid owner of the copyrights, but does find a dispute of fact regarding the infringement element of the claim, Montwillo hereby requests an order for partial summary judgment on the issue of ownership.

### 1.    Montwillo Owns the Copyrights.

A valid certificate of registration is creates prima facie evidence of ownership of the copyright. *Estate of Hogarth v. Edgar Rice Burroughs, Inc.*, 342 F.3d 149, 166-67 (2d Cir. 2003) (certificate of registration creates rebuttal presumption of copyright validity), *cert. denied*, 541 U.S. 937 (2004). "A certificate of registration in a copyright infringement action shifts the burden of proof to the party defending the infringement claim, who must produce evidence weighing against validity." *Collezione Europa U.S.A., Inc. v. Hillsdale House, Ltd.*, 243 F.Supp.2d 444, 452 (M.D.N.C. 2003). Montwillo registered his copyrights before the alleged infringement and has produced certifications to the Court. Montwillo Decl. ¶, Exhs. N, O.

The Copyright Act of 1976 provides that copyright ownership "vests initially in the author or authors of the work. 17 U.S.C. § 201(a). As a general rule, the author is the party who actually creates the work, that is, the person who translates an idea into a fixed, tangible expression entitled to copyright protection. § 102." *Community for Creative Non-Violence v. Reid*, 490 U.S. 730, 737, 109 S.Ct. 2166, 104 L.Ed2d 811 (1989) ("*CCNV v. Reid*"). Under the Copyright Act, there are only three methods by which the original author is not the copyright owner: (1) by conveyance in a written instrument (17 U.S.C. § 204(a)); (2) by creation as a "work made for hire" (17 U.S.C. § 201(b)); and (3) by operation of law (17 U.S.C. § 204(a)).

SOMMERS LAW GROUP

Additionally, a defendant can assert the defense of being granted an implied nonexclusive limited license. (17 U.S.C. § 101).

Each of the four methods and defenses listed above are somewhat implicated by defendants in their interrogatory response as to the facts underlying their claim that Montwillo is not the valid owner of the copyrights.

Specifically, interrogatory number 7 requested defendants state all facts supporting defendants' contention in their cross-complaint that the "copyright applications [] pertain to designs created by Montwillo while he was the managing member of Arsenic & Apple Pie LLC, and as such are assets of that Company, and are not, and have never been, the personal property of Montwillo." Sommers Decl. ¶ 6, Exh. E, page 3, Interrogatory 7. Defendants responded as follows:

> The subject dolls [sic] designs were conceived of by Montwillo in his capacity as a member of Arsenic & Apple Pie, LLC pursuant to his promise as set forth in the Operating Agreement to conceive, design and implement doll designs for the Company as his contribution in lieu of monetary capital. After each doll in question was conceived, placed into production and manufactured by Arsenic & Apple Pie, LLC, the Company claimed the copyrights to same in a manner consistent with the Operating Agreement and fully known to Montwillo. Montwillo actively and knowingly participated in and memorialized the ownership claim of Arsenic & Apple Pie, LLC to the copyrights to the dolls in question.

Sommers Decl. ¶ 7, Exh. F.

As the discussion below demonstrates, defendants' "facts" are wholly inadequate and as such this Court should grant Montwillo's motion on the issue of copyright ownership.

    *a.*    *The Operating Agreement Does Not Convey Copyrights to AAP.*

The writing requirement for conveyances of copyrights is contained in section 204(a) of the Copyright Act of 1976.[3] Courts have consistently required that the written instrument

---

[3] Hereinafter, all references to "section(s)" are references to the Copyright Act or 1976, 17 U.S.C. §§ 100, et seq.

SOMMERS LAW GROUP

making the conveyance be clear and unambiguous.  In the Ninth Circuit, in *Effects Assocs. v. Cohen,* 908 F.2d 555 (9th Cir. 1990)("*Effects II*"), the court stated:

> The [section 204(a) writing] requirement is not unduly burdensome ... The rule is really quite simple: if the copyright holder agrees to transfer ownership to another party, that party must get the copyright holder to sign a piece of paper saying so. It doesn't have to be a Magna Carta; a one-line pro forma statement will do.

*Id.* at 557.

To the extent there is any ambiguity concerning an alleged transfer, the interpretation must be in favor of the original copyright holder.  Section 204(a) "ensures that the creator of a work will not give away his copyright inadvertently and forces a party who wants to use the copyright work to negotiate with the creator to determine precisely what rights are being transferred and at what price." *Effects II,* 908 F.2d at 557.  "Any ambiguity in the transfer document must be construed in favor of the original copyright holder in order to avoid such inadvertent transfers." *Cassway v. Chelsea Historic Props.,* 1993 WL 64633 (E.D.Pa. Mar. 4, 1993); *see also Tasini v. New York Times Co.,* 972 F.Supp. 804, 810 (S.D.N.Y.), *rev'd on other grounds,* 206 F.3d 161 (2d Cir. 2000).

Of the 36 pages of the Operating Agreement, the only language defendants could possibly argue addresses intellectual property is section 2.7, which describes the scope of the managing members' different managerial responsibilities.  However, courts have found that in order for the written instrument to be construed as a conveyance, it must refer to the domain of copyright ownership and **not** of other interests. *Bieg v. Hovnanian Enterprises, Inc.,* 157 F.Supp.2d 475, 481 (E.D.Pa. 2001).  In *Bieg v. Hovnanian Enterprises, Inc.,* in a work made for hire context, the court specifically rejected language in letters indicating a transfer of the responsibility to produce copyrightable materials as a conveyance of the copyrights on the basis that only one party signed the letters **and** because the letters only "refer only to a transfer of management responsibilities, not copyright ownership." *Ibid.*

While other courts have held that the conveyance document does not need to include the word "copyright" in order to constitute a valid transfer, the "terms of any writing purporting to

transfer copyright interests, even a one-line pro forma statement, **must be clear**." *Papa's June Music v. McLean*, 921 F.Supp. 1154, 1159 (S.D.N.Y.1996)(bold added). In *Schiller & Schmidt v. Nordisco Corporation*, 969 F.2d 410 (7th Cir. 1992), the court held that an agreement, which did not include the word "copyright", but whose "wording leaves little doubt that [the alleged transferor] sold all the assets of Spotline Studios, tangible and intangible alike" was sufficient to constitute a transfer under Section 204(a). *Id.* at 413; see also *Kenbrooke Fabrics v. Soho Fashions*, 690 F.Supp. 298, 301 (S.D.N.Y. 1988).

Regarding Montwillo, Section 2.7 charges him with a multitude of managerial duties including the oversight of product development. But nowhere in Section 2.7 is there language that clearly means "transfer," "assign," or "conveyance" of any intellectual rights. If the parties intended for Montwillo to produce original artwork as a contribution to AAP, it could have easily done so. Instead, defendants must rely on a term that clearly has a different objective, to delineate managerial responsibilities. Indeed, it is quite possible that in order to fulfill his responsibilities under section 2.7 to develop products, Montwillo could deploy several possible methods, including but not limited to, hiring employees or independent contractors, purchasing licenses from third parties, or hiring himself as an employee or independent contractor.

A survey of cases where the court found a conveyance is useful to highlight how section 2.7 falls short of section 204(a)'s requirement for an unambiguous writing. Several such cases that focus on contract language that delineates control over the "reproduction" of copyrightable materials. For example, in *Urantia Foundation v. Maaherra*, 114 F.3d 955 (9th Cir. 1997), the court held that the parties intended to transfer copyright interests when they agreed that the transferee would have "absolute and unconditional control of all plates and other media **for the printing and reproduction of the Urantia book.**" *Id.* at 960 (bold added). Another example is *Armento v. The Laser Image*, 950 F.Supp. 719 (W.D.N.C. 1996), where the court found an agreement explicitly referred to the right to control reproduction constituted a transfer document. *Id.* at 733. In that case, the court further noted that since the document was drafted by an attorney, as was the AAP Operating Agreement, if the language intended a transfer of copyright, it would have been clear. *Ibid.*

SOMMERS LAW GROUP

1    Conversely, assignments of rights or interests that do not reference rights of reproduction

2  have been held to be too ambiguous and therefore invalid under 204(a). For example, in *Playboy*

3  *Enterprises v. Dumas,* 53 F.3d 549 (2d Cir. 1995), the court found the following language was

4  too ambiguous and therefore not a valid transfer: "Payee acknowledges payment in full for the

5  assignment to Playboy Enterprises, Inc. of all right, title and interest in and to the following

6  items." *Id.* at 564. In another case, *Pamfiloff v. Giant Records,* 794 F.Supp. 933,

7  (N.D.Cal.1992), the court found an agreement which made no reference to "publishing rights or

8  rights to musical compositions" not a sufficient writing under Section 204(a)). *Id.* at 936.

9    Further, defendants' assertion that Montwillo promised to "conceive, design and

10  implement doll designs for the Company *as his contribution in lieu of monetary capital*" is

11  blatently contradicted by numerous other terms in the Operating Agreement that indicate both

12  members equally invest with the initial capital contribution, equally share in managerial

13  responsibility, and equally share in the profits: specifically sections 2.7, 3.1, 3.4, 3.5, 3.7, 3.8,

14  5.1, 7.1, 8.7, and Exhibit B. On the four corners of the Operating Agreement, there is no

15  language that permits the substitution of intellectual property for capital.

16    In this case, the Operating Agreement is not unambiguous with regards to conveyance of

17  copyright, since it is completely silent on the matter. However, California law does permit

18  consideration of parol evidence "to explain the meaning of the terms of a contract even when the

19  meaning appears unambiguous." *Foad Consulting Group, Inc. v. Azzalino,* 270 F.3d 821, 826

20  (9th Cir. 2001).

21    If the Court decides an examination of parol evidence is useful, it will find unmistakable

22  evidence that the parties did not intend for Montwillo to give to AAP his copyrights in lieu of

23  capital contribution in the Operating Agreement. First, Montwillo contributed $2,500 in capital,

24  same as Tull. Second, during the initial negotiations for the Operating Agreement, Montwillo

25  specifically insisted on the removal of all mention of intellectual property assignment to prevent

26  losing his copyrights. Third, in 2003 when Tull and Montwillo were negotiating re-purchase of

27  Montwillo's share, Tull acknowledged Montwillo's rights to intellectual property in the dolls in

28  the two purchase agreements. In the second draft, payments were even conditioned on the return

SOMMERS LAW GROUP

of two prototype dolls.  Fourth, **the first time AAP claimed ownership of the copyrights was after the failed re-purchase attempt of Montwillo's membership**. When Wong asserted AAP's claim over the copyrights on the basis that AAP financed the dolls' development, Montwillo clearly, emphatically, and unambiguously rejected the claim.

Finally, the "writing must precede the creation in order to serve its purpose of identifying the (noncreator) owner unequivocally." *Schiller & Schmidt*, supra, 969 F.2d 410, 413.  The newspaper articles unequivocally prove that Montwillo created these dolls before the formation of AAP.  Montwillo Decl. ¶, Exh. A.

        b.     *Montwillo Did Not Create the Dolls as Works Made for Hire.*

Section 101 provides that a work is "for hire" under two sets of circumstances:

> (1) a work prepared by an employee within the scope of his or her employment; or
>
> (2) a work specially ordered or commissioned for use as a contribution to a collective work, as a part of a motion picture or other audiovisual work, as a translation, as a supplementary work, as a compilation, as an instructional text, as a test, as answer material for a test, or as an atlas, if the parties expressly agree in a written instrument signed by them that the work shall be considered a work made for hire.

17 U.S.C. § 101.

It is undisputed that Montwillo was never an employee of AAP at anytime.  Sommers Decl. ¶, Exhs. G, H, Request for admission number 2.  In fact, defendants so admitted in its response to request for admission number 2 and thus becomes law of the case.

Likewise, the work cannot fall within the description of section 101(2) for independent contractors since the work does not fall within one of the enumerated categories and there is no clear writing expressing a work for hire relationship, and Montwillo was never paid anything.

        c.     *Montwillo Did Not Convey His Copyrights as an Operation of Law.*

The Copyright Act's requirement for transfers to be memorialized in writing is inapplicable when done so as an "operation of law." 17 U.S.C. § 204(a).  "The statute leaves the contours of that exception undefined.  Presumably, the intent is to refer to such matters as

disposition by courts in bankruptcy, probate, and the like." 3 Nimmer 10.03[A][6] (citations omitted). There are no facts relating to any "operation of law" context.

> ### d.    Montwillo Did Not Grant an Implied Nonexclusive License.

Implied nonexclusive licenses are a "narrow exception to the writing requirement" of section 204(a). *Effects II*, supra, 908 F.2d 555, 558. "Section 204 provides that all transfers of copyright ownership must be in writing; section 101 defines transfers of ownership broadly, but expressly removes from the scope of 204(a) 'nonexclusive license.'" *Ibid.*

Any assertion by defendants that they did not infringe on Montwillo's copyrights because Montwillo granted an implied nonexclusive license must fail for the following reasons: (1) an implied license is a defense that defendants failed to plead in their answer to the complaint; (2) if Montwillo did grant an implied nonexclusive license he only granted it to AAP, meaning any use of the copyrights by defendants Tull, Gibby or GN would be beyond the scope of the license; (3) Montwillo never received any consideration; and (4) absent any purported contribution of his copyrights, Montwillo's other contributions to AAP were not "minimal."

> #### i.    Defendants failed to plead an implied license as a defense.

"A license is a defense to infringement, [citation] and must be affirmatively pleaded." *Oddo v. Ries*, 743 F.2d 630, 634 n.6 (9th Cir. 1984)(citing Fed.R.Civ.P. 8, 12.) A party cannot oppose summary judgment on grounds not in issue under the pleadings: "Simply put, summary judgment is not a procedural second chance to flesh out inadequate pleadings." *Wasco Products, Inc. v. Southwall Technologies, Inc.*, 435 F.3d 989, 991 (9th Cir. 2006) (citations omitted) (plaintiffs seeking to toll statute of limitation based on an ongoing conspiracy could not raise tolling ground for the first time in opposition to summary judgment motion where conspiracy not alleged). In their answer to the complaint, defendants did not plead that Montwillo granted an implied license as an affirmative defense and should be barred from raising it for the first time at summary judgment.

> #### ii.    Any implied license Montwillo may have granted did not extend to defendants Tull, GN or Gibby.

Nonexclusive licensees cannot transfer its license or grant a sublicense without permission of the licensor. *Fritz v. Arthur D. Little, Inc.*, 994 F.Supp. 95, 100 n.5 (D.Mass.

SOMMERS LAW GROUP

1996) ("[T]he general rule seems to be that a copyright license is not transferable without express permission.") (citing *Harris v. Emus Records Corp.*, 734 F.2d 1329, 1334 (9th Cir. 1984)). Even if Montwillo granted an implied nonexclusive license to AAP, he never conveyed an implied nonexclusive license to the three defendants. In fact, he vehemently opposed any transfer. Accordingly, defendants should be barred from using this defense.

> iii.    Montwillo never received any consideration for his copyrights.

"[N]onexclusive licenses are revocable absent consideration." *Nimmer* § 10.02[B][5]. There is no dispute that Montwillo never received a dime from any of his work with AAP.

> iv.    Montwillo's contributions to were not "minimal."

"By negative implication, nonexclusive licenses may therefore be granted orally, or may even be implied from conduct. When the totality of the parties' conduct indicates intent to grant such permission, the result is a nonexclusive license." 3 M. Nimmer & D. Nimmer, *Nimmer on Copyright* § 10.03[A][7] (2007) (citations omitted.) For instance, in *Effects II, supra,* 908 F.2d 555, 556 the court held that the defendant had an implied nonexclusive right to use the plaintiff's film footage since: (1) the footage was created at the defendant's request, (2) the plaintiff delivered the footage to the defendant, and (3) the plaintiff intended that the defendant copy and distribute the footage. *Id.* at 558-59. The court reasoned that the plaintiff's intent was evident since to hold otherwise would mean that the plaintiff's contribution was "of minimal value" - a conclusion unsupported by the payment of $56,000 for the footage. *Id.* at 559.

Here, Montwillo contributed the same amount of initial capital to AAP as Tull. Montwillo was involved in the development of the website, advertising, marketing, packaging, trademark and trade dress development, and corporate identification. Further, as previously mentioned, Montwillo was never compensated for any of his work. Unlike Montwillo, the plaintiff if *Effects II* only contributed the work at issue and was compensated for it.

**2.    Defendants Infringed Montwillo's Copyrights.**

Copyright infringement is the unauthorized exercise of one of the exclusive rights secured by section 106. 17 U.S.C. § 106. The copyright owner has the exclusive right "to distribute copies ...of the copyrighted work to the public by sale or other transfer or

SOMMERS LAW GROUP

ownership...." 17 U.S.C. § 106(3). When Tull sold the inventory of dolls and the copyrights to all five dolls including the Pregnant and Mullet doll to himself, he infringe on Montwillo's copyrights. Tull infringed a second time when he then sold the inventory and the five copyrights to Gibby. Gibby infringed Montwillo's copyright by selling the dolls and copyrights to the dolls to GN. GN then infringed by distributing the existing dolls to the public, manufacturing the Pregnant and Mullet dolls and distributing them to the public.

To the extent the manufacture of the Pregnant and Mullet dolls slightly vary from Montwillo's copyrighted dolls, they infringe as derivative copies of the original copyrights. 17 U.S.C. § 106(2). All parties have contributorally infringed by encouraging each other to infringe Montwillo's exclusive rights to distribution.

### 3.    Defendants Infringement Was Willful.

Tull acknowledged Montwillo's copyrights in the two purchase agreements and Montwillo emphatically and clearly asserted his ownership by letter in 2004 at the first mention by Wong that he was not the valid copyright owner. This is not a situation where a plaintiff later dreamed-up his right to copyright ownership, but rather from before the execution of the Operating Agreement, Montwillo actively took steps to protect the ownership of his work so communicate to Tull and Wong. On their parts, instead of ascertaining a qualified legal opinion as to the ownership rights to the copyrights, defendants had attorney Wong threaten Montwillo with an injunction if he continued to use any AAP intellectual property after unilaterally dissolving it and selling it to Gibby.

Gibby and GN knew or should have known that Montwillo claimed the copyrights and had registered the copyrights with the Copyright Office. *Yurman Designs, Inc. v. PAJ, Inc.*, 262 F.3d 101, 112 (2d Cir. 2001) (willfulness does not require showing the defendant knew it was infringing; sufficient to show defendant recklessly disregarded the possibility); *Kepner-Trego, Inc. v. Vroom*, 186 F.3d 283, 288 (2d Cir. 1999), *cert. denied*, 531 U.S. 827 (2000).

### 4.    Montwillo Elects Statutory Damages Pursuant to Section 504(c)(2).

As of the drafting of this memorandum, defendants Gibby and GN have failed to produce any written documentation establishing the extent of sales of dolls based on Montwillo's

SOMMERS LAW GROUP

1   copyrights. Given the above and that defendants' willfully infringed Montwillo's copyrights,

2   Montwillo seeks maximum statutory damages this Court will permit pursuant to section 504(c).

3   17 U.S.C. § 504(c)(2).

4       Montwillo fulfilled the procedural requirements by registering his five copyrights with

5   the Copyright Office prior to the alleged infringement. 17 U.S.C. § 412.

6       **5.    Montwillo Prays for Costs and Attorneys' Fees.**

7       Montwillo also respectfully requests this Court for an award of costs and attorneys' fees

8   pursuant to section 505. 17 U.S.C. § 505.

9   **B.    MONTWILLO SEEKS DISMISSAL OF TULL'S FIRST COUNTERCLAIM FOR CONVERSION.**

10      Tull's first counterclaim for conversion should be dismissed on two separate grounds.

11  First, the claim entirely relies upon the premise that Montwillo is not the valid and proper owner

12  of the copyrights in question. Since, as shown above, Montwillo is the valid owner of the

13  copyrights, there can be no conversion by Montwillo for registering the copyrights. Second, the

14  claim seeks the equivalent of a vindication and clarification of ownership rights under the

15  Copyright Act. 17 U.S.C. §§ 100, et seq. As such, Tull's state law conversion claim is

16  preempted by the Copyright Act and should be dismissed. 17 U.S.C. § 301.

17  **C.    MONTWILLO SEEKS DISMISSAL OF TULL'S SECOND COUNTERCLAIM FOR BREACH OF CONTRACT.**

18

19      Tull's second counterclaim for breach of contract seeks monetary damages against

20  Montwillo for not seeking a resolution of the validity of his copyrights in arbitration under the

21  arbitration clause of the Operating Agreement. However, Montwillo has not raised a contract

22  resolution claim, only an infringement claim. Resolution of copyright claims exclusively vests

23  in federal courts. 28 U.S.C. § 1338(a).

24      By Tull's own logic, Tull must bring his claim for breach of the Operating Agreement to

25  arbitration pursuant to its arbitration clause. Finally, Tull failed to bring a motion in this court

26  compelling arbitration. For the above reasons, Montwillo respectfully requests this Court

27  dismiss Tull's second counterclaim.

28

SOMMERS LAW GROUP

**D.    MONTWILLO SEEKS DISMISSAL OF TULL'S THIRD COUNTERCLAIM FOR BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING AND BREACH OF FIDUCIARY DUTY.**

It is unclear what Tull is alleging in his third counterclaim for breach of covenant of good-faith and fair dealing and breach of fiduciary duty. However, in the context of Tull's unilateral grab of all AAP's and Montwillo's personal assets, it is difficult to understand how Montwillo breached any covenants or duties. "Where the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories and admissions on file.' Such a motion, whether or not accompanied by affidavits, will be 'made and supported as provided in this rule.'" *Celotex, supra*, 477 U.S. 317, 106 S.Ct. 2548, 2553.

## V.    CONCLUSION

For reasons discussed above, Montwillo respectfully requests this Court grant his motion for summary judgment by determining that he is the valid copyright owner of the five copyrights registered with the Copyright Office and that defendants willfully infringed upon his copyrights. Further, Montwillo respectfully requests this Court grant his motion by dismissing each and every counterclaim filed by defendant Tull.


Date:  March 21, 2008

Respectfully Submitted,
SOMMERS LAW GROUP


Stephen Sommers
Attorney for Plaintiff/Counter-Defendant
Paul Montwillo