# EXHIBIT B

## OPERATING AGREEMENT FOR ARSENIC AND APPLE PIE, LLC

This Operating Agreement is entered into as of this /4ᵗ day
of ~~February~~ March, 1999, by William Tull and Paul Montwillo, hereinafter "Members"

A.    The Members desire to form a Limited Liability Company (Company)
under the Beverly-Killea Limited Liability Company Act.

B.    The Members enter into this Operating Agreement in order to form and
provide for the governance of the Company and the conduct of its business and to
specify their relative rights and obligations.

NOW THEREFORE, the Members hereby agree as follows:

### DEFINITIONS

The following capitalized terms used in this Agreement have the meanings
specified in the Article or elsewhere in this Agreement and when not so defined shall
have the meanings set forth in California Corporations Code section 17001.

1.1    **"Act"** means the Beverly-Killea Limited Liability Company Act (California
Corporations Code sections 17000-17705), including amendments from time to time.

1.2    "Agreement" means this operating agreement, as originally executed and
as amended from time to time.

1.3　"Articles of Organization" is defined in California Corporations Code section 17001(b) as applied to this Company.

1.4　"Assignee" means a person who has acquired a Member's Economic Interest in the Company, by way of a Transfer in accordance with the terms of this Agreement but who has not become a Member.

1.5　"Assigning Member" means a Member who by means of a Transfer has transferred an Economic Interest in the Company to an Assignee.

1.6　"Capital Account" means, as to any Member, a separate account maintained and adjusted in accordance with Article III, Section 3.3.

1.7　"Capital Contribution" means, with respect to any Member, the amount of the money and the Fair Market Value of any property (other than money) contributed to the Company (net of liabilities secured by such contributed property that the Company is considered to assume or take "subject to" under IRC section 752) in consideration of a Percentage Interest held by such Member. A Capital Contribution shall not be deemed a loan.

1.8　"Capital Event" means a sale or disposition of any of the Company's capital assets, the receipt of insurance and other proceeds derived from the involuntary conversion of Company property, the receipt of proceeds from a refinancing of Company property, or a similar event with respect to Company property or assets.

1.9     "Code" or "IRC" means the Internal Revenue Code of 1986, as amended, and any successor provision.

1.10    "Company" means the Company named in Article II, Section 2.2.

1.11    "Economic Interest" means a Person's right to share in the income, gains, losses, deductions, credit or similar items of, and to receive distributions from, the Company, but does not include any other rights of a Member, including the right to vote or to participate in management.

1.12    "Encumber" means the act of creating or purporting to create an Encumbrance, whether or not perfected under applicable law.

1.13    "Encumbrance" means, with respect to any Membership Interest, or any element thereof, a mortgage, pledge, security interest, lien, proxy coupled with an interest (other than as contemplated in this Agreement) option, or preferential right to purchase.

1.14    "Fair Market Value" means, with respect to any item of property of the Company, the item's adjusted basis for federal income tax purposes, except as follows:

(a)     The Fair Market Value for any property contributed by a Member to the Company shall be the value of such property, as mutually agreed by the contributing Member and the Company;

(b)    The Fair Market Value of any item of Company property distributed to a Member shall be the value of such item of property on the date of distribution, as mutually agreed by the distributee Member and the Company; and

(c)    Fair Market Value for purposes of Article VIII, Section 8.7 shall be as determined under that section.

1.15    " Initial Member" or Initial Members" means those Persons whose names are set forth in the first sentence of this Agreement. A reference to an "Initial Member" means any of the Initial Members.

1.16    "Involuntary Transfer" means, with respect to any Membership Interest, or any element thereof, any Transfer or Encumbrance, whether by operation of law, pursuant to court order, foreclosure of a security interest, execution of a judgment or other legal process, or otherwise, including a purported transfer to or from a trustee in bankruptcy, receiver, or assignee for the benefit of creditors.

1.17    "Losses." See "Profits and Losses."

1.18    "Majority of Members" means a Managing Member or Managing Members whose Percentage Interests represent more than 50 percent of the Percentage Interests of all the Members.

1.19    "Meeting" is defined in Article V, Section 5.2.

1.20 "Member" means an Initial Member or a Person who otherwise acquires a Membership Interest, as permitted under this Agreement, and who remains a Member.

1.21 "Managing Member" means a Member identified herein as a person entitled and having the right to vote or participate in management of the company.

1.22 "Investment Member" means a Member or a person entitled to receive distributions and information concerning the business and affairs of the company as provided for herein.

1.23 "Notice" means a written notice required or permitted under this Agreement. A notice shall be deemed given or sent when deposited, as certified mail, or for overnight delivery, postage and fees prepaid, in the United States mails; when delivered to Federal Express, United Parcel Service, DHL WorldWide Express, or Airborne Express, for overnight delivery, charges prepaid or charged to the sender's account; when personally delivered to the recipient; when transmitted by electronic means, and such transmission is electronically confirmed as having been successfully transmitted; or when delivered to the home or office of a recipient in the care of a person whom the sender has reason to believe will promptly communicate the notice to the recipient.

1.24 "Percentage Interest" means a fraction, expressed as a percentage, the numerator of which is the total of a member's Capital Account and the denominator of which is the total of all Capital Accounts of all Members.

1.25    "Person" means an individual, partnership, limited partnership, trust, estate, association, corporations, limited liability company, or other entity, whether domestic or foreign.

1.26    "Profits and Losses" means, for each fiscal year or other period specified in this Agreement, an amount equal to the Company's taxable income or loss for such year or period, determined in accordance with IRC section 703(a).

1.27    "Proxy" has the meaning set forth in the first paragraph of California Corporations code section 17001(ai).  A Proxy may not be transmitted orally.

1.28    "Regulations" ("Reg") means the income tax regulations promulgated by the United States Department of the Treasury and published in the Federal Register for the purpose of interpreting and applying the provisions of the code, as such Regulations may be amended from time to time, including corresponding provisions of applicable successor regulations.

1.29    "Substituted Member" is defined in Article VIII, Section 8.8.

1.30    "Successor in Interest" means an Assignee, a successor of a Person by merger or otherwise by operation of law, or a transferee of all or substantially all of the business or assets of a Person.

1.31    "Transfer" means, with respect to a Membership Interest, or any element

of a Membership Interest, any sale, assignment, gift, Involuntary Transfer, or other disposition of a Membership Interest or any element of such a Membership Interest, directly or indirectly, other than an Encumbrance that is expressly permitted under this Agreement.

1.32    "Triggering Event" is defined in Article VIII, Section 8.3.

1.33    "Vote" means a written consent or approval, a ballot cast at a Meeting, or a voice vote.

1.34    "Voting Interest" means, with respect to a Managing Member, the right to Vote or participate in management and any right to information concerning the business and affairs of the Company provided under the Act, except as limited by the provisions of this Agreement. A Managing Member's Voting Interest shall be directly proportional to that Managing Member's Percentage Interest.

## ARTICLE II
### ARTICLES OF ORGANIZATION

2.1    Promptly following execution of this Agreement, the Members shall cause Articles of Organization, in the form attached to this Agreement as Exhibit 1, to be filed with the California Secretary of State.

2.2    The name of the Company shall be ARSENIC & APPLE PIE LLC.

2.3    The principal executive office of the Company shall be at

_____, San Francisco, California, or such other place or places as may be determined by the Members from time to time:

2.4     The initial agent for service of process on the Company shall be David Y. Wong, Esq. of SMITH & WONG, 100 Shoreline Highway, Suite 295, Mill Valley, California 94941. A majority of Members may from time to time change the Company's agent for service or process.

2.5     The Company will be formed for the purposes of engaging in the business of any lawful business activity, including the design, manufacture, distribution and sale of dolls and toys.

2.6     The term of existence of the Company shall commence on the effective date of the filing of Articles of Organization with the California Secretary of State, and shall continue until December 31, 2028, unless sooner terminated by the provisions of this Agreement or as provided by law.

2.7     The Managing Members shall be as follows:

> **Paul Montwillo** - Manager in charge of Art Direction, Design and Advertising of product line, including but not limited to, corporate identification, product design, packaging, web site design, web site maintenance and print advertising.

> **William Tull** - Manager in charge of Administration, business affairs, accounting, distribution, sales and manufacturing.

## ARTICLE III
## CAPITALIZATION

3.1    Each member shall contribute to the capital of the Company as the Member's Capital Contribution the money and property specified in Exhibit "B" to this Agreement. The Fair Market Vale of each item of contributed property as agreed between the Company and the Member contributing such property is set forth in Exhibit "B". Unless otherwise agreed in writing by all Members, no Member shall be required to make additional Capital Contributions.

3.2    If a Member fails to make a required Capital Contribution within 30 days after the effective date of this Agreement, that Member's entire Membership Interest shall terminate and that Member shall indemnify and hold the Company and the other Members harmless from any loss, cost, or expense, including reasonable attorney fees caused by the failure to make such Capital Contribution.

3.3    An individual Capital Account shall be maintained for each Member consisting of that Member's Capital Contribution, (1) increased by that Member's share of Profits, (2) decreased by that Member's share of Losses, and (3) adjusted as required in accordance with applicable provisions of the Code and Regulations.

3.4    A Member shall not be entitled to withdraw any part of the Member's Capital Contribution or to receive any distributions, whether of money or property from the Company except as provided in this Agreement.

3.5     No interest shall be paid on funds or property contributed to the capital of

the Company or on the balance of a Member's Capital Account.

3.6     A Member shall not be bound by, or be personally liable for, the

expenses, liabilities, or obligations of the Company except as otherwise provided in the

Act or in this Agreement.

3.7     No Member shall have priority over any other Member, with respect to the

return of a Capital Contributions, or distributions or allocations of income, gain, losses,

deductions, credits, or items thereof, except as set forth herein below.

3.8     If a Member loans money to the Company, said loan shall bear interest at
vi    ABLE Rates depending upon the origin of the funds
      a rate of _____ percentage per annum as of the date the funds are advanced to or on

behalf of the Company until paid.

3.9 ·   If a Member loans money to the Company, an individual loan document

shall be maintained showing the amount loaned and any payments made thereon.

3.10    If a Member loans money to the Company, a Promissory Note may, but

shall not be required to be executed with the amount due with accrued interest _At Variable_
rates depending upon the origin of the funds
years from the date of the loan, or at such date as may be agreed to at the date of the

loan.

3.11    If a Member loans money to the Company, before any profits are

distributed, credited, allocated or paid to any member or the Company, said loan(s) shall be paid back and retired in advance of the due date. Thereafter, distributions of profits, etc., shall be on the basis of the members' respective interests as set forth on Exhibit "B" hereto.

3.12    As of the date of the formation of this Limited Liability Company and this Operating Agreement, the following loan(s) made to it by members are recognized and acknowledged:

| Amount | Loan Inception Date | Maturity Date |
|--------|---------------------|---------------|
| see attached schedule | | |

## ALLOCATIONS AND DISTRIBUTIONS

4.1 The Profits and Loses of the Company and all items of Company income, gain, loss, deduction, or credit shall be allocated, for the Company book purposes and for tax purposes, to a Member in accordance with the Member's Percentage Interest as set forth on Exhibit "B" hereto.

4.2 If any Member unexpectedly receives any adjustment, allocation, or distribution described in Reg sections 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5), or 1.704-1(b)(2)(ii)(d)(6), items of Company gross income and gain shall be specially allocated to that Member in an amount and manner sufficient to eliminate any deficit balance in the Member's Capital Account created by such adjustment, allocation, or distribution as quickly as possible. Any special allocation under this Section 4.2 shall be taken into account in computing subsequent allocations of Profits and Losses so that the net amount of allocation of income and loss and all other items shall, to the extent possible, be equal to the net amount that would have been allocated if the unexpected adjustment, allocations, or distribution had not occurred. The provisions of this Section 4.2 and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Reg sections 1.704-1(b) and 1.704-2 and shall be interpreted and applied in a manner consistent with such Regulations.

4.3 Any unrealized appreciation or unrealized depreciation in the values of Company property distributed in kind to all the Members shall be deemed to be Profits or Losses realized by the Company immediately prior to the distribution of the property and such Profits or Losses shall be allocated to the Members' Capital Accounts in the same proportions as Profits are allocated under Section 4.1. Any property so

distributed shall be treated as a distribution to the Members to the extent of the Fair Market Value of the property less the amount of any liability secured by and related to the property. Nothing contained in this Agreement is intended to treat or cause such distributions to be treated as sales for value. For the purposes of this Section 4.3, "unrealized appreciation" or "unrealized depreciation" shall mean the difference between the Fair Market Value of such property and the Company's basis for such property.

4.4  In the case of a Transfer of an Economic Interest during any fiscal year, the Assigning Member and Assignee shall each be allocated the Economic Interest's share of Profits or Losses based on the number of days each held the Economic Interest during that fiscal year.

4.5  All cash resulting from the normal business operations of the Company and from a Capital Event shall be distributed among the Members in proportion to their Percentage Interests at such time as the Members may agree after repayment of all outstanding member loans.

4.6    If the proceeds from a sale or other disposition of a Company asset consists of property other than cash, the value of such property shall be as determined by the Members  Such noncash proceeds shall then be allocated among all the Members in proposition to their Percentage Interests. If such non-cash proceeds are subsequently reduced to cash; such cash shall be distributed to each Member in accordance with Section 4.5

4.7     Notwithstanding any other provisions of this Agreement to the contrary, when there is a distribution in liquidation of the Company, or when any Member's interest is liquidated, all items of income and loss first shall be allocated to the Members; Capital Accounts under this Article IV, and other credits and deductions to the Member's Capital Accounts shall. be made before the final distribution is made. The final distribution to the Members shall be made to the Members to the extent of and in proportion to their positive Capital Account balances.

## ARTICLE V
## MANAGEMENT

5.1     The business of the Company shall be managed by the respective Managers named in Section 2.7, or a successor manager as selected in accordance with Section 5.3. A Member shall be a manager only during the time the Member is a Member of the Company. Unless otherwise provided in this Agreement, all final decisions concerning the management of the Company's business shall be made by the Manager.

5.2     The Manager shall serve until the earlier of (1) the Manager's resignation, retirement, death, or disability; (2) the manager's removal by the Members; and (3) the expiration of the manager's term as Manager, if a term has been designated by a . Majority of Members. A new Manger shall be appointed by a Majority of Members on the occurrence of any of the foregoing events.

5.3    Each Manager shall be appointed by a Majority of Members for (a) term expiring with the appointment of a successor, or (b) a term expiring at a definite time specified by a Majority of Members in connection with such an appointment. A Manager who is not also a Member may be removed with or without cause at any time by action of a Majority of Members. A Manager who is a Member may be removed only on the Vote of all other Members and the execution and filing of a Certificate of Amendment of the Articles of Organization of the Company in conformity with Corp C section 17054, if necessary, to provide that the Company is to be managed by Members.

5.4    The Manager, who shall be the President of the Company, shall have the powers and duties described in Section 5.8 hereof and such other powers and duties as may be prescribed in this Agreement or by the Members. Notwithstanding the foregoing, the Manager shall not take any of. the following actions on behalf of the Company unless a Majority of Members has consented to the taking of such action.

(a) ·    Any act that would make it impossible to carry on the ordinary business of the Company;

(b)    Any confession of a judgment against the Company;

(c)    The dissolution of the Company;

(d)    The disposition of all or a substantial part of the Company's assets not in the ordinary course of business;

(e)    The incurring of any debt not in the ordinary course of business;

(f)    A change in the nature of the principal business of the Company;

(g)    The incurring of any contractual obligation or the any capital expenditure with a total cost of more than $ _3 000_ ;

(h)    The filing of a petition in bankruptcy or the entering into of an arrangement among creditors; and

(i)    The entering into, on behalf of the Company, of any transaction constituting a "reorganization" within the meaning of Corp Code §17600.

5.5    The Managing Members shall hold weekly meetings, although decisions may be reached through one or more informal consultations followed by agreement among a Majority of the Managing Members, provided that all Members are consulted (although all Members need not be present during a particular consultation), or by a written consent signed by a Majority of Members. In the event that Members wish to hold a formal meeting (a "Meeting") for any reason, the following procedure's shall apply:

(1)    Any two Managing Members may call a Meeting of the Managing Members by giving Notice of the time and place of the Meeting at least 48 hours prior to the time for the holding of the Meeting. The Notice need not specify the purpose of the

meeting, or the location if the Meeting is to be held at the principal executive office of the Company.

(2)    A majority of Managing Members shall constitute a quorum for the transaction of business at any Meeting of the Managing Members.

(3)    The transactions of the Managing Members at any Meeting, however called or noticed, or wherever 'held, shall be as valid as though transacted at a Meeting duly held after call and notice if a quorum is present and if, either before or after the Meeting, each Managing Member not present signs a written waiver of Notice of consent to the holding of the Meeting, or an approval of the minutes of the Meeting.

(4)    Any action required or permitted to be taken by the Managing Members under this Agreement may be taken without a Meeting if a Majority of the Managing Members individually or collectively consent in writing to such action.

(5) ·    Managing Members may participate in the Meeting through the use of a conference telephone or similar communication equipment, provided that all members participating in the Meeting can hear one another.

(6)    The Managing Members shall keep or cause to be kept with the books and records of the Company full and accurate minutes of all Meetings, Notices, and waivers of Notices of Meetings, and all written consents in lieu of Meetings.

5.6    The Managing Members as such and as managers shall not be entitled to compensation for their services.

5.7    All assets of the Company, whether real or personal shall be held in the name of the Company.

5.8    All funds of the Company shall be deposited in one or more accounts with one or more recognized financial institutions in the name of the Company, at such locations as shall be determined by a Majority of the Managing Members.  Withdrawal from such accounts shall require the signature of the Manager.

5.9    In the event that the Company purchases goods or supplies from another business in which a Managing Member has an ownership interest, the goods or supplies shall be provided to the Company based on the actual cost of the goods or supplies plus ___% for labor and overhead.

## ARTICLE VI
## ACCOUNTS AND RECORDS

6.1    Complete books of account of the Company's business, in which each Company transaction shall be fully and accurately entered, shall be kept at the Company's principal executive office and shall be open to inspection and copying by each Member or the Member's authorized representatives on reasonable Notice during normal business hours.  The costs of such inspection and copying shall be borne by the

Member.

6.2 Financial books and records of the Company shall be kept on the cash method of accounting, which shall be the method of accounting followed by the Company for federal income tax purposes. A balance sheet and income statement of the Company shall be prepared promptly following the close of each fiscal year in a manner appropriate to and adequate for the Company's business and for carrying out the provisions of this Agreement. The fiscal year of the Company shall be January 1 through December 31.

6.3 At all times during the term of existence of the company and beyond that term if a majority of the members deem it necessary, the members shall keep or cause to be kept the books of account referred to in Section 6.2, and the following:

(a) A current list of the full name and last known business or residence address of each Member, together with the Capital Contribution and the share in Profits and Losses of each Member;

(b) A copy of the Articles of Organization, as amended;

(c) Copies of the Company's federal, state, and local income tax or information returns and reports, if any, for the six most recent taxable years;

(d) Executed counterparts of this Agreement, as amended;

(e)     Any powers of attorney under which the Articles of Organization or any amendments thereto were executed;

(f)     Financial statements of the Company for the six most recent fiscal years; and

(g)     The Books and Records of the Company as they relate to the Company's internal affairs for the current and past four fiscal years.

If a Majority of Members deem that any of the foregoing items shall be kept beyond the term of existence of the Company, the deposit of said items shall be as designated by a Majority of Members

6.4     Within 90 days after the end of each taxable year of the Company, the Company shall send to each of the Members all information necessary for the Members to complete their federal and state income tax or information returns, and a copy of the Company's federal, state, and local income tax or information returns for such year.

## MEMBERS AND VOTING

7.1     There shall be two classes of membership. Each Member shall have such rights and/or preferences as those possessed by any other Member as set forth herein. The two classes of membership shall be the Managing Members and the Investment Members. Each Managing Member shall Vote in accordance with the Member's voting allocation as set forth in Exhibit "B" hereto. Each Investment Member

Operating Agreement for
Arsenic & Apple Pie, LLC                    Page 20 of 36                    3004b/Feb99

shall have such percentage interest in the Company in proportion to the Member's Percentage Interest as of the governing record date as set forth in Exhibit "B" hereto. Until otherwise changed as provided for herein, the Managing Members and Investment Members of the Company are as follows:

(A)    Managing Members:

William Tull    (one vote)
Paul Montwillo    (one vote)

(B)    Investment Members:

None

7.2    Each Managing Member shall Vote in accordance with the Member's Voting allocation as of the governing record date, determined in accordance with Section 7.3. Any action that may or that must be taken by the Members shall be by a majority of the Managing Members, except that the following actions shall require the unanimous Vote of all members, both Managing and Investment:

(a)    a decision to continue the business of the Company after any event mentioned in Article IX;

(b)    the transfer of a Membership Interest and the admission of the Assignee as a Member of the Company;

(c)    any amendment of the Articles of Organization or this Agreement; or

(d)    compromise of the obligation of a Member to make a Capital Contribution.

7.2    The record date for determining the Members entitled to Notice of any Meeting, to vote, to receive any distribution, or to exercise any right in respect of any other lawful action, shall be the date set by a Majority of Members, provided that such record date shall not be more than 60, nor less than 10 days prior to the date of the Meeting, nor more than 60 days prior to any other action.

In the absence of any action setting a record date the record date shall be determined in accordance with California Corporations Code section 17104(k).

7.3    At all Meetings of Managing Members, a Member may Vote in person or by Proxy. Such Proxy shall be filed with any Member before or at the time for the Meeting, and may be filed by facsimile transmission to a Member at the principal executive office of the Company or such other address as may be given by a Majority of Members to the Members for such purposes.

ARTICLE VIII

## TRANSFERS OF MEMBERSHIP INTERESTS.

8.1    A Member may withdraw from the Company at any time by giving Notice of Withdrawal to all other Members at least 180 calendar days before the effective date of withdrawal. Withdrawal shall not release a Member from any obligations and liabilities under this Agreement accrued or incurred before the effective date of withdrawal. A withdrawing Member shall divest the Member's entire Membership Interest before the effective date of withdrawal in accordance with the transfer restrictions and option rights set forth below.

8.2    Except as expressly provided in this Agreement, a Member shall not Transfer any part of the Member's Membership Interest in the Company, whether now owned or hereafter acquired, unless (1) the other Members unanimously approve the transferee's admission to the Company as a Member upon such Transfer and (2) the Membership Interest to be transferred, when added to the total for all other Membership Interests transferred in the preceding 12 months, will not cause the termination of the Company unless such Encumbrance has been approved in writing by all the other Members.

Any transfer or Encumbrance or a Membership Interest without such approval shall be void. Notwithstanding any other provision of this Agreement to the contrary, a Member who is a natural person may transfer all or any portion of his or her Membership Interest to any revocable trust created for the benefit of the Member, or any combination between or amount the Member, the Member's spouse, and the Member's issue; provided that the Member retains a beneficial interest in the trust and all for the Voting Interest included in such Membership Interest. A transfer of a

Member's entire beneficial interest in such trust or failure to retain such Voting Interest shall be deemed a Transfer of a Membership Interest.

8.3    On the happening of any of the following events (Triggering Events) with respect to a Member, the Company and the other Members shall have the option to purchase all or any portion of the Membership Interest in the Company or such member (Selling Member) at the price and on the terms provided in Section 8.7 of this Agreement:

    (a)    the death or incapacity of a Member;

    (b)    the bankruptcy of a Member;,

    (c)    the winding up and dissolution of a Corporate Member, or merger or other corporate reorganization of a Corporate Member as a result of which the Corporate Member does not survive as an entity;

    (d)    the withdrawal of a Member; or

    (e)    except for the events stated in Section 8.4, the occurrence of any other event that is, or that would cause, a Transfer in contravention of this Agreement.

Each Member agrees to promptly give Notice of a Triggering Event to all other Members.

8.4    Notwithstanding any other provisions of this Agreement:

If, in connection with the divorce or dissolution of the marriage of a Member, any court issues a decree or order that transfers, confirms, or awards a Membership Interest, or any portion thereof, to that Member's spouse or domestic partner (an Award), then, notwithstanding that such transfer would constitute an unpermitted Transfer under this Agreement, that Member shall have the right to purchase from his or her former spouse or domestic partner the Membership Interest, or portion thereof, that was so transferred, and such former spouse/ partner shall sell the Membership Interest or portion thereof to that Member at the price set forth in Section 8.7 of this Agreement. If the Member has failed to consummate the purchase within 180 days after the Award (the Expiration Date), the Company and the other Members shall have the option to purchase from the former spouse/partner the Membership Interest or portion thereof pursuant to Section 8.5 of this Agreement; provided that the option period shall commence on the later of (1) the day following the Expiration Date, or (2) the date of actual notice of the Award.

(b) .    If, by reason of the death of a spouse/partner of a Member, any portion of a Membership Interest is transferred to a Transferee other than (1) that Member or (2) a trust created for the benefit of that Member (or for the benefit of that Member and any combination between or among the Member and the Member's issue) in which the Member is the sole Trustee and the Member, as trustee or individually possesses all of the Voting Interest included in that Membership Interest, then the Member shall have the right to purchase the Membership Interest or portion thereof from the estate or other successor of his or her deceased spouse/partner or Transferee of such deceased spouse/partner, and the estate, successor or Transferee shall sell the Membership

Interest or portion thereof at the price set forth in Section 8.7 of this Agreement. If the Member has failed to consummate the purchase within 180 days after the date of death (the Expiration Date), the Company and the other Members shall have the option to purchase from the estate or other successor of the deceased spouse/partner the Membership Interest or portion thereof pursuant to Section 8.5 of this Agreement; provided that the option period shall commence on the later of (1) the day following the Expiration Date, or (2) the date of actual notice of the death.

8.5     On the receipt of Notice by the other Members as contemplated by Section 8.1, and on receipt of actual notice of any Triggering Event, the Company shall have the option, for a period ending 30 calendar days following the determination of the purchase price as provided in Section 8.7, to purchase the Membership Interest in the Company to which the option relates, at the price and on the terms provided in Section 8.7, and the other Members, pro rate in accordance with their prior Membership Interest in the Company, shall then have the option, for a period of 30 days thereafter, to purchase the Membership Interest in the Company not purchased by the Company, on the same terms and conditions as apply to the Company. If all other Members do not elect to purchase the entire remaining Membership Interest in the Company, then the Members electing to purchase shall have the right, pro rata in accordance with their prior Membership Interest in the Company, to purchase the additional Membership Interest in the Company available for purchase. The transferee of the Membership Interest in the Company that is not purchased shall hold such Membership Interest in the Company subject to all of the provisions of this Agreement.

8.6     No Member shall participate in any vote or decision in any matter

pertaining to the disposition of that Member's Membership Interest in the Company under this Agreement.

8.7    The purchase price of the Membership Interest that is the subject of an option under this Agreement shall be the Fair Market Value of such Membership Interest as determined under this Section 8.7., Each of the selling and purchasing parties shall use his, her, or its best efforts to mutually agree on the Fair Market Value. If the parties are unable to so agree within 30 days of the date on which the option is first exercisable (the Option date), the selling party shall appoint, within 40 days of the Option Date, one appraiser, and the purchasing party shall appoint within 40 days of the Option Date, one appraiser. The two appraisers shall within a period of five additional days, agree on and appoint within 40 days of the Option Date one appraiser. The two appraisers shall within a period of five additional days, agree on and appoint an additional appraiser. The three appraisers shall, within 60 days after the appointment of the third appraiser, determine the Fair Market Value of the Membership Interest in writing and submit their report to all the parties. The Fair Market Value shall be determined by disregarding the appraiser's evaluation that diverges the greatest from each of the other two appraisers; valuations, and the arithmetic mean of the remaining two appraisers' valuations, and the arithmetic mean of the remaining two appraisers' valuations shall be the Fair Market Value. Each purchasing party shall pay for the services of the appraiser selected by it, plus one-half of the fee charged by the third appraiser. The option purchase price as so determined shall be payable in cash.

8.8    Except as expressly permitted under Section 8.2., a prospective

Operating Agreement for
Arsenic & Apple Pie, LLC                    Page 27 of 36                    3004b/Feb99

transferee (other than an existing Member) of a Membership Interest may be admitted as a Member with respect to such Membership Interest (Substituted Member) only (1) on the unanimous Vote of all the other Members in favor of the prospective transferee's admission as a Member, and (2) on such prospective transferee's executing counterpart of this Agreement as a party hereto. Any prospective transfer of a Membership Interest shall be deemed an Assignee, and therefore, the owner of only an Economic Interest until such prospective transferee has been admitted as a Substituted Member.

8.9 Any person admitted, to the Company as a Substituted Member shall be subject to all provisions of this Agreement.

8.10 The initial sale of Membership Interest in the Company to the initial Members, has not been qualified or registered under the securities laws of any state, or registered under the Securities Act of 1933, as amended in reliance upon exemptions from the registration provisions of those laws. No attempt has been made to qualify the offering and sale of Membership Interests to Members under the California Corporate Securities Law of 1968, as amended, also in reliance upon an exemption from the requirement that a permit for issuance of securities be procured. Notwithstanding any other provision of this Agreement, Membership Interests may not be transferred or Encumbered unless registered or qualified under applicable state and federal securities laws or unless, in the opinion of legal counsel satisfactory to the Company, such qualification or registration is not required. The Member who desires to transfer a Membership Interest shall be responsible for all legal fees incurred in connection with said opinion.

## ARTICLE IX
## DISSOLUTION AND WINDING UP

9.1    The Company shall be dissolved on the first to occur of the following events:

(a)    The death, incapacity, or withdrawal of a Managing member; or the bankruptcy or corporate dissolution of a Managing member; provided, however, that the remaining Members may, by the Vote of a Majority of Members within 90 days of the happening of that event, Vote to continue the Company, in which case that Company shall not dissolve. If the remaining Members fail to so Vote, the remaining Members shall wind up the Company. For purposes of this Paragraph (a), in determining Majority of Members, the Percentage Interest or the Member who has died, becomes incapacitated, withdrawn, or who has become bankrupt or dissolved shall not be taken into account.

(b)    The expiration of the term of existence of the Company.

(c)    The written agreement of all Members to dissolve the Company.

(d)    The sale or other disposition of substantially all of the Company assets.

(e)    Entry of a decree of judicial dissolution pursuant to California Corporations Code section 27351.

9.2    On the dissolution of the Company, the Company shall engage in no

further business other than that necessary to wind up the business and affairs of the Company. The Members who have not wrongfully dissolved the Company shall give written Notice of the commencement of winding up by mail to all known creditors and claimants against the Company whose addresses appear in the records of the Company. After paying or adequately providing for the payment of all known debts of the Company (except debts owing to Members) the remaining assets of the Company shall be distributed or applied in the following order of priority:

 (a) To pay the expenses of liquidation.

 (b) To repay outstanding loans to Members. If there are insufficient funds to pay such loans in full, each Member shall be repaid in the ratio that the Member's respective loan, together with interest accrued and unpaid thereon, bears to the total of all such loans from Members, including all interest accrued and unpaid on those loan. Such repayment shall first be credited to unpaid principal and the remainder shall be credited to accrued and unpaid interest.

 (c) Among the Members' in accordance with the provisions of Article IV, Section 4.7.

 9.3 Each Member shall look solely to the assets of the Company for the return of the Member's investment, and if the Company property remaining after the payment or discharge of the debts and liabilities of the Company is insufficient to return the investment of any Member, such Member shall have no recourse against any other Members for indemnification, contribution, or reimbursement.

## ARBITRATION

10.1    Any action to enforce or interpret this Agreement or to resolve disputes between the Members or by or against any Member shall be settled by binding arbitration in accordance with the rules of the American Arbitration Association. Arbitration shall be the exclusive dispute resolution process in accordance with the laws of the State of California. Any party may commence arbitration by sending a written demand for arbitration to the other parties. Such demand shall set forth the nature of the matter to be resolved by arbitration. Arbitration shall be conducted at San Francisco, California. the substantive law of the state of California shall be applied by the arbitrator to the resolution of the dispute. The parties shall share equally all initial costs of arbitration. The prevailing party shall be entitled to reimbursement of attorney fees, costs, and expenses incurred in connection with the arbitration. All decisions of the arbitrator shall be final, binding, and conclusive on all parties. Judgment may be entered upon any such decision in accordance with applicable law in any court having jurisdiction thereof.

## GENERAL PROVISIONS

11.1    This Agreement constitutes. the whole and entire agreement of the parties with respect to the subject matter of this Agreement, and it shall not be modified or amended in any respect except by a written instrument executed by all the parties. This Agreement replaces and supersedes all prior written and oral agreements by and among the Members or any of them.

11.2    This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

11.3    This Agreement shall be construed and enforced in accordance with the internal laws of the State of California. If any provision of this Agreement is determined by any court of competent jurisdiction or arbitrator to be invalid, illegal, or unenforceable to any extent, that provision shall, if possible, be construed as though more narrowly drawn, if a narrower construction would avoid such invalidity, illegality, or unenforcability or, if that is not possible, such provision shall, to the extent of such invalidity, illegality, or Unenforcability, be severed, and the remaining provisions of this Agreement shall remain in effect.

11.4    This Agreement shall be binding on and inure to the benefit of the parties and their heirs, personal representatives, and permitted successors and assigns.

11.5    Whenever used in this Agreement, the singular shall include the plural, the plural shall include the singular, and the neuter gender shall include the male and female as well as a trust, firm, company, or corporation, all as the context and meaning of this Agreement may require.

11.6    The parties to this Agreement shall promptly execute and deliver any and all additional documents, instruments, notices, and other assurances, and shall do any and all other acts and things, reasonably necessary in connection with the performance

of their respective obligations under this Agreement and to carry out the intent of the parties.

11.7    Except as provided in this Agreement, no provision of this Agreement shall be construed to limit in any manner the Members in the carrying on of their own respective businesses or activities.

11.8    Except as provided in this Agreement, no provision of this Agreement shall be construed to constitute a Member, in the Member's capacity as such, the agent of any other Member.

11.9    Each Member represents and warrants to the other Members that the Member has the capacity and authority to enter into this Agreement.

11.10    The article, section, and paragraph titles and headings contained in this Agreement are inserted as a matter of convenience and for each of reference only an shall be disregarded for all other purposes, including the construction or enforcement of this Agreement or any of its provisions.

11.11    This Agreement may be altered, amended, or repealed only by a writing signed by all of the Members.

11.12    Time is of the essence of every provision of this Agreement that

specifies a time for performance.

11.13    This Agreement is made solely for the benefit of the parties to this Agreement and their respective permitted successors and assigns, and no other person or entity shall have or acquire any right by virtue of this Agreement.

11.14    The Members intend the Company to be a limited liability company under the Act. No member shall take any action inconsistent with the express intent of the parties to this agreement.

## EXECUTION CLAUSE

IN WITNESS WHEREOF, the parties have executed or caused to be executed this Agreement on the day and year first above written.

Date:  $5/3/0b$

William Tull, Managing Member

Date: $5/4/40$

Paul Montwillo, Managing Member

## SPOUSAL/DOMESTIC PARTNER CONSENT

The undersigned are the spouse(s) of the foregoing members and acknowledge(s) that she/he/they have read the foregoing Agreement dated _March 14, 1999_ and understand its provisions. The undersigned are aware that by the provisions of the Agreement, she/he/they have agreed to sell or transfer all their Membership Interest in the Company, including any community property interest or quasi-community property interest, in accordance with he terms and provisions of the Agreement. The undersigned hereby expressly approve(s) of and agree(s) to be bound by the provisions of the Agreement in its entirety, including, but not limited to, those provisions relating to the sale and transfer of Membership Interests and the restrictions thereon. If the undersigned predeceases a member while the member owns any Membership Interest in the Company, she/he/they hereby agree(s) not to devise or bequeath whatever community property interest or quasi community property interest she/he/they may have in the Company in contravention of the Agreement.

Dated: 5/4/00

(Signature)

Dated: 5/3/00

(Signature)

Operating Agreement for
Arsenic & Apple Pie, LLC

Page 35 of 36

3004b/Feb99

## EXHIBIT "B"

### CAPITAL CONTRIBUTION AND PERCENTAGE OWNERSHIP

1.    **William Tull, Managing Member**          Percentage:    50%

2.    **Paul Montwillo, Managing Member**       Percentage"   50%

### MANAGING MEMBER VOTING ALLOCATIONS:

1.    **William Tull, Managing Member**          **One Vote**

2.    **Paul Montwillo, Managing Member**        **One Vote**

Initials

( ) 
W.Tull      P. Montwillo

Operating Agreement for
Arsenic & Apple Pie, LLC                    Page 36 of 36                    3004b/Feb99

# EXHIBIT C

**DAVID Y. WONG**

ATTORNEY AT LAW

320 Montford Ave.
Mill Valley, California  94941
Tel: (415) 339-8810
Fax: (415) 388-5582

April 7, 2003

Paul Montwillo
3638 22nd Street
San Francisco, CA 94114

> Re:    Arsenic & Apple Pie, LLC
>        Your Petition in Bankruptcy

Dear Mr. Montwillow:

On behalf of Arsenic & Apple Pie, LLC, please be advised that your membership interest in Arsenic & Apple Pie, LLC is now subject to repurchase by the Company pursuant to Section 8 of the Operating Agreement. A copy of the Arsenic & Apple Pie Operating Agreement is enclosed for your review.

On or about March 10, 2003, Managing Member William Tull learned that you had filed a petition in bankruptcy court to discharge your debts. Under Section 8.3 of the Agreement, each member of the company agrees to promptly give notice of any triggering event to all other members. The filing of a petition in bankruptcy by a member is a triggering event. Section 8.7 of the Agreement further provides that upon receipt of notice of a triggering event, the Company or its other members shall determine a fair market value for your membership interest. Following the finding of a fair market value under Section 8.7, the Company has the right to repurchase your membership interest for a period of thirty (30) days.

Pursuant to the above agreement and a review of the company's net worth, Mr. Tull has determined that your membership interest has a fair market value of $1.00. The net worth of your interest is based on an accounting of the individual capital contributions and loans of each member, the share of losses and expenses attributed to each member, and the absence of any net profit generated by the Company to date. Section 3 of the Agreement, further provides that any outstanding loans to the company made by Mr. Tull are to deducted before net worth can be determined. For your review a copy of the Company's Annual Income Statement for the period ending December 31, 2002, is enclosed. If you disagree with Mr. Tull's calculations, you should contact him at your earliest opportunity to resolve the matter.

If you do not contact Mr. Tull or the undersigned in writing within 30 days to object to the net value of your membership interest as Mr. Tull has proposed, Arsenic & Apple Pie, LLC will adopt and use Mr. Tull's figure as its purchase price for your entire membership interest. In any event, you are notified that the Company will repurchase your entire membership interest and will resist and prevent any attempt by you to transfer, sell or otherwise convey your interest to a third party.

If you have any questions or concerns not addressed above, please do not hesitate to contact the undersigned.

Very truly yours,

David Y. Wong

enclosure: Operating Agreement
cc: William Tull

# EXHIBIT D



Paul Montwillo
Managing Partner
Arsenic & Apple Pie, LLC
3638 22nd Street
San Francisco, CA 94114

David Wong                                                                                    May 2, 2003
Attorney at Law
320 Montford Ave.
Mill Valley, CA 94941

Re:  Arsenic & Apple Pie, LLC
     Mr Tull's Breach of Contract

Dear Mr Wong:

I respectfully decline Mr Tull's offer to purchase my interest in Arsenic & Apple Pie, LLC for the amount
of $1.00, and object to that figure as a fair market value for my interest in the Company.

In regards to your letter dated April 7, 2003, your statement in Paragraph 2 asserting that Mr. Tull
learned of the filing by me of a Chapter 7 Bankruptcy Petition on or about March 10, 2003, is plainly
false. I informed Mr. Tull of my intent to file the petition in August of 2001, and subsequently informed him
of the actual filing on or about March 10, 2002.

On no fewer than five separate occasions after I notified Mr. Tull of the filing of my Chapter 7 bankruptcy,
Mr. Tull expressed his desire and intent to exercise his option to purchase my interest in the Company
pursuant to Section 8.7 of the operating agreement.

Accordingly we entered into conversations and negotiations in order to determine the fair market value
for my interest in the Company. Our efforts resulted in an agreement, pursuant to Section 8.7 of the
operating agreement, which fixed the fair market value of my interest in the Company at $16,000.00.

Regrettably, Mr Tull, in material breach of Section 8.7 of the operating agreement, has failed to deliver
cash payment to me in the foregoing amount.

Even more regrettably, he failed on several subsequent occasions to cure that breach when he also did
not produce the $16,000.00 cash payment despite repeated assurances that he would do so.

Although it is my position that the fair market value of my interest in the Company has increased to a
figure well in excess of the $16,000.00 agreed upon figure, in the interest of finality and a swift conclusion
to this matter, I will accept, within 10 business days of your receipt of this letter, payment in the amount
of $16,000.00 in the form of a cashier's check payable to the order of Paul Montwillo in full consideration
of my consent to the transfer of all of my interest in the Company.

In closing, I request that any further communications regarding any matters concerning the Company
stay exclusively between you and myself, unless I should choose to let my lawyers speak for me.

Thank you for your prompt attention in this matter.

Sincerely,

Paul J. Montwillo
Managing Partner
Arsenic & Apple Pie, LLC

# EXHIBIT E

**DAVID Y. WONG**

ATTORNEY AT LAW

320 Montford Ave.
Mill Valley, California  94941
Tel: (415) 339-8810
Fax: (415) 388-5582

May 31, 2003

Paul Montwillo
3638 22nd Street
San Francisco, CA 94114

Re:    Arsenic & Apple Pie, LLC

Dear Mr. Montwillow:

As you requested, I have forwarded your comments and letter of May 2, 2003, to William Tull.

In response, Mr. Tull has indicated that he is prepared to honor his previous offer to purchase your membership interest for the sum of Sixteen Thousand Dollars ($16,000), payable in installments. Enclosed, please find a proposed Agreement for Purchase of Membership Interest which sets forth the terms of the sale. Assuming that the Agreement is acceptable, please notify me at your earliest opportunity so that we can arrange for its execution.

Before the Agreement can be executed and consideration transferred, I still need to obtain from you a copy of your Bankruptcy release or dismissal. Alternatively, please provide me with the name of your attorney. Once I have confirmed that there is no longer any duty on the part of Mr. Tull or Arsenic & Apple Pie to report or turn over funds to the bankruptcy trustee, I will advise Mr. Tull to make payments directly to you in accordance with the payment schedule in the Agreement.

If you have any questions or concerns not addressed above, please do not hesitate to contact the undersigned.

Very truly yours,

David Y. Wong

encl.: Proposed Purchase Agreement
cc: William Tull

## Agreement For The Purchase of Membership Interest

This Agreement for the purchase of Membership Interest in the Limited Liability Company known as Arsenic & Apple Pie, LLC,  is hereby agreed to and  made effective this ___ day of June, 2003, by and between Paul Montwillo, hereinafter referred to as "Seller," whose principal place of residence is 2638 22nd Street,San Francisco, California, and William Tull, hereinafter referred to as "Buyer," whose principal place of business is 432 Castro Street, San Francisco, California. Seller and Buyer may be collectively referred to as the "Parties."

Buyer desires to purchase from Seller and Seller desires to sell to Buyer, on the terms and subject to the conditions of this agreement, Seller's entire Fifty percent interest (50%) in the business and property owned and held by the Limited Liability Company known as Arsenic & Apple Pic, LLC, in exchange for the consideration herein stated.

Included within the terms of the sale of membership interest contemplated by this Agreement and subject to the terms and conditions of same, are any and all rights, claims, property interests, proprietary claims, patent rights or other intellectual property rights to two doll concepts which Buyer has previously conceived and developed, identified for purposes of this agreement as the:

(1) "Pregnant" doll
(2) "Mullet" doll

In consideration of the mutual promises herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties further agree as follows:

I.

Buyer shall receive Seller's entire 50% managing membership Interest in Arsenic & Apple Pie, LLC.  The sale and purchase of said membership interest shall include, without limitation, all property rights, assets, inventory,  profits, bonuses, commissions, salaries or other forms of distribution or compensation associated with said membership interest, as well as all claims and rights under leases, contracts copyrights, service marks, trademarks, trade names, trade secrets, and licenses held or asserted by the aforementioned company.

Buyer shall also receive physical possession of and all property and intellectual property rights to the "Pregnant" and "Mullet" dolls developed by Seller.

II.

The Membership Interest shall be sold, transferred and delivered to Buyer on or about June__ , 2003.  The transfer of any physical assets or property between Seller and Buyer shall take place at the offices of Injeanous, 432 Castro Street, San Francisco, California.

III.

In consideration of the sale, transfer and delivery of the Membership Interest and dolls referenced above, Buyer shall pay Seller the sum of Sixteen Thousand Dollars ($16,000).  Said sum shall be payable in no more than eleven months as per the following schedule:  six monthly payments of at least one thousand dollars ($1,000.00), and five monthly payments of no less than two thousand dollars ($2,000.00) until the sum total of payments is sixteen thousand dollars.  Payments shall begin no later than two weeks after the execution of this agreement and continue uninterrupted thereafter. For example, if the execution of this agreement occurs on the fifth of the month, Buyer's monthly payments shall commence and be payable on or before the 15th of that month.  If the execution date is after the 15th the payment date shall commence on the 1st of the succeeding month.

IV.

Buyer shall receive the percentage of profits and distributions to which his membership interest in Arsenic & Apple Pie, LLC, is entitled only after such time as his purchase price of $16,000 has been fully paid.  Until then, Seller shall retain all rights to any and all percentage of profits and distributions to which his membership interest is entitled, if any, but shall not enjoy or exercise any management or control over the Company.  If for any reason within the control of Buyer any of the foregoing payments is overdue more than 30 days, then this Agreement shall terminate and the percentage of membership interest in Arsenic & Apple Pie, LLC, which has not been paid for shall remain the property of Seller and all rights and privileges accorded to said membership interest shall be restored.  All future ownership and management rights in the Company shall be as per the terms of its Operating Agreement dated March 1999, in accordance with the respective membership interest percentages held by each party

V.

SELLER HEREBY WARRANTS TO BUYER WITH RESPECT TO THE MEMBERSHIP INTEREST AND DOLL PROPRIETARY RIGHTS CONVEYED THAT GOOD AND VALID TITLE EXISTS AND IS HEREBY TRANSFERRED TO BUYER AND BUYER ALONE. SELLER FURTHER REPRESENTS AND WARRANTS THAT HE IS THE SOLE OWNER OF THE SPECIFIED PROPERTY AND THAT NO SPOUSAL, COMMUNITY PROPERTY, DOMESTIC PARTNER, OR COMPARABLE INTEREST OR CLAIM IN SAID MEMBERSHIP INTEREST EXISTS OR IS RECOGNIZED. MONTWILLO FURTHER WARRANTS THAT THE SPECIFIED PROPERTY BEING SOLD IS FREE AND CLEAR OF ANY SECURITY INTERESTS, LIENS, CLAIMS OR OTHER ENCUMBRANCES. SELLER HEREBY COVENANTS AND AGREES TO DEFEND, HOLD HARMLESS AND/OR INDEMNIFY BUYER, HIS AGENTS AND ASSIGNS, AGAINST ANY TITLE OR OWNERSHIP CLAIMS, LIENS OR OTHER ENCUMBRANCES ASSERTED BY A CREDITOR OR TRUSTEE IN ANY PAST OR PRESENT BANKRUPTCY PROCEEDING INITIATED BY SELLER IN REGARD TO THE PROPERTY WHICH IS THE SUBJECT OF THIS AGREEMENT.

**VI.**

The Parties agree to endeavor, in good faith, to settle any controversy or claim arising out of, in connection with, or relating to this Agreement or an alleged breach thereof, by binding arbitration. A party may initiate an arbitration proceeding by a request in writing to the other party. Thereupon, both parties will be obligated to engage in arbitration of the dispute pursuant to the provisions of CCP Section 1280, et seq.. The proceeding shall be held in the County of San Francisco pursuant to the laws of the State of California. **The parties agree that the decision of the arbitrator shall be binding.**

The Parties shall attempt to jointly select a neutral arbitrator familiar with business law in California. In the event that the parties are unable to agree on an arbitrator within 30 days of the request for arbitration, the Court, upon the proper request of either party pursuant to CCP Section 1281.6, shall appoint a neutral arbitrator. Such arbitration shall be binding. The confirming court, if any, shall review the record of the arbitration to determine if an error of law has occurred. In the event the court determines that a substantial error of law has occurred and that a retrial is required, such trial shall be had de novo in the reviewing court without a jury.

**VII.**

The terms of this Agreement terminate and supersede all prior understandings or agreements between them on the subject matter hereof. This Agreement is intended as a final expression of their Agreement and may be modified only in a writing between them duly executed by the Parties.

Agreement For Purchase of Membership Interest
and Doll Proprietary Rights
Arsenic & Apple Pie, LLC

## VIII.

If any term of this Agreement is held by a court of competent jurisdiction to be invalid or unenforceable, then this Agreement, including all of the remaining terms, will remain in full force and effect as if such invalid or unenforceable term had never been included.

**IN WITNESS WHEREOF**, the parties to this Agreement have duly executed it on the day and year indicated.

Signed and executed this _____ day of June, 2003, at San Francisco, California.

Seller:_____
            Paul Montwillo

Buyer: _____
            William Tull

# EXHIBIT F

Paul Montwillo
Managing Partner
Arsenic & Apple Pie, LLC
3638 22nd Street
San Francisco, CA 94114

David Wong                                                              June 30, 2003
Attorney at Law
320 Montford Ave.
Mill Valley, CA 94941

Re:   Arsenic & Apple Pie, LLC

Dear Mr. Wong,

I am in receipt of your letter, dated May 31, 2003, and the proposed draft Agreement of Purchase and
Sale (the "Agreement") enclosed therewith. Subject to Mr. Tull's agreement to the changes reflected in
the revised draft Agreement, enclosed for your review, I am prepared to proceed with execution of the
Agreement.

Also enclosed, pursuant to your request, is a copy of the Discharge of Debtor. On June 16th I spoke with
Lynn Schoenmann, the Trustee in my bankruptcy case. Ms. Schoenmann assured me that neither her-
self nor the court is concerned with what I do with my assets, since the case is closed and she has been
discharged from my case since last October. Ms. Schoenmann can be contacted at (415) 362-0415.
Accordingly, you will note that payments, under the Agreement, would be payable to the order of Paul J.
Montwillo.

Yours very truly,


Paul J. Montwillo

# EXHIBIT G

### Agreement for the Purchase of Membership Interest

This Agreement hereinafter referred to as the "Agreement", for the purchase of Membership Interest in the Limited Liability Company known as Arsenic & Apple Pie, LLC, hereinafter referred to as the "Company", is hereby agreed to and made effective this __ day of July 2003, by and between Paul Montwillo, hereinafter referred to as "Seller", whose principal place of residence is 3638 22nd Street, San Francisco, California, and William Tull Jr., hereinafter referred to as "Buyer", whose principal place of business is 432 Castro Street, San Francisco, California. Seller and Buyer may be collectively referred to as the "Parties".

Seller desires to sell to Buyer and Buyer desires to purchase from Seller, on the terms and subject to the conditions of this agreement, Seller's entire fifty percent interest (50%) in the business and property owned and held by the Company, in exchange for the consideration herein stated.

Included within the terms of the sale of Membership Interest contemplated by the Agreement and subject to the terms and conditions of the same, are any intellectual rights, claims, property interests, proprietary claims or other intellectual property rights to two doll concepts which Seller has previously conceived and developed, identified for purposes of this agreement as the:

(1) "Pregnant" doll
(2) "Mullet" doll

In consideration of the mutual promises herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties further agree as follows:

Buyer shall receive Seller's entire 50% managing Membership Interest in the Company. The sale and purchase of said Membership Interest shall include, without limitation, all property rights, assets, inventory profits, bonuses, commissions, salaries or other forms of distribution or compensation associated with said Membership Interest, as well as all claims and rights under leases, contracts copyrights, service marks, trademarks, trade names, trade secrets, and licenses held or asserted by the aforementioned company, along with any and all liabilities of the Company past, present and future, without limitation, thus releasing Seller from any and all claims and obligations arising, related to, or concerning the Company in any way effectively indemnifying Seller from any such claims.

II.

The Membership Interest shall be sold, transferred and delivered to Buyer upon receipt of the final payment according to this Agreement. The transfer of any physical assets or property between Seller and Buyer shall take place at the offices of In-jean-ious, 432

Castro Street, San Francisco, California.

III.

In consideration of the sale, transfer and delivery of the Membership Interest and dolls referenced above, Buyer shall pay the sum of Sixteen Thousand Dollars ($16,000.00). Said sum shall be payable by certified or cashiers check in each instance, payable to Paul Montwillo, pursuant to the following schedule: a payment of six thousand dollars ($6000.00) upon execution of this agreement, a second payment of five thousand dollars ($5000.00) upon Seller's delivery to Buyer of the prototype of of the Pregnant doll, and a final payment of five thousand dollars ($5000.00) upon Seller's delivery to Buyer of the prototype of of the Mullet doll.

Seller and Buyer hereby agree to the following delivery and corresponding payment schedule: Seller shall deliver the prototype of the Pregnant doll within 30 days of the execution of this Agreement and buyer shall pay according to the foregoing terms the $5000.00 payment in exchange therefore. Within 30 days after delivery of the prototype of the Pregnant doll, Seller shall deliver the prototype of the Mullet doll and buyer shall pay according to the foregoing terms the $5000.00 payment in exchange therefore.

IV.

Buyer shall receive the percentage of profits and distributions to which his Membership Interest in the Company is entitled only after such time as his purchase price of $16,000.00 has been fully paid. Until then, Seller shall retain all rights to any and all percentage of profits and distributions to which his Membership Interest is entitled, if any, but shall not enjoy or exercise any management or control over the Company. If for any reason any of the foregoing payments is overdue, then this agreement shall terminate. Furthermore all future ownership and management rights in the Company shall be as per the terms of its Operating Agreement dated March 1999. In addition to Seller's retention of all of his 50% interest in the Company upon such termination, Seller shall be under no obligation to deliver either the prototype of the Pregnant doll and/or the Mullet doll as the case may be.

V.

SELLER HEREBY WARRANTS TO BUYER WITH RESPECT TO THE MEMBERSHIP INTEREST AND DOLL PROPRIETARY RIGHTS CONVEYED THAT GOOD AND VALID TITLE EXISTS AND IS HEREBY TRANSFERRED TO BUYER AND BUYER ALONE. SELLER FURTHER REPRESENTS AND WARRANTS THAT HE IS THE SOLE OWNER OF THE SPECIFIED PROPERTY AND THAT NO SPOUSAL, COM-MUNITY PROPERTY, DOMESTIC PARTNER, OR COMPARABLE INTEREST OR CLAIM IN SAID MEMBERSHIP INTEREST EXISTS OR IS RECOGNIZED. PARTIES WARRANT THAT THE SPECIFIED PROPERTY BEING SOLD IS FREE AND CLEAR OF ANY SECURITY INTERESTS, LIENS, CLAIMS OR OTHER ENCUMBRANCES.

SELLER, THEREFORE BUYER, HEREBY COVENANTS AND AGREES TO DEFEND, HOLD HARMLESS AND/OR INDEMNIFY EACH OTHER, THEIR AGENTS AND ASSIGNS, AGAINST ANY AND ALL CLAIMS, PAST, PRESENT AND FUTURE, ARIS-ING OUT OF OR RELATING TO THE PROPERTY WHICH IS THE SUBJECT OF THIS AGREEMENT.

VI.

The Parties agree to endeavor, in good faith, to settle any controversy or claim arising out of, in connection with, or relating to this Agreement, or an alleged breach thereof, by binding arbitration. A party may initiate an arbitration proceeding by a request in writing to the other party. Thereupon, both parties will be obligated to engage in arbitra-tion of the dispute pursuant to the provisions of CCP Section 1280, et seq.. The pro-ceeding shall be held in the County of San Francisco pursuant to the laws of the State of California. **The parties agree that the decision of the arbitrator shall be binding.**

The Parties shall attempt to jointly select a neutral arbitrator familiar with business law in California. In the event that the parties are unable to agree on an arbitrator within 30 days of the request for arbitration, the Court, upon proper request of either party pur-suant to CCP Section 1281.6, shall appoint a neutral arbitrator. Such arbitration shall be binding. The confirming court, if any, shall review the record of the arbitration to determine if an error of law has occurred. In the event the court determines that a sub-stantial error of law has occurred and a retrial is required, such trail shall be had de novo in the reviewing court without a jury.

VII.

The terms of this Agreement terminate and supercede all prior understandings of agreements between them on the subject matter hereof except in the event of the ter-mination of this Agreement as contemplated in Article IV, in which case the Operating Agreement·shall govern as described in such Article IV.

VIII.

If any term of this Agreement is held by a court of competent jurisdiction to be invalid or unenforceable, then this Agreement, including all of the remaining terms, will remain in full force and effect as if such invalid or unenforceable term had never been includ-ed.

IN WITNESS WHEREOF, the parties to this Agreement have duly executed it on the day and year indicated.

Signed and executed this _____day of July, 2003, at San Francisco, California.

Seller:_____
        Paul Montwillo

Buyer:_____
       William Tull Jr.

# EXHIBIT H

## DAVID Y. WONG

ATTORNEY AT LAW

320 Montford Ave.
Mill Valley, California  94941
Tel: (415) 339-8810
Fax: (415) 388-5582

June 23, 2004

Via Registered Mail

Paul Montwillo                          William Tull
3638 22nd Street                        4153 24th Street, Suite 1
San Francisco, CA 94114                 San Francisco, CA 94114

Re:    Arsenic & Apple Pie, LLC

Dear Mr. Montwillow and Mr. Tull:

As each of  you are aware, Section 8.3 of the Operating Agreement of Arsenic & Apple Pie provides that in the event of the bankruptcy of a member, that member's interest in the company is subject to re-purchase by the LLC.  In April of 2003, the Company was formally advised that Mr. Montwillo had filed a Petition in Bankruptcy, and wrote to him in regard to the re-purchase of his membership interest.  Mr. Tull, on behalf of the Company, has since attempted to negotiate terms for the re-purchase of Mr. Montwillo's interest but, to date, has been unsuccessful.  Mr. Tull has now indicated that he will discontinue any further negotiations to repurchase the interests of Mr. Montwillo, given the fact that the company has yet to show a profit and is unlikely to do so in the near future.

Although there is some disagreement as to when Mr. Tull was advised of the fact that Mr. Montwillo had declared bankruptcy, there is presently no dispute that Mr. Montwillo filed his bankruptcy petition on March 11, 2002.  There is also no dispute that since Mr. Montwillo filed his bankruptcy petition in March of 2002, Arsenic & Apple Pie has **not** held a meeting of the remaining members to vote on whether to continue to operate the company.  I thus call to your attention, Section 9.1(a) of the Operating Agreement which provides that unless the remaining members vote to continue the company within 90 days of a triggering event, such as the bankruptcy of a managing member, that the Company shall be dissolved.

In his capacity as the remaining Managing Member, Mr. Tull has decided that he will not waive Section 9.1(a) of the Operating Agreement.  Thus, as provided by the terms of the Operating Agreement, Arsenic & Apple Pie must dissolve.  As per the Agreement, Mr. Tull automatically assumes the role of Liquidating Manager of the Company and is responsible for winding up the financial affairs of the Company.

Paul Montwillo
William Tull

June 23, 2004

The Operating Agreement, Section 9.2, specifies the procedure for allocating and distributing the assets of the Company upon dissolution. First to be satisfied are all outstanding debts to third-party creditors of the Company. After these debts have been satisfied, the Liquidating Manager must use the Company's assets to pay all expenses associated with liquidation. After liquidation expenses have been satisfied, the Company's assets are to be used to repay all outstanding loans made to the Company by its members. If there are insufficient assets to pay the loans in full, each member will be paid proportionately, along with interest. Finally, if there are any assets remaining, those assets will be distributed in accordance with the percentages held by each of the members.

Please note that under Section 9.3 of the Operating Agreement, after payment or discharge of the debts and liabilities of the Company, no member shall be subject to any other member for indemnification, contribution or reimbursement.

Enclosed with this letter, please find a copy of Arsenic & Apple Pie's Income Statement and Balance Sheet for the period ending May 31, 2004. As in years past, the Income Statement reflects that for the period the Company incurred a loss of $727.38 after payment of its yearly tax obligation. More importantly, the Balance Sheet reflects that the company's current liabilities are the in the amount of $15,066.96. On behalf of the Company, I ask that each of you identify and set forth the specifics of any additional debts and liabilities of the company owed to third parties who do not hold a membership interest in the Company.

Moreover, while I note that the Balance Sheet reflects two promissory notes in favor of Mr. Tull, totaling $70,216.60, I also ask that each of you further identify any and all loans made to the Company, in addition to your capital contributions. In order to be fully recognized, any loan or note must be in writing and signed by all of the essential parties. In light of the schedule for winding up the Company, I must insist that any claim of loan and all supporting materials be received by the Undersigned within 5 business days of your receipt of this letter. If I do not receive sufficient documentation of any additional loans, the Company will presume that the two loans identified in the Balance Sheet are the only valid loans made to it by members.

Once Arsenic & Apple Pie has identified and confirmed the existence and amount of all debts and liabilities, and all loans made to it by members, it will determine whether the company's assets are sufficient to satisfy these obligations and finally distribute any remaining monies to its members in accordance with their interests.

Paul Montwillo
William Tull

June 23, 2004


Should either of you have any questions regarding the above, please do not hesitate to contact me.


Very truly yours,

David Y. Wong

encl.: May 31,  2004 Income Statement and Balance Sheet