David Y. Wong, Attorney at Law (SBN 105031)
100 Shoreline Highway, Suite 100 B
Mill Valley, CA  94941
Tel: (415) 339-0430
Fax:  (415) 332-8679

Law Office of Marc H. Greenberg
536 Mission Street, Suite 2323
San Francisco, CA  94105
Tel: (415) 442-6611

Attorneys for Defendants William Tull, Daniel Gibby and
Gibby Novelties, LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PAUL MONTWILLO, an individual | CASE NO.  C 07 3947 SI |
| Plaintiff, | |
| vs. | AFFIDAVIT OF WILLIAM TULL IN SUPPORT OF OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT |
| WILLIAM TULL; DANIEL GIBBY; GIBBY NOVELTIES, LLC dba ARSENIC & APPLE PIE, a California Limited Liability Corporation and DOES 1 through 20, inclusive, | April  25, 2008 9:00 a.m. Judge Illston, Courtroom 10 |
| Defendants. | The Federal Building 450 Golden Gate Avenue San Francisco, CA  94102 |
| And Related Counter-Claim of Tull | |
| | Complaint filed:  August 1, 2007 |

The Undersigned, William Tull, does hereby state and declare as follows:

1.      I am one of the Defendants and the Cross-Claimant in the above-captioned

matter and submit the following in support of Defendants' Opposition to Plaintiff's

Motion for Summary Judgment;

2.    The following facts are based on my personal knowledge of same, having personally witnessed the events and facts described, except as to those matter stated on information and belief and as to said matters I believe them to be true;

3.    In January of 1997, my store, In-Jean-Ious, was sued by Mattel, Inc., USDC Case No. C97-0012 EFL, in regard to the sales of satirical dolls based on the Barbie doll line produced by Paul Montwillo, then known as "Paul Hansen". While I was unaware of the dolls being sold in my store until then, I was forced to retain legal counsel to represent and defend my store against trademark infringement and other claims made by Mattel's attorneys.  In May of 1997, I settled the matter with Mattel on behalf of In-Jean-Ious.  A true and correct copy of the Agreement is attached as Exhibit 1.  In the agreement, I agreed to a permanent injunction to refrain from:

    1.    producing, selling, advertising or distributing any dolls based on Mattel's Barbie line,

    2.    imitating or copying Mattel's copyrights to the Barbie line,

    3.    imitating, copying or using the Barbie line packaging, including it's specific shade of pink, the yellow or white wording, or the Barbie trademarks,

    4.    imitating or copying the unique proportions of the Barbie "hour-glass" shaped body, and the particular set of facial features known as Barbie,

    5.    imitating or copying the body shape or facial features of the Ken doll, and

    6.    Assisting or aiding any other person or entity to violate the above terms.

4.    In July of 1997, I and Paul Montwillo agreed to enter into a partnership called

Arsenic & Apple Pie to design, produce and sell satirical dolls which did not violate any of the terms of the injunction which I had agreed to.  At the time, I was not aware of any existing doll designs by Paul Montwillo that did not violate the Mattel Injunction terms.  Thus, in my discussions with Montwillo, he and I specifically agreed that once he was a partner in Arsenic & Apple Pie, that he would design and create new dolls that did not violate the Injunction, which the company would then produce and manufacture in China for sale in the United States.  A true and correct copy of the Partnership Agreement is attached as Exhibit 2;

5.     From July until late December of 1998, I understand that Montwillo worked on new designs for the Trailer Trash doll concept, all expenses being paid for by Arsenic & Apple Pie.  In exchange for his efforts, Montwillo would receive half of the company's profits after our production costs were covered;

6.     In December of 1998, just as we were ready to put the first Trailer Trash doll into production, Montwillo and I converted the Partnership into a Limited Liability Company.   My attorney, David Y. Wong, drew up a proposed Operating Agreement based on the Partnership Agreement and after I made some handwritten changes, I gave it to Montwillo to look over;

7.     In March of 1999, I received back the signed Operating Agreement from Montwillo, with no additional changes, additions or deletions.  Specifically, Montwillo did not ask, nor would I have agreed, to remove, alter or insert any language from or into the Operating Agreement that would have given Montwillo the intellectual property rights to the Trailer Trash doll line.  It was the clear understanding of both of us that any intellectual property rights to the dolls that may have existed would be the property of Arsenic & Apple Pie, LLC;

8.     About the same time, I and Montwillo consulted with an attorney about trying to protect our rights in the Trailer Trash doll line by obtaining a copyright or

trademark registration.  We were told by the attorney that neither the "Trailer Trash" name nor the dolls produced under the concept could be legally protected under the law.  The reason, we were told, was that the Trailer Trash name and concept were too common and well used to be protected.  In addition, we were told that dolls of that design would not be original so they could not be protected;

9.  Production of the first Trailer Trash Doll began in 1999, and in the following years, several other dolls were designed, developed, manufactured and sold by Arsenic & Apple Pie, LLC.  In addition to the original Trailer Trash Doll, the Company produced a Blonde Drag Queen and Redhead Drag Queen doll.  All of these dolls were manufactured in China, along with boxes also designed by Montwillo.  The dolls were assembled and then packaged in China, shipped to the United States, and then sold by Arsenic & Apple Pie, LLC.

10.  On the back side of the box of each Trailer Trash, Blonde Drag Queen and Redhead Drag Queen doll was an inscription which showed the © symbol followed by the date of manufacture, the words "Arsenic & Apple Pie, Inc", its address and the words "All Rights Reserved."  Copies of two such examples are attached to the Declaration of Marc Greenberg as Exhibit 3, were cited in the deposition of Montwillo as Exhibit 5, and are attached to this Affidavit as Exhibit 3.  Every Trailer Trash doll was sold in a box inscribed with a copyright claim for Arsenic & Apple Pie;

11.  In or about 2003, after Montwillo had designed two additional Trailer Trash dolls, specifically a Pregnant Talking doll and a male mullet doll, Montwillo and I agreed to put their production on hold until the Company was in better financial condition.  Until then, sales from the dolls had not covered production costs and we did not want to incur more debt to produce these two additional dolls;

12.  Around this time, Montwillo came to me asking if I would buy him out.  Montwillo claimed that he was absolutely broke and that his interest in the business had to

MONTWILLO V. TULL, ET AL.  USDC Action No. C 07 3947 SI                    4

AFFIDAVIT OF WILLIAM TULL IN SUPPORT OF OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY

JUDGMENT

be worth at least $16,000.  At the time, I felt that since the five dolls and their

designs belonged to the Company, that I might be able to turn it around and

begin to make a profit on subsequent runs, without his delays.  I also felt sorry

for him and in the course of our discussions, I told him that I would buy him out

after I looked at the finances of the company.  After I saw how much money the

Company was losing, and how much it still owed me on my initial loans, I decided

that the price we had discussed was excessive and refused to buy his interest in

the company.  Based on my review of the books of the Company, I felt his

interest was virtually worthless, as was mine;

13.   I also learned for that Montwillo had filed a Petition in bankruptcy in March of

2002.  Arsenic's Operating Agreement provided that the Company would wind up

and dissolve in the event of a triggering event, one of which was defined as a

member filing a petition in bankruptcy (Section 8.3).  Arsenic was thus forced to

windup and dissolve as per its Operating Agreement.  The dissolution and

windup was initiated in June of 2004, and the Company was formally dissolved

on July 12, 2004;

14.   From the inception of the Arsenic & Apple Pie partnership, through the

termination of the Arsenic & Apple Pie, LLC, both Montwillo and I received

annual K-1 statements detailing the financial status of the Company each year.

In all but one year, the Company failed to show a profit, and in that year, 2000,

the Company showed a new profit of only $6,140.  In all the other years that

Arsenic & Apple Pie, LLC existed, it incurred a net loss as follows:

| 1999: | ($2,096) |
| 2000 | $6,140 |
| 2001 | ( $32.033) |
| 2002 | ( $26,276) |
| 2003 | ( $31,662) |

2004                    (21,561)

15.    At the time of the decision to windup and dissolve, Arsenic's tangible assets consisted primarily of unsold doll inventory with a book value of $35,763. Arsenic, however, had outstanding liabilities of $88,283, mostly the unpaid loans owed to me.  As stipulated by the Operating Agreement, Arsenic liquidated its assets and offered them for sale to the highest bidder.   No bids or offers were received.  The debts of the Company were thus paid in order of priority, with third party vendors paid first.  After satisfaction of the Company's third party debts, there was still an additional $70,000 in unpaid loans, so I elected to receive the remaining doll inventory and the intellectual property rights to all five doll designs and concepts in satisfaction of my loans to Arsenic.  With no assets remaining, neither Montwillo nor I received anything in consideration of our member interests in Arsenic upon dissolution;

16.    On July 15, 2004, I sold Daniel Gibby the  "trailer trash doll" inventory of Arsenic and their intellectual property rights that I had received in consideration for my cancellation of my loans.   I believe Gibby then transferred the dolls and the intellectual rights to the dolls to Gibby Novelties, LLC, a company he had just formed.  Gibby Novelties, LLC has since sold the existing trailer trash doll inventory, barely breaking even.  It also further developed and produced two new talking dolls, roughly based on the two abandoned doll concepts acquired from Arsenic, vis-à-vis Tull and Gibby, but with vast differences so as to be entirely distinct and distinguishable;

17.    I have reviewed the attached Memorandum of Points and Authorities in Opposition to Plaintiff's Motion for Summary Judgment and attest that any and all of the supporting facts set forth therein which I have neglected to mention above are, in fact, true and correct, except as to those matters stated on information and belief and as to same I believe them to be true.

I hereby declare and affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that if called to testify I could and would do so competently and of my own personal knowledge.

Executed this 2nd day of April, 2008, in Mill Valley, California.

William Tull

**EXHIBIT 1**

1 | QUINN EMANUEL URQUHART & OLIVER, LLP
     Adrian M. Pruetz (Bar No. 118215)
2 |   Crady L. White (Bar No. 169157)
     Anna Y. Joo (Bar No. 183148)
3 | 865 South Figueroa Street, 10th Floor
   Los Angeles, California  90017-2543
4 | (213) 624-7707

5 | Attorneys for Plaintiff
   Mattel, Inc.
6 |

7 |

8 |               UNITED STATES DISTRICT COURT

9 |             NORTHERN DISTRICT OF CALIFORNIA

10 |             SAN FRANCISCO HEADQUARTERS

11 | MATTEL, INC., a Delaware    )    CASE NO. C-97-0012 EFL
    corporation,                )
12 |                            )
                  Plaintiff,    )    STIPULATED INJUNCTION BY
13 |                            )    DEFENDANT IN-JEAN-IOUS, INC.
         v.                     )
14 |                            )
    IN-JEAN-IOUS, INC., a       )
15 | California corporation; PAUL )
    HANSEN, an individual;      )
16 | VARIOUS JOHN DOES, JANE DOES,)
    and XYZ COMPANIES,          )
17 |                            )
                  Defendants.   )
18 |                            )
                                )
19 | _____)

20 |

21 |

22 |

23 |

24 |

25 |

26 |

27 |

28 |

RECEIVED

MAR 2 1 1997

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

DEFENDANT'S
EXHIBIT
3
9/10/08 Montville

04513/123884.1

1        Plaintiff Mattel, Inc. and defendant In-Jean-Ious,

2  Inc., by their attorneys, hereby stipulate as follows with

3  respect to this action:

4        A.   In-Jean-Ious, Inc. and its principals, directors,

5  officers, agents, servants, employees, successors and assigns,

6  and all those in active concert or participation with them, will

7  immediately and permanently cease manufacturing, producing,

8  distributing, circulating, selling, offering for sale,

9  advertising, importing, exporting, promoting or publicly

10  displaying any product or thing bearing any simulation,

11  reproduction, counterfeit, copy or confusingly similar likeness

12  of Mattel's BARBIE® doll line Trademarks, BARBIE® doll line

13  Copyrights, BARBIE® doll line Product or Packaging Trade Dress or

14  KEN® Product Trade Dress, or engaging in any other activity

15  constituting an infringement of Mattel's BARBIE® doll line

16  Trademarks, BARBIE® doll line Copyrights, BARBIE® doll line

17  Product or Packaging Trade Dress, KEN® Product Trade Dress or of

18  Mattel's rights in, or to use or to exploit, said trademarks,

19  copyrights and trade dress or constituting any dilution of

20  Mattel's name, reputation or good will, including but not limited

21  to:

22       1.   Imitating, copying or making unauthorized use of

23     Mattel's Registered Trademarks in its BARBIE® line of dolls,

24     which includes the KEN® doll and other BARBIE® doll family

25     and friend dolls, including but not limited to Mattel's

26     Registered Trademarks Nos. 689,055, 726,935, 741,208,

27     768,397, 774,892, 799,068, 884,564, 907,137, 1,000,125,

28     1,461,136, 1,476,981,  1,476,090, 1,476,981, 1,477,905,

-2-

04513/123884.1

1,493,304, 1,503,153, 1,506,108, 1,549,304, 1,564,784,

1,564,789, 1,567,336, 1,572,146, 1,687,244, 1,710,196,

1,773,571, 1,760,729, 1,780,437, 1,897,052, 1,940,997,

1,947,330, 1,988,932, 1,995,873, 1,996,483, 2,016,054,

2,016,384 and 2,037,634 (hereinafter "Barbie Trademarks").

2.    Imitating, copying or making unauthorized use of Mattel's Registered Copyrights in the BARBIE® line of dolls, which includes the KEN® doll and other BARBIE® doll family and friend dolls, and packaging for the BARBIE® line of dolls and products associated with the BARBIE® line of dolls, including but not limited to Mattel's Certificates of Copyright Registration Nos. GP 121682, RE 280637, RE 280638, RE 374906, RE 664481, RE 664482, VA 121837, VA 121923, VA 157488, VA 157489, VA 214712, VA 222223, VA 222225, VA 226313, VA 286513, VA 287403, VA 290561, VA 290562, VA 297202, VA 323785, VA 351455, VA 370521, VA 373201, VA 376038, VA 377302, VA 426477, VA 454723, VA 623672, VA 639942, VA 722238 (hereinafter "Barbie Copyrights").

3.    Imitating, copying or making unauthorized use of Mattel's BARBIE® doll line Packaging Trade Dress, including but not limited to the following elements:

(a)    background or trim in specific shades of pink;

(b)    the name of the products in yellow and/or white words;

(c)    the BARBIE® doll line trademarks scripted in white.

-3-

04513/123884.1

4.    Imitating, copying or making unauthorized use of Mattel's BARBIE® doll line Product Trade Dress defined by at least the following elements:

(a)    the unique proportions of the BARBIE® doll's hour-glass shaped body, and

(b)    the BARBIE® doll's particular set of facial features which alert the public as to the source of the BARBIE® doll as Mattel.

5.    Imitating, copying or making unauthorized use of Mattel's KEN® Product Trade Dress defined by at least the following elements:

(a)    a particular body shape, and

(b)    the KEN® doll's particular set of facial features which alert the public as to the source of the KEN® doll as Mattel.

6.    Assisting, aiding or abetting any other person or business entity in engaging or performing any of the activities referred to in subparagraphs 1 through 5 above.

B.    In consideration of this Stipulated Injunction, Mattel hereby dismisses its claims against defendant In-Jean-Ious; provided, however that this Court will retain jurisdiction

-4-

over In-Jean-Ious to the extent necessary to enforce this
injunction and to determine any contempt issues which may arise
concerning this Order.

IT IS SO STIPULATED.

Dated: _March 18_, 1997

QUINN EMANUEL URQUHART & OLIVER, LLP

By _Adrian M. Pruetz_

Adrian M. Pruetz
Attorneys for Plaintiff
Mattel, Inc.

Dated: _March 19_, 1997

MORGENSTEIN & JUBELIRER

By _Lewis J. Barr_

Lewis Barr
Attorneys for
Defendant In-Jean-Ious, Inc.

[PROPOSED] ORDER

Having read and considered the foregoing Stipulation of
the parties and good cause appearing therefor,

IT IS SO ORDERED.

MAR 2 7 1997

_____
Honorable Eugene F. Lynch
U.S. DISTRICT COURT JUDGE

-5-

04513/123884.1

## VERIFICATION

STATE OF CALIFORNIA, COUNTY OF _____

I have read the foregoing _____

_____ and know its contents

☒ CHECK APPLICABLE PARAGRAPH

☐    I am a party to this action. The matters stated in the foregoing document are true of my own knowledge except as to those matters which are stated on information and belief, and as to those matters I believe them to be true.

☐    I am ☐ an Officer ☐ a partner _____ ☐ a _____ of _____

a party to this action, and am authorized to make this verification for and on its behalf, and I make this verification for that reason. ☐ I am informed and believe and on that ground allege that the matters stated in the foregoing document are true. ☐ The matters stated in the foregoing document are true of my own knowledge except as to those matters which are stated on information and belief, and as to those matters I believe them to be true.

☐    I am one of the attorneys for _____.

a party to this action. Such party is absent from the county of aforesaid where such attorneys have their offices, and I make this verification for and on behalf of that party for that reason. I am informed and believe and on that ground allege that the matters stated in the foregoing document are true.

Executed on _____, 19___, at _____, California

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

_____          _____
Type or Print Name                                    Signature

## PROOF OF SERVICE
1013A (3) CCP Revised 5/1/88

STATE OF CALIFORNIA, COUNTY OF    LOS ANGELES

I am employed in the county of ____LOS ANGELES____, State of California.

I am over the age of 18 and not a party to the within action; my business address is:

865 South Figueroa Street, 10th Floor, Los Angeles, California 90017

On April 1, 19 97, I served the foregoing document described as _____

STIPULATED INJUNCTION BY DEFENDANT IN-JEAN-IOUS, INC.

on ____interested parties____ in this action

☐ by placing the true copies thereof enclosed in sealed envelopes addressed as stated on the attached mailing list:
☒ by placing ☐ the original ☒ a true copy thereof enclosed in sealed envelopes addressed as follows:

Lewis D. Barr, Esq.                        Denise DeMory, Esq.
Morgenstein & Jubelirer                    Keker & VanNest LLP
One Market Plaza                           710 Sansome Street
Spear Street Tower, 32nd Floor             San Francisco, California 94111
San Francisco, California 94105

☒ BY MAIL

☐    *I deposited such envelope in the mail at _____, California.
The envelope was mailed with postage thereon fully prepaid.

☒    As follows : I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing.
Under that practice it would be deposited with U.S. postal service on that same day with postage thereon fully prepaid at
Los Angeles, California in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

Executed on April 1, 19 97 at Los Angeles, California

☐    **(BY PERSONAL SERVICE) I delivered such envelope by hand to the offices of the addressee.

Executed on _____, 19___, at _____, California.

☐ (State)    I declare under penalty of perjury under the laws of the State of California that the above is true and correct.
☒ (Federal)    I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

____Martha P. Herrera____          _Martha P. Herrera_ (signature)
Type or Print Name                        Signature

STUART'S EXBROOK TIMESAVER (REVISED 6/1/88)
NEW DISCOVERY LAW 2030 AND 2031 CCP
(May be used in California State or Federal Courts)

*(BY MAIL SIGNATURE MUST BE OF PERSON DEPOSITING ENVELOPE IN MAIL SLOT, BOX, OR BAG)
**(FOR PERSONAL SERVICE SIGNATURE MUST BE THAT OF MESSENGER)

IN SAN DIEGO COUNTY LOCAL RULE 6.1 REQUIRES "ALL PROOFS OF SERVICE FILED WITH THE COURT AS OF JULY 1, 1990" MUST SPECIFY THE NAME OF THE PARTY SERVED, THE NATURE AND STATUS OF HIS/HER INVOLVEMENT IN THE CASE, I.E. PLAINTIFF, DEFENDANT, CROSS COMPLAINANT, ETC., AND THE NAME, ADDRESS AND PHONE NUMBER OF HIS/HER COUNSEL OF RECORD

**EXHIBIT 2**

## Partnership Agreement



DEFENDANT'S
EXHIBIT
2
3/10/08 Montwillo

This contract is a binding agreement between William Tull Jr. and Paul Montwillo (d.b.a. Hansen), concerning their responsibilities in their partnership in the business known as "Arsenic and Apple Pie".

William Tull Jr. will be primarily responsible for the financial investment of startup costs, and upkeep until the business shows a profit. Mr. Tull is also responsible for bookkeeping, sales, and distribution.

Paul Montwillo will be primarily responsible for Art Direction, Design, and Advertising of the product line. This would include such things as: corporate identification, product design, package design, web site design and maintenance, and print advertising.

Both parties will share the responsibility of marketing, and any of the fore-mentioned responsibilities, should a need arise.

In return for their efforts each party shall receive 50% of the net profits from the business, after Mr. Tull has been returned his initial investment plus interest at the current a.p.r.

If either party should decide not to fulfill his designated responsibilities within the partnership, the remaining partner shall retain exclusive rights to all the products of their combined efforts until that point in time.

This contract will remain in effect for two years from date signed, or until a limited liability corporation has been formed.

_William Tull Jr._     7/16/97

William Tull Jr.        date

_Paul Montwillo_     7/16/97

Paul Montwillo        date

**EXHIBIT 3**



© 2003 Arsenic & Apple Pie Inc., San Anselmo, CA 94960 U.S.A. All Rights Reserved.

Manufactured in China for:
Arsenic & Apple Pie™
40 De Burgh Drive
San Anselmo, CA 94960
www.trailertrash.com
www.trailertrash@aol.com

DEFENDANT'S
EXHIBIT
5
PENG—3/10/08 Mantoillo

000018



000019