David Y. Wong, Attorney at Law (SBN 105031)
100 Shoreline Highway, Suite 100 B
Mill Valley, CA 94941
Tel: (415) 339-0430
Fax: (415) 332-8679

Law Office of Marc H. Greenberg (SBN 88493)
536 Mission Street, Suite 2323
San Francisco, CA 94105
Tel: (415) 442-6611

Attorneys for Defendants William Tull, Daniel Gibby and
Gibby Novelties, LLC

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PAUL MONTWILLO, an individual | CASE NO. C 07 3947 SI |
| Plaintiff, | Declaration of David Y. Wong in Support of Opposition to Plaintiff's Motion for Summary Judgment **(FRCP RULE 56(C)** |
| vs. | |
| WILLIAM TULL; DANIEL GIBBY; GIBBY NOVELTIES, LLC dba ARSENIC & APPLE PIE, a California Limited Liability Corporation and DOES 1 through 20, inclusive, | April 25, 2008<br>9:00 a.m.<br>Judge Illston, Courtroom 10 |
| Defendants. | The Federal Building<br>450 Golden Gate Avenue<br>San Francisco, CA 94102 |
| And related Counter-Claim | |
| | Complaint filed: August 1, 2007 |

I, David Y. Wong, declare:

1.     I am an attorney licensed by the State of California, admitted to practice before this

Court since 1982, and I am co-counsel for Defendants William Tull, Daniel Gibby and

Gibby Novelties, LLC. I am authorized by my clients to make this Declaration in support of their Motion for Summary Judgment, filed herewith.

2.    On the afternoon of March 10, 2008, I attended the deposition of the Plaintiff, Paul Montwillo, in this action. Mr. Montwillo was represented in his deposition by his attorney, Stephen A. Sommers.

3.    The Memorandum of Points and Authorities contains citations to deposition testimony of Plaintiff Paul Montwillo. Attached hereto and incorporated by reference herein are true and correct copies of the following deposition transcript pages, in full, wherein each of the cited testimony excerpts may be found. The pages attached are arranged in numerical order, as follows: Pages 27, 31, 35, 36, 37, 38, 39, 40, 41, 42, 43, 44, 45, 47, 48, 70, 91, 92, 93, 94, 95, 107, 108.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, and that I am able to testify competently thereto.

Executed in Mill Valley, California on April 3, 2008.

_____
            David Y. Wong

**MONTWILLO DEPOSITION**

PAUL MONTWILLO - MARCH 10, 2008

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

PAUL MONTWILLO, an )
individual, )
 )
                   Plaintiff, )
     vs. )   No. C 07 3947 SI
 )
WILLIAM TULL; DANIEL GIBBY; GIBBY )   Pages 1 thru 124
NOVELTIES, LLC dba ARSENIC & APPLE )
PIE, a California Limited )   Volume I
Liability Corporation and DOES 1 )
through 20, inclusive, )
 )
                   Defendants. )
_____ )

Deposition of

PAUL MONTWILLO

March 10, 2008

Reported By:

JAN BROWN JONES # 4685

COPY

------------------------------------------------------------

JAN BROWN & ASSOCIATES

CERTIFIED SHORTHAND REPORTERS

701 Battery St., 3rd Floor, San Francisco, California 94111

(415) 981-3498 or (800) 522-7096

1

PAUL MONTWILLO - MARCH 10, 2008

| | | |
|---|---|---|
| 10:36 | 1 | MR. WONG:  It wasn't in the file. |
| 13:40:36 | 2 | MR. SOMMERS:  And when I broke before I |
| 13:40:40 | 3 | was confusing this one with that one. |
| 13:40:43 | 4 | MR. GREENBERG:  Okay. |
| 13:40:44 | 5 | Q.  Do you know where you might have a copy of that? |
| 13:40:47 | 6 | A.  I might have given it to my previous counsel.  I |
| 13:40:53 | 7 | just gave him whatever I had, you know. |
| 13:40:57 | 8 | Q.  Now, you indicated I believe in earlier testimony |
| 13:41:00 | 9 | that when Mr. Tull got out of the case you were |
| 13:41:04 | 10 | still in it for a period of time. |
| 13:41:07 | 11 | A.  Yes, sir. |
| 13:41:07 | 12 | Q.  Was it three months, six months, how long? |
| 41:10 | 13 | A.  A year. |
| 13:41:11 | 14 | Q.  I'm sorry? |
| 13:41:11 | 15 | A.  A year. |
| 13:41:12 | 16 | Q.  A year.  So your settlement with Mattel was |
| 13:41:17 | 17 | sometime in 1998.  Is that right? |
| 13:41:19 | 18 | A.  It was actually -- I remember because I was leaving |
| 13:41:22 | 19 | to go home for Christmas.  It was December of '97. |
| 13:41:26 | 20 | Q.  And so you signed off and were done with Mattel by |
| 13:41:29 | 21 | December of '97.  Is that right? |
| 13:41:32 | 22 | A.  Yeah. |
| 13:41:40 | 23 | Q.  In response to this lawsuit -- well, let me back |
| 13:41:46 | 24 | up.  In March of '97, nine months or so before you |
| 41:53 | 25 | reached your settlement, were you in production, |

27

PAUL MONTWILLO - MARCH 10, 2008

| | | |
|---|---|---|
| 13:52:13 | 1 | MR. GREENBERG:  So I think we had a |
| 13:52:14 | 2 | question pending, did we? |
| 13:52:16 | 3 | THE WITNESS:  Repeat the question, |
| 13:52:18 | 4 | please. |
| 13:52:42 | 5 | MR. GREENBERG:  Yes, she's going to read |
| 13:52:42 | 6 | it back for you. |
| 13:52:42 | 7 | |
| 13:52:42 | 8 | (Record read as requested.) |
| 13:52:42 | 9 | |
| 13:52:42 | 10 | MR. GREENBERG: |
| 13:52:42 | 11 | Q.  You indicated that you changed the body of the doll |
| 13:52:44 | 12 | so as to avoid further problems with Mattel.  Is |
| 13:52:47 | 13 | that right? |
| 13:52:47 | 14 | A.  That's correct. |
| 13:52:48 | 15 | Q.  What change did you make? |
| 13:52:50 | 16 | A.  I just used a different body. |
| 13:52:53 | 17 | Q.  Did you create that body or did you find an |
| 13:52:56 | 18 | existing -- |
| 13:52:57 | 19 | A.  It was a doll. |
| 13:52:58 | 20 | Q.  What was the source? |
| 13:53:03 | 21 | A.  Toy stores, big lots, whatever. |
| 13:53:07 | 22 | Q.  I see.  So you either bought or found other dolls |
| 13:53:12 | 23 | to create the replacement dolls from? |
| 13:53:19 | 24 | A.  Yeah. |
| 13:53:21 | 25 | Q.  Did you actually -- well, let me back up.  Let's |

31

PAUL MONTWILLO - MARCH 10, 2008

| | | |
|---|---|---|
| 56:51 | 1 | responsibilities? |
| 13:56:51 | 2 | A.   Uh-huh.   Yes. |
| 13:56:53 | 3 | Q.   And then it says that you will be primarily |
| 13:56:56 | 4 | responsible for art direction, design and |
| 13:56:58 | 5 | advertising of the product line. |
| 13:57:01 | 6 | Do you see that sentence? |
| 13:57:02 | 7 | A.   Yes. |
| 13:57:02 | 8 | Q.   What product line is referred to there? |
| 13:57:06 | 9 | A.   Toys. |
| 13:57:07 | 10 | Q.   Sorry? |
| 13:57:07 | 11 | A.   Toys. |
| 13:57:08 | 12 | Q.   What kind of toys? |
| 57:10 | 13 | A.   Dolls. |
| 13:57:12 | 14 | Q.   Dolls.   Any others contemplated at this time? |
| 13:57:18 | 15 | A.   Yeah, I think so.   We were talking about watches |
| 13:57:22 | 16 | back then and -- yeah, I was designing some |
| 13:57:26 | 17 | watches.   I don't remember what else, T-shirts. |
| 13:57:33 | 18 | Q.   Okay.   And were all of these products, this product |
| 13:57:38 | 19 | line referred to here, was this all the Trailer |
| 13:57:41 | 20 | Trash concept put into different products? |
| 13:57:47 | 21 | A.   Yes. |
| 13:57:49 | 22 | Q.   Okay.   Just so you and I have an understanding when |
| 13:57:53 | 23 | we're referring to "product line," would it be fair |
| 13:57:57 | 24 | to say that it's the Trailer Trash product line? |
| 57:59 | 25 | A.   Well, we did drag queens too. |

35

PAUL MONTWILLO - MARCH 10, 2008

| | | |
|---|---|---|
| 13:58:03 | 1 | Q. Okay. So Trailer Trash and drag queens. |
| 13:58:06 | 2 | A. Yes; I mean, I designed 35 probably different |
| 13:58:10 | 3 | concepts reproduced many, many times. But yeah, |
| 13:58:13 | 4 | when I originally did this stuff, I was doing it in |
| 13:58:17 | 5 | my little studio in the back of my house, in the |
| 13:58:20 | 6 | back of my apartment. So I mean, no two were |
| 13:58:24 | 7 | exactly the same, nothing was identical. |
| 13:58:28 | 8 | Like, say, a Trailer Trash doll could be |
| 13:58:30 | 9 | wearing like the Daisy Duke shorts and that little |
| 13:58:34 | 10 | red halter top. Or she would be wearing a leather |
| 13:58:39 | 11 | jacket, you know. It just looked like whatever |
| 13:58:42 | 12 | clothes I could make or find or come up with that |
| 13:58:45 | 13 | looked like Trailer Trash, so -- |
| 13:58:48 | 14 | Q. So if I understand you correctly, what you are |
| 13:58:50 | 15 | really talking about is that each doll you did was |
| 13:58:56 | 16 | essentially custom- and handmade. Is that true? |
| 13:58:59 | 17 | A. Yeah. Well, I don't know about custom. |
| 13:59:01 | 18 | MR. SOMMERS: Objection, because it's |
| 13:59:02 | 19 | vague as to time. |
| 13:59:04 | 20 | MR. GREENBERG: Sure. Just so you are |
| 13:59:06 | 21 | clear. |
| 13:59:06 | 22 | Q. I'm referring to the period of time here in 1997 |
| 13:59:11 | 23 | prior to the December settlement with Mattel on |
| 13:59:14 | 24 | your part that you referred to, basically March to |
| 13:59:18 | 25 | December '97. So we're talking about a nine-month |

36

PAUL MONTWILLO - MARCH 10, 2008

1  period here.  And during that time I believe you

2  were talking about making individual dolls in your

3  studio and that each one was different.  Is that

4  correct?

5  A.  Well, I guess -- well, I wasn't making that many

6  anymore because I wasn't selling them at that time.

7  I was still making them and photographing them, but

8  they weren't for sale at that time.

9  Q.  And the ones that had been for sale prior to that

10  time were the ones that used the Barbie body.  Is

11  that correct?

12  A.  Uh-huh.  Yes, yes.

13  Q.  So after March of '97 through December of '97,

14  while you continued to make some different designs,

15  you didn't offer any of those dolls for sale.  Is

16  that right?

17  A.  Not during that time period.

18  Q.  Okay.  And it goes on in discussing this in

19  Exhibit 2, the Partnership Agreement, third

20  paragraph, that your responsibilities would include

21  corporate ID, product design, package design,

22  website design and maintenance and print

23  advertising.

24  Is that your understanding of what your

25  responsibilities were?

37

PAUL MONTWILLO - MARCH 10, 2008

| | | |
|---|---|---|
| 10:38 | 1 | A.    Uh-huh.   Yeah, I was -- yeah. |
| 14:00:45 | 2 | Q.    And then skipping down a paragraph to the fifth |
| 14:00:50 | 3 | paragraph on this page, it says, quote, "In return |
| 14:00:53 | 4 | for their efforts each party shall receive |
| 14:00:55 | 5 | 50 percent of the net profits from the business, |
| 14:00:58 | 6 | after Mr. Tull has been returned his initial |
| 14:01:01 | 7 | investment plus interest at the current APR." |
| 14:01:05 | 8 | "APR" standing for annual percentage |
| 14:01:07 | 9 | rate.   Is that right? |
| 14:01:09 | 10 | A.    Yes. |
| 14:01:09 | 11 | Q.    Is this an accurate statement of your understanding |
| 14:01:13 | 12 | of how the proceeds of your business with Mr. Tull |
| 01:19 | 13 | were going to be divided? |
| 14:01:20 | 14 | A.    Yeah.   That was very naive of me. |
| 14:01:23 | 15 | Q.    Why do you say it was naive of you? |
| 14:01:27 | 16 | A.    Well, nowadays, you know, I never would have signed |
| 14:01:35 | 17 | anything like that. |
| 14:01:36 | 18 | Q.    Okay.   And why is that? |
| 14:01:37 | 19 | A.    I knew nothing about business. |
| 14:01:40 | 20 | Q.    So you don't consider yourself to be savvy as a |
| 14:01:45 | 21 | businessman? |
| 14:01:46 | 22 | A.    Yes, I agree with that statement. |
| 14:01:49 | 23 | Q.    All right.   And the last paragraph says, quote, |
| 14:02:01 | 24 | "This contract will remain in effect for two years |
| 02:04 | 25 | from date signed or until a limited liability |

38

PAUL MONTWILLO - MARCH 10, 2008

| | | |
|---|---|---|
| 02:07 | 1 | corporation has been formed," close quote. |
| 14:02:10 | 2 | Was a limited liability corporation |
| 14:02:12 | 3 | formed within two years of July 1997? |
| 14:02:17 | 4 | A.  I believe it was, yes. |
| 14:02:18 | 5 | Q.  Okay.  From July 1997 going forward, did you design |
| 14:02:30 | 6 | for manufacture a Trailer Trash doll product? |
| 14:02:39 | 7 | MR. SOMMERS:  Objection, vague, |
| 14:02:40 | 8 | ambiguous. |
| 14:02:42 | 9 | THE WITNESS:  It was previously designed. |
| 14:02:45 | 10 | I got a body from China and I just designed it -- |
| 14:02:52 | 11 | that wasn't redesigned, it was the same as before. |
| 14:02:56 | 12 | MR. GREENBERG:  Okay. |
| 02:57 | 13 | Q.  So would it be fair to say that you got you said a |
| 14:03:02 | 14 | body from China and then incorporated the other |
| 14:03:06 | 15 | design elements that you had previously done using |
| 14:03:10 | 16 | a Barbie body? |
| 14:03:11 | 17 | A.  Yeah. |
| 14:03:12 | 18 | Q.  Okay.  Who arranged to obtain the body from China? |
| 14:03:21 | 19 | A.  Jeff Trojan was the man's name. |
| 14:03:23 | 20 | Q.  What is his name? |
| 14:03:25 | 21 | A.  Jeff Trojan. |
| 14:03:26 | 22 | Q.  Okay.  Do you know how to spell that last name? |
| 14:03:29 | 23 | A.  Like the condom. |
| 14:03:31 | 24 | Q.  Oh, Trojan.  Okay.  Jeff Trojan. |
| 03:33 | 25 | And where is Mr. Trojan these days? |

39

PAUL MONTWILLO - MARCH 10, 2008

| | | |
|---|---|---|
| 3:36 | 1 | A.  I have no idea.  I have tried to contact him in the |
| 14:03:39 | 2 | past and he's disappeared. |
| 14:03:42 | 3 | Q.  He lived in San Francisco at the time? |
| 14:03:44 | 4 | A.  Los Angeles.  The last I heard from him he was in |
| 14:03:47 | 5 | Los Angeles. |
| 14:03:48 | 6 | Q.  And what was his involvement in getting the doll |
| 14:03:51 | 7 | body? |
| 14:03:52 | 8 | A.  He was a contact to Hong Kong for us, or China, |
| 14:03:58 | 9 | wherever they are. |
| 14:04:06 | 10 | Q.  Well, can you tell me, please, a little bit about |
| 14:04:13 | 11 | how the process of this manufacturing of dolls took |
| 14:04:16 | 12 | place using these bodies? |
| 04:18 | 13 | MR. SOMMERS:  Calls for a narrative. |
| 14:04:20 | 14 | MR. GREENBERG:  It does indeed. |
| 14:04:25 | 15 | THE WITNESS:  So it was the same process, |
| 14:04:27 | 16 | like I would strip down a Barbie.  Well, they gave |
| 14:04:31 | 17 | me a stripped down body, added the exact same |
| 14:04:35 | 18 | things, you know, darkened the roots, gave it a |
| 14:04:38 | 19 | cigarette, dressed it, you know, and sent it off to |
| 14:04:41 | 20 | them. |
| 14:04:42 | 21 | So then they would try and copy me.  And |
| 14:04:47 | 22 | then they would send it back to me and I would say, |
| 14:04:51 | 23 | "No, you did this wrong, you did that wrong, modify |
| 14:04:54 | 24 | it."  So back and forth like that. |
| 04:57 | 25 | MR. GREENBERG: |

40

PAUL MONTWILLO - MARCH 10, 2008

```
04:57      1   Q.   So what you were doing was, you were creating the
14:04:59   2        prototype and they would then attempt to make a
14:05:04   3        copy of that.  You were testing back and forth to
14:05:07   4        make sure you got a final version that everyone was
14:05:10   5        satisfied with.  Is that accurate?
14:05:13   6   A.   Yeah.  I was just trying to get them to accurately
14:05:16   7        copy my work, yeah.
14:05:17   8   Q.   Once you had reached agreement, was it your
14:05:19   9        understanding that once you had reached an
14:05:20  10        agreement and you were satisfied with what they had
14:05:23  11        done, they would then go into mass production to
14:05:26  12        make a number of dolls?
05:27     13   A.   Yes.
14:05:29  14   Q.   Okay.  And were they shipping finished packaged
14:05:32  15        dolls back or was packaging done here?
14:05:35  16   A.   It was done there.
14:05:36  17   Q.   It was done there.  So you got basically boxes
14:05:40  18        filled with individual packaged boxes.
14:05:43  19   A.   Yes.  I had to design the packaging as well.
14:05:47  20   Q.   And you designed the packaging as well.
14:05:50  21   A.   Yes.
14:05:50  22   Q.   Now, this is taking place -- is this taking place,
14:05:54  23        this process of going back and forth with -- was it
14:05:58  24        China?
05:59     25   A.   China.
```

41

PAUL MONTWILLO - MARCH 10, 2008

| | | |
|---|---|---|
| 5:59 | 1 | Q. Was this taking place prior to December of 1997? |
| 14:06:04 | 2 | A. No. |
| 14:06:06 | 3 | Q. This took place after you had settled with Mattel? |
| 14:06:09 | 4 | A. That's correct. |
| 14:06:11 | 5 | Q. Was this taking place during the time the |
| 14:06:14 | 6 | partnership was in existence or was it during the |
| 14:06:17 | 7 | time the LLC was in existence or a little of both? |
| 14:06:21 | 8 | MR. SOMMERS: Objection, compound. Go |
| 14:06:22 | 9 | ahead. |
| 14:06:25 | 10 | THE WITNESS: I don't recall. |
| 14:06:26 | 11 | MR. GREENBERG: I understand. |
| 14:06:28 | 12 | THE WITNESS: I would guess it would be |
| 6:30 | 13 | after -- |
| 14:06:31 | 14 | MR. SOMMERS: Don't guess. |
| 14:06:32 | 15 | MR. GREENBERG: |
| 14:06:32 | 16 | Q. What's your best recollection? |
| 14:06:34 | 17 | A. My best recollection would be after the initial |
| 14:06:37 | 18 | partnership agreement was signed. |
| 14:06:39 | 19 | Q. Okay. But before the LLC? |
| 14:06:45 | 20 | A. I think so. I'm not sure. |
| 14:06:47 | 21 | MR. SOMMERS: Don't guess. |
| 14:06:48 | 22 | MR. GREENBERG: I understand. |
| 14:06:52 | 23 | Q. With respect to this design process that you were |
| 14:06:55 | 24 | going through, the process with China and you |
| 6:58 | 25 | finally reached a design that you were satisfied |

42

| | | |
|---|---|---|
| 07:01 | 1 | with, what was your understanding of who owned that |
| 14:07:03 | 2 | design? |
| 14:07:04 | 3 | MR. SOMMERS:  Objection, that the |
| 14:07:06 | 4 | question misstates the testimony that there was a |
| 14:07:08 | 5 | design process. |
| 14:07:10 | 6 | MR. GREENBERG:  Well, I'll rephrase that, |
| 14:07:12 | 7 | Counsel.  Thank you for the comment. |
| 14:07:14 | 8 | Q.  With respect to this process you were going through |
| 14:07:17 | 9 | where you were shipping copies of the prototype |
| 14:07:21 | 10 | back and forth between you and China, as you put |
| 14:07:24 | 11 | it, to get them to get your design right, who owned |
| 14:07:29 | 12 | that final design that came out? |
| 07:31 | 13 | A.  I do. |
| 14:07:31 | 14 | Q.  "I do."  You did? |
| 14:07:33 | 15 | A.  Uh-huh. |
| 14:07:34 | 16 | Q.  You were in partnership at the time or in an LLC |
| 14:07:37 | 17 | with Mr. Tull.  Did Mr. Tull have any ownership |
| 14:07:40 | 18 | interest in this design? |
| 14:07:43 | 19 | A.  No, he does not have ownership to my intellectual |
| 14:07:46 | 20 | property.  I licensed the designs to the |
| 14:07:52 | 21 | corporation. |
| 14:07:53 | 22 | Q.  You did.  Let's talk about that. |
| 14:08:00 | 23 | MR. SOMMERS:  Before you ask your |
| 14:08:00 | 24 | question, let me take a quick second. |
| 08:04 | 25 | MR. GREENBERG:  Sure. |

43

PAUL MONTWILLO - MARCH 10, 2008

| | | |
|---|---|---|
| ?  8:05 | 1 | |
| 14:08:05 | 2 | (Off the record at 2:08 p.m and |
| 14:08:09 | 3 | back on the record at 2:13 p.m.) |
| 14:10:47 | 4 | |
| 14:13:42 | 5 | MR. GREENBERG:  Are you all set? |
| 14:13:44 | 6 | THE WITNESS:  All set. |
| 14:13:44 | 7 | MR. GREENBERG:  Back on the record. |
| 14:13:49 | 8 | Q.  Mr. Montwillo, before our break you indicated that |
| 14:13:51 | 9 | you licensed your designs, I believe you said to |
| 14:13:56 | 10 | the corporation.  I think in that respect were you |
| 14:14:03 | 11 | referring to the partnership and/or the LLC of |
| 14:14:06 | 12 | Arsenic & Apple Pie? |
| ]  4:08 | 13 | A.  Yes. |
| 14:14:09 | 14 | Q.  And when you say you "licensed your designs," was |
| 14:14:16 | 15 | this a written license? |
| 14:14:19 | 16 | A.  No.  I let the company use my work. |
| 14:14:22 | 17 | Q.  Okay.  When you indicate you let the company use |
| 14:14:24 | 18 | your work, is this what you mean by licensed? |
| 14:14:31 | 19 | A.  Yes.  I don't know like legal terms if this is -- |
| 14:14:39 | 20 | you know.  There was no written license. |
| 14:14:44 | 21 | Q.  Okay.  When you say you let the company use your |
| 14:14:48 | 22 | work or that you licensed it, I need to know from |
| 14:14:53 | 23 | you since there wasn't anything in writing, what |
| 14:14:55 | 24 | the terms of that license were; how long was the |
| 1   4:58 | 25 | license of the designs to run? |

44

| | | |
|---|---|---|
| 14:15:08 | 1 | A.  As long as I was in the company. |
| 14:15:11 | 2 | Q.  As long as you were in the company.  Okay.  And if |
| 14:15:15 | 3 | you left the company, was it your understanding |
| 14:15:19 | 4 | that you would be able to take your rights to the |
| 14:15:24 | 5 | design with you and that the company would no |
| 14:15:27 | 6 | longer be able to use those designs? |
| 14:15:31 | 7 | A.  Yes. |
| 14:15:32 | 8 | Q.  Okay.  And was that irrespective of whether the |
| 14:15:37 | 9 | company at that point was profitable or was in |
| 14:15:42 | 10 | debt?  In other words, when you left you left and |
| 14:15:49 | 11 | it didn't matter what the state of the company was |
| 14:15:49 | 12 | at the time? |
| 14:15:49 | 13 | MR. SOMMERS:  Objection, compound.  Go |
| 14:15:49 | 14 | ahead. |
| 14:15:55 | 15 | THE WITNESS:  If I left -- |
| 14:15:56 | 16 | MR. GREENBERG:  Did you not understand |
| 14:15:57 | 17 | the question?  Yes. |
| 14:16:00 | 18 | Q.  If you left, what would happen in other words? |
| 14:16:03 | 19 | A.  The company could no longer use my work. |
| 14:16:06 | 20 | Q.  Okay.  And if for example the company -- |
| 14:16:12 | 21 | A.  The company could purchase the rights to use my |
| 14:16:14 | 22 | work. |
| 14:16:14 | 23 | Q.  Okay.  Had you set a price on the rights at that |
| 14:16:17 | 24 | time? |
| 14:16:18 | 25 | A.  We had discussed it. |

45

PAUL MONTWILLO - MARCH 10, 2008

17:01  1          MR. SOMMERS:  Objection, assumes facts

14:17:04  2     not in evidence.

14:17:05  3          MR. GREENBERG:  That's why I am asking.

14:17:06  4  Q.  Is that what you testified?

14:17:08  5  A.  No.

14:17:08  6  Q.  Let me ask you a different question.  You say you

14:17:11  7     licensed your designs.  Did you and Mr. Tull ever

14:17:14  8     sit down and have a discussion about the terms of

14:17:18  9     this license?

14:17:19  10  A.  No.  I don't think so, no.

14:17:23  11  Q.  Did you discuss the terms of this license with

14:17:27  12     anyone else in the Arsenic & Apple Pie partnership?

17:32  13  A.  No.

14:17:34  14  Q.  Were the terms of this license only existing in

14:17:36  15     your own mind?

14:17:38  16  A.  No.  I specifically -- when we drew up the

14:17:44  17     operating agreement, I specifically made sure there

14:17:47  18     was no language that would deprive me of my

14:17:52  19     intellectual property.

14:17:54  20  Q.  Well, that's not really my question.

14:17:56  21  A.  Well then, yes, because it was discussed in the

14:17:58  22     drafting and I had some language removed.

14:18:03  23  Q.  You had some language removed from the operating

14:18:06  24     agreement --

18:07  25  A.  Right.

47

| | | |
|---|---|---|
| 18:07 | 1 | Q. -- which you were concerned would affect a transfer |
| 14:18:11 | 2 | of your intellectual property rights. Is that what |
| 14:18:15 | 3 | you are saying? |
| 14:18:15 | 4 | A. Yes, that was my concern. |
| 14:18:17 | 5 | Q. All right. So in the Partnership Agreement that |
| 14:18:24 | 6 | we've been looking at, Exhibit 2, there isn't any |
| 14:18:27 | 7 | language regarding intellectual property rights, is |
| 14:18:30 | 8 | there? |
| 14:18:31 | 9 | A. No, that was just a preliminary agreement -- |
| 14:18:34 | 10 | Q. Okay. |
| 14:18:35 | 11 | A. -- before the LLC. |
| 14:18:37 | 12 | MR. SOMMERS: Just answer the question |
| 18:38 | 13 | that is being asked. Keep it simple. |
| 14:18:42 | 14 | THE WITNESS: Okay. |
| 14:18:42 | 15 | MR. GREENBERG: |
| 14:18:49 | 16 | Q. Did the LLC operating agreement -- well, actually |
| 14:18:53 | 17 | hold on a second. |
| 14:19:55 | 18 | Mr. Montwillo, what language was removed |
| 14:19:56 | 19 | from the operating agreement that you were |
| 14:19:59 | 20 | concerned would have some impact on your |
| 14:20:01 | 21 | intellectual property rights? |
| 14:20:03 | 22 | A. I don't recall exactly. |
| 14:20:05 | 23 | Q. Okay. |
| 14:20:06 | 24 | A. I do recall it was there. |
| 20:07 | 25 | Q. You recall something was there? |

48

PAUL MONTWILLO - MARCH 10, 2008

| | | |
|---|---|---|
| 3:56 | 1 | something. |
| 14:53:58 | 2 | Q. I'm sorry? |
| 14:53:59 | 3 | A. It's a sticker. |
| 14:54:04 | 4 | Q. Okay. Do you know what was there before? |
| 14:54:07 | 5 | A. I don't know what is under there. |
| 14:54:11 | 6 | Q. You don't know what is under it? |
| 14:54:12 | 7 | A. No. |
| 14:54:13 | 8 | Q. Was there a sticker on the first one regarding the |
| 14:54:19 | 9 | copyright date or is it printed on the box? |
| 14:54:22 | 10 | A. It's printed on the box. |
| 14:54:23 | 11 | Q. Okay. And you oversaw the production of these |
| 14:54:26 | 12 | boxes? |
| 4:27 | 13 | A. Yes. |
| 14:54:29 | 14 | Q. If you owned the copyrights to these designs, why |
| 14:54:34 | 15 | does the copyright notice say it's copyright |
| 14:54:37 | 16 | Arsenic & Apple Pie on both of these? |
| 14:54:43 | 17 | A. I don't know. I own the copyrights to the dolls. |
| 14:54:57 | 18 | Q. Okay. Now, from the 1997 partnership agreement |
| 14:55:03 | 19 | date, through to the dissolution of the LLC in |
| 14:55:09 | 20 | 2004, am I correct that all costs for the design, |
| 14:55:15 | 21 | development, manufacture and distribution of the |
| 14:55:23 | 22 | dolls was paid for by Bill Tull? |
| 14:55:23 | 23 | A. Bill Tull made a loan to the company, yes. |
| 14:55:26 | 24 | Q. To cover those costs? |
| 5:28 | 25 | A. Yeah. So the company paid for them. |

70

PAUL MONTWILLO - MARCH 10, 2008

| | | |
|---|---|---|
| 31:46 | 1 | MR. SOMMERS: Again, why don't you do it |
| 15:31:47 | 2 | that way, not that globally. |
| 15:31:47 | 3 | MR. GREENBERG: |
| 15:31:48 | 4 | Q. Other than the body -- |
| 15:31:49 | 5 | A. Right. |
| 15:31:51 | 6 | Q. Well, let's back up. With respect to those three |
| 15:31:53 | 7 | dolls, Trailer Trash Doll, Blonde Drag Queen and |
| 15:31:56 | 8 | Red Head Drag Queen, you didn't design the body. |
| 15:31:59 | 9 | Is that correct? |
| 15:32:01 | 10 | A. That's correct. |
| 15:32:03 | 11 | Q. What did you design on those three dolls? |
| 15:32:10 | 12 | A. The clothing. The pants. The accessories. |
| 32:21 | 13 | Q. Okay. |
| 15:32:22 | 14 | MR. SOMMERS: Was there anything besides |
| 15:32:23 | 15 | the body that you didn't design? |
| 15:32:26 | 16 | THE WITNESS: The only thing I didn't |
| 15:32:27 | 17 | design was the body. We used standard bodies. I |
| 15:32:30 | 18 | designed everything else. |
| 15:32:34 | 19 | MR. GREENBERG: |
| 15:32:34 | 20 | Q. And taking a look at the box we've got here, which |
| 15:32:40 | 21 | we're not going to be able to attach to the record, |
| 15:32:42 | 22 | but I'll just represent -- and I think that we've |
| 15:32:45 | 23 | already concluded that this is one of the designs, |
| 15:32:47 | 24 | Trailer Trash Edition 1. Is that correct? |
| 32:50 | 25 | A. Yes. |

91

PAUL MONTWILLO - MARCH 10, 2008

| | | |
|---|---|---|
| 32:53 | 1 | Q. This particular design features the model, the doll |
| 15:33:01 | 2 | in what looks to be a representation of blue jean |
| 15:33:06 | 3 | shorts.  I believe you previously made reference to |
| 15:33:11 | 4 | these as "Daisy May" shorts? |
| 15:33:13 | 5 | A. Daisy Duke shorts. |
| 15:33:16 | 6 | Q. Daisy Duke shorts.  And does that come from "The |
| 15:33:19 | 7 | Dukes of Hazard" television show? |
| 15:33:22 | 8 | A. Yes. |
| 15:33:22 | 9 | Q. The character of Daisy Duke?  That's how you were |
| 15:33:26 | 10 | describing them. |
| 15:33:27 | 11 | A. There was a reference, yes. |
| 15:33:33 | 12 | Q. And the doll also is wearing a red and white |
| 33:38 | 13 | checked halter top.  Is that how you would |
| 15:33:42 | 14 | characterize that garment? |
| 15:33:46 | 15 | A. Well, I guess halter top isn't correct, but -- |
| 15:33:49 | 16 | Q. How would you describe it? |
| 15:33:51 | 17 | A. I can't remember the correct word for that. |
| 15:33:54 | 18 | Q. Is it a crop top? |
| 15:33:55 | 19 | A. Crop top maybe, something.  I don't know.  Skimpy, |
| 15:33:59 | 20 | skimpy thing on top. |
| 15:34:02 | 21 | Q. Right.  And the hairdo of the doll is pig tails? |
| 15:34:07 | 22 | A. Yes. |
| 15:34:08 | 23 | Q. Pig tails and bangs? |
| 15:34:11 | 24 | A. And black roots, yes. |
| 34:12 | 25 | Q. And notably the black roots. |

92

PAUL MONTWILLO - MARCH 10, 2008

| | | |
|---|---|---|
| 34:15 | 1 | A.   And the cigarette, yes.  And the blue eye shadow. |
| 15:34:16 | 2 | Q.   Okay.  Cigarettes, blue eye shadow. |
| 15:34:23 | 3 | Have you ever seen characters in |
| 15:34:26 | 4 | literature, movies or any other genre, where these |
| 15:34:32 | 5 | elements are incorporated to convey rural or poor |
| 15:34:38 | 6 | white individuals? |
| 15:34:39 | 7 | A.   Well, that's what I was trying to convey; I mean, |
| 15:34:42 | 8 | it obviously stems from a stereotype. |
| 15:34:48 | 9 | Q.   And these elements are elements of that stereotype, |
| 15:34:52 | 10 | right? |
| 15:34:53 | 11 | A.   Yes. |
| 15:34:53 | 12 | Q.   Would it be fair to say that with respect to the |
| 34:56 | 13 | Blonde Drag Queen and the Red Head Drag Queen, that |
| 15:34:59 | 14 | you attempted also to utilize similar genre |
| 15:35:05 | 15 | stereotypes to convey the impression of what the |
| 15:35:08 | 16 | doll was? |
| 15:35:09 | 17 | MR. SOMMERS:  Objection, horribly vague. |
| 15:35:11 | 18 | Horribly, horribly vague. |
| 15:35:16 | 19 | THE WITNESS:  No. |
| 15:35:17 | 20 | MR. GREENBERG:  Okay. |
| 15:35:19 | 21 | Q.   With respect to the Blonde Drag Queen, what |
| 15:35:23 | 22 | elements did you add to that design? |
| 15:35:28 | 23 | A.   Everything but the body. |
| 15:35:30 | 24 | Q.   And what were those elements; what is the |
| 15:32 | 25 | everything? |

93

PAUL MONTWILLO - MARCH 10, 2008

| | |
|---|---|
| 35:35 | 1 |
| 15:35:42 | 2 |
| 15:35:46 | 3 |
| 15:35:50 | 4 |
| 15:35:53 | 5 |
| 15:36:05 | 6 |
| 15:36:16 | 7 |
| 15:36:19 | 8 |
| 15:36:21 | 9 |
| 15:36:24 | 10 |
| 15:36:26 | 11 |
| 15:36:29 | 12 |
| 36:32 | 13 |
| 15:36:33 | 14 |
| 15:36:38 | 15 |
| 15:36:42 | 16 |
| 15:36:45 | 17 |
| 15:36:46 | 18 |
| 15:36:47 | 19 |
| 15:36:47 | 20 |
| 15:36:48 | 21 |
| 15:36:53 | 22 |
| 15:36:59 | 23 |
| 15:37:01 | 24 |
| 17:02 | 25 |

A.    Dress, purse, hair, makeup.  Everything.

Packaging.  Whatever.

Q.    And how would it be that someone looking at that

doll would know that it was supposed to be a drag

queen as opposed to an actual female?

A.    It has a male body.  It's exaggerated makeup.  It's

a drag queen.

Q.    From your expression --

A.    I'm like, what?  It's a drag queen.

Q.    Right.  My sense is that the elements that you

incorporated were so clear that anyone looking at

it would know it was a drag queen.  Is that right?

A.    That's correct.

Q.    And in order for that to happen, people looking at

this have to have a stereotype in mind of what a

drag queen is.  Isn't that also true?

                MR. SOMMERS:  Objection, argumentative.

                THE WITNESS:  No.

                MR. GREENBERG:  No?

                THE WITNESS:  No.

                MR. SOMMERS:  Calls for opinion.

                MR. GREENBERG:  Okay.

Q.    How would you characterize the hair on the Blonde

Drag Queen?

                MR. SOMMERS:  Objection, vague.

94

PAUL MONTWILLO - MARCH 10, 2008

| | |
|---|---|
| 37:06 | 1 |

                        MR. GREENBERG:

15:37:06  2  Q.  Well, what choice did you make as to what the hair

15:37:09  3      should be for the Blonde Drag Queen?

15:37:11  4              MR. SOMMERS:  Objection, vague.  Go

15:37:12  5      ahead.

15:37:13  6              THE WITNESS:  I chose long blonde hair.

15:37:15  7              MR. GREENBERG:

15:37:15  8  Q.  Why?

15:37:17  9  A.  I knew I was going to do a white dress.  So a lot

15:37:23  10     of drag queens like to do Marilyn, so I put the

15:37:27  11     blonde in a white dress.

15:37:30  12 Q.  Sort of to evoke the drag queen version of Marilyn?

37:33     13 A.  Yes.

15:37:38  14 Q.  Was the Red Head Drag Queen evocative of any

15:37:43  15     celebrity?

15:37:47  16 A.  Brian O'Rourke.

15:37:48  17 Q.  And who is that?

15:37:49  18 A.  A friend of mine.

15:37:51  19 Q.  And does Brian O'Rourke on occasion attire himself

15:37:57  20     as a drag queen?

15:37:58  21 A.  Yes.

15:38:00  22 Q.  So this was designed to look like him?

15:38:03  23 A.  Yes.

15:38:06  24 Q.  Did you get a license from him?

38:09     25 A.  No.  No, I did not.  I believe he has the original

                                                            95

PAUL MONTWILLO - MARCH 10, 2008

01:44      1   Q.   Going back to Exhibit 4, July 13, 2004, this is
16:01:49   2        your letter to Mr. Wong.  You state in the third
16:01:56   3        paragraph, "I hold the copyrights to all my
16:01:59   4        designs, not the company." We've gone over that
16:02:01   5        once or twice before.
16:02:04   6             Was it your understanding, Mr. Montwillo,
16:02:08   7        that as of July 13, 2004, Arsenic & Apple Pie
16:02:16   8        intended to continue to sell the dolls that you
16:02:22   9        claim you held the copyrights to?
16:02:24  10   A.   That was a response.  I don't recall the letter it
16:02:28  11        was in response to.  I was addressing a letter I
16:02:30  12        received from Mr. Wong.
02:32     13   Q.   Okay.  After July 13, 2004, was it your
16:02:36  14        understanding that Arsenic & Apple Pie continued to
16:02:38  15        sell the designs -- the dolls that embodied the
16:02:43  16        designs you claim to own?
16:02:45  17   A.   Yes.
16:02:53  18   Q.   Did you prior to the filing of the copyright
16:02:56  19        infringement lawsuit in this case, ever send notice
16:03:01  20        to Arsenic & Apple Pie that you believed that they
16:03:05  21        were violating your copyright?
16:03:09  22   A.   You are looking at it.
16:03:11  23   Q.   Okay.  So in your view this letter of July 13,
16:03:14  24        2004, was you sending notice to them that they were
03:18     25        violating your copyright?

                                                              107

PAUL MONTWILLO - MARCH 10, 2008

03:19   1   A.    Yes.

16:03:23   2              MR. SOMMERS:   I'll object to the extent

16:03:25   3   that that requests a legal conclusion.

16:03:38   4              MR. GREENBERG:

16:03:43   5   Q.   Mr. Montwillo, your counsel filed on your behalf

16:03:46   6   what are referred to by lawyers as initial

16:03:52   7   disclosures, and those initial disclosures include

16:03:56   8   lists of witnesses and other elements in the case.

16:03:59   9   I need to find out who some of these people are, so

16:04:03   10  I'm going to ask you some questions about that.

16:04:05   11             I'm not asking you about any of the legal

16:04:07   12  conclusions, if any there are in this disclosure,

04:10   13  but I need to find out who these people are.   All

16:04:13   14  right?

16:04:14   15  A.    Okay.

16:04:14   16  Q.    Can you tell me, please, who Eloise Clark is?

16:04:20   17  A.    No.   Eloise Clark?

16:04:23   18  Q.    E-L-O-I-S-E Clark it says will testify that Gibby

16:04:28   19  Novelties, LLC sold the copyrighted dolls.   Do you

16:04:32   20  know who that person is?

16:04:34   21             MR. SOMMERS:   I think she's the

16:04:35   22  accountant or bookkeeper for Gibby Novelties.

16:04:40   23             MR. GREENBERG:

16:04:41   24  Q.    Would it be fair to say you don't know who that

04:43   25  person is?

108