1  David Y. Wong, Attorney at Law (SBN 105031)
   100 Shoreline Highway, Suite 100 B
2  Mill Valley, CA  94941
   Tel: (415) 339-0430
3  Fax:  (415) 332-8679

4  Law Office of Marc H. Greenberg (SBN 88493)
   536 Mission Street, Suite 2323
5  San Francisco, CA 94105
   Tel: (415) 442-6611
6
7  Attorneys for Defendants William Tull, Daniel Gibby and
   Gibby Novelties, LLC

8                    UNITED STATES DISTRICT COURT

9                   NORTHERN DISTRICT OF CALIFORNIA

10 | PAUL MONTWILLO, an individual           )  CASE NO.  C 07 3947 SI
11 |                                         )
   |                  Plaintiff,             )
12 |                                         )  Defendants William Tull's, Daniel Gibby's and
   |                                         )  Gibby Novelties, LLC's Opposition to Plaintiff's
   | vs.                                     )  Motion for Summary Judgment; Affidavit of
13 |                                         )  William Tull and Declaration of David Y. Wong
14 | WILLIAM TULL; DANIEL GIBBY;             )  in Support Thereof.
   | GIBBY NOVELTIES, LLC dba ARSENIC        )     **(FRCP RULE 56(C)**
15 | & APPLE PIE, a California Limited        )
   | Liability Corporation and DOES 1 through )  April 25, 2008
16 | 20, inclusive,                          )  9:00 a.m.
   |                                         )  Judge Illston, Courtroom 10
17 |                  Defendants.            )
   | _____     )  The Federal Building
18 | And related Counter-Claim                   450 Golden Gate Avenue
19 | _____         San Francisco, CA  94102
20
                                                 Complaint filed:  August 1, 2007
21
22
23
24
25
26
27
28

# TABLE OF CONTENTS

**Page No.**

Table of Contents                                                                        i-ii

Authorities                                                                              iii

Affidavit/ Declaration                                                                   iv

Deposition Transcript Excerpts                                                           iv

**PROCEDURAL OBJECTIONS TO PLAINTIFF'S MOTION**                                          1

    a.    **Defendants' Objection to the Declaration of Paul Montwillo**       2

    b.    **Plaintiff's Failure to Include a Proposed Order**                  3

**A.    LEGAL ARGUMENT**

**SUBSTANTIVE OBJECTIONS TO PLAINTIFF'S MOTION**                                         3

**SUBSTANTIVE OBJECTIONS TO DECLARATION OF PAUL MONTWILLO**                              4

**1.  PLAINTIFF MOTION MUST BE DENIED BECAUSE THE**                            5
**COPYRIGHTS CLAIMED BY MONTWILLO AS THE BASIS**
**OF HIS INFRINGEMENT CLAIM ARE INVALID.**

    a.    **The Doll Designs Are Comprised Of Stereotypical Design**          6
        **Elements Which Lack Originality And Are Not Copyrightable.**

    b.    **The Doll Designs Principally Incorporate Genre Elements**          10
        **Which Are Not Entitled To Copyright Protection Under The**
        **Doctrine Of "Scenes A Faire".**

    c.    **The Doll Designs Claimed by Plaintiff Were New and**               12
        **Conceived of During the Arsenic & Apple Pie Partnership or**
        **Limited Liability Company- Mattels' Injunction was Not Violated**
        **or Breached.**

    d.    **Plaintiff Cannot Explain Why, If He Owned The Copyrights To**      16
        **The Doll Designs, All Of The Dolls Manufactured By Arsenic &**

MONTWILL V. TULL, ET AL.  USDC Action No. C 07 3947 SI                                    i

Apple Pie Were Sold, In Packaging Designed And Approved By Plaintiff, Bearing A Copyright Claim For Arsenic.

e.    Plaintiff's Own Testimony Confirms the Existence of a License.    17

f.    Plaintiff's Bankruptcy Petition Establishes Either The    21
      Abandonment Of Any Copyrights Or Licenses To The Dolls, Or
      That The Instant Action And Motion Are Admissions That Plaintiff
      Lied In His Bankruptcy Petition.

2.  IF PLAINTIFF DID NOT CONVEY OR ABANDON HIS DESIGNS TO    21
    THE DOLLS WHEN HE FILED HIS BANKRUPTCY PETITION, HIS
    FAILURE TO DISCLOSE THE ASSETS CONSTITUTES SUFFICIENT
    GROUNDS FOR THE RE-OPENING OF HIS BANKRUPTCY CASE AND
    POSSIBLE DENIAL OF DISCHARGE.

3.  EVEN IF PLAINTIFF DID NOT CONVEY OR ABANDON THE COPYRIGHTS    23
    TO THE DOLLS TO ARSENIC & APPLE PIE, PLAINTIFF'S MOTION MUST
    BE DENIED BECAUSE HE FAILED TO FILE SUIT WITHIN THE THREE
    YEAR STATUTE OF LIMITATIONS.

4.    THE ARGUMENTS AGAINST DEFENDANTS' COUNTERCLAIM FAIL TO    24
      ESTABLISH A LACK OF MERIT THAT WOULD WARRANT DISMISSAL.

B.    CONCLUSION    25

# AUTHORITIES

## Cases

*Carol Barnhart. Inc. v. Economy Cover Corp. (773 F. 2d 411 (2d Cir. 1985)*      10

*Chalik v. Moorefield*, 748 F.2d 616, 618 (7th Cir. 1984)      23

*Ets-Hokin v. Skyy Spirits, Inc.*, 323 F. 3d 763 (2003)      10

*Feist Publications, Inc. v. Rural Telephone Service Co.*, (499 U.S. 340 (1991)      6

*Foster v. Arcata Associates,* 772 F.2d 1453, 1462 (9th Cir.1985),      4

*cert. denied,* 475 U.S. 1048, 106 S.Ct. 1267, 89 L.Ed.2d 576 (1986)

*Galliano v. Harrah's Operating Co.*, 424 F. Supp. 2d 1211 (C.D. Cal. 2006)      10

*In re Lopez*, 283 B.R. 22, (9th Cir. BAP 2002)      22

*Kennedy v. Allied Mut. Ins. Co.*  952 F.2d 262 (9th Cir 1991)      5

<u>*Perma Research and Development Co. v. Singer Co.*, 410 F.2d 572, 578 (2d Cir.1969)</u>      5

*Radobenko v. Automated Equipment Corp.,* 520 F.2d 540, 543-44 (9th Cir.1975)      4

*Stone v. Williams*, 970 F.2d 1043, 1049-50 (2nd Cir.1992) *cert. denied,*      23

508 U.S. 906, 113 S.Ct. 2331, 124 L.Ed.2d 243 (1993)

*Todd v. Montana Silversmiths*, 379 F. Supp. 2d 1110 (2005)      11

*U. S. v. Ivers*, 512 F.2d 121 (C.A.8.N.D.,1975)      22

*Wood v. Santa Barbara Chambers of Commerce, Inc.,* 507 F.Supp. 1128, 1135 (D.Nev.1980)      23

## Statutes

Federal Rules of Civil Procedure, Rule 12(b); Rule 56

11 U.S.C. § 541(a)(1)

11 U.S.C. § 554

11 U.S.C. § 727(a)(4)(a)

11 U.S.C. § 102(a)

17 U.S.C.A. § 507(b)

Local Rule 5-4

Local Rule 7-2(c)

General Order 45

General Order 45 (VI)(D)

General Order 45(IX)

Trademark and Copyright Act Section 301

1  **Declaration/Affidavit**

2  William Tull

3  Exhibits:  1.    Stipulated Injunction – Mattel v. In-Jean-Ious  USDC Case No. C97-0012 EFL

4          2.    Arsenic & Apple Pie Partnership Agreement of July 1997

5          3.    Copyright Notice on Trailer Trash dolls

6

7  David Y. Wong

8  **Deposition Transcript Pages Attached**

9  Montwillo Deposition pages:  27, 31, 35, 36, 37, 38, 39, 40, 41, 42, 43, 44, 45, 47, 48,

10 70, 91, 92, 93, 94, 95, 107, 108                    Attached to Declaration of Wong

1   David Y. Wong, Attorney at Law (SBN 105031)
    100 Shoreline Highway, Suite 100 B
2   Mill Valley, CA  94941
    Tel: (415) 339-0430
3   Fax:  (415) 332-8679

4   Law Office of Marc H. Greenberg (SBN 88493)
    536 Mission Street, Suite 2323
5   San Francisco, CA 94105
    Tel: (415) 442-6611
6
    Attorneys for Defendants William Tull, Daniel Gibby and
7   Gibby Novelties, LLC

8                       UNITED STATES DISTRICT COURT

9                      NORTHERN DISTRICT OF CALIFORNIA

10  PAUL MONTWILLO, an individual          )   CASE NO.  C 07 3947 SI
                                           )
11                    Plaintiff,           )
                                           )   Defendants William Tull's, Daniel Gibby's and
12  vs.                                    )   Gibby Novelties, LLC's Opposition to Plaintiff's
                                           )   Motion for Summary Judgment; Affidavit of
13                                         )   William Tull and Declaration of David Y. Wong
    WILLIAM TULL; DANIEL GIBBY;            )   in Support Thereof.
14  GIBBY NOVELTIES, LLC dba ARSENIC       )   (FRCP RULE 56(C)
    & APPLE PIE, a California Limited       )
15  Liability Corporation and DOES 1 through )  April 25, 2008
    20, inclusive,                         )   9:00 a.m.
16                                         )   Judge Illston, Courtroom 10
                                           )
17                    Defendants.          )

18  _____        The Federal Building
    And related Counter-Claim                  450 Golden Gate Avenue
19                                              San Francisco, CA  94102

20
                                                Complaint filed:  August 1, 2007
21

22

23          Defendants William Tull, Daniel Gibby and Gibby Novelties, LLC, hereby submit their

24  Memorandum of Points and Authorities in Opposition to the Motion for Summary Judgment of

25  Plaintiff Paul Montwillo.

26                **PROCEDURAL OBJECTIONS TO PLAINTIFF'S MOTION**

27          It is not the general practice of counsel for Defendants to file procedural objections in

28  motions of this nature.  In this case, however, the procedural violations of Plaintiffs have

rendered it nearly impossible for Defendants to fully respond to Plaintiff's Motion, and these violations place Defendants at a severe disadvantage in their response. For those reasons, Defendants object to and move the Court to disregard and strike from the record, those portions of Plaintiff's Motion that violate and otherwise fail to comply with the Rules of Federal Civil Procedure and the Court's Local Rules. As provided therein, Defendants object to, and the Court is urged to strike and refuse to consider, the Declaration of Paul Montwillo filed after the Court-ordered deadline and apparently never served on Defendants. In addition, Defendants urge this Court to reject and strike the entire motion on the basis of Plaintiff's failure to submit a proposed Order as required under Local Rule 7-2(c).

a.    **Defendants' Objection to the Declaration of Paul Montwillo**

Judge Illston's Court has been designated a participant in the Court's e-filing program. General Order 45 and local rule 5-4 provide that cases assigned to judges participating in its e-filing program shall be presumptively designated as e-filing cases. In such cases, all papers filed by the parties must be e-filed. Papers which are filed manually will not be considered filed electronically and must be served on opposing counsel in accordance with "...the applicable Federal Rules of Civil and Criminal Procedure and the Local Rules for filing and service of non-electronic documents." General Order 45(IX). An attempt to file documents electronically does not alter any filing deadlines. All electronic transmissions of documents must be completed (i.e., received completely by the Clerk's Office) prior to midnight in order to be considered timely filed that day. General Order 45 (VI)(D).

As evidenced by the Court's Pretrial Preparation Order of November 16, 2007, all dispositive motions and supporting papers were to be filed by March 21, 2008. The Declaration of Paul Montwillo, however, was not presented until March 24, 2008. At that time, Plaintiff not only failed to file his Declaration electronically, but manually presented a hard copy before the

Court Clerk as reflected in the Clerk's Notice Re: Failure to File Electronically.  As of the date of this Opposition, Defendants have received no notice that Plaintiff has cured this failure to electronically file his Declaration. Nor are Defendants aware of any effort by Plaintiff to extend the filing deadline.  Hence, Plaintiff's Declaration was neither timely filed with the Court nor deemed served on Opposing Counsel.  It must be stricken and disregarded by the Court.

Moreover, as of the date of this Opposition, Plaintiff has failed to serve Montwillo's Declaration on Opposing Counsel.  Indeed, no proof of service of any form is contained or attached to Plaintiff's Motion, nor has a copy been received in any form by Defense Counsel. This failure to serve, if allowed by the Court and if the Court considers the evidence allegedly contained in the Declaration, will force Defendants to rely on an Opposition to Plaintiff's Motion prepared without ever having seen the critical evidence that forms the core of that Motion. Based on Plaintiff's multiple violations of the FRCP and Local Rules, Defendants object to and move to strike from consideration the Declaration of Montwillo based on his failure to effect service, at the time of filing or at all.

### b.    Plaintiff's Failure to Include a Proposed Order with His Motion

Local Rule 7-2(c) provides that "Unless excused by the Judge who will hear the motion, each motion must be accompanied by a proposed order."  The Court has not excused the filing of a proposed order in this case.  Plaintiff's Motion, seeking relief as to multiple claims, offers no help as it cannot be understood, let alone ruled upon, in the absence of a proposed order specifying the scope and terms of relief sought by Plaintiff.  As a consequence, Defendants urge this Court to deny the motion in its entirety based on Plaintiff's blatant and unexcused violation of the Local Court Rules and Federal Rules of Civil Procedure.

### A.    LEGAL ARGUMENT

### SUBSTANTIVE OBJECTIONS TO PLAINTIFF'S MOTION

Plaintiff's Notice of Motion is incoherent.  It is not clear, from either the Motion itself or its Table of Contents, whether Plaintiff is moving for Summary Judgment on his Complaint, or just

MONTWILL V. TULL, ET AL.  USDC Action No. C 07 3947 SI                    3

Defendants' Opposition to Plaintiff's Motion for Summary Judgment

1   Summary Adjudication as to the issue of liability. Neither Defendants nor the Court are required
2   to ferret out the intent of the motion – its unintelligibility is grounds for its denial. This basic lack
3   of clarity is further evidenced by what appears to be an attempt to also seek to obtain a ruling,
4   characterized as a "dismissal", of Defendants' counterclaims in this action, seemingly in the
5   ambit of Rule 12(b) as opposed to Rule 56.

6

7   **SUBSTANTIVE OBJECTIONS TO DECLARATION OF PAUL MONTWILLO**

8   The vast majority of the facts relied upon in Plaintiff's Motion are allegedly supported by
9   the Declaration of Paul Montwillo[1], a document Defendants have never seen nor been served
10  with. In addition, many of the claimed "facts" referenced to his Declaration have already been
11  directly contradicted by Montwillo's sworn testimony in deposition. In Defendants' Motion for
12  Summary Judgment, filed March 21, 2008, Defendants cited numerous instances where
13  Plaintiff's deposition testimony contradicts the allegations of his complaint, and contains
14  admissions which establish both the merits of Defendants' defense and the lack of any triable
15  issues of fact as to Plaintiff's Complaint. Had Defendants been served, there is no doubt they
16  could have cited other excerpts from Montwillo's testimony which contradict the claims
17  reportedly made in his Declaration. Defendants thus request that the Court disregard the
18  Declaration in its entirety as Defendants have been deprived of the opportunity to demonstrate
19  the lack of merit of those statements.

20  Alternatively, Defendants submit that the Court may and should declare the "facts"
21  contained in Plaintiff's Declaration a sham and move to disregard same in favor of his
22  deposition testimony.

23  The general rule in the Ninth Circuit is that a party cannot create an issue of fact by an
24  affidavit contradicting his prior deposition testimony. *See, Foster v. Arcata Associates,* 772 F.2d
25  1453, 1462 (9th Cir.1985), *cert. denied,* 475 U.S. 1048, 106 S.Ct. 1267, 89 L.Ed.2d 576 (1986);
26  *Radobenko v. Automated Equipment Corp.,* 520 F.2d 540, 543-44 (9th Cir.1975). "[I]f a party

27  _____

28  [1]  In the section of Plaintiff's Memorandum of Points and Authorities entitled "Factual Background" alone, there are a
    total of 79 citations to facts allegedly found in Montwillo's Declaration.
    MONTWILL V. TULL, ET AL.  USDC Action No. C 07 3947 SI                                          4

    Defendants' Opposition to Plaintiff's Motion for Summary Judgment

1  who has been examined at length on deposition could raise an issue of fact simply by

2  submitting an affidavit contradicting his own prior testimony, this would greatly diminish the

3  utility of summary judgment as a procedure for screening out sham issues of fact." _Foster, 772_

4  _F.2d at 1462; Radobenko, 520 F.2d at 544_ (quoting _Perma Research and Development Co. v._

5  _Singer Co., 410 F.2d 572, 578 (2d Cir.1969)_).   More recently, in _Kennedy v. Allied Mut. Ins. Co._

6  952 F.2d 262 (9th Cir 1991), the Court reaffirmed this rule regarding the interpretation and

7  weighing of conflicting evidence, especially in the context of summary judgment, and instructed

8  that the trial court first render a determination that the conflicting affidavit be declared a sham.

9      To the extent that such contradictory statements exist in Montwillo's Declaration, if the

10  Court chooses to overlook its late filing, the absence of service on Defendants, and the

11  prejudicial effect on Defendants' ability to respond to this motion, and allows the Declaration to

12  be considered for this motion, it may and should view Plaintiff's deposition admissions with

13  greater weight than his Declaration on the grounds that the Declaration is merely a sham

14  intended to create an issue of fact where none exists.

15

16  **1.    PLAINTIFF MOTION MUST BE DENIED BECAUSE THE COPYRIGHTS CLAIMED BY**

17  **MONTWILLO AS THE BASIS OF HIS INFRINGEMENT CLAIM ARE INVALID.**

18      Even if the factual claims of copyright registration made by Plaintiff are truthful[2],

19  Plaintiff's Motion fails to meet its burden of production and persuasion as to crucial elements

20  that must be satisfied before enforcement may be pursued.  To wit: Are the design aspects of

21  Plaintiff's copyright registrations valid and protectable under Copyright Law.  Plaintiff's Motion is

22  completely silent in that regard for the simple reason that he cannot establish a legitimate right

23

24

25

26  [2]  The registration certificates relied upon by Plaintiff, copies of which were also attached to Defendants' Motion, do
    not show the back page of the certificate, where Montwillo presumably signed them under penalty of perjury. Since
27  there is no proof before the Court that the design rights claimed by Plaintiff were made under penalty of perjury, or
    that Montwillo even signed the applications, the Court and Defendants are unable to determine if the copyright
28  registrations are, in fact, valid or authentic.

to any copyright interests in the subject dolls. Defendants thus submit that Plaintiff's Motion must be denied on multiple grounds, including the following:

a.  The Doll Designs are comprised of stereotypical design elements which lack originality and are not copyrightable;

b.  The Doll Designs principally incorporate genre elements which are not entitled to Copyright Protection under the doctrine of "Scenes a Faire";

c.  The design elements claimed by Plaintiff were conceived during the Arsenic & Apple Pie Partnership and LLC and did not violate the injunction with Mattel, Inc.;

d.  Plaintiff cannot explain why, if he owned the copyrights to the doll designs, all of the dolls manufactured by Arsenic & Apple Pie were sold in packaging designed and approved by Plaintiff bearing a copyright claim for Arsenic, not Plaintiff;

e.  Plaintiff's own testimony confirms the existence of a license; and

f.  Plaintiff's Bankruptcy petition establishes either the abandonment of any copyrights or licenses to the dolls, or that the instant Complaint and Motion are admissions that Plaintiff lied in his Bankruptcy Petition.

Many of these points are addressed in detail in Defendants' Motion for Summary Judgment, now pending before this Court. To the extent that the above issues require elaboration beyond the argument presented in this Opposition, the Court is requested to take judicial notice of the contents of that Motion, in addition to the arguments presented in this Opposition.

**a.    The Doll Designs Are Comprised Of Stereotypical Design Elements Which Lack Originality And Are Not Copyrightable.**

Section 102(a) of the Copyright Act of 1976 (17 U.S.C. § 102(a)) provides that copyright protection extends to "original works of authorship". In the seminal case of *Feist Publications, Inc. v. Rural Telephone Service Co.*, (499 U.S. 340 (1991), the Supreme Court defined originality as a work which possessed "at least some minimal degree of creativity". *Id. at 341.*

MONTWILL V. TULL, ET AL.  USDC Action No. C 07 3947 SI                                    6

1   While acknowledging that the amount of creativity required is not a large amount, the Court also

2   noted that there are some works "in which the creative spark is utterly lacking or so trivial as to

3   be virtually non-existent". *Id. at 359.*

4   With this framework in mind, Plaintiff's own admissions in deposition establish that the

5   designs put together in the case of these dolls was not sufficiently original or creative to warrant

6   copyright protection, as a matter of law. Where there is no copyright owned, there can be no

7   infringement.

8

9   Plaintiff has admitted that he did not design, and in fact had nothing to do whatsoever,

10  with the creation of four of the five plastic dolls used in the Arsenic line of doll products, which

11  are here at issue. He admits that the bodies used for the first Trailer Trash Doll, and the first two

12  Drag Queen Dolls, as well as the prototype Male Trailer Trash Doll, were all purchased from

13  retailers and used without modification. His only contribution, by admission, was to dress the

14  dolls up in stereotypical "trailer trash" clothing and accessories, and apply makeup to the dolls.

15  His testimony, containing these admissions, is as follows:

16

17  | Q. | *Well, let's back up. With respect to those three dolls, Trailer Trash Doll,* |

18  |    | *Blonde Drag Queen and Red Head Drag Queen, you didn't design the* |
    |    | *body. Is that correct?* |

19  | A. | *That's correct.* |

20  | Q. | *What did you design on those three dolls?* |

21  | A. | *The clothing. The pants. The accessories.* |

22  | Q. | *Okay.* |

    | Q. | *And taking a look at the box we've got here, ...I think we've already* |
23  |    | *concluded that this is one of the designs, Trailer Trash Edition 1. Is that* |
24  |    | *correct?* |

25  | A. | *Yes.* |

26  | Q. | *This particular design features the model, the doll in what looks to be a* |
27  |    | *representation of blue jean shorts. I believe you previously made* |
    |    | *reference to these as "Daisy May" shorts?* |
28  | A. | *Daisy Duke shorts.* |

MONTWILL V. TULL, ET AL.  USDC Action No. C 07 3947 SI                                    7

Defendants' Opposition to Plaintiff's Motion for Summary Judgment

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Q.      *Daisy Duke shorts. And does that come from "The Dukes of Hazzard"*
        *television show?*

A       *Yes.*

Q.      *The character of Daisy Duke? That's how you were describing them.*

A.      *There was a reference, yes.*

Q.      *And the doll also is wearing a red and white checked halter top. Is that*
        *how you would characterize that garment?*

A.      *Well, I guess halter top isn't correct, but –*

Q.      *How would you describe it?*

A.      *I can't remember the correct word for that.*

Q.      *Is it a crop top?*

A.      *Crop top maybe, something. I don't know. Skimpy, skimpy thing on top.*

Q.      *Right. And the hairdo of the doll is pig tails?*

A.      *Yes.*

Q.      *Pig tails and bangs?*

A.      *And black roots, yes.*

Q.      *And notably the black roots.*

A.      *And the cigarette, yes. And the blue eye shadow.*

Q.      *Okay. Cigarettes, blue eye shadow. Have you ever seen characters in*
        *literature, movies or any other genre, where these elements are*
        *incorporated to convey rural or poor white individuals?*

A.      *Well, that's what I was trying to convey; I mean, it obviously stems from a*
        *stereotype.*

Deposition of Paul Montwillo, at 91:6 – 93:8.


Montwillo made similar admissions regarding the lack of originality in his choice of

clothing and accessories for the Drag Queen dolls he worked on:

Q.      *With respect to the Blonde Drag Queen, what elements did you add to that*
        *design?*

A.      *Everything but the body.*

Q.      *And what were those elements; what is the everything?*

A.      *Dress, purse, hair, makeup. Everything. Packaging. Whatever.*

1    Q.    And how would it be that someone looking at that doll would know that is was
2          supposed to be a drag queen as opposed to an actual female?
3    A.    It has a male body. It's exaggerated makeup. It's a drag queen.
     Q.    From your expression –
4    A.    I'm like, what? It's a drag queen.
5    Q.    Right.  My sense is that the elements that you incorporated were so clear that
6          anyone looking at it would know it was a drag queen.  Is that right?
7    A.    That's correct.
8          Deposition of Paul Montwillo at 93:21-25 – 94:1-13.

9          Mr. Montwillo further admitted that the Blonde Drag Queen was modeled after Marilyn
10   Monroe, because she is a popular source of imitation by drag queens:

11   Q.    Well, what choice did you make as to what the hair should be for the Blonde
12         Drag Queen?
13   R.    MR. SOMMERS: Objection, vague. Go ahead.
     A.    I chose long blonde hair.
14   Q.    Why?
15   A.    I knew I was going to do a white dress.  So a lot of drag queens like to do
16         Marilyn, so I put the blonde in a white dress.
17   Q.    Sort of to evoke the drag queen version of Marilyn?
18   A.    Yes.
     Deposition of Paul Montwillo at 95:2-13.
19

20

21        Mr. Montwillo, by his testimony, admits that he purposely copied stereotypical, genre

22   elements in designing the dolls. The common elements were found in popular depictions of

23   "trailer trash" characters, notably from the television show The Dukes of Hazzard.    These

24   classic and well-recognized stereotypes can be traced back to comic strips and contain nothing

25   original in their execution to warrant copyright protection.

26        Mr. Montwillo's only design claim is to have participated in the design for a pregnant

27   trailer trash doll. Here again, the design of a generic style mannequin has been held not be a

28

1  valid subject of copyright protection in the *Carol Barnhart. Inc. v. Economy Cover Corp. (773 F.*
2  *2d 411 (2d Cir. 1985)* case.

3      Similarly, in *Galliano v. Harrah's Operating Co.*, 424 F. Supp. 2d 1211 (C.D. Cal. 2006),
4  the Court held that copyright protection does not extend to garment designs on the grounds that
5  they are useful articles that are the product of a craft or trade, rather than art. *Id at 419-22.* The
6
7  novelty of what Plaintiff "created" is in the humorous, satirical depiction of a rouge "All-
8  American" Barbie – by merely dressing Barbie-type dolls in stereotypical trailer trash clothing.
9  Funny as this may be to some, the idea isn't afforded protection under Copyright law.  The
10  embodiment of a common idea drawing stereotype elements isn't a sufficiently original artistic
11  expression to warrant copyright protection.   In short, Plaintiff is not entitled to summary
12  judgment because the designs he attempted to copyright lack sufficient originality and creativity.
13

14          **b.     The Doll Designs Principally Incorporate Genre Elements Which Are Not**
15                **Entitled To Copyright Protection Under The Doctrine Of "Scenes A Faire".**
16      A further ground to deny summary judgment to Plaintiff is based on the absence of a
17  valid design entitled to copyright protection.   Montwillo, by his own admission, dressed dolls in
18  stereotypical clothing – in other words the clothing designs he used were not original to him.
19  The doctrine of "scenes a faire" bars a grant of copyright protection for these types of genre
20  usages. Montwillo's admission, in the deposition testimony cited above, that he based his
21  "designs" on non-original stereotypical clothing and accessories, supports a finding that the
22  "scenes a faire" defense warrants summary judgment in this case.
23

24      The validity of a "scenes a faire" defense, as a defense to summary judgment in a
25  copyright infringement case, has previously been ruled on by this Court in the case of *Ets-Hokin*
26  *v. Skyy Spirits, Inc.*, wherein this Court granted summary judgment to defendant Skyy Spirits on
27  a variety of grounds, including that the "scenes a faire" doctrine was a valid defense to Plaintiff's
28  infringement claim. Judge Illston's decision was affirmed by the Court of Appeals for the Ninth

1  Circuit in *Ets-Hokin v. Skyy Spirits, Inc.*, 323 F. 3d 763 (2003).  In writing for a unanimous court,

2  Chief Judge Schroeder, explained the doctrine thusly:

3              "Likewise, when similar features of a work are "as a practical matter

4                  indispensable, or at least standard, in the treatment of a given idea, they are

5                  treated like ideas and are therefore not protected by copyright." Apple Computer

6                  v. Microsoft Corp., 35 F. 3d 1444 (9th Cir. 1994)". Id. at 765-66.

7

8          In a similar case, *Todd v. Montana Silversmiths*, 379 F. Supp. 2d 1110 (2005), the court

9  granted summary judgment against a plaintiff who alleged copyright infringement against a

10 jewelry manufacturer who, plaintiff claimed, had infringed her original jewelry designs, which

11 used barbed wire for "Western-themed" jewelry. *Id.*

12         Noting that plaintiff's copyright registration of her designs only created a rebuttable

13 presumption of copyright validity, the Court held that defendants could rebut that presumption

14 by presenting evidence that cast doubt on the copyrightability of the work in question. *Id.* at

15 1111.  In so ruling, the Court concluded that plaintiff's designs made no original contributions to

16 barb-wire jewelry that do not already exist in ordinary public domain barbed-wire, "so as a result,

17 her jewelry lacks sufficient originality to be the subject of a valid copyright." *Id.*  The Court further

18 noted that "she has taken the constituent elements of barbed-wire and arranged them in a way

19 that by all objective measures still matches the elemental arrangement of barbed-wire". *Id.* at

20 1113.

21

22         The foregoing authorities, coupled with the deposition testimony admissions of Plaintiff

23 Montwillo, provide a dual basis for the Court to deny summary judgment to Plaintiff in this case:

24 on the grounds that the claim of copyright here fails due to the lack of original content in the doll

25 "designs", and the fact that the stereotypical elements in these designs are barred from

26 copyright protection by the scenes a faire doctrine.

27

28

c.    **The Doll Designs Claimed by Plaintiff Were New and Conceived of During the Arsenic & Apple Pie Partnership or Limited Liability Company- Mattels' Injunction was Not Violated or Breached.**

Plaintiff's Motion goes to great length to argue that the doll designs in question were in existence prior to the formation of Arsenic & Apple Pie, either in its partnership form or as an LLC.  The point is crucial for Plaintiff as he then argues that since neither the Partnership Agreement nor the Operating Agreement for Arsenic & Apple Pie required Plaintiff to convey his existing doll designs in lieu of a capital contribution, that he then retained all such rights.

Plaintiff's assertions, however, do not constitute credible evidence as he asks the Court to accept that the dolls produced and manufactured by Arsenic & Apple Pie were of the same design as the earlier dolls based on the Barbie line, just without the Barbie name or the pink package. (Plaintiff's Mtn, Page 2, lines 17-20)  This is contradicted by Montwillo's own deposition testimony and Tull's Affidavit (Paragraphs 3 & 4) in support of this Opposition, in which testifed that Arsenic & Apple Pie strictly refrained from violating any aspect or term of the injunction agreed to with Mattel, Inc.  Montwillo testified in deposition as follows:

> Q.    *You indicated that you changed the body of the doll so as to avoid further problems with Mattel. Is that right?*
>
> A.    *That's correct.*
>
> Q.    *What change did you make?*
>
> A     *I just used a different body.*
>
> Q.    *Did you create that body or did you find an existing - -*
>
> A.    *It was a doll.*
>
> Q.    *What was the source?*
>
> A.    *Toy stores, [b]ig [l]ots, whatever.*
>
> Q     *I see.  So you either bought or found other dolls to create the replacement dolls from?*
>
> A.    *Yeah*

Deposition of Paul Montwillo at 31:11-24.

1   In short, the notion that the dolls produced by Plaintiff and Tull were the same is completely and

2   utterly false. Far from wanting to be sued again by Mattel again, the parties carefully refrained

3   from using Barbie bodies, the Barbie name and pink boxes in the style used and protected by

4   Mattel[3].

5

6       Plaintiff's Motion then argues that he and Tull, "[u]ndeterred by the restrictions contained

7   in the settlement agreement... went into a partnership to create and distribute Montwillo's dolls."

8   Ibid at 2:21-22.  He thus argues that Arsenic & Apple Pie then produced the same dolls which

9   led to the Mattel lawsuit. As shown above, that was clearly not the case. Furthermore, the

10  deposition of Plaintiff makes clear that he did not begin to produce any replacement dolls until

11  after he settled with Mattel, well after he entered into the Arsenic & Apple Pie Partnership.

12      Referring to the Mattel settlement date, Montwillo testified as follows:

13      Q.    A year. So your settlement with Mattel was sometime in 1998. Is that right?

14      A.    It was actually - - I remember because I was leaving to go home for Christmas. It

15            was December of '97.

16      Q.    And so you signed off and were done with Mattel by December of '97. Is that

17            right?

        A.    Yeah.

18
        Deposition of Paul Montwillo at 27:16 – 22.

19  Montwillo then explained the process by which the dolls were produced in China through an

20  intermediary:

21      Q.    So would it be fair to say that you got you said a body from China and then

22            incorporated the other design elements that you had previously done using a

23            Barbie body?

24      A.    Yeah.

25      Q.    Okay.  Who arranged to obtain the body from China?

26
---
27  [3]   A further distinction admitted to by Montwillo was that the original dolls he crafted using Barbie doll bodies, were
    one-of-a-kind items.  The dolls created by Montwillo while he was a partner and/or member of the LLC were newly
    created for mass production.  See, Deposition of Paul Montwillo 36:2 – 37:17.
28

1    A.    *Jeff Trojan was the man's name.*

2    Deposition of Paul Montwillo at 39:13 – 19

3

4    Q.    *And what was his involvement in getting the doll body?*

     A.    *He was a contact to Hong Kong for us, or China, wherever they are.*

5    Q.    *Well, can you tell me, please, a little bit about how the process of this*

6          *manufacturing of dolls took place using these bodies?*

7          *SOMMERS:          Calls for a narrative.*

8          *GREENBERG:        It does indeed.*

     A.    *So it was the same process, like I would strip down a Barbie. Well, they gave me*
9
           *a stripped down body, added the exact same thing, you know, darkened the*
10         *roots, gave it a cigarette, dressed it, you know, and sent it off to them.*

11                  *So then they would try and copy me. And then they would send it back to*

12                  *me and I would say, "No, you did this wrong, and you did that wrong,*

13                  *modify it." So back and forth like that.*

14   Q.    *So what you were doing was, you were creating the prototype and they would*

           *then attempt to make a copy of that. You were testing back and forth to make*
15
           *sure you got a final version that everyone was satisfied with. Is that accurate?*

16   A.    *Year. I was just trying to get them to accurately copy my work, yeah.*

17   Q.    *Once you had reached agreement, was it your understanding that once you had*

18         *reached an agreement and you were satisfied with what they had done, they*

           *would then go into mass production to make a number of dolls?*
19
     A.    *Yes.*

20   Q.    *Okay. And were they shipping finished packaged dolls back or was packaging*

21         *done here?*

22   A.    *It was done there.*

23   Q.    *It was done there. So you got basically boxes filled with individual packaged*

           *boxes.*
24
     A.    *Yes, I had to design the packaging as well.*

25   Q.    *And you designed the packaging as well.*

26   A.    *Yes.*

27   Q.    *Now, this is taking place - - is this taking place, this process of going back and*

28         *forth with - - was it China?*

          MONTWILL V. TULL, ET AL.  USDC Action No. C 07 3947 SI                              14

          Defendants' Opposition to Plaintiff's Motion for Summary Judgment

1      A.    China.

2      Q.    Was this taking place prior to December of 1997?

3      A.    No.

4      Q.    This took place after you had settled with Mattel?

       A.    That's correct.

5      Q.    Was this taking place during the time the partnership was in existence or was it

6            during the time the LLC was in existence or a little of both?

7            SOMMERS: Objection, compound. Go ahead.

8            WITNESS: I don't recall.

             GREENBERG: I understand.
9
             WITNESS:     I would guess it would be after - -
10
             SOMMERS:     Don't guess.

11     Q..   What's your best recollection?

12     A.    My best recollection would be after the initial partnership agreement was signed.

13     Deposition of Paul Montwillo at 40:6 – 42:18.

14
       As shown by the Partnership Agreement presumably attached to Montwillo's declaration,
15
       (attached as Exhibit 2 to the Declaration of Greenberg in support of Defendant's Motion for
16
       Summary Judgment) Montwillo and Tull entered into their partnership in July of 1997. Hence,
17
18     since Montwillo's best recollection is that the production process took place after the Mattel

19     lawsuit was settled, it is clear that Plaintiff's work on all design aspects of the dolls took place

20     many months after he joined the partnership. Indeed, that is precisely what was intended and

21     understood by Montwillo when he entered into the partnership:

22     Q.    And when it say that you will be primarily responsible for art direction, design and

23           advertising of the product line. Do you see that sentence?

24     A.    Yes.

25     Q.    What product line is referred to there?

       A.    Toys.
26
       Q.    Sorry?
27     A.    Toys.

28     Q.    What kind of toys?

1  A. *Dolls.*

2  Q. *Dolls. Any others contemplated at this time?*

3  A. *Year, I think so. We were talking about watches back then and - - yeah, I was
designing some watches. I don't remember what else, T-Shirts.*

4

5  Q. *Okay. And were all of these products, this product line referred to here, was this
all the Trailer Trash concept put into different products?*

6  A. *Yes.*

7  Q. *Okay. Just so you and I have an understanding when we're referring to "product
line," would it be fair to say that it's the Trailer Trash product line?*

8

9  A. *Well, we did drag queens too.*

Deposition of Paul Montwillo at 35:3 – 25.

10

11  The above text from Montwillo's deposition establishes beyond question that the subject

12 dolls were much different from the ones he originally created using Barbie dolls. Moreover, his

13 testimony shows that after the Mattel lawsuit was settled in December of 1997, he made

14 significant alterations to the type of body, the name of the product and its packaging in

15

16 conjunction with producing the doll in China. Above all, Montwillo redesigned the dolls, created

17 a prototype and approved production *after* he had already entered into the Arsenic & Apple Pie

18 partnership where his specific duties included: art direction, design and advertising of the

19 product line, i.e. the Trailer Trash doll concept. There is, therefore, no triable issue of fact that

20 the designs created by Montwillo were not in existence prior to his membership in the LLC –

21 only the idea of a trailer trash doll pre-existed these business entities.

22

23  d. **Plaintiff Cannot Explain Why, If He Owned The Copyrights To The Doll
Designs, All Of The Dolls Manufactured By Arsenic & Apple Pie Were Sold,
In Packaging Designed And Approved By Plaintiff, Bearing A Copyright
Claim For Arsenic**

24

25

26  Glaringly absent from any mention or discussion in Plaintiff's Motion is that fact that he

27 has acknowledged in his deposition that he designed the packaging for all of the subject dolls.

28

1   Tull's Affidavit (paragraph 9) confirms this important point. If Plaintiff is to believed, that he

2   alone held all of the copyright interests to the dolls during the seven years (1997 – 2004) that he

3   was an owner in the Arsenic & Apple Pie business, then what rational explanation can be

4   offered for the presence of a copyright claim notice by Arsenic & Apple Pie on the back of each

5   box? Tull's Affidavit (paragraph 10) establishes that the copyright claim was present on each

6

7   and every box containing a Trailer Trash or Drag Queen Doll ever produced by Arsenic & Apple

8   Pie. When questioned about this in his deposition, Montwillo could offer no rational explanation

9   for this damaging, undisputed fact:

10   Q.   If you owned the copyrights to these designs, why does the copyright notice say it's

11         copyright Arsenic & Apple Pie on both of these?

12   A.   I don't know. I own the copyrights to the dolls.

13   Deposition of Paul Montwillo at 70:14-17.

14

15   The significance of this fact, given Montwillo's involvement in personally designing the

16   boxes for each doll and the absence of any explanation to support his claims, is that it clearly

17   shows that Plaintiff either knowingly conveyed all design rights to the dolls to Arsenic & Apple

18   Pie in exchange for a share of the profits, or that he openly acknowledged that the dolls were

19

20   designed and conceived of as a "work for hire" for Arsenic & Apple Pie. Clearly, if Plaintiff is

21   unable or unwilling to address this issue, then his Motion must be denied in its entirety.

22

23   **e.   Plaintiff's Own Testimony Confirms the Existence of a License.**

24   Plaintiff's Motion argues that Defendants infringed upon his copyrights since he (1) did

25   not grant an implied non-exclusive license, (2) if he did grant such a license, it did not extend to

26   Tull, Gibby or Gibby Novelties, (3) Plaintiff never received any consideration for it, and (4) his

27   contributions were not minimal. (Plaintiff's Motion 21:8-14). In response, Defendants point out

28   that each and every point has been addressed in Defendants' favor in Montwillo's testimony.

1    Asked whether Plaintiff ever granted a license to Arsenic & Apple Pie, Plaintiff's testified:

2        Q.    You were in partnership at the time or in an LLC with Mr. Tull. Did Mr. Tull have

3              any ownership interest in this design?

4        A.    No, he does not have ownership to my intellectual property. I licensed the

5              designs to the corporation.

     Deposition of Paul Montwillo at 43:16 – 21.

6

7    Regarding the specific details of the license Montwillo admitted to having granted to

8    Arsenic & Apple Pie, he stated:

9        Q.    Mr. Montwillo, before our break you indicated that you licensed your designs, I

10             believe you said to the corporation. I think in that respect were you referring to

11             the partnership and/or the LLC of Arsenic & Apple Pie?

12       A.    Yes.

         Q.    And when you say you "licensed your designs," was this a written license?

13       A.    No. I let the company use my work.

14       Q.    When you indicate you let the company use your work, is this what you mean by

15             licensed?

16       A.    Yes.  I don't know like legal terms if this is - - you know.  There was no written

17             license.

18       Q.    Okay, when you say you let the company use your work or that you licensed it, I

               need to know from you since there wasn't anything in writing, what the terms of

19             that license were; how long was the license of the designs to run?

20       A.    As long as I was in the company.

21       Q.    As long as you were in the company. Okay. And if you left the company, was it

22             your understanding that you would be able to take your rights to the design with

               you and the company would no longer be able to use those designs?

23       A.    Yes.

24   Deposition of Paul Montwillo at 44:8 – 45:7.

25

26   The license granted by Montwillo, however, existed in his head alone in that he admitted

27   he never discussed the existence of, the terms or the length of his license with anyone,

28   including his business partner, Tull. Plaintiff's testimony in support is as follows:

1  Q.   Let me ask you a different question.  You say you licensed your designs.  Did
2       you and Mr. Tull ever sit down and have a discussion about the terms of this
3       license?
4  A.   No. I don't think so, no.
   Q.   Did you discuss the terms of this license with anyone else in the Arsenic & Apple
5       Pie partnership?
6  A.   No.
7  Q.   Were the terms of this license only existing in your own mind?
8  A.   No.  I specifically - - when we drew up the operating agreement, I specifically
        made sure there was no language that would deprive me of my intellectual
9       property.
10  Deposition of Paul Montwillo at 47:6 – 19.
11

12      Tull, in his Affidavit in support of this Opposition, firmly denies that any changes were
13  made to the Operating Agreement other than those specifically reflected in the document which
14  was actually signed.  (Exhibit A to Tull Affidavit in support of Defendants' Motion).  No where in
15  the signed Operating Agreement is there any language deleted or added that preserved to
16  Plaintiff his copyrights to the subject dolls.  Indeed, the best Plaintiff can do is to claim that some
17  language was removed.  However, he cannot remember what language was removed, nor can
18  he produce any communications or the drafts that allegedly went back and forth on the topic
19  since he conveniently threw them all away:

20  Q.   Mr. Montwillo, what language was removed from the operating agreement that
21       you were concerned would have some impact on your intellectual property
22       rights?
23  A.   I don't recall exactly.
    Q.   Okay.
24  A.   I do recall it was there.
25  Q,   You recall something was there?
26  A.   I recall having it removed because - - for that reason.
27  Q.   Okay.  And you discussed removing some of the language with Mr. Tull?
28  A.   Yes.  We were sending back and forth drafts and I remember we were making
        notes on them.

MONTWILL V. TULL, ET AL.  USDC Action No. C 07 3947 SI                19

Defendants' Opposition to Plaintiff's Motion for Summary Judgment

1  Q.    So you asked that certain language be removed?

2  A.    Yes.

3  Q.    But you don't recall what the language was?

4  A.    Not precisely, no. I t was a very long time ago.

   Q.    Do you have copies of any of those communications between you and Mr. Tull

5        and in particular the one in which you made a request that this language be

6        removed?

7  A.    I do not. I threw all the drafts away.

8  Deposition of Paul Montwillo at 48:18 – 49:15.

9

10  Turning to Plaintiff's assertion that no license was granted, he purports that no

11  consideration was ever received. Nothing could be further from the truth. In exchange for his

12  work on behalf of the partnership, and later company, Montwillo received the right to an equal

13  share of the net profits. He acknowledged this fact in deposition:

14  Q.    And then skipping down a paragraph to the fifth paragraph on this page, it says,

15        quote, "In return for their efforts each party shall receive 50 percent of the net

16        profits from the business, after Mr. Tull has been returned his initial investment

16        plus interest at the current APR." "APR" standing for annual percentage rate. Is

17        that correct?

18  A.    Yes.

19  Q.    Is this an accurate statement of your understanding of how the proceeds of your

         business with Mr. Tull were going to be divided?

20  A.    Yeah.  That was very naïve of me.

21  Deposition of Paul Montwillo at 38:2 – 14.

22

23  Finally, as to the nature of Montwillo's contributions to the LLC, they were limited to his

24  work on the designs of the dolls, which as admitted in his deposition testimony, consisted

25  merely of placing genre elements of "trailer trash" or "drag queen" clothing and makeup on the

26  doll bodies imported from China.

27

28

f.  **Plaintiff's Bankruptcy Petition Establishes Either The Abandonment Of Any Copyrights Or Licenses To The Dolls, Or That The Instant Action And Motion Are Admissions That Plaintiff Lied In His Bankruptcy Petition.**

In his Motion, Plaintiff offers the thinnest of explanations when discussing the contents of his sworn Petition in Bankruptcy of 2002. His Declaration presumably claims that since he had never made any money from the artwork upon which the dolls were based, that he did not list them on his bankruptcy petition. Plaintiff offers no authority for this unique and wholly unsupported explanation. The lack of merit of this argument is discussed in detail in the next section of this Memorandum, *infra*. In addition, the overwhelming weight of the evidence in this case shows clearly that Plaintiff did not list the copyrights or licenses for the simple reason that he no longer considered them to be his.

At the time of Plaintiff's Bankruptcy, Arsenic & Apple Pie, LLC was in existence and Plaintiff was a co-managing member with a 50% ownership interest. By disclosing that interest in the LLC, but not his alleged copyrights or license to Arsenic, Plaintiff recognized that he had either conveyed his rights to the dolls to the company or had conceived of them during his tenure with the company, in which case his works were the property of the company as per the "works for hire doctrine". Moreover, Plaintiff was actively aware, and fully assisted, Arsenic & Apple Pie in claiming ownership of all copyrights to the dolls, as demonstrated by the copyright claim notice which Plaintiff included in his design of the boxes for each of the dolls. In short, Defendants submit that Plaintiff's Motion must be denied as the is no tangible issue of fact that Plaintiff no longer owned any copyrights to the dolls by the time he filed his bankruptcy petition.

2.  **IF PLAINTIFF DID NOT CONVEY OR ABANDON HIS DESIGNS TO THE DOLLS WHEN HE FILED HIS BANKRUPTCY PETITION, HIS FAILURE TO DISCLOSE THE ASSETS CONSTITUTES SUFFICIENT GROUNDS FOR THE RE-OPENING OF HIS BANKRUPTCY CASE AND POSSIBLE DENIAL OF DISCHARGE.**

1    As amply shown in the Motion for Summary Judgment filed by Defendants, Plaintiff
2  failed to disclose the existence of any copyrights or licenses to the subject dolls when he filed
3  his Petition in Bankruptcy in 2002. (Attached as Exhibit 3 to the Declaration of Greenberg) Not
4  only does Plaintiff's Chapter 7 Petition list none of the copyrights or licenses which he now
5  asserts, he further stated that he owned no such intellectual property rights bearing any value.
6  This fact clearly flies in the face of Plaintiff's claim in the instant case, and presents a dilemma
7  for the Court in that these undisclosed assets, if they actually existed, were never released or
8  abandoned by the Bankruptcy Trustee, hence they remain the property of the estate, not
9  Plaintiff.

10    When a bankruptcy case is filed, virtually all of the debtor's assets vest in the bankruptcy
11  estate. 11 U.S.C. § 541(a)(1).  Once an asset becomes part of the bankruptcy estate, the
12  debtor's rights in the asset are extinguished unless the asset is abandoned back to the debtor.
13  11 U.S.C. § 554.  However, when an interest or claim is not listed on a bankruptcy schedule,
14  and the case is closed, that interest or claim remains in the bankruptcy estate. In re Lopez, 283
15  B.R. 22, (9th Cir. BAP 2002), U. S. v. Ivers, 512 F.2d 121 (C.A.8.N.D.,1975).

16    In instances such as the instant matter where assets have clearly not been disclosed to
17  the Court, there has been no opportunity for the trustee to administer the assets. The law thus
18  provides for the reopening of the bankruptcy case to administer the undisclosed asset.  In re
19  Lopez, 283 B.R. 22 (9th Cir. BAP 2002) is the landmark case on the subject and involved a
20  debtor who asked to reopen her case so as to include a sexual harassment claim which she had
21  neglected to disclose in her petition. On appeal, the appellate court held that reopening a case
22  under Section 350(b) of the bankruptcy Code is a ministerial act.  Whether on the debtor's or the
23  Court's own motion, the court has a duty to reopen the estate whenever there is proof that it has
24  not been fully administered. The proper focus is on the benefit to the creditors, so that if the
25  asset has any value, the case should be reopened. Id. at 28.

26    Therefore, if there is any potential that Plaintiff's copyright claims have any merit or
27  value, then it is incumbent on this Court to report and transfer this matter to the U.S. Bankruptcy
28  Court with a recommendation to reopen Montwillo's Chapter 7 Petition so that a trustee can be

Case 3:07-cv-03947-SI    Document 46    Filed 04/04/2008    Page 28 of 30
Case 3:07-cv-03947-SI    Document 41    Filed 04/03/2008    Page 28 of 30

1    Perhaps more troubling for Plaintiff should this matter proceed, is the fact that his

2    discharge in bankruptcy may be overturned based on his knowing failure to disclose assets.

3    Bankruptcy cases are unanimous in holding that all assets of a debtor must be disclosed, even

4    those assets of limited or no value. In *Chalik v. Moorefield*, 748 F.2d 616, 618 (7th Cir. 1984)

5    the Court warned "[t]he recalcitrant debtor may not escape a section 727(a)(4)(a) denial of

6    discharge by asserting that the admittedly omitted or falsely stated information concerned a

7    worthless relationship or holding; such a defense is specious." Hence, should this matter lead to

8    a re-opening of Plaintiff's bankruptcy, he should be aware that the burden of proof will rest with

9    him to put forth a credible explanation of his bankruptcy schedule.

10    Defendants' suggest that the evidence in this case reflects not that Plaintiff intentionally

11    lied to the Bankruptcy Court, but rather show that Plaintiff, in making the instant claim of

12    ownership of copyright, failed to consider that his prior sworn statements in his bankruptcy filing

13    provide ample evidence that the present claim is wholly without merit or support.

14

15    3.    EVEN IF PLAINTIFF DID NOT CONVEY OR ABANDON THE COPYRIGHTS TO THE

16          DOLLS TO ARSENIC & APPLE PIE, PLAINTIFF'S MOTION MUST BE DENIED

17          BECAUSE HE FAILED TO FILE SUIT WITHIN THE THREE YEAR STATUTE OF

18          LIMITATIONS.

19

20    17 U.S.C.A. § 507(b) provides, in pertinent part, that no civil action for copyright

21    infringement shall be maintained unless it is commenced within three years after the claim

22    accrued.    A cause of action for copyright infringement accrues when one has knowledge of a

23    violation or is chargeable with such knowledge. *Wood v. Santa Barbara Chambers of*

24    *Commerce, Inc.*, 507 F.Supp. 1128, 1135 (D.Nev.1980).    Recovery is thus barred on any claim

25    for damages that accrued more than three years before commencement of suit. *Stone v.*

26    *Williams*, 970 F.2d 1043, 1049-50 (2nd Cir.1992).

27    In the present action, it is clear from the testimony of Plaintiff that to the extent he has a

28    valid claim, his claim of infringement accrued on July 13, 2004, when he wrote a letter intending

MONTWILL V. TULL, ET AL.  USDC Action No. C 07 3947 SI    23

Defendants' Opposition to Plaintiff's Motion for Summary Judgment

1    to put Defendants on notice that they were violating his copyrights.  Plaintiff's admission is as

2    follows:

3       Q.      *Did you prior to the filing of the copyright infringement lawsuit in this case, ever*

4               *send notice to Arsenic & Apple Pie that you believed that they were violating*

5               *your copyright?*

6       A.      *You are looking at it.*

7       Q.      *Okay. So in your view this letter of July 13, 2004, was you sending notice to*

        *them that they were violating your copyright.*

8       A.      *Yes.*

9       Deposition of Paul Montillo at 107:18-24 – 108:1

10      Using July 13, 2004 as the date of accrual, the last possible date that Plaintiff could have

11   lawfully sued for copyright infringement was July 13, 2007.  Plaintiff, however, did not initiate

12   this action for copyright infringement until August 1, 2007, several weeks after the expiration of

13   the three year statute of limitations for copyright infringement.  As a matter of law, Defendants

14
15   are entitled to summary judgment on the sole cause of action contained in Plaintiff's Complaint.

16

17   **4.      THE ARGUMENTS AGAINST DEFENDANTS' COUNTERCLAIM FAIL TO**
         **ESTABLISH A LACK OF MERIT THAT WOULD WARRANT DISMISSAL**
18

19      Tacked on in a hurried fashion at the end of Plaintiff's Memorandum of Points and

20   Authorities is an argument that the CounterClaims filed by Defendant Tull should be dismissed.

21   It unclear what place these arguments have this Memorandum, as they seem to be asserting a

22   different right to relief by Plaintiff – in this case a right to a dismissal, presumably based on

23   Rule 12(b) of the Federal Rules.  Such a motion, if that is what Plaintiff intends this section of

24   the Memorandum to be, is not properly presented in this motion, and is wholly without merit or

25   supporting authorities or evidence, and should be disregarded for those reasons.

26
27      By way of brief Opposition to this motion to dismiss, Defendant Tull notes that, contrary

28   to Plaintiff's claims, the conversion claim does not seek vindication or clarification of ownership

By way of brief Opposition to this motion to dismiss, Defendant Tull notes that, contrary to Plaintiff's claims, the conversion claim does not seek vindication or clarification of ownership -- that would have been the subject of a declaratory relief action, not a conversion one. Therefore it is not pre-empted by the Copyright Act Section 301. Given that Montwillo designed and released product boxes verifying Arsenic and Apple Pie's copyright ownership, and denied his own alleged ownership in sworn statements to the Bankruptcy Court, it seems undisputed that he never was the owner. Hence, his 2004 assertion of ownership through a copyright registration, at the very least presents an issue of fact as to whether he converted those rights.

Based on the foregoing summary statement, and the total lack of evidentiary support for this apparent motion to dismiss, Defendant Tull requests that this motion be denied in its entirety.

B.    CONCLUSION

Plaintiff's Motion for Summary Judgment is rife with procedural violations, and relies heavily on a suspect Declaration of Plaintiff Montwillo, which was untimely filed and not served on Defendants. It must, for those reasons, be disregarded. The remaining pleadings fail to meet Plaintiff's burdens of production and persuasion in a motion for summary judgment per FRCP Rule 56. The Court is therefore respectfully requested to deny this motion in its entirety.

Dated: April 3, 2008                    Respectfully Submitted,


David Y. Wong, Attorney at Law
Marc H. Greenberg, Attorney at Law
Attorneys for Defendants William Tull, Daniel Gibby
and Gibby Novelties, LLC

MONTWILL V. TULL, ET AL.  USDC Action No. C 07 3947 SI                    25

Defendants' Opposition to Plaintiff's Motion for Summary Judgment