STEPHEN A. SOMMERS, SBN 225742
Sommers Law Group
870 Market Street, Ste. 1142
San Francisco, CA 94102
(415) 839-8569 (Telephone)
(415) 956-0878 (Fax)
ssommers@sommerslaw.com

Attorney for Plaintiff & Counter-
defendant Paul Montwillo

UNITED STATES DISTRICT COURT

FOR NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PAUL MONTWILLO, an individual;<br><br>Plaintiff,<br><br>vs.<br><br>WILLIAM TULL, an individual; DANIEL GIBBY, and individual; GIBBY NOVELTIES, LLC dba ARSENIC & APPLE PIE, a California limited liability company; and DOES 1-100, inclusive,<br><br>Defendants.<br><br>WILLIAM TULL, an individual;<br><br>Counter-Claimant,<br><br>vs.<br><br>PAUL MONTWILLO, an individual, and DOES 21 through 30, inclusive,<br><br>Counter-Defendants | Case No. C 07 3947 SI<br><br>SUPPLEMENTAL DECLARATION OF STEPHEN A. SOMMERS IN SUPPORT OF MOTION FOR SUMMARY JUDGEMENT OF PLAINTIFF PAUL MONTWILLO<br><br>Date: April 25, 2008<br>Time: 9:00 a.m.<br>Court: Room 10, 19th Floor<br>Judge: Honorable Susan Illston<br><br>Complaint Filed:      August 1, 2007<br>Counterclaim Filed:  January 11, 2008<br><br>Trial Date:                June 30, 2008 |

I, Stephen A. Sommers, declare:

1.  I am an attorney licensed by the State of California, admitted to practice before this Court since 2003, and am counsel for Plaintiff Paul Montwillo. I am authorized by my client

1. to make this Supplemental Declaration in support of his Motion for Summary Judgment, filed herewith.

2. On March 20, 2008, I conducted the deposition of Defendant, William Tull, in this action. Mr. Tull was represented by his attorneys David Y. Wong and Marc H. Greenberg.

3. The Memorandum of Points and Authorities in Opposition to Defendants' Motion for Summary Judgment contains citations to deposition testimony of William Tull. Attached hereto and incorporated by reference herein are true and correct copies of the deposition transcript pages, in full wherein each of the cited testimony excerpts may be found. I declare that the deposition testimony as recited in the transcript attached accurately reflects the actual deposition. The pages attached are arranged in numerical order as follows: 25-35, 56, 104-105.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, and that I am able to testify competently thereto.

Executed in San Francisco, California on April 4, 2008.

_____
Stephen Sommers

EXHIBIT A

```
 1   A.   Yes.
 2   Q.   And at some time after that, did you and -- did
 3        Mr. Montwillo ask to sell, ask you to sell more dolls
 4        in your store?
 5   A.   Mr. Montwillo didn't, no.  The buyer of my store
 6        mentioned it.
 7   Q.   And who is that?
 8   A.   It's Woody Evans.
 9   Q.   Woody Evans?  And is he your employee?
10   A.   Yes, he is.
11   Q.   And what did Mr. Evans tell you about the dolls?
12   A.   That Paul had dressed up some Barbies and that people
13        seemed to like them.  And if it was possible, we
14        could enter into an agreement that, you know, he
15        would get the wholesale price, and we would double
16        his wholesale price and we would pay him for the
17        dolls that we sold.
18   Q.   And did you ever have a conversation directly with
19        Mr. Montwillo about what the dolls would look like
20        that would be sold in your store?
21   A.   Never.  You mean Barbie dolls?
22   Q.   Yes.
23   A.   No, no, absolutely not.  I had nothing to do with it.
24   Q.   When Mr. Montwillo initially put the Barbie dolls in
25        your store, did he sell a Barbie doll that was called
```

25

| | | |
|---|---|---|
| 1 | | Trailer Trash Barbie doll? |
| 2 | A. | I don't know. |
| 3 | Q. | Do you recall any of the models that were originally |
| 4 | | sold? |
| 5 | A. | Oh, yeah, yeah. |
| 6 | Q. | What were some of the other dolls that were sold that |
| 7 | | you recall? |
| 8 | A. | Well, I mean, he did various things to various dolls. |
| 9 | Q. | Specifically -- |
| 10 | A. | They were all different. Every doll was different. |
| 11 | | Dressed differently, but I can tell you honestly I |
| 12 | | never really paid attention to them. |
| 13 | Q. | Do you recall any drag queen dolls? |
| 14 | A. | No, I don't recall any. |
| 15 | Q. | Do you recall any specific dolls that were sold? |
| 16 | A. | Not specifically. I mostly recall the packaging. |
| 17 | Q. | And the packaging, that was the pink packaging? |
| 18 | A. | The pink packaging, yeah. |
| 19 | Q. | At a certain point after Mr. Montwillo started |
| 20 | | selling the dolls in your store, did you come in |
| 21 | | contact with the attorneys for Mattel, Incorporated? |
| 22 | A. | Well, first Mr. Montwillo wasn't selling the dolls in |
| 23 | | the store; I was selling them. They were dolls that |
| 24 | | he had in my store that I sold under my auspices. |
| 25 | Q. | Did you purchase the dolls at wholesale price? |

26

```
 1   A.   No, they were on --
 2   Q.   Consignment?
 3   A.   -- consignment.  Yeah, they were on consignment.
 4   Q.   So at a certain point, were you contacted by lawyers
 5        from Mattel?
 6   A.   Yes.
 7   Q.   Were you sued by Mattel?
 8   A.   Yes, I was.
 9   Q.   And what did Mattel sue you for?
10   A.   They sued me -- well, I don't really remember
11        accurately, so I probably shouldn't venture on --
12   Q.   What's your best estimate for that?
13   A.   My best estimate would be a guesstimate.  Truly, I'm
14        not a lawyer; I'm not going to venture.
15   Q.   Did they sue you over the dolls?
16   A.   Yes, they did.
17   Q.   And the selling of the dolls?
18   A.   And the selling of the dolls.
19   Q.   And do you recall around the same period a time when
20        Mr. Montwillo had an art show with the dolls?
21   A.   Yes, yes.
22   Q.   Do you recall that art show to be at 111 Minna?
23   A.   Yes, I do.
24   Q.   Did you attend that art show?
25   A.   I certainly did.
```

| | | |
|---|---|---|
| 1 | Q. | And did you view the dolls at the art show? |
| 2 | A. | Yes. |
| 3 | Q. | Do you recall any dolls at the art show that looked |
| 4 | | like Trailer Trash -- that were Trailer Trash Barbie |
| 5 | | dolls? |
| 6 | A. | No, actually the doll I recall was -- what I will |
| 7 | | give Paul credit for -- was the one where he had the |
| 8 | | two ice skaters. I can't remember. Tonya Harding, |
| 9 | | and one of the dolls was carrying a bat. That was |
| 10 | | very funny. That's the doll I remember. |
| 11 | Q. | And you don't recall any of the other dolls that |
| 12 | | were -- |
| 13 | A. | No, I really don't. |
| 14 | Q. | -- presented? So if I were to tell you that |
| 15 | | Mr. Montwillo sold dolls at your store that were |
| 16 | | called Trailer Trash Barbie dolls, you wouldn't have |
| 17 | | a recollection of anything other than that? You |
| 18 | | wouldn't have a reason to say that that was |
| 19 | | incorrect? |
| 20 | | MR. WONG: I'm going to object to your |
| 21 | | question as vague and ambiguous as to time and |
| 22 | | place. |
| 23 | | MR. SOMMERS: I'll rephrase. |
| 24 | Q. | In the beginning when you were selling the Barbie |
| 25 | | dolls out of your store, if I were to say that |

28

|  |  |  |
|---|---|---|
| 1 |  | Mr. Montwillo was selling a Trailer Trash Barbie |
| 2 |  | doll, as you sit here today, you couldn't tell me |
| 3 |  | that was inaccurate, correct? |
| 4 | A. | Nor could I say it was necessarily accurate. |
| 5 | Q. | And if I were to sit here today and tell you that one |
| 6 |  | of the dolls that was sold from your store as a |
| 7 |  | Barbie doll was a Trailer Trash Barbie doll with dark |
| 8 |  | roots and a cigarette hanging out of her mouth and a |
| 9 |  | missing front tooth, you couldn't tell me that would |
| 10 |  | be inaccurate; is that correct? |
| 11 | A. | Wait a minute.  Wait a minute.  Wait a minute.  That |
| 12 |  | is -- isn't that a convoluted question? |
| 13 |  | MR. WONG:  Let's have it read back. |
| 14 |  | THE WITNESS:  Yeah, yeah.  I -- |
| 15 |  |  |
| 16 |  | (Record read as requested.) |
| 17 |  |  |
| 18 |  | THE WITNESS:  Since I don't recall -- |
| 19 |  | MR. WONG:  I'm going to state an objection. |
| 20 |  | The question is compound, makes no sense whatsoever |
| 21 |  | and was grammatically incorrect. |
| 22 |  | If you can answer it and formulate a response, go |
| 23 |  | ahead. |
| 24 |  | THE WITNESS:  Read it back again. |
| 25 |  | MR. SOMMERS:  I'll rephrase it. |

29

1   Q.   Earlier you said that you don't recall any of the
2        models, the dolls, that were sold from your store
3        under the Barbie doll, the Barbie doll era, the pink
4        boxes.  So I'm just confirming that if I were to say
5        that one of those dolls that were sold was a
6        blond-haired Trailer Trash Barbie doll with dark
7        roots, you couldn't tell me that was inaccurate?
8   A.   That's what you're saying.  That's not what I'm
9        saying.
10  Q.   I'm saying you don't have any recollection otherwise,
11       correct?
12  A.   Oh, you're -- can I speak to my attorney?
13              MR. WONG:  I don't understand the question.
14              THE WITNESS:  I don't understand the
15       question either.  These are complicated questions.
16              MR. SOMMERS:  No, it's not a complicated
17       question.
18              THE WITNESS:  Yes, they are.
19              MR. SOMMERS:  Let me rephrase.  I want to
20       make this very simple for you.
21  Q.   Earlier this morning you said that you don't
22       remember, that you don't have any memory of --
23              MR. WONG:  Well, why don't you ask him if
24       that is the case.
25              MR. SOMMERS:  Will you not interrupt me,

30

1   please?
2           MR. WONG:  Well, I'm trying to help you.
3           MR. SOMMERS:  I don't need your help,
4   Mr. Wong.
5           MR. WONG:  Obviously you do.  But if you're
6   not going the accept it, that's fine.  We're just
7   going to be here for a long time asking the same
8   question.
9           MR. SOMMERS:  Unfortunately, I have a very
10  short list, and we'll be here as long as it takes for
11  us to get through it.
12  Q.  Mr. Tull, you said earlier that you don't have a
13      memory of the specific models that were sold in your
14      store in the pink boxes, correct?
15  A.  No, I don't have a specific memory of them, no.
16  Q.  So that means you -- if there were a doll that was
17      sold in a pink box that looked like the dolls that
18      were sold later in Arsenic & Apple Pie, you wouldn't
19      have a memory whether that doll existed in the pink
20      box?
21          MR. WONG:  Objection.  I don't understand
22  the question at all.  It makes no sense.  Don't
23  answer it.
24          THE WITNESS:  I'll follow the advice of my
25  attorney.  I don't understand the question.

31

| | |
|---|---|
| 1 | MR. SOMMERS: Okay. Let's try this one more |
| 2 | time. |
| 3 Q. | If Mr. Montwillo asserted that the dolls that he sold |
| 4 | in your store before the formation of Arsenic & Apple |
| 5 | Pie were substantially similar to the dolls that were |
| 6 | sold after the formation of Arsenic & Apple Pie, you |
| 7 | don't have a memory that would contradict that, |
| 8 | correct? |
| 9 | MR. WONG: Objection. First of all, you |
| 10 | haven't established any sort of groundwork as to what |
| 11 | the dolls look like either before or after or what |
| 12 | the terms substantially similar" is implying. I'm |
| 13 | going to object. It's vague and ambiguous, clearly |
| 14 | overbroad and impossible to answer. If you can |
| 15 | formulate a response, you can. |
| 16 | THE WITNESS: I'm trying to, but I can't. |
| 17 | So I'm sorry. |
| 18 | MR. SOMMERS: |
| 19 Q. | Could you describe for me the Trailer Trash doll that |
| 20 | was sold by Arsenic & Apple Pie? |
| 21 A. | No. |
| 22 Q. | You can't describe the details of that doll? |
| 23 A. | No. |
| 24 Q. | Can you answer whether you have a memory of any doll |
| 25 | that looked like the doll that was sold under Arsenic |

32

```
 1         & Apple Pie as a Trailer Trash doll --
 2   A.    No.
 3   Q.    -- before it --
 4         MR. WONG:  Hold on a second.
 5         MR. SOMMERS:
 6   Q.    -- before the formation of Arsenic & Apple Pie?
 7         MR. WONG:  Well, first of all --
 8         MR. SOMMERS:
 9   Q.    -- from your store?
10         MR. WONG:  Your question assumes facts not
11   in evidence.
12         MR. SOMMERS:  It's not a proper objection in
13   a deposition.
14         MR. WONG:  Fine.  If you want to end it,
15   that's fine.  I'm trying to tell you, your question
16   makes no sense whatsoever.  It's improper, compound,
17   contains facts not in evidence and assumes facts not
18   in evidence and asks the witness to speculate as to
19   what you're trying to ask.
20      If you want to rephrase it and ask him a proper
21   question that can be answered in a non-convoluted
22   fashion, you're free to do so.  But that question,
23   no.  He's not going to answer it.
24         MR. SOMMERS:
25   Q.    Do you have a specific memory -- withdraw that.
```

33

1          As you sit here today, are you able to affirm the
2     following sentence:  Before the formation of Arsenic
3     & Apple Pie, you sold in your store a doll that was
4     called Trailer Trash Barbie doll?
5              MR. WONG:  Do you recall that specific title
6     of a doll?
7              THE WITNESS:  No, I don't recall.
8              MR. SOMMERS:  Okay.
9  Q.  Are you able to disaffirm the statement, before the
10     formation of Arsenic & Apple Pie, there was a doll
11     that was sold called Trailer Trash Barbie doll?
12 A.  He sold me many different dolls, and each one was
13     different, so I can't.  And frankly, my store has
14     hundreds and hundreds and hundreds of articles and
15     items in it.  I can't honestly tell you, answer that
16     question.
17 Q.  So the answer would be no to the question that you
18     can't disaffirm the statement --
19 A.  I can't disaffirm?
20 Q.  Yes.
21 A.  That's going -- can I talk to my lawyer 'cause
22     honestly, since I -- this is complex.  You're asking
23     me to affirm some, some, some --
24 Q.  I'm asking you to negate --
25 A.  Something that I don't know --

34

1        MR. WONG:  (Inaudible) -- have to affirm it.
2  It's silly.
3
4        (Off the record at 11:01 a.m. and
5        back on the record at 11:03 a.m.)
6
7        MR. SOMMERS:
8  Q.  Are you familiar with the five different dolls that
9      were sold by Arsenic & Apple Pie?
10  A.  Yes.
11       MR. WONG:  Well, hold on a -- which five
12  dolls?  Arsenic & Apple Pie --
13       MR. SOMMERS:
14  Q.  Are you familiar with a doll sold by Arsenic & Apple
15      Pie called Trailer Trash Doll?
16  A.  Yes.
17  Q.  Are you familiar with a doll sold by Arsenic & Apple
18      Pie called Blonde Drag Queen Doll?
19  A.  Yes.
20  Q.  Are you familiar with a doll sold by Arsenic & Apple
21      Pie called Red Head Drag Queen Doll?
22  A.  Yes.
23  Q.  Are you familiar with a doll that was sold by Arsenic
24      & Apple Pie called --
25       MR. WONG:  Go ahead.

|    |    |                                                                 |
|----|----|-----------------------------------------------------------------|
| 1  |    | would think most of that fell to me because there was          |
| 2  |    | no participation from him.                                      |
| 3  | Q. | At any time during the existence of Arsenic & Apple            |
| 4  |    | Pie, did Paul Montwillo receive a paycheck?                     |
| 5  | A. | No.                                                             |
| 6  | Q. | At any time was Paul an employee of Arsenic & Apple            |
| 7  |    | Pie?                                                            |
| 8  | A. | That is a complex question.  I don't know how to               |
| 9  |    | answer that.                                                    |
| 10 | Q. | Was there ever any workers' compensation procured              |
| 11 |    | because of Mr. Montwillow's contributions to Arsenic           |
| 12 |    | & Apple Pie, to make sure he was covered under                 |
| 13 |    | workers' compensation?                                          |
| 14 | A. | Why do he get covered?  For what?                              |
| 15 | Q. | I'm asking you a yes-or-no question, Mr. Tull.                 |
| 16 | A. | There was no workers' comp.                                     |
| 17 | Q. | At any time was there employment taxes paid on behalf          |
| 18 |    | of Mr. Montwillo?                                               |
| 19 | A. | He was not an employee.                                         |
| 20 | Q. | Returning to the Exhibit 1, this one here.  That               |
| 21 |    | first page of the pregnant doll, did you physically            |
| 22 |    | put a black leather jacket on a doll that was                  |
| 23 |    | pregnant at any time?                                           |
| 24 | A. | Did I physically put a black leather jacket on a               |
| 25 |    | doll?                                                           |

56

1    3.8 reads: "If a member loans money to the company,
2    said loan shall bear interest at" -- and I believe
3    that's supposed to say "variable rates depending on
4    the origin of funds, percentage per annum as of the
5    date the funds were advanced to or on behalf of the
6    company until paid."
7       Is that your handwriting where it has in there
8    "variable rates depending upon the origin of the
9    funds"?
10  A.   I believe it is my handwriting, yes.
11  Q.   And is it also your handwriting in section 3.10 where
12       it says, "variable rates depending upon the origin of
13       the funds"?
14  A.   Yes.
15  Q.   And was it under these general sections that you
16       ended up loaning so much money to the company?
17  A.   Yes.
18  Q.   Okay, all right. If you could please turn to page 8.
19       Do you have a page 8, David?
20           MR. WONG: No, no.
21           MR. SOMMERS: You're good?
22           MR. WONG: Yeah.
23           MR. SOMMERS: Okay.
24  Q.   At the bottom, 2.7, it says, "The managing members
25       shall be as follows: Paul Montwillo."

104

1      Then after that, it says, "Manager in charge of
2   art direction, design and advertising of product
3   line, including but not limited to corporate
4   identification, product design, packaging, website
5   design, website maintenance and print advertising."
6      And then it says, "William Tull, manager in
7   charge of administration, business affairs,
8   accounting, distribution, sales and manufacturing."
9      Is it fair to say that your understanding of this
10  section was a differentiation of the scope of
11  responsibility between you and Mr. Montwillo?
12  A.  When it was initially done, yes.
13  Q.  That he would do some things, and you would do some
14  other things?
15  A.  Yes.
16  Q.  Is there anywhere in this agreement that you were
17  aware of -- and I can say I've read it several
18  times -- that you could point to me where there is a
19  conveyance of a copyright?
20  A.  Again, you're trying to confuse me.  And let me tell
21  you why.  You first got me going back saying that I
22  dissolved the company when I did not.  Paul's
23  bankruptcy dissolved the company.  So I'm really --
24  could you possibly ask me that question one more
25  time?