STEPHEN A. SOMMERS, SBN 225742
Sommers Law Group
870 Market Street, Ste. 1142
San Francisco, CA 94102
(415) 839-8569 (Telephone)
(415) 956-0878 (Fax)
ssommers@sommerslaw.com

Attorney for Counter-defendant
Paul Montwillo

UNITED STATES DISTRICT COURT

FOR NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PAUL MONTWILLO, an individual;<br><br>Plaintiff,<br><br>vs.<br><br>WILLIAM TULL, an individual; DANIEL GIBBY, and individual; GIBBY NOVELTIES, LLC dba ARSENIC & APPLE PIE, a California limited liability company; and DOES 1-100, inclusive,<br><br>Defendants.<br><br>WILLIAM TULL, an individual;<br><br>Counter-Claimant,<br><br>vs.<br><br>PAUL MONTWILLO, an individual, and DOES 21 through 30, inclusive,<br><br>Counter-Defendants | Case No. C 07 3947 SI<br><br>PLAINTIFF MONTWILLO'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT<br><br>Date:   April 25, 2008<br>Time:  9:00 a.m.<br>Court:  Room 10, 19th Floor<br>Judge:  Honorable Susan Illston<br><br>Complaint Filed:  August 1, 2007<br>Counterclaim Filed:  January 11, 2008<br><br>Trial Date:  June 30, 2008 |

- i -

Montwillo, et al. v. Tull et al., USDC/NC Case No. C 07 3947 SI
PLAINTIFF MONTWILLO'S MEMO OF P&A'S IN OPP TO DFTS' MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

I. INTRODUCTION .................................................................................................. 1

II. DISCUSSION ...................................................................................................... 1

    A. MONTWILLO'S CLAIM IS NOT BARRED BY THE STATUTE OF LIMITATIONS. ............................................................................................ 1

    B. MONTWILLO NEVER ASSIGNED HIS COPYRIGHTS. .............................. 3

        1. The Operating Agreement Does Not Contain an Assignment and the Lack of a Reservation of Rights Clause Is Immaterial. ...................................... 6

        2. The Work for Hire Doctrine Fails Since Montwillo Was Never an Employee. ........................................................................ 7

        3. The Copyright Publication Is Not Material to the Issue of Copyright Ownership. .............................................................................. 9

        4. Montwillo's Bankruptcy Filing Is Immaterial to Copyright Ownership. ............................................................................. 10

    C. MONTWILLO'S COPYRIGHTS MEET THE MINIMAL ORIGINALITY REQUIREMENTS. ............................................................... 10

II. CONCLUSION ................................................................................................... 14

# TABLE OF AUTHORITIES

**United States Supreme Court Cases** — Pages(s)

*Community for Creative Non-Violence v. Reid*, 490 U.S. 730 (1989) — 8

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340 (1991) — 11

**Federal Circuit Decisions**

*Aymes v. Bonelli*, 980 F.2d 857 (2d Cir. 1992) — 8

*Effects Assoc. v. Cohen*, 908 F.2d 555 (9th Cir. 1990) — 6

*Ets-Hokin v. Skyy Spirits, Inc.*, 323 F.3d 763 (9th Cir. 2003) — 13, 14

*JCW Investments, Inc. v. Novelty, Inc.*, 483 F.3d 910 (7th Cir. 2007) — 12, 13

*The Martha Graham School and Dance Foundation, Inc. v. Martha Graham Center of Contemporary Dance, Inc.*, 380 F.3d 624 (2d Cir. 2004) — 8, 9

*Playboy Enterprises v. Dumas*, 53 F.3d 549 (2d Cir. 1995). — 7

*Polar Bear Productions, Inc. v. Timex Corp.*, 384 F.3d 700 (9th Cir. 2004) — 2

*Satava v. Lawry*, 323 F.3d 805 (9th Cir. 2003) — 11

*Urantia Foundation v. Maaherra*, 114 F.3d 955 (9th Cir. 1997) — 7

**United States District Court Decisions**

*Bieg v. Hovnanian Enterprises, Inc.*, 157 F.Supp.2d 475 (E.D.Pa. 2001) — 6

*Express, LLC v. Fetish Group, Inc.*, 424 F.Supp.2d 1211 (C.D.Cal. 2006) — 13

*Papa's-June Music v. McLean*, 921 F.Supp. 1154 (S.D.N.Y. 1996) — 7

*Todd v. Montana Silversmiths*, 379 F.Supp.2d 1110 (D.Colo. 2005) — 14

Montwillo, et al. v. Tull et al., USDC/NC Case No. C 07 3947 SI
PLAINTIFF MONTWILLO'S MEMO OF P&A'S IN OPP TO DFTS' MOTION FOR SUMMARY JUDGMENT

United States Statutes

| | |
|---|---:|
| Copyright Act of 1976, 17 U.S.C. §§ 100, *et seq.* | 6, 10 |
| Federal Rules of Civil Procedure Rule 36(a) | 7 |

Other Authorities

| | |
|---|---:|
| M. Nimmer & D. Nimmer, *Nimmer on Copyright* (2007) | 11 |
| B. Keller & J. Conard, Practicing Law Institute, *Copyright Law*, (2008) | 9 |

- iv -

Montwillo, et al. v. Tull et al., USDC/NC Case No. C 07 3947 SI
PLAINTIFF MONTWILLO'S MEMO OF P&A'S IN OPP TO DFTS' MOTION FOR SUMMARY JUDGMENT

# I. INTRODUCTION

Defendants throw the proverbial "kitchen sink" to obscure the undisputed fact: Montwillo is the original author because he created the dolls as a non-employee and he never executed a written assignment. Defendants' memorandum is thin on authority, and the authority defendants do cite confirms Montwillo's position as a valid owner of the copyrights.

Defendants William Tull ("Tull"), Daniel Gibby ("Gibby"), and Gibby Novelties, LLC ("GN") argue against Plaintiff Paul Montwillo's ("Montwillo") valid copyright claims in three sections: (1) plaintiff's complaint is barred by the three year statute of limitations applicable to copyright infringement claims; (2) Montwillo relinquished his copyrights to Arsenic & Apple Pie, LLC ("AAP"); and (3) Montwillo's copyrights are invalid because they fail to meet copyright law's minimal originality requirement. None of these arguments get defendants around the undisputed fact that Montwillo created the dolls, making him the copyright owner, and he never assigned them away.[1]

# II. DISCUSSION

## A. MONTWILLO'S CLAIM IS NOT BARRED BY THE STATUTE OF LIMITATIONS.

Defendants' argument that Montwillo had knowledge of infringement on July 13, 2004 rests on an unfounded conflation that AAP's claims of copyright ownership is the same as defendants' infringing actions as alleged in the complaint. Further, defendants' argument ignores that each infringement must fall outside the three-year statute of limitations, and clearly all of GN's publications and distributions fall outside the three years.

---

[1] On the same day defendant filed their motion for summary judgment, plaintiff filed his motion for summary judgment. The evidence plaintiff relies upon for his motion significantly overlaps with the facts relied upon here. Thus, for the sake of economy, plaintiff incorporates the description of the factual background from his memorandum in support of his motion, along with the two declarations submitted with his memorandum. As used herein, Montwillo's prior declaration shall be referred to as "Montwillo Decl." and attorney Stephen Sommers's prior declaration shall be referred herein as "Sommers Decl." Additionally, Sommers submits a supplemental declaration that shall be referred herein as "Sommers Suppl. Decl."

Under the Copyright Act, "[n]o civil action shall be maintained under the provisions of this title unless it is commenced within three years after the claim accrued." 17 U.S.C. § 507(b). In the Ninth Circuit, "the three-year clock begins upon discovery of the infringement." *Polar Bear Productions, Inc. v. Timex Corp.*, 384 F.3d 700, 706 (9th Cir. 2004). "[T]he statute of limitations does not prohibit recovery of damages incurred more than three years prior to filing of suit if the copyright plaintiff was unaware of the infringement, and that lack of knowledge was reasonable under the circumstances." *Ibid.* Repeated infringement within the statute of limitations, even if the initial infringement occurred prior to three years, are actionable. *Ibid.*

The infringing conduct alleged in the complaint is a series of assignments of the copyright, from AAP to Tull, from Tull to Gibby, then from Gibby to GN, then GN's ultimate distribution and publication to the public. Montwillo has not sued AAP, so its claim of ownership is just a necessary starting point for the discussion.

Plaintiff was reasonably unaware of defendants' infringement within the statute of limitation. Plaintiff filed this action on August 1, 2007, making the limitation August 1, 2004. Defendants' argument solely relies on a letter dated July 13, 2004[2] Montwillo sent to attorney Wong, where Montwillo allegedly admitted he was "conscious of both his rights and [] knowledgeable that a claim of infringement had accrued against Defendants…" Defendants Memorandum of Points in Authority in Support of Motion for Summary Judgment ("Defendants' MSJ"), 10:2-6. Defendants bolster its argument by citing Montwillo's responses at deposition:

> Q. Did you prior to the filing of the copyright infringement lawsuit in this case, **ever send notice to Arsenic & Apple Pie** that you believed that they were violating your copyright?
>
> A. You are looking at it.
>
> Q. Okay. So in your view this letter of July 13, 2004, was [sic] you sending notice **to them that they** were violating your copyright.

---

[2] Montwillo's July 13, 2004 letter is Exhibit K of his declaration.

   A. Yes.

Defendants' MSJ; 10:9-14.

  The only thing this letter and deposition response achieves for defendants is that Montwillo noticed AAP, who is not a party to this lawsuit, that it should not violate his copyrights. Since Montwillo did not sue AAP, even if Montwillo's letter puts AAP on notice, it is not probative of when Montwillo learned of Tull's assignment from AAP to himself which began the chain of infringement alleged in this lawsuit.

  Further, Tull's assignment of the assets from AAP to himself happened on July 17, 2004, three days after Montwillo wrote his July 13 letter. Therefore, Montwillo's July 13, 2004 letter cannot show that he had knowledge of the subject event that began the series of infringements. It is simply not possible Montwillo had knowledge of infringements that had not yet occurred.

  In a letter dated July 20, 2004 (7 days after Montwillo's July 13, 2004) "as Counsel" for *AAP*, attorney Wong notified Montwillo that AAP retained "sole ownership" of the copyrights – not defendants Tull, Gibby or GN. Montwillo Decl. Exh. M. In his letter, Wong specifically told Montwillo: "Regarding the proprietary rights to the doll designs, the Company respectfully disagrees with your claim of ownership. The position of ***the Company*** is that it alone financed the development of each of the designs and, therefore, ***claims sole ownership***." *Ibid*. Emphasis added. Thus, even if the letter somehow does show Montwillo had knowledge of the complained of infringement, Wong's letter reasonably disabuses him of that knowledge.

  Montwillo learned of defendants' infringement months after August 1, 2004, when he hired a lawyer to demand that AAP not transfer to defendants the copyrights. Montwillo Decl. ¶ 22. Thus, Montwillo's complaint is easily within the three year statute of limitations.

**B. MONTWILLO NEVER ASSIGNED HIS COPYRIGHTS.**

  In section B of their memorandum, Defendants argue that by his actions and/or inactions, Montwillo relinquished his copyright ownership. This section particularly obscures the basic fact that Montwillo created the dolls, was never an employee, and never executed a written assignment. In most of this section, defendants cite certain evidence to show Montwillo did not believe he owned the copyrights. However, as an operation of law, Montwillo's mindset is

immaterial. Although it is not the case that Montwillo believed he was relinquishing his copyrights to AAP, it is not material in this case since Montwillo was not an employee and did not execute an assignment.

The Court is free to consider the parol evidence forwarded by defendants in this section if it believes section 2.7 of the operating agreement, which defendants claim is an assignment provision, requires parol to ascertain its meaning. If the Court finds section 2.7 to clearly not be an assignment as it is drafted, it is free to disregard all parol evidence and end its inquiry there.

Defendants' arguments rely on the erroneous and unsupported presumption that Montwillo created the copyrightable elements of the dolls during the life of the operating agreement, because each relies on the language of section 2.7. However, defendants provide no evidence that disputes Montwillo's declaration that he created the combination of elements for each doll before he executed the operating agreement on May 3 and May 4, 2000.

Montwillo created the copyrightable combination of elements of his designs over a several year period of time in the 1990's, he sold the dolls at Tull's store and displayed them at an art show. Montwillo Decl. ¶¶ 1, 2, 3, 7; Exh. A. The news article attached as Exhibit A to Montwillo's declaration repeatedly refer to drag queen dolls and trailer trash dolls. Montwillo Decl. Exh. A. At the end of the January 12, 1997 San Francisco Examiner article, Montwillo says, "It's going to be hard to top Trailer Trash Barbie – everybody loves her[.] ... You can't just have one Drag Queen Barbie – you have to have a blond, a brunette and a redhead." *Ibid.* On the front page of The Recorder from November 11, 1997, there is picture of a young Paul "Hanson" Montwillo holding several of his dolls, including the Trailer Trash Doll. *Ibid.* Although the photograph has faded some, it is possible to make-out that she has blond braided pigtails with dark roots, smoking a cigarette, and wearing her revealing checkered top, denim shorts. *Ibid.*

At deposition, Tull confirmed he lacks facts to refute Montwillo's claim that he created the combination of elements for the pre-AAP Barbie dolls.

> Q. When Mr. Montwillo initially put the Barbie dolls in your store, did he sell a Barbie doll that was called Trailer Trash Barbie doll?
> A. I don't know.

> Q. Do you recall any of the models that were originally sold?
> A. Oh, yeah, yeah.
>
> Q. What were some of the other dolls that were sold that you recall?
> A. Well, I mean, he did various things to various dolls.
>
> Q. Specifically --
> A. They were all different. Every doll was different. Dressed differently, but I can tell you honestly I never really paid attention to them.

Sommers Suppl. Decl. Exh. A, 25:23 – 26:12.

> Q. And do you recall around the same period a time when Mr. Montwillo had an art show with the dolls?
> A. Yes, yes.
>
> Q. Do you recall that art show to be at 111 Minna?
> A. Yes, I do.
>
> Q. Did you attend that art show?
> A. I certainly did.
>
> Q. And did you view the dolls at the art show?
> A. Yes.
>
> Q. Do you recall any dolls at the art show that looked like Trailer Trash -- that were Trailer Trash Barbie dolls?
> A. No, actually the doll I recall was -- what I will give Paul credit for -- was the one where he had the two ice skaters. I can't remember. Tonya Harding, and one of the dolls was carrying a bat. That was very funny. That's the doll I remember.
>
> Q. And you don't recall any of the other dolls that were --
> A. No, I really don't.

Sommers Suppl. Decl. Exh. A, 27:19 – 28:13

> Q. In the beginning when you were selling the Barbie dolls out of your store, if I were to say that Mr. Montwillo was selling a Trailer Trash Barbie doll, as you sit here today, you couldn't tell me that was inaccurate, correct?
> A. Nor could I say it was necessarily accurate.

Sommers Suppl. Decl. Exh. A, 28:24 – 29:4.

Further, when Tull was asked whether he could factually negate Montwillo's claim that he sold dolls in Tull's stores that looked like the dolls subject to this litigation, Tull, with heavy assistance from attorney Wong, repeatedly dodged the question over the course of more than seven transcript pages and then just left the room. Sommers Suppl. Decl. Exh. A, 28:14 – 35:2. Defendants' arguments fail because they rely on the unfounded premise Montwillo created the copyrightable elements during the life of the operating agreement. Assuming *arguendo*, that Montwillo did create the dolls under the language of section 2.7, defendants' arguments still cannot succeed.

*1.    The Operating Agreement Does Not Contain an Assignment and the Lack of a Reservation of Rights Clause Is Immaterial.*

In section 2(a) of their memorandum, defendants claim that by virtue of becoming a managing member of AAP in charge of "Art Direction, Design, and Advertising of the product line, including but not limited to, corporate identification, product design, packaging, web site design, web site maintenance and print advertising[,]" as prescribed in section 2.7 of the operating agreement, Montwillo's artwork becomes the property of AAP, **and** that since Montwillo did not insist on a reservation of rights clause, he relinquished his copyrights. Defendants have the burden of proving Montwillo assigned his rights since under copyright law, they are automatically reserved. Defendant fails to provide authority substantiating their claim the management clause is an assignment of copyrights.

Under the Copyright Act of 1976, an original author is the default owner of the copyright unless there is a non-ambiguous written assignment. 17 U.S.C. §§ 201(a) & 204(a). Even if there is a written agreement, if it is ambiguous, then the copyright defaults to the original author. *Effects Assoc. v. Cohen*, 908 F.2d 555, 557 (9th Cir. 1990) ("*Effects II*"). Language that "refers only to a transfer of management responsibilities, not copyright ownership" are not adequate. *Bieg v. Hovnanian Enterprises, Inc.*, 157 F.Supp.2d 475, 481 (E.D.Pa. 2001). Even though the language does not need to use the words "copyright" or "assignment," the transference "must be clear." *Papa's-June Music v. McLean*, 921 F.Supp. 1154, 1159 (S.D.N.Y. 1996). Clear language must include specific transfer of rights held by the owner of the copyright, such as

printing and reproduction. *Urantia Foundation v. Maaherra*, 114 F.3d 955, 960 (9th Cir. 1997). Even language that conveys the "right, title and interest" to a particular work is not sufficient to convey the bundle of rights that are held in a copyright. *Playboy Enterprises v. Dumas*, 53 F.3d 549, 564 (2d Cir. 1995).

Section 2.7 is a management responsibility clause on its face. Nowhere in the clause does it say Montwillo is giving anything to the company. It only provides that Montwillo will perform certain managerial tasks. Defendant Tull admitted as much.

> Q. At the bottom, 2.7, it says, "The managing members shall be as follows: Paul Montwillo." Then after that, it says, "Manager in charge of art direction, design and advertising of product line, including but not limited to corporate identification, product design, packaging, website design, website maintenance and print advertising." And then it says, "William Tull, manager in charge of administration, business affairs, accounting, distribution, sales and manufacturing."
> Is it fair to say that your understanding of this section was a differentiation of the scope of responsibility between you and Mr. Montwillo?
>
> A. When it was initially done, yes.
>
> Q. That he would do some things, and you would do some other things?
> A. Yes.

Sommers Suppl. Decl. Exh. A, 104:24 – 105:12.

As a "kitchen sink" catch-all, Defendants argue that Montwillo was required to negotiate a reservation of rights clause into the operating agreement to preserve his copyrights. Defendants fail to cite authority for this proposition, because it is not the law.

2. *The Work for Hire Doctrine Fails Since Montwillo Was Never an Employee.*

As discussed in Montwillo's memorandum, defendants admitted in a response to a request for admission that Montwillo was never an employee of AAP. Sommers Decl. Exhs. G, H, RFA no. 2. Since "[a]ny matter admitted under [Rule 36] is conclusively established unless the court on motion permits withdrawal or amendment of the admission," defendants' admission alone defeats defendants' work for hire argument. Fed.R.Civ.P., Rule 36(a).

Further, at deposition, Tull admitted Montwillo was not an employee:

> Q. At any time during the existence of Arsenic & Apple Pie, did Paul Montwillo receive a paycheck?
> A. No.
>
> Q. At any time was Paul an employee of Arsenic & Apple Pie?
> A. That is a complex question. I don't know how to answer that.
>
> Q. Was there ever any workers' compensation procured because of Mr. Montwillow's contributions to Arsenic & Apple Pie, to make sure he was covered under workers' compensation?
> A. Why do he get covered? For what?
>
> Q. I'm asking you a yes-or-no question, Mr. Tull.
> A. There was no workers' comp.
>
> Q. At any time was there employment taxes paid on behalf of Mr. Montwillo?
> A. He was not an employee.

Sommers Suppl. Decl. Exh. A., 56:3-19.

Even if these two critical admissions did not resolve this issue, defendants' attempt to apply the judicially created factors for determining employment status also fails. The more exhaustive list of factors were created in *Community for Creative Non-Violence v. Reid*, 490 U.S. 730, 752 (1989)("*Reid*") and then further refined in *Aymes v. Bonelli*, 980 F.2d 857, 862 (2d Cir. 1992) ("*Aymes*"). Defendants extensively rely on the application of these factors in *The Martha Graham School and Dance Foundation, Inc. v. Martha Graham Center of Contemporary Dance, Inc.* ("*Martha Graham*")[3]. The key difference between *Martha Graham* and this case that defendants failed to mention in their argument, Martha Graham was an actual "employee" on the payroll and working under an employment contract. *Martha Graham*, 380 F.3d 624, 639. The

---

[3] Defendants only once provide the case citation for *Martha Graham*, but did so as "374 F.Supp. 355 (S.D.N.Y. 2005), affirmed under the same name in 466 F.3d 97 (C.A.N.Y. 2006)," which is an erroneous citation. However, 374 F.Supp.2d 355 (S.D.N.Y. 2005) is a case of the same name, however there is no mention of *Reid* or *Aymes* anywhere in the case. Another case of the same name at 380 F.3d 624 (2d Cir. 2004) does discuss the *Reid* and *Aymes* factors. For the purposes of responding to this motion, plaintiff assumes defendants intended to cite this case. If defendants respond that the Second Circuit case is not the case upon which they rely, and the Court finds the issue not otherwise defeated, plaintiff requests an opportunity for a sur-reply.

relevant issue in that case was could Martha Graham as an employee create choreographies not subject to the works for hire doctrine because her employer afforded a considerable amount of discretion. *Ibid.* The facts in *Martha Graham* could not be more different than those here:

> During the entire interval from 1978 to 1991, Graham continued as the Center's Artistic Director. She received employee benefits and reimbursement for personal expenses, travel, and medical benefits, and a regular salary '[t]o make dances.' [] The Center routinely withheld income and social security taxes from her salary. Graham created her dances on the Center's premises and with the Center's resources. Graham's choreography was also the regular activity of the Center. All these factors weigh in favor of finding an employment relation between Graham and the Center.

*Id.*, at 641-642.

Montwillo received no wages or benefits, and had no boss. AAP never paid employment taxes or worker's compensation. Additionally, Montwillo exercised ultimate control and discretion over his area of responsibility under the terms of the operating agreement. Simply, Montwillo was not AAP's employee, he was its owner.

3. *The Copyright Publication Is Not Material to the Issue of Copyright Ownership.*

Defendants' argue that since the packaging had a copyright publication on it, Montwillo somehow assigned his copyrights to AAP. This claim is not grounded in law or is even probative as parol evidence. Publication serves no role regarding the determination of who owns a copyright, but is only used in the following limited situations: (1) determining the duration of a copyright; (2) limiting the protection of non-U.S. authors; (3) as part of a fair use defense; and (4) to defeat an "innocent infringement" defense offered to mitigate damages. B. Keller & J. Conard, Practicing Law Institute, *Copyright Law*, section 6:1 (2008).

As parol evidence to determine the meaning of section 2.7, defendants present no evidence that Montwillo had any understanding of what the © symbol on the box even meant. Montwillo's deposition testimony cited by defendants confirms he did not know what it meant. Further, it must be weighed against all the other parol evidence, such as Montwillo being an equal financial partner in AAP with multiple management responsibilities; Montwillo specifically negotiating AAP's operating agreement to exclude any assignment; the two

Page 9 of 14
Montwillo, et al. v. Tuff et al., USDC/NC Case No. C 07 3947 SI
PLAINTIFF MONTWILLO'S MEMO OF P&A'S IN OPP TO DFTS' MOTION FOR SUMMARY JUDGMENT

occasions Tull offered to buy the copyrights from Montwillo as part of a membership buyout; and the first time AAP actually claimed ownership of the copyrights, Montwillo loudly protested. Montwillo MSJ, 19:21 – 22:4. Also, the copyright publication refers to a company that never existed: "Arsenic & Apple Pie, *Inc.*." Thus, Arsenic & Apple Pie, *LLC* cannot derive any legal value from the publication and such a fundamental mistake further demonstrates that neither Tull nor Montwillo really understood they put the © symbol on the boxes.

    4.  *Montwillo's Bankruptcy Filing Is Immaterial to Copyright Ownership.*

By operation of law, Montwillo's bankruptcy petition serves no role in determining copyright ownership in this case, and Defendants cite no such authority to the contrary. As parol evidence regarding the meaning of section 2.7, it has extremely limited probative value. Montwillo testified he filed his bankruptcy in *pro per* and did not believe he needed to list his copyrights because he could not believe that every piece of art he ever created needed to be listed. Since Montwillo never made any money from the copyrights, as a lay person it is natural he would not list them. Montwillo's petition only shows he did believe he needed to list his artwork which is supported by his deposition testimony. It does not mean he thought AAP owned the copyrights.

### C. MONTWILLO'S COPYRIGHTS MEET THE MINIMAL ORIGINALITY REQUIREMENTS.

In section C of their memorandum, defendants argue that Montwillo's dolls are not sufficiently original to be copyrightable because they are not unique, and any unique qualities they may possess are subject to the scènes à faire doctrine.[4]

Section 102(a) of the Copyright Act of 1976 defines copyrightable subject matter as "original works of authorship fixed in any tangible medium of expression." 17 U.S.C. § 102(a). "Originality" in the copyright sense, refers to the originating source of a work, not to any standard of aesthetic or creative value. For a work to be "original," its expression must have

---

[4] Defendants' argument contradicts defendant Tull's allegations in his first counterclaim for conversion, where he alleges that Montwillo attempted to convert "assets" of AAP by registering the copyrights. Thus, for the purpose of Tull's counterclaim, Tull tacitly admits that the doll designs have value which can only be derived from being copyrightable. But, for the purposes of defendants' motion, defendants inconsistently argue the dolls are not copyrightable.

originated with the author and not have been copied from another source. *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 345 (1991) ("*Feist*"). In *Feist*, the U.S. Supreme Court reiterated the principle that "[o]riginal, as the term is used in copyright, means only that the work was independently created by the author (as opposed to copied from other works)," emphasizing the additional requirement that, to be copyrightable, a work must have "some minimal degree of creativity." *Feist*, 499 U.S. at 345.

The Ninth Circuit has held that combinations of unprotected elements are "unique" and eligible for copyright protection if those elements are sufficiently numerous and their selection and arrangement are sufficiently original. *Satava v. Lawry*, 323 F.3d 805, 811 (9th Cir. 2003) ("*Satava*"). Copyright's definition of "originality" isolates the idea/expression dichotomy and gives rise to the scènes à faire doctrine. Unprotected scènes à faire elements are forms of expression which are inextricably linked to the underlying idea, and ideas are not copyrightable. 3 M. Nimmer & D. Nimmer, *Nimmer on Copyright* § 10.03[A][7] (2007) at [B][4]. For each doll, Montwillo selected a number of different detailed elements and arranged them in a particular way so the uniqueness threshold is easily met. Clearly, Montwillo's dolls show that there are various ways to express the "trailer trash" and "drag queen" doll concepts:

1. "Trailer Trash" Girl Doll: She has her blonde hair is in braded pigtails with dark hair roots, exaggerated make-up, freckles, smoking a cigarette, missing a front tooth, and her ensemble includes a revealing checkered shirt, cowboy boots, and short denim shorts. And, she's holding a pig.

2. Talking Pregnant "Trailer Trash" Doll: She's pregnant, shoeless, her blonde hair is in curlers and has dark roots, she's missing a front tooth, her ensemble includes white sweat pants, a black leather jacket, big loopy earrings, and a skimpy flower top, and her make-up is exaggerated.

3. "Trailer Trash" Boy Doll: He has distinctive mustache and eyebrows, a "mullet" style hair cut, smoking a cigarette, missing front teeth, and he's wearing distinctive white "b-boy" tennis shoes with black stripes and long dangly laces, jeans with holes in the knees, an originally created white "Metal" shirt with black short sleeves, and a gold stud earring.

4.     Redhead "Drag Queen" Doll: "She" has big wavy red hair, is shoeless, has large arms, chest and neck, and distinctive facial features and make-up. Her evening dress is extra busty, has unique gold accents flairs along the front and in the flair, and it opens and jets outward just above the knees.

5.     Blonde "Drag Queen" Doll: She has large white hair, shoeless, exaggerated make-up, a pearl necklace, pearl earrings, and distinctive facial features and make-up. Her white cocktail dress is extra busty, tight at the waist, above the knee, and flared. (Photographs of the dolls Montwillo submitted with his copyright application are Exhibit A to Montwillo's complaint.)

As demonstrated by the combination of elements Montwillo chose, the concepts that underlie each doll can be expressed in countless ways, thus the scènes à faire doctrine is not operable. The two "drag queen" dolls are two very different variations of the same concept. The two female "trailer trash" dolls are very different variations of the "trailer trash" concept. Although plaintiff's position is that the uniqueness of the elemental combinations are copyrightable, even if Montwillo only had "thin" copyrights in the specific models, since defendants infringed the exact models with each distribution, they still willfully infringed even if the court finds the elements to fall within the scènes à faire of the concepts.

The Seventh Circuit rejected a similar scènes à faire arguement, in a case where the court had obvious fun with the subject matter, regarding two dolls called "Fartman" and "Pull My Finger Fred." *JCW Investments, Inc. v. Novelty, Inc.*, 483 F.3d 910 (7th Cir. 2007). In that case, plaintiff created Fred, who "is a white, middle-aged, overweight man with black hair and a receding hairline, sitting in an armchair wearing a white tank top and blue pants. Fred is a plush doll and when one squeezes Fred's extended finger on his right hand, he farts." *Id.* at 912. Defendant created Fartman, which had nearly all the same elements. *Id.* at 913.

In that case, defendant argued that "Fred himself is only minimally creative, representing a combination of elements that were in the public domain or were scènes à faire." *Id.* at 917. The court found Fred sufficiently unique since "the combination of [Fred's] elements as well as the expression that is Fred himself are creative." *Ibid.* Then the court examined Fred through the scènes à faire doctrine.

> It is not the idea of a farting, crude man that is protected, but this particular embodiment of that concept. [Defendant] could have created another plush doll of a middle-aged farting man that would seem nothing like Fred. He could, for example, have a blond mullet and wear flannel, have a nose that is drawn on rather than protruding substantially from the rest of the head, be standing rather than ensconced in an armchair, and be wearing shorts rather than blue pants. To see how easy this would be, one need look no further than [plaintiff's] Frankie doll, which is also a plush doll, but differs in numerous details: he is not sitting, and he has blond hair, a tattoo, and a red-and-white striped tank. Frankie is not a copy of Fred. Fartman is. We have no trouble concluding that the district court properly granted partial summary judgment to [plaintiff] on the issue of liability for copyright infringement.

Ibid.

Defendants are making the exact same argument in this matter. However, cases cited by defendants are easily distinguishable. Defendants argue that the dolls' clothing is not copyrightable since they are garment designs, and clothing is a useful article.[5] However, in the case cited by defendants, the court found "the utilitarian functions of the [garment] cannot be protected by copyright. However, because the lace and embroidery accents are totally irrelevant to the utilitarian functions of the [garment], those aspects … are copyrightable. *Express, supra,* 424 F.Supp.2d 1211, 1224. Defendants cite the Ninth Circuit upholding this Court's decision in *Ets-Hokin v. Skyy Spirits, Inc.*, 323 F.3d 763 (9th Cir. 2003). In that case, a photographer sued Skyy Spirits for infringement of his photographs of the Skyy Vodka bottle. However, the court found plaintiff only had "thin" copyrights, which only protects against virtually identical copying. *Id.* at 766. The only thing the court found similar between the copyrighted

---

[5] For this proposition, defendants cite to "*Galliano v. Harrah's Operating Co.,* 424 F.Supp.2d 1211 (C.D.Cal. 2006)." This is also citation an error. It appears that defendants intended on citing *Express, LLC v. Fetich Group, Inc.* ("*Express*"), which can be found at the same citation and holds that "As a general rule, items of clothing are not entitled to copyright protection. This is because items of clothing are generally considered useful articles, and useful articles are not entitled to protection under the Copyright Act. The design of a useful article, however, is entitled to protection 'if, and only to the extent that, such design incorporates pictorial, graphic, or sculptural features that can be identified separately from, and are capable of existing independently of, the utilitarian aspects of the article.'" *Id.* at 1124.

photographs and the allegedly infringing photographs was the vodka bottle and found that the Skyy bottle is scènes à faire for a photo of a Skyy vodka bottle. *Ibid.* Finally, defendants cite *Todd v. Montana Silversmiths*, 379 F.Supp.2d 1110 (D.Colo. 2005), which is a case about Western style jewelry in the form of barbed-wire. That court held if copyright protection extended to plaintiff's jewelry, then in effect plaintiff would have copyright in the "idea" of barbed-wire jewelry since there are so few ways to bring the idea of a barbed-wire necklace into form. *Id.* at 1114. Here, the idea of a "drag queen" doll or "trailer trash" doll can be manifested in countless forms depending upon the creators' subjective vision of that concept; barbed wire is barbed wire.

Each of these cases demonstrates Montwillo's dolls are copyrightable. Montwillo developed the concept of trailer trash and drag queen dolls into a tangible form in unique and varied ways, demonstrating that the concepts can be developed very uniquely. Further, even under "thin" copyrights, defendants still infringed by distributing the exact same models.

### III. CONCLUSION

Defendants have no evidence Montwillo knew the complained of infringements occurred before August 1, 2004. There is no dispute Montwillo created the dolls. Whether the copyrightable elements were created before or after the execution of the operating agreement is immaterial, since there is no written assignment in the operating agreement, or anywhere else. He was never an employee, so the works for hire doctrine cannot apply. So, as the original author, the copyrights belong to Montwillo.

Date: April 4, 2008

Respectfully Submitted,
SOMMERS LAW GROUP

Stephen Sommers
Attorney for Plaintiff/Counter-Defendant
Paul Montwillo

## DECLARATION OF PROOF OF SERVICE

I, the undersigned, am employed in the County of San Francisco; I am over the age of eighteen years and not a party to the within action.

I am employed by the Sommers Law Group, 870 Market Street, Suite 1142, San Francisco, California 94102.

On April 4, 2008 I served the following document(s) entitled:

**PLAINTIFF MONTWILLO'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**SUPPLEMENTAL DECLARATION OF STEPHEN A. SOMMERS IN SUPPORT OF MOTION FOR SUMMARY JUDGEMENT OF PLAINTIFF PAUL MONTWILLO**

on the interested parties in this action by mailing a true and accurate copy thereof, enclosed in a sealed envelope with postage thereon fully prepaid, and by causing such envelope to be deposited in California Overnight Mail at 870 Market Street, Suite 1142, San Francisco, California 94102, addressed as follows:

David Wong
100 Shoreline Highway, Suite 100B
Mill Valley, CA 94941

Marc H. Greenberg
Law Offices of Marc H. Greenberg
536 Mission Street, Suite 2323
San Francisco, CA 94105

I am readily familiar with the firm's practice of collecting and processing correspondence for mailing with the California Overnight Service.

I declare under the penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Dated: April 4, 2008

San Francisco, California

Stephen Sommers