STEPHEN A. SOMMERS, SBN 225742
Sommers Law Group
870 Market Street, Ste. 1142
San Francisco, CA 94102
(415) 839-8569 (Telephone)
(415) 956-0878 (Fax)
ssommers@sommerslaw.com

Attorney for Plaintiff &
Counter-defendant
Paul Montwillo

# UNITED STATES DISTRICT COURT

## FOR NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PAUL MONTWILLO, an individual; | Case No. C 07 3947 SI |
| Plaintiff, | PAUL MONTWILLO'S REPLY TO DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT |
| vs. | |
| WILLIAM TULL, an individual; DANIEL GIBBY, and individual; GIBBY NOVELTIES, LLC dba ARSENIC & APPLE PIE, a California limited liability company; and DOES 1-100, inclusive, | **Date:** **April 4, 2008** <br> **Time:** **9:00 a.m.** <br> **Court:** **10, 19th Floor** <br> **Judge:** **Honorable Susan Illston** |
| Defendants. | |
| WILLIAM TULL, an individual; | Complaint Filed: August 1, 2007 <br> Counterclaim Filed: January 11, 2008 |
| Counter-Claimant, | Trial Date: June 30, 2008 |
| vs. | |
| PAUL MONTWILLO, an individual, and DOES 21 through 30, inclusive, | |
| Counter-Defendants | |

SOMMERS LAW GROUP

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2

## TABLE OF CONTENTS

3

4    I.    INTRODUCTION                                                                      1

5    II.   DEFENDANTS' PROCEDURAL OBJECTIONS                                                 1

6              A.    Montwillo's Declaration                                                 2

7              B.    Montwillo's Filing of His Proposed Order.                               4

8              C.    Discerning the Intent of Plaintiff's Motion.                            4

9              D.    Statute of Limitations.                                                 5

10   III.  LEGAL ARGUMENTS                                                                   5

11             A.    Defendants' Copyright Infringement Arguments Are

12                   Immaterial and Only Serve to Highlight the Strength

13                   of Montwillo's Claim and Show Defendants' Maliciousness.                5

14                   1.    When Montwillo Created the Dolls Is Immaterial

15                         Since No Written Assignment Exists, Nonetheless

16                         He Did Create Them Before Executing the

17                         Operating Agreement Which Abrogates All

18                         Prior Agreements.                                                 6

19                   2.    Even If Montwillo Granted AAP an Implied License,

20                         an Implied License Is Not an Exclusive Assignment.               6

21                   3.    Montwillo's Creditors from 2002 Have Nothing to Do

22                         with This Case.                                                   7

23             B.    Defendants' Fail to Lodge Arguments Regarding Counterclaims.           7

24                   1.    Tull's Conversion Counterclaim Is Preempted by Federal

25                         Copyright Law.                                                    7

26                   2.    Tull Failed to Oppose Plaintiff's Motion to Deny His

27                         Counterclaim for Breach of Contract.                             8

28

- ii -

SOMMERS LAW GROUP

SOMMERS LAW GROUP

1    3.    Tull Failed to Oppose Plaintiff's Motion to Deny His

2         Counterclaim for Breach of Fiduciary Duty and

3         Breach of Covenant of Good Faith and Fair Dealing.    8

4  IV.   DAMAGES                                                9

5         A.   Statutory Damages for Willful Infringement.     9

6         B.   Attorneys' Fees.                                14

7  V.    CONCLUSION                                            15

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- iii

## TABLE OF AUTHORITIES

Pages(s)

### United States Supreme Court Cases

*Celotex Corp. v. Catrett*                                                                7
477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)

### Federal Circuit Decisions

*Fitzgerald Pub. Co., Inc. v. Baylor Publishing Co., Inc.*                              9, 10
807 F.2d 1110 (2d Cir. 1986)

*Guarino v. Brookfield Township Trustees*                                                 8
980 F.2d 399 (6th Cir. 1992)

*Harris v. Emis Records Corp.*                                                            7
734 F.2d 1329 (9th Cir. 1984)

*Schiller & Schmidt*                                                                      6
969 F.2d 410 (7th Cir. 1992)

*Schrott v. Bristol-Myers Squibb Co.*                                                     8
403 F.3d 940 (7th Cir. 2005)

*United States ex rel. Berge v. Bd. of Trustees of the Univ. of Ala.*                     8
104 F.3d 1453 (4th Cir.1997)

### United States Statutes

Copyright Act of 1976, 17 U.S.C. §§ 100, *et seq.*                                3, 4, 9, 10, 14

Federal Rules of Civil Procedure Rule 56(e)                                               8

### Other Authorities

M. Nimmer & D. Nimmer, *Nimmer on Copyright* (2007)                                        8

- iv

SOMMERS LAW GROUP

# I.    INTRODUCTION

In their twenty-five (25) page opposition, defendants fail to dispute facts which support the elements of Montwillo's infringement claim, specifically, that Montwillo personally created the dolls, he never executed a clear unambiguous written assignment, and he was never an employee of Arsenic & Apple Pie, LLC ("AAP").  On the issue of infringement, defendants fail to present any evidence or mount any defense to Montwillo's evidence of the following acts of infringement:

(1)    Defendant William Tull ("Tull") conveyed the five doll copyrights and copyrighted inventory from AAP (which was never the owner of the copyrights) to himself in forgiveness of substantial debt owed him by AAP;

(2)    Tull distributed the five doll copyrights and copyrighted inventory to his domestic partner, defendant Daniel Gibby ("Gibby"), for cash;

(3)    Gibby transferred the copyrights and copyrighted inventory to his newly created limited liability company, Gibby Novelties, LLC ("GN"), as start-up capital; and

(4)    GN advertised and sold the copyrighted inventory and manufactured two new dolls based on Montwillo's copyrights, then advertised and sold those dolls.

Instead of addressing the actual substantive controversy, defendants waste the Court's time on immaterial discussions and unsubstantiated procedural objections.

Plaintiff hereby requests this Honorable Court grant his motion for both his affirmative motion for summary judgment determining that Montwillo is the valid owner of the five copyrights and order maximum statutory damages for repeated willful infringement of each of the five copyrights by each of the three defendants.  Further, plaintiff requests this Honorable Court grant his motion for summary judgment disposing defendants' three counterclaims. Plaintiff further requests the Court grant an award for attorneys' fees.

## II.    DEFENDANTS' PROCEDURAL OBJECTIONS

With their numerous procedural objections, defendants attempt to cloud issues of liability.  Ironically, however, an examination of defendants' objections further demonstrates the solidity of Montwillo's claim.

SOMMERS LAW GROUP

SOMMERS LAW GROUP

A.    **Montwillo's Declaration**

Defendants disingenuously claim that they were placed at a "severe disadvantage" because they did not have a copy of Montwillo's declaration and requests the Court to "declare the 'facts' contained in Plaintiff's Declaration a sham…" and requests to both strike it from the record and favor deposition testimony. Defendants' Opposition, 2:2-3; 4:20-22.

While plaintiff acknowledges that he hand-filed Montwillo's declaration because it was too large a file for ECF, plaintiff vigorously disputes that he did not properly serve defendants, as stated in the proof of service and the declaration of Stephanie Joynt, assistant to plaintiff's attorney. Joynt Decl. ¶1, Exh. A. Further, plaintiff indeed complied with the local rules regarding hand-filing of documents for cases designated for ECF. *Ibid.* Even so, assuming *arguendo* defendants were not served with the declaration, their disingenuous claim of "severe disadvantage" would have been remedied by simply asking plaintiff's attorney to email a copy. Further, the Court has the discretion to permit defendants additional time to address any factual issues raised in Montwillo's declaration – an unrequested remedy.

Nonetheless, defendants' objection highlights defendants' absurd contradiction between Tull's counterclaims and defendants' resistance to Montwillo's infringement claim. If the Court were to choose to disregard Montwillo's declaration, it would need to look no further than paragraphs 13 through 17 of Tull's counterclaims[1] for every prerequisite fact required to grant Montwillo's motion:

> 13.    On or about July 2, 2004, Montwillo filed copyright registration for two different doll designs, described and numbered as follows:   VAu000631337 – [Talking Pregnant Trailer Trash

---

[1] Although only Tull filed counterclaims, Tull, Gibby and GN's verified responses to interrogatories number 7 and 8 repeat the factual allegations in paragraphs 13 though 15, almost verbatim. Sommers Decl. ¶¶ 7, 8; Exhs. G, F. Further, defendants' response to interrogatory number 10 is an admission that Gibby and GN infringed:

> Gibby Novelties, LLC received a capital contribution from Daniel Gibby which included the intellectual property rights to the dolls which are the subject of this litigation.

*Ibid.*

Doll a.k.a.] Trash talking Trixie; and VAu00631338 [-- Bubba, Mullet Doll].

14.     On or about July 13, 2004, Montwillo filed copyright registration for three different doll designs, described and numbered as follows: VA0001271343 -- Blonde drag queen doll; VA0001271341 -- Redhead drag queen doll; and VA0001271342 -- Trailer trash doll. True and correct copies of the Copyright Office's records regarding these applications are attached hereto as Exhibits A, B, C, D and E respectively, and are incorporated herein by this reference as though fully set forth.

15.     Counter-Claimant Tull is informed and believes, and thereon alleges, that all of these copyright applications, pertain to designs created by Montwillo while he was a managing member of the Arsenic and Apple Pie LLC, and as such are assets of that Company, and are not, and have never been, the personal property of Montwillo. Montwillo did not seek the consent of Tull before filing these applications, and in fact made these filings in secret.

16.     The claim made in these applications is a fraud on the Copyright Office, and is a conversion by Montwillo of Company assets which, following the dissolution of the Company, were transferred to Tull in satisfaction of the substantial debt owed to him by the Company. The applications were further fraudulent in that Montwillo failed to disclose the ownership claim of the Company to said dolls.

17.     The conversion of these assets, and the subsequent assertion of this meritless complaint alleging copyright infringement, were intentional acts which have clouded the title to these designs, and caused significant financial damage to Tull, in that these claims hamper his ability to exploit these designs, and have caused him to be compelled to retain counsel, and defend his ownership rights to these designs in three different legal forums since 2005, all to his damage in an amount to be shown according to proof at trial.

Defendant Tull's Counterclaim, 4:22 -- 5:21.

To prove his claim, Montwillo need only show he created the dolls as a non-employee, properly registered his copyrights, and defendants willfully infringed. Tull admits all this above.

First, copyright ownership vests with the author. 17 U.S.C. § 201(a). In paragraph 15, Tull admits the "copyright applications [] pertain to designs created by Montwillo…" Second, defendants' works made for hire defense requires plaintiff to be an employee. 17 U.S.C. §

SOMMERS LAW GROUP

1  201(b). In paragraph 15, Tull admits the dolls' "designs [were] created by Montwillo while he

2  was a *managing member* of the Arsenic and Apple Pie LLC" – i.e., not an employee. Third,

3  Montwillo must have registered the work with the Copyright Office before the infringement for

4  statutory damages. 17 U.S.C. § 412. In paragraphs 13 and 14, Tull admits Montwillo registered

5  the copyrights on July 2 and 13, 2004. The infringement began on July 15, 2004. Fourth, Tull

6  admits the dolls are copyrightable in paragraphs 15, 16, and 17, by stating Montwillo's "designs"

7  are "assets." Tull further alleges Montwillo's applications "clouded the title to these designs, …

8  in that these claims hamper his ability to exploit these designs." Fifth, Tull admits that he

9  willfully infringed by transferring the "claim made in the [copyright registration] applications"

10  (i.e., the copyrights) to himself and that his ability to "exploit" the dolls were "hampered" by

11  Montwillo's registrations, but he exploited them anyway[2].

12  **B.    Montwillo's Filing of His Proposed Order.**

13  Defendants claim that since plaintiff did not upload a proposed order through ECF, they

14  cannot comprehend "the scope and terms of relief sought by Plaintiff[,]" and urge the Court to

15  deny plaintiff's motion. Defendants Opp., 3:22-24. As with Montwillo's declaration, defendants

16  were properly served with a proposed order. Joynt Decl. ¶ 1, Exh. A. Defendants argue without

17  a proposed order, they cannot discern if they are to oppose only liability or also damages.

18  However, plaintiff's memorandum devotes three sections to the specific remedies he seeks.

19  Plaintiff's MSJ, sections A(3), (4) and (5), 23:11 – 24:8.

20  **C.    Discerning the Intent of Plaintiff's Motion.**

21  Defendants claim "Plaintiff's Notice of Motion is incoherent. It is not clear, from either

22  the Motion itself, or its Table of Contents, whether plaintiff is moving for Summary Judgment on

23  his Complaint, or just Summary Adjudication as to the issue of liability[,]" and request the Court

24  deny plaintiff's motion. Defendants' Opp. 3:27-4:5. However, nowhere in the notice of motion

25  and motion, table of contents, or memorandum, does plaintiff mention summary "adjudication"

26

27  [2] Since defendants admit they were represented by counsel for each of the infringements, they
cannot plead ignorance of law (Sommers Decl., ¶¶ 5, 8, 9; Exh. D, G, H, response to request for

28  admission no. 6).

SOMMERS LAW GROUP

1  or partial summary judgment. Plaintiff clearly requests an award of statutory damages and
2  attorneys' fees in his notice of motion and motion, his table of contents and sections IV.A.(2),
3  (3), (4) and (5).

4  **D.    Statute of Limitations.**

5      Defendants' statute of limitations argument only highlights their willful infringement,
6  arrogance and deceit. By letter dated July 3, 2004, Wong notified Montwillo that AAP was in
7  the process of winding up its operations and suggested for the first time that the "intellectual
8  property rights to the dolls" be auctioned. Montwillo Decl. ¶ 16, Exh. I, page 2. Montwillo
9  replied with his July 13, 2004 letter. *Id.* ¶ 18, Exh. K. In his letter, Montwillo specifically did
10  four things: (1) objected to the dissolution; (2) requested accounting information; (3) gave notice
11  of his ownership of the copyrights and made an offer to sell them; and (4) notified Wong that if
12  Wong put Tull's best interests above AAP's, a conflict of interest would arise. *Ibid.*

13      Without further notification to plaintiff, over the next four days, defendants dissolved
14  AAP and executed a series of unlawful copyright assignments that eventually gave GN the
15  copyrights. Sommers Decl. ¶¶ 2, 3, 4, 7, 8; Exh. A, B, C, F, G, see response to interrogatory
16  number 10. Three days after the unlawful assignments, defendants' attorney, acting under the
17  auspices of counsel for AAP, misrepresented to Montwillo in a letter that AAP is the "sole
18  owner" of the copyrights, not Tull, Gibby or GN. Montwillo Decl., ¶ 20, Exh. M. For good
19  measure, in the same letter Wong also threatened to sue Montwillo unless he stopped using
20  AAP's logo, which has a cartoon of Montwillo holding a pit with a doll head in it. *Ibid.*[3]

21  **III.    LEGAL ARGUMENTS**

22  **A.    Defendants' Copyright Infringement Arguments Are Immaterial and Only Serve to
23  Highlight the Strength of Montwillo's Claim and Show Defendants' Maliciousness.**

24      Defendants mainly rehash legal arguments they made in their memorandum in support of
25  their motion that plaintiff addressed in his opposition and needs not be repeated here.

26  [3] For a more complete discussion of defendants' statute of limitations argument, please see
27  plaintiff's opposition, section II, A. Plaintiff Opposition, 1:15-3:22.

28

SOMMERS LAW GROUP

Defendants do devote space to three immaterial additional arguments regarding when Montwillo created the dolls vis-à-vis AAP's formation, licensing, and Montwillo's bankruptcy.

> 1.    When Montwillo Created the Dolls Is Immaterial Since No Written Assignment Exists, Nonetheless He Did Create Them Before Executing the Operating Agreement Which Abrogates All Prior Agreements.

Quoting the seventh Circuit in *Schiller & Schmidt*, 969 F.2d 410, 413 (7th Cir. 1992), plaintiff made a two sentence argument that since he created the dolls before the formation of AAP, the operating agreement cannot serve as an assignment since an assignment must identify the "(noncreator) owner unequivocally." Plaintiff's MSJ, 20:5-8. Defendants argued for five pages that since the AAP *partnership* contains similar language as the *limited liability company* operating agreement, whether Montwillo created the dolls during the partnership or the LLC does not matter.

Defendants' vigorous defense draws attention away from the basic fact that the language section 2.7 and the corresponding language in the partnership agreement are not assignments. Nonetheless, even if the language did create an assignment, defendants cannot conflate the partnership agreement with the operating agreement, because the operating agreement contains an integration/entire agreement clause – section 11.1. Montwillo Decl., Exh. B, page 31. Section 11.1 specifically provides that the operating agreement "replaces and supersedes all prior written and oral agreements by and among the Members of any of them." *Ibid*. Accordingly, any prior assignments would be abrogated. In Montwillo's supplemental declaration, he provides documentary proof that the AAP versions of the dolls were designed and manufactured before May 4, 2000, the date he executed the operating agreement. Montwillo Suppl. Decl. ¶ 1, Exh. A. Thus, even if the copyrighted elements were created under the partnership **and** section 2.7 is an assignment, Montwillo is still the owner of the copyrights since the AAP dolls were created before the execution of the LLC's operating agreement.

> 2.    Even If Montwillo Granted AAP an Implied License, an Implied License Is Not an Exclusive Assignment.

Plaintiff argued that for reasons such as failure of consideration, Montwillo did not even grant AAP an implied license. Plaintiff's MSJ, 21:3– 14. Plaintiff's intended to demonstrate

SOMMERS LAW GROUP

1  that not only do defendants fail to show a valid written assignment; they cannot even

2  demonstrate a limited non-transferable implied license. For three and half pages, defendants

3  argue that Montwillo did grant AAP a license. Defendants' Opp., 17:23-20:26, section A(1)(e).

4  Defendants profoundly miscomprehend implied licenses, which only flow to the licensee, cannot

5  be transferred, and are non-exclusive. *Harris v. Emis Records Corp.*, 734 F.2d 1329, 1334 (9th

6  Cir. 1984). So, even if Montwillo had provided AAP an implied license, Tull, Gibby and GN

7  still infringed.

8        3.    Montwillo's Creditors from 2002 Have Nothing to Do with This Case.

9        Montwillo's misadventures with AAP left him so broke that in March 2002 he filed

10  personal bankruptcy without a lawyer to discharge a mere $17,246, listing his monthly income as

11  $920. Montwillo Suppl. Decl. ¶ 2, Exh. B. Defendants argue his bankruptcy case should be re-

12  opened, even though Montwillo's creditors were not Tull, Gibby or GN, but three credit card

13  companies. *Ibid.* Defendants' request that the Court report Montwillo to the Bankruptcy Court

14  only serves to highlight defendants' level of malice.

15  **B.    Defendants' Fail to Lodge Arguments Regarding Counterclaims.**

16        Defendant Tull filed three completely baseless counterclaims, further highlighting his

17  malicious intent. Plaintiff adequately moved to have the counterclaims denied. In plaintiff's

18  notice of motion and motion, he sets forth the grounds for denial. Tull's counterclaims are so

19  groundless, that plaintiff had no need to devote considerable space to disputing them and did not

20  just "tack[] on" his arguments, but were part of a carefully considered motion that contained all

21  relevant undisputed facts. Defendants' Opp., 24:19-20.

22        Tull has the burden of proof at trial on his counterclaims and a summary judgment

23  motion is proper if Montwillo presents undisputed facts that undermine an essential element.

24  *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

25        1.    Tull's Conversion Counterclaim Is Preempted by Federal Copyright Law.

26        Defendant Tull explicitly alleges that the basis for his conversion claim is that by

27  registering the copyrights, Montwillo was laying claim to design assets that he did not own, thus

28  "hampering" Tull's ability to exploit the copyrights. Such state law conversion claims are

SOMMERS LAW GROUP

1  preempted by section 301 of the Copyright Act. *United States ex rel. Berge v. Bd. of Trustees of*
2  *the Univ. of Ala.*, 104 F.3d 1453, 1463 (4th Cir.1997). Since the court must determine the valid
3  owner of the copyrights to determine the validity of the conversion claim, all the undisputed facts
4  presented in plaintiff's affirmative motion are material.

5        2.    Tull Failed to Oppose Plaintiff's Motion to Deny His Counterclaim for Breach of
6              Contract.

7        Montwillo presented the material fact that the operating agreement's arbitration clause
8  does not cover federal copyright claims and Tull failed to present facts in dispute. Federal Rules
9  of Civil Procedure, Rule 56(e) requires the adverse party to "set forth specific facts showing that
10 there is a general issue for trial" and if the adverse party fails to do so, "summary judgment, if
11 appropriate, shall be entered against the adverse party." Fed.R.Civ.P. Rule 56(e). See also,
12 *Schrott v. Bristol-Myers Squibb Co.*, 403 F.3d 940, 944 (7th Cir. 2005) (summary judgment may
13 be granted where party files no opposition and the moving party disproves an essential element
14 of the case). The Court is not required to search the record *sua sponte* for some a fact to dispute
15 the moving parties fact presentation, rather the Court may entirely rely on the evidence
16 designated by the moving party showing no triable issue. *Guarino v. Brookfield Township*
17 *Trustees*, 980 F.2d 399, 403 (6th Cir. 1992). Thus, it is appropriate for the Court to grant
18 Montwillo's motion.

19       3.    Tull Failed to Oppose Plaintiff's Motion to Deny His Counterclaim for Breach of
20             Fiduciary Duty and Breach of Covenant of Good Faith and Fair Dealing.

21       Similar to Tull's counterclaim for breach of contract, Tull failed to present evidence
22 defending his convoluted counterclaim for breach of fiduciary duty and breach of covenant of
23 good faith and fair dealing. The only offending acts Tull alleges is that Montwillo registered his
24 copyrights and did not arbitrate his infringement claim. Montwillo has presented considerable
25 evidence that the registrations are appropriate and that he need not arbitrate his case. Tull failed
26 to present evidence to the contrary, thus the Court may properly deny his counterclaim.

27 ///

28 ///

SOMMERS LAW GROUP

1

## IV.    DAMAGES

2  A.    **Statutory Damages for Willful Infringement.**

3       Plaintiff has elected to statutory damages pursuant to section 504(c) for willful

4  infringement.  17 U.S.C. § 504(c).  The court in *Fitzgerald Pub. Co., Inc. v. Baylor Publishing*

5  *Co., Inc.* 807 F.2d 1110 (2d Cir. 1986) discusses "willfulness" at length.

> One commentator has concluded that "willfully" means with
> knowledge that defendant's conduct represents an infringement.
> See 3 Nimmer § 14.04[B][3] at 14-28. Defining knowledge,
> several district courts have held that something less than proof of
> actual knowledge will suffice to establish knowledge and, hence,
> willfulness. For example, one court found a willful infringement
> based upon the infringer's position-itself a publisher of a
> copyrighted newspaper-and its failure to appear and defend in the
> copyright action. [Citation.]    Another court held that "reckless
> disregard" for the copyright holder's rights establishes knowledge
> of the infringement. [Citation.]

*Id.* at 1115.

14      If the Court determines that defendants willfully infringed Montwillo's five copyrights,

15  the Court may award statutory damages not less than $750 per doll, per defendant (totaling

16  $11,250) in joint and several liability.  On the high-end, if the Court finds willful infringement

17  by all three defendants, it may award a maximum of $150,000 per dolls, per defendant (totaling

18  $2,250,000), in joint and several liability.  17 U.S.C. § 504(c)(2).

19      In *Fitzgerald Pub. Co., Inc. v. Baylor Publishing Co., Inc.* 807 F.2d 1110 (2d Cir. 1986),

20  the court extensively discussed the factors courts commonly use to determine the amount of

21  statutory damages.

> Most of the factors relied upon in deciding upon the appropriate
> statutory damages award do not depend on the trial court's
> weighing the blameworthiness of one defendant against another.
> For example, the expenses saved and the profits reaped by the
> infringers are considered. [citation] Other factors-not dependent on
> a particular defendant's culpability-are also examined, including
> the revenues lost by the plaintiff, [citation] the value of the
> copyright, [citation] and the deterrent effect on others besides the
> defendant. [Citation.]

SOMMERS LAW GROUP

Some factors do focus upon an individual defendant's culpability, for instance, whether the defendant's conduct was innocent or willful, [citation] or whether a defendant has cooperated in providing particular records from which to assess the value of the infringing material produced. [citation] Finally, the potential for discouraging the defendant is factored into the determination of the award. [citation]

Consideration of these factors in setting the statutory damage award sometimes results-on account of their several and joint liability-in a less culpable defendant being held liable in an amount greater than otherwise would be the case had it appeared in the action alone. This possibility is not a fatal obstacle. Awards of statutory damages serve two purposes-compensatory and punitive. [citation] To the extent that an award of statutory damages compensates the plaintiff for its injury, the relative faults of the defendants are irrelevant.

As to that part of the award that is punitive in nature, the less culpable defendant will have a recovery over against the more culpable defendant in most instances. Moreover, § 504(c) provides two opportunities for a defendant to escape the full measure of joint and several liability with a more culpable defendant. It can establish that it was an innocent infringer under § 504(c)(2), or it may successfully oppose the plaintiff's contention that it willfully infringed plaintiff's copyright. Nevertheless, when the copyright owner has successfully established that two or more defendants were willful infringers, § 504(c)(2) is unconcerned about gradations in blameworthiness.

*Id.* at 1117.

In this case, none of the defendants are innocent and all the infringements are willful. Defendants continually fish around for a defense to the indefensible, that Tull maliciously power-grabbed Montwillo's copyrights in forgiveness of his loans and gave them to his domestic partner on the cheap so he could have the business. Gibby went along with Tull's unlawful scheme. Wong registered GN for Gibby before AAP's dissolution even ended. To this day, Gibby and GN continue to infringe by advertising (publication) and selling (distribution).

Tull was aware the dolls were copyrightable and so demonstrated by twice offering to buy them from Montwillo, listing them as assets on his release of AAP's debt, the bill of sale of the assets to himself, and the bill of sale of the assets to Gibby. Finally, Tull's counterclaims

SOMMERS LAW GROUP

1   against Montwillo for registering the copyrights and "hampering" his ability to "exploit" them.

2   Tull cannot have it both ways. If he believes the dolls are not copyrightable, then he's engaged

3   in malicious prosecution by filing his counterclaims. If he does believe the dolls are

4   copyrightable and he wanted AAP to own them, then he needed Montwillo to execute an

5   unambiguous assignment of the copyrights, as he did five times with the two bills of sale, the

6   debt release, and the two draft purchase agreements. Instead, Tull just decided he would dissolve

7   AAP and just appropriate the copyrights without compensating Montwillo.

8          At deposition, Tull made his motivations for taking the copyrights clear – financial.

9          *Q.     Why did you choose to dissolve Arsenic & Apple Pie?*
10         *A.     We were losing money hand over fist. I think I put quite*
           *enough into it. So Paul's insistence on $16,000 was to me*
11         *absolutely ridiculous, and so I decided to dissolve it.*

12         *Q.     Is there any other reason that you decided to dissolve*
13         *Arsenic & Apple Pie?*
           *A.     No, I think --*
14         *WONG: Go ahead.*

15         *THE WITNESS: No. There isn't, wasn't.*

16         When further questioned about purchasing of Montwillo's copyrights, Tull initially

17  attempted to deny draft purchase agreements existed.

18         *Q.     Was there ever a written agreement that was part of the*
19         *tentative agreement?*
           *A. No. I didn't say, "Here, take this piece of paper. This is my*
20         *tentative agreement."*

21         Tull Depo. 61:25-62:3. After being presented with a copy of a draft agreement, complete

22  with a cover letter from Wong, Tull provided the following testimony:

23         *Q.     Do you have any reason to believe that this letter was not sent*
24         *to Mr. Montwillo with an attached proposed purchase agreement?*
           *A.     Do I have any reason to believe that it was not sent to him?*
25         *So you're asking do I have a reason that it was sent to him, right?*

26         *MR. SOMMERS: Yeah.*
27         *MR. WONG: No.*
           *MR. SOMMERS: Well, you can answer it either way you like.*
28         *MR. WONG: Rephrase the question if that's what you want to do.*

SOMMERS LAW GROUP

MR. SOMMERS:
Q.    Does it seem reasonable to you that this letter with the attached purchase agreement was sent to Mr. Montwillo by Mr. Wong?
A.    Reasonable?

Q.    Do you believe it happened?
A.    Honestly, belief is a very funny concept. I believe in a lot of things. I believe maybe in the higher power. But belief isn't proof. So I mean that's -- I don't know. I would have to guess to say that that really truly happened, wouldn't I?  Believe.

MR. WONG: You've answered the question.

MR. SOMMERS:
Q.    Do you have a reason to believe that this letter was not sent to Mr. Montwillo with the attached agreement?
A.    I'm not going to answer that anymore. That's silly again.

Tull Depo. 64:13-65:18. Later, Tull does admit to requesting Wong to draft a purchase agreement. Tull Depo. 100:10-24.

Although the crux of Tull's argument is that section 2.7 is an assignment, Tull gave the following testimony as to that section's meaning:

Q.    Is it fair to say that your understanding of [section 2.7] was a differentiation of the scope of responsibility between you and Mr. Montwillo?
A.    When it was initially done, yes.

Q.    That he would do some things, and you would do some other things?
A.    Yes.

Q.    Is there anywhere in this agreement that you were aware of -- and I can say I've read it several times -- that you could point to me where there is a conveyance of a copyright?
A.    Again, you're trying to confuse me. And let me tell you why. You first got me going back saying that I dissolved the company when I did not. Paul's bankruptcy dissolved the company. So I'm really -- could you possibly ask me that question one more time?

Q.    Move to strike as unresponsive, but that's fine. Could you point to anything in this document -- when you signed it, right, this

SOMMERS LAW GROUP

1

*is the agreement. You said you read it. Where in this document if*
*-- let me rephrase that.*

2

*Is there a place in this document that assigns or conveys in any*
*manner intellectual property?*

3

*A.    We --*

4

*MR. WONG: From whom to whom?*

5

*MR. SOMMERS:*

6

*Q.    Anybody.*

7

*A.    Again, I -- I -- again, I'm being confused.*

8

9

*Q.    ...Do you have an understanding that there is somewhere in*
*this document a mention of intellectual property?*

10

*A.    It was understood. My contribution was financial; Paul's was*
*the design of the product, and that the product belonged to the*

11

*company. And he also -- when we went to Steinhart & Falconer,*
*he knew that the products were not copyrightable or*

12

*trademarkable trademarticable [sic]? That's a good one. So*
*therefore, that subject had already been broached and understood*

13

*between both parties.*

14

15

*Q.    Okay. You're not answering my question. The question is, do*
*you understand that this document contains a clause that discusses*

16

*intellectual property, this document?*

17

*A.    I can't answer that specific question because I -- I don't know.*
*I'm a layperson.*

18

19

*Q.    Okay, all right. So as a layperson, is there any part of this*
*that you understood to address the issues of intellectual property?*

20

*A.    No, because Paul -- it was never brought up. Nothing was*
*ever brought up about intellectual property. Nothing. This was --*

21

*everything that was done was the property of Arsenic & Apple Pie,*
*and I think -- I think that was fairly clear.*

22

23

*Q.    And is it your position that the things that were created, the*
*dolls, et cetera, were the property of Arsenic & Apple Pie based on*

24

*an oral agreement between you and Paul?*

25

*MR. WONG: I think we need to take a break.*

26

*MR. SOMMERS: I have a question pending. I would just like a*
*simple answer.*

27

28

SOMMERS LAW GROUP

> *THE WITNESS: All right. Excuse me. I have to go to the bathroom anyway. Where is the men's room?*
>
> *MR. SOMMERS: I'd like the record to reflect that I'm asking Mr. Tull to answer a simple question, and he's leaving with his attorney before he comes back to answer.*

Tull Depo. 104:24-1087. Upon Tull's return from discussing his answer with his attorney, Tull astutely selected section 2.7 as an assignment. Tull Depo. 112:12-22.

Gibby and GN's conduct is no better. To this day, GN continues advertise and sell the dolls, including the pregnant doll that GN manufactured from copyrighted work, side-by-side on his website with the "Vintage Redneck Collection" by famous "redneck" comedian Jeff Foxworthy. Joynt Decl. ¶ 3, Exh. C. In interviews he Gibby claims he made the dolls and appropriates Montwillo's story about being sued by a "major toy maker." Joynt Decl., ¶¶ 3, 4; Exhs. C, D. Gibby and GN have flatly refused to provide any documentation of the sale of the dolls. Sommers 2d Suppl. Decl. ¶ 2, Exh. B; request for documents number 24. At Tull's march 20, 2008 deposition, Wong stated on the record "they'll be produced probably in the next week and a half." Tull Depo., 109:18-110:18. On April 2 & 3, 2008, plaintiff requested the documents via email and were told that it would be an additional two weeks. Sommers 2d Suppl. Decl., ¶ 4, Exh. D.

While Gibby and GN refuse to provide documents, what is certain from internet research, the dolls are widely popular. A simple Google search produces thousands of hits in multiple languages, including Spanish, French, Portuguese, and German. Joynt Decl., ¶ 4, Exh. D. The dolls are also available for purchase countless retail outlets, such as Amazon.com and toydirectory.com. *Ibid.*

## B.    Attorneys' Fees.

"[T]he court may also award a reasonable attorney's fee to the prevailing party as part of the costs[,]" where, as here, plaintiff properly registered his copyrights. 17 U.S.C. §§ 412(2), 505. Plaintiff hereby requests that his reasonable attorneys' fees be awarded.

///

///

SOMMERS LAW GROUP

## V.    CONCLUSION

There is no dispute of material fact as to defendants' copyright infringement. Defendants make creative arguments, but fail to dispute the basic elements: Montwillo created the dolls, he was never an employee, he never executed an assignment, and defendants conveyed them to each other and them reproduced some, but advertised and distributed each of them. Since the lynchpin in Montwillo's motion to deny the counterclaims is a determination of ownership, the counterclaims should be denied. Montwillo requests this Honorable Court grant his motion in whole and maximize the statutory damages against each of the three defendants, in joint and several liabilities. Montwillo further requests an Order for reasonable attorneys' fees.

Respectfully submitted,

Date: April 11, 2008

SOMMERS LAW GROUP

Stephen Sommers
Attorney for Plaintiff/
Counterclaim-defendant
Paul Montwillo

SOMMERS LAW GROUP

### AFFIDAVIT AND DECLARATION OF PROOF OF SERVICE

I, the undersigned, am employed in the County of San Francisco; I am over the age of eighteen years and not a party to the within action.

I am employed by the Sommers Law Group, 870 Market Street, Suite 1142, San Francisco, California 94102.

On April 11, 2008  I served the following document(s) entitled:

Paul Montwillo's Reply to Defendants' Opposition to Plaintiff's Motion for Summary Judgment

Stephen Sommers's Second Supplemental Declaration in Support of Plaintiff's Motion for Summary Judgment

Paul Montwillo's Supplemental Declaration in Support of His Motion for Summary Judgment

Declaration of Stephanie Joynt in Support of Plaintiff's Motion for Summary Judgment

on the interested parties in this action by mailing a true and accurate copy thereof, enclosed in a sealed envelope with postage thereon fully prepaid, and by causing such envelope to be deposited in Federal Express at 100 California St., San Francisco, California 94111, addressed as follows:

Marc Greenberg

GGU School of Law

536 Mission St.

San Francisco, CA 94105

David Wong

100 Shoreline Highway, 100B

Mill Valley, CA 94941

I am readily familiar with the firm's practice of collecting and processing correspondence for mailing with Federal Express.

I declare under the penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Dated: April 11, 2008                                 San Francisco, California

                                                      Stephen Sommers