United States District Court
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

PAUL MONTWILLO,

    Plaintiff,

  v.

WILLIAM TULL; DANIEL GIBBY; and
GIBBY NOVELTIES LLC dba ARSENIC &
APPLE PIE,

    Defendants.
    _____/
WILLIAM TULL,

    Counter-claimant,

  v.

PAUL MONTWILLO,

    Counter-defendant.
    _____/

No. C 07-3947 SI

**ORDER DENYING CROSS-MOTIONS
FOR SUMMARY JUDGMENT**

On April 25, 2008, the Court heard argument on the parties' cross-motions for summary judgment. For the reasons set forth below, the Court DENIES the motions.

**BACKGROUND**

This case arises out of a failed business venture between plaintiff Paul Montwillo and defendant William Tull to create and distribute dolls designed by Montwillo. As background, several years prior to the business venture, Montwillo made several "drag queen" and "Trailer Trash Barbie" dolls by dressing Barbie dolls in wigs, applying make-up, and changing their outfits. In 1996, Montwillo began selling his dolls at a store owned by Tull in San Francisco, In-Jean-ious Active. Soon thereafter, Mattel, Inc., the producer of Barbie Doll, sued Montwillo and In-Jean-ious Active for trademark and copyright

1 infringement.[1] Montwillo and In-Jean-ious Active settled the lawsuit with Mattel, Inc. by agreeing, *inter alia*, to refrain from selling any dolls based on Mattel's Barbie line; imitating or copying or using the Barbie line packaging; imitating or copying the body shape or facial features of "Barbie" and "Ken." *See* Tull Opposition Decl. Ex. 1 (Stipulated Injunction in *Mattel* case).

In July 1997, Tull and Montwillo entered into a partnership to create and distribute dolls that did not violate the terms of the Mattel settlement. Greenberg Moving Decl. Ex. 2 (Partnership Agreement). The Partnership Agreement, signed July 16, 1997, states that Tull "will be primarily responsible for the financial investment of startup costs, and upkeep until the business shows a profit. Mr. Tull is also responsible for bookkeeping, sales, and distribution." *Id*. With respect to Montwillo, the Partnership Agreement provides that he "will be primarily responsible for Art Direction, Design, and Advertising of the product line. This would include such things as: corporate identification, product design, package design, web site design and maintenance, and print advertising." *Id*.

In the fall of 1998, Tull and Montwillo converted the partnership into a limited liability company, and registered it with the State of California as Arsenic & Apple Pie, L.L.C. ("AAP"). At some time soon thereafter, the two men, with the assistance of Tull's attorney, David Wong, entered into negotiations over the company's Operating Agreement. The parties dispute the nature of these negotiations. Montwillo claims that during the negotiations he removed from the Operating Agreement any language that would transfer his rights to the intellectual property of his dolls to AAP. Montwillo Moving Decl. ¶ 4. In contrast, Tull states that "[i]n March of 1999, I received back the signed Operating Agreement from Montwillo, with no additional changes, additions or deletions. Specifically Montwillo did not ask, nor would I have agreed, to remove, alter or insert any language from or into the Operating Agreement that would have given Montwillo the intellectual property rights to the Trailer Trash doll line. It was the clear understanding of both of us that any intellectual property rights to the dolls that may have existed would be the property of Arsenic & Apple Pie, LLC." Tull Opposition Decl. ¶ 7.

Section 2.7 of the Operating Agreement states,

The Managing Members shall be as follows:

---

[1] Montwillo states that for privacy reasons he used the name Paul Hansen, and that is the name by which he was sued.

2

      **Paul Montwillo** – Manager in charge of Art Direction, Design and Advertising of product line, including but not limited to, corporate identification, product design, packaging, web site design, web site maintenance and print advertising.

      **William Tull** – Manager in charge of Administration, business affairs, accounting, distribution, sales and manufacturing.

Greenberg Moving Decl. Ex. A to Ex. 10 at 8.

During the years of the Arsenic and Apple Pie Partnership and later during the Arsenic and Apple Pie LLC,[2] Montwillo designed, developed and helped market the first three Trailer Trash Doll models: "Trailer Trash Doll," "Blonde Drag Queen," and "Redhead Drag Queen."[3] Montwillo also developed a pre-production prototype of the "Talking Pregnant Trailer Trash Doll." It is undisputed that all dolls were manufactured, developed, financed and distributed by Arsenic. Montwillo Depo. 70:18-71:7; Tull Moving Decl. ¶ 10. It is also undisputed that Montwillo was actively involved in the design and artwork of the cardboard package in which each doll was sold; on the back of each box, there was a copyright notice on behalf of Arsenic & Apple Pie. Montwillo Depo. 41:17-21; 67:9-68:6; 70:11-17; Greenberg Moving Decl. Ex. 3.

AAP was not profitable; from its inception in 1999 until its dissolution in 2004, AAP lost money every year except in 2000, when it showed a profit of $6,140. Tull Opposition Decl. ¶ 14 (stating yearly net losses for AAP ranged from $2,096 to $31,662).

Tull states that on or about March 10, 2003, he learned that Montwillo had filed a Voluntary Petition in bankruptcy court in March of 2002. Montwillo Moving Decl. Ex. C; Greenberg Moving Decl. Ex. 4 (petition); Tull Opposition Decl. ¶¶ 12-13. Schedule B of Montwillo's Petition listed his membership interest in AAP as the most significant asset that he owned. Greenberg Moving Decl. Ex.

---

[2] In an effort to buttress his copyright claims, Montwillo asserts that he began creating the Trailer Trash dolls prior to signing the LLC agreement in 1999, and as support has submitted correspondence and other documents, such as invoices, dating as early as August 1997. However, Montwillo and Tull entered into the AAP Partnership Agreement in July 1997, so Montwillo's contention is unavailing.

[3] These three dolls, along with "Talking Pregnant Trailer Trash Doll," and "Male Mullet Trailer Trash Doll," are the five dolls at issue in this lawsuit.

3

4.[4] However, Montwillo stated on the Petition that he did not own any "patents, copyrights, and other intellectual property." *Id.*

In response to learning about Montwillo's bankruptcy Petition, Tull invoked Section 8.3 of the Operating Agreement, which provides:

> 8.3 On the happening of any of the following events (Triggering Events) with respect to a Member, the Company and the other Members shall have the option to purchase all or any portion of the Membership Interest in the Company of such member (Selling Member) at the price and on the terms provided in Section 8.7 of this Agreement:
>
> . . .
>
> (b)     the bankruptcy of a Member;
>
> . . .
>
> Each Member agrees to promptly give Notice of a Triggering Event to all other Members.

Greenberg Moving Decl. Ex. A to Ex. 10 at 24.

By letter dated April 7, 2003, Tull's attorney informed Montwillo that due to Montwillo's bankruptcy filing, Montwillo's membership interest in AAP was subject to repurchase, and that Tull had determined that Montwillo's membership interest had a fair market value of $1. Montwillo Moving Decl. Ex. C. In a letter dated May 2, 2003, Montwillo rejected Tull's $1 offer, stated that he had repeatedly informed Tull of his intention to file for bankruptcy and that he had promptly notified Tull of the bankruptcy petition. Montwillo Moving Decl. Ex. D; *see also id.* ¶ 15 (stating that Tull never told him that he intended to dissolve company upon Montwillo's bankruptcy filing). Montwillo also stated that he believed that the fair market value of his interest in the company was $16,000, and that the two men had previously discussed and agreed on that amount. *Id.*

Montwillo and Tull then engaged in negotiations over the value of Montwillo's share, and exchanged drafts of an "Agreement For Purchase of Membership Interest and Doll Proprietary Rights." *Id.* Ex. E. The draft agreement, which appears to have been drafted by Tull's attorney, states, *inter alia*,

> Included within the terms of the sale of Membership Interest contemplated by the Agreement and subject to the terms and conditions of the same, are any intellectual rights, claims, property interests, proprietary claims or other intellectual property rights to two doll concepts which Seller [Montwillo] has previously conceived and developed,

---

[4] On Schedule B, "Personal Property," Montwillo listed his interest in Arsenic & Apple Pie LLC, valued at $6000.00. Greenberg Moving Decl. Ex. 4.

4

> identified for the purposes of the agreement as the:
>
>> (1) "Pregnant" doll
>>
>> (2) "Mullet" doll
>
> . . .
>
> Buyer shall receive Seller's entire 50% managing membership Interest in Arsenic & Apple Pie, LLC. The sale and purchase of said membership interest shall include, without limitation, all property rights, assets, inventory, profits, bonuses, commissions, salaries or other forms of distribution or compensation associated with said membership interest, as well as all claims and rights under leases, contracts copyrights, service marks, trademarks, trade names, trade secrets, and licenses held or asserted by the aforementioned company.
>
> Buyer shall also receive physical possession of and all property and intellectual property rights to the "Pregnant" and "Mullet" dolls developed by Seller.
>
> . . .
>
> SELLER HEREBY WARRANTS TO BUYER WITH RESPECT TO THE MEMBERSHIP INTEREST AND DOLL PROPRIETARY RIGHTS THAT GOOD AND VALID TITLE EXISTS AND IS HEREBY TRANSFERRED TO BUYER AND BUYER ALONE. . . .

*Id.* Ex. C.

Montwillo and Tull never signed the agreement, and in June 2004, Tull initiated the dissolution and windup of AAP. AAP was formally dissolved on July 12, 2004. Tull Opposition Decl. ¶ 13. According to Tull, at the time of the dissolution, AAP's tangible assets consisted primarily of unsold doll inventory with a book value of $35,763. *Id.* ¶ 14. AAP had outstanding liabilities of $88,283, primarily consisting of unpaid loans owed to Tull. *Id.* As provided by the terms of the Operating Agreement, AAP liquidated its assets and offered them for sale to the highest bidder. *Id.* There were no bids or offers, and the debts of AAP were paid in order of priority, with third party vendors paid first. *Id.* After satisfaction of AAP's third party debts, there was still an additional $70,000 in unpaid loans. Tull states that he "elected to receive the remaining doll inventory and the intellectual property rights to all five doll designs and concepts in satisfaction of my loans to Arsenic." *Id.* Tull also states that "[w]ith no assets remaining, neither Montwillo nor I received anything in consideration of our member interests in Arsenic upon dissolution." *Id.*

On July 15, 2004, Tull sold defendant Daniel Gibby (Tull's domestic partner) the left-over "Trailer Trash" doll inventory and the intellectual property rights to the dolls and designs. *Id.* ¶ 15.

5

According to Tull,

> I believe Gibby then transferred the dolls and the intellectual rights to the dolls to [defendant] Gibby Novelties, LLC, a company he had just formed. Gibby Novelties, LLC has since sold off the existing trailer trash doll inventory, barely breaking even. It also further developed and produced two new talking dolls, roughly based on the two abandoned doll concepts acquired from Arsenic, vis-a-vis Tull and Gibby, but with vast differences so as to be entirely distinct and distinguishable.

*Id.* ¶ 15.

In July of 2004, unbeknownst to Tull, Montwillo filed copyright registrations with the Copyright Office for the five Trailer trash dolls and concepts. On July 2, 2004, Montwillo filed registrations for the two undeveloped doll concepts, "Talking Pregnant Trailer Trash Doll" and "Male Mullet Trailer Trash Doll." Greenberg Moving Decl. Ex. 5 & 6. On July 13, 2004, Montwillo submitted registrations for "Trailer Trash Doll," "Redhead Drag Queen," and "Blonde Drag Queen." *Id.* Ex. 7-9.

On July 13, 2004, Montwillo also sent a letter by certified mail to Tull's attorney, stating that Montwillo did not agree to the dissolution of AAP, and stating that he owned the copyrights to the five doll designs. *Id.* Ex. 10. Montwillo's letter offered to give exclusive license to the five designs for $10,000 each. *Id.* Montwillo testified in his deposition that his July 13, 2004 letter was intended to send notice to AAP that AAP was violating his copyrights. Montwillo Depo. 107:18-25.

Montwillo filed suit against Tull, Gibby, and Gibby Novelties LLC on August 1, 2007, alleging a claim of copyright infringement. Tull counterclaimed for conversion, breach of contract, and breach of covenant of good faith and fair dealing.

## LEGAL STANDARD

Summary adjudication is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

In a motion for summary judgment, "[if] the moving party for summary judgment meets its initial burden of identifying for the court those portions of the materials on file that it believes demonstrate the absence of any genuine issues of material fact, the burden of production then shifts so

6

that the non-moving party must set forth, by affidavit or as otherwise provided in Rule 56, specific facts showing that there is a genuine issue for trial." *See T.W. Elec. Service, Inc., v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). In judging evidence at the summary judgment stage, the Court does not make credibility determinations or weigh conflicting evidence, and draws all inferences in the light most favorable to the non-moving party. *See T.W. Electric*, 809 F.2d at 630-31 (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 (1986)); *Ting v. United States*, 927 F.2d 1504, 1509 (9th Cir. 1991). The evidence presented by the parties must be admissible. Fed. R. Civ. P. 56(e). Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment. *Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

**DISCUSSION**

**I.    Timeliness**

Defendants contend that plaintiff's copyright infringement claim is barred by the three-year statute of limitations. 17 U.S.C. § 507(b) provides that no civil action for copyright infringement shall be maintained unless it is commenced within three years after the claim accrued. Plaintiff filed this lawsuit on August 1, 2007. Defendants cite Montwillo's deposition testimony in which he stated that he believed his July 13, 2004 letter was providing notice to AAP and Tull (through Tull's lawyer) that "they" were infringing his copyrights. Plaintiff responds that his July 13, 2004 letter was only providing notice to AAP, not to Tull, Gibby or Gibby Novelties. Further, plaintiff states that AAP's assets were sold to Gibby, and then Gibby Novelties, after he wrote his July 13, 2004 letter, and that he did not learn about the sale/transfer until September 2004 when he hired an attorney to represent him and investigate the matter.

Defendants have not submitted any evidence showing that plaintiff knew about the dissolution of AAP and the sale and transfer of the doll inventory prior to August 1, 2004. Based upon this record, the Court finds that plaintiff's copyright infringement claim is not time-barred.

## II.     Work for hire

The Copyright Act of 1976 defines a "work for hire" to mean "a work prepared by an *employee* within the scope of his or her employment" or, for certain types of works, "a work specially ordered or commissioned." 17 U.S.C. § 101 (emphasis added). Defendants contend that the five dolls and doll designs are "works for hire" owned by AAP. Plaintiff contends that the doctrine is inapplicable because he was not an "employee" of AAP. As support, plaintiff cites defendant's response to a Request for Admission admitting that "Paul Montwillo was never an employee of Arsenic & Apple Pie, LLC." Sommers Moving Decl. Ex. G & H.

Defendants primarily rely on *The Martha Graham School & Dance Foundation v. Martha Graham Center of Contemporary Dance*, 224 F. Supp. 2d 567 (S.D.N.Y. 2002). In that case, the court held that the Martha Graham Center of Contemporary Dance owned the copyrights to numerous dances choreographed by Martha Graham under the "work for hire" doctrine. However, as plaintiff correctly notes, the *Martha Graham* court found that Martha Graham was an "employee" of the Center, and noted that she was a salaried employee of the Center and received employment benefits. *Id*. at 589.

Here, it is undisputed that plaintiff was not an "employee" of AAP. Defendants have not cited any cases applying the "work for hire" doctrine to a non-employee, and the Court is not aware of any such authority. In the absence of any such authority, and because the statute defines a "work for hire" as "a work prepared by an employee . . .", the Court finds that the "work for hire" doctrine is inapplicable.

## III.    Do the designs warrant copyright protection?

Defendants also contends that plaintiff's dolls and doll designs are not sufficiently original to warrant copyright protection. Section 102(a) of the Copyright Act of 1976 provides that copyright protection extends to "original works of authorship." In *Feist Publications, Inc. v. Rural Telephone Service Company*, 499 U.S. 340 (1991), the Supreme Court explained that "the requisite level of creativity is extremely low; even a slight amount will suffice. The vast majority of works make the grade quite easily, as they possess some creative spark, 'no matter how crude, humble or obvious' it might

be." *Id.* at 345 (quoting (quoting 1 M. Nimmer & D. Nimmer, Copyright § 1.08[C][1] (1990)). Defendants bear the burden of proving the invalidity of plaintiff's copyrights. *Ets-Hokin v. Skyy Spirits, Inc.*, 225 F.3d 1068, 1076 (9th Cir. 2000)

Defendants invoke the doctrine of "scènes à faire," and contend that because plaintiff used stereotypical, genre elements of "trailer trash" and "drag queens," the dolls lack originality. "Under the . . . doctrine of scènes à faire, courts will not protect a copyrighted work from infringement if the expression embodied in the work necessarily flows from a commonplace idea." *Id.* at 1092; *see also id.* at 1092 n.17 ("Nimmer explains:[F]or example, if two scenarios wish to treat the unprotected idea of police life in the south Bronx, for each it will be only natural to depict [certain stereotypical, stock scenes].").

The Court finds that plaintiff's dolls and doll designs are sufficiently original to warrant copyright protection. As the Ninth Circuit has repeatedly stated, "the requisite level of creativity is extremely low." *CDN Inc. v. Kapes*, 197 F.3d 1256, 1260 (9th Cir. 1999) (holding retail price list copyrightable); *see also Urantia Foundation v. Maaherra*, 114 F.3d 955, 959 (9th Cir. 1997) (holding that the arrangement of divine revelations met the level of creativity required for copyright); *Los Angeles News Serv. v. Tullo*, 973 F.2d 791 (9th Cir. 1992) (holding that raw news videotape is original and copyrightable). Here, plaintiff made creative decisions about the dolls' hairstyles, clothing, make-up, accessories, facial features, and so forth. Plaintiff's dolls and doll designs contain more than a minimum amount of creativity and originality.

**IV.    Ownership of copyright/implied license**

Defendants argue that the facts show that the parties intended for AAP to own the dolls and doll designs, and that to the extent plaintiff ever owned any intellectual property rights he implicitly assigned them and/or waived his rights in various ways.[5] Defendants argue that plaintiff voluntarily agreed to contribute any doll designs he may have had in exchange for a share in the partnership, and later the

---

[5] Defendants also contend that plaintiff transferred his copyright ownership to the partnership, and later the LLC, through Paragraph 3 of the written partnership agreement. The Court finds this contention lacks merit, as Paragraph 3 of the agreement only states the job responsibilities of Montwillo and Tull, and does not address in any way the ownership or transfer of any copyrights.

9

LLC. Defendants emphasize the fact that plaintiff designed the doll packages which identified AAP as the copyright owner, and also that plaintiff denied owning any copyrights in his 2002 bankruptcy petition.

The Court finds that there are issues of fact regarding whether plaintiff granted an implied nonexclusive license. As an initial matter, the Court finds that defendants have sufficiently raised the defense of an implied license in the answer by pleading that plaintiff transferred his rights (to the extent he owned the copyrights) to the partnership and LLC, and that plaintiff, by his conduct, waived his rights he may have against defendants. Nonexclusive licenses may be implied from conduct. *See Oddo v. Ries*, 743 F.2d 630, 634 (9th Cir. 1984). "When the totality of the parties' conduct indicates an intent to grant such permission, the result is a nonexclusive license." 3 Nimmer § 10.03[A][7; *see also Nelson-Salabes, Inc. v. Morningside Dev., LLC*, 284 F.3d 505, 516 (4th Cir. 2002) (discussing factors to consider in determining existence of an implied license). The Court finds that there are numerous issues of fact regarding the parties' conduct and whether plaintiff intended to grant a nonexclusive license to the partnership, and to Tull. Accordingly, the Court finds that summary judgment on this issue is inappropriate.

## CONCLUSION

For the foregoing reasons, the Court hereby DENIES the parties' cross-motions for summary judgment. (Docket Nos. 31 & 36).

**IT IS SO ORDERED.**

Dated: June 2, 2008

SUSAN ILLSTON
United States District Judge