David Y. Wong, Attorney at Law (SBN 105031)
100 Shoreline Highway, Suite 100 B
Mill Valley, CA 94941
Tel: (415) 339-0430
Fax: (415) 332-8679

Law Office of Marc H. Greenberg (SBN 88493)
536 Mission Street, Suite 2323
San Francisco, CA 94105
Tel: (415) 442-6611

Attorneys for Defendants William Tull, Daniel Gibby and Gibby Novelties, LLC

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PAUL MONTWILLO, an individual<br><br>　　　　　Plaintiff,<br><br>vs.<br><br>WILLIAM TULL; DANIEL GIBBY; GIBBY NOVELTIES, LLC dba ARSENIC & APPLE PIE, a California Limited Liability Corporation and DOES 1 through 20, inclusive,<br><br>　　　　　Defendants.<br><br>And related Counter-Claim | CASE NO. C 07 3947 SI<br><br>Pre-Trial Conference Statement of Defendants William Tull, Daniel Gibby and Gibby Novelties, LLC<br><br>June 26, 2008<br>2:00 p.m.<br>Judge Illston, Courtroom 10<br><br>The Federal Building<br>450 Golden Gate Avenue<br>San Francisco, CA 94102<br><br>Complaint filed: August 1, 2007 |

Defendant and Counter-Claimant WILLIAM TULL, and Defendants DANIEL GIBBY and GIBBY NOVELTIES, LLC, (hereinafter cumulatively referred to as "Defendants") hereby file their Pretrial Conference Statement in accordance with the Court's Pretrial Instructions.

Defendants regret that a joint statement, as prescribed by Court rules, could not be

submitted. Following the telephone conference between the Court and counsel on June 19th, Plaintiff's counsel sought a meeting between counsel the next day. Defendants' counsel attempted to contact Plaintiff's counsel repeatedly by phone to meet and confer, without success. Defendants' counsel then requested that Plaintiff's counsel provide, by the close of business on June 20th, draft copies of the Pretrial Statement and Proposed Jury Instructions that Plaintiff's Counsel had represented were "nearly complete", so that these materials could be prepared and submitted jointly in accordance with the Court's Pretrial Instructions. Plaintiff's counsel agreed to this request, and promised to provide documents as soon as they were completed.

Although Plaintiff's counsel did prepare and file five *in limine* motions on June 20th, he did not prepare or distribute either a draft Pretrial Conference Statement or Jury Instructions on Friday, Saturday or Sunday. At approximately 10:00 on June 23, Plaintiff submitted his draft statement. Not only was it too late to review because of the scheduled settlement conference, Plaintiff's draft failed to identify any exhibits, summaries or schedules, nor did it include any proposed jury instructions or verdict forms. Defendants objected and demanded compliance but Plaintiff has refused.

Under these circumstances, Defendants have prepared, this separate Pretrial Conference Statement. The information responsive to the first three items requested in the Court's Pretrial Instructions is derived from the Court's Order on the parties' cross-motions for Summary Judgment.

### 1. The Action

**(A) Substance of the Action** - Montwillo filed suit against Tull, Gibby, and Gibby Novelties LLC on August 1, 2007, alleging a claim of copyright infringement. Tull counterclaimed for conversion, breach of contract, and breach of covenant of good faith and fair dealing.

**(B) Relief Prayed** – Defendant Tull, in his counterclaim, seeks attorneys fees and costs of suit, and punitive damages for the willful conversion by Plaintiff Montwillo of the copyrights in the subject doll designs, which Plaintiff Montwillo first abandoned and granted consent to the

1  Arsenic and Apple Pie LLC to use, and thereafter, without notice to the LLC or Defendant Tull,
2  registered as his own property with the U.S. Copyright Office.

### 2. The Factual Basis of the Action

**(A) Undisputed Facts** - This case arises out of a failed business venture between plaintiff Paul Montwillo and defendant William Tull to create and distribute dolls designed by Montwillo. As background, several years prior to the business venture, Montwillo made several "drag queen" and "Trailer Trash Barbie" dolls by dressing Barbie dolls in wigs, applying make-up, and changing their outfits. These three dolls, along with "Talking Pregnant Trailer Trash Doll," and "Male Mullet Trailer Trash Doll," are the five dolls at issue in this lawsuit.

In 1996, Montwillo began selling his dolls at a store owned by Tull in San Francisco, In-Jean-ious Active. Soon thereafter, Mattel, Inc., the producer of Barbie Doll, sued Montwillo and In-Jean-ious Active for trademark and copyright infringement. Montwillo and In-Jean-ious Active settled the lawsuit with Mattel, Inc. by agreeing, *inter alia*, to refrain from selling any dolls based on Mattel's Barbie line; imitating or copying or using the Barbie line packaging; imitating or copying the body shape or facial features of "Barbie" and "Ken."
See Tull Opposition Decl. Ex. 1 (Stipulated Injunction in *Mattel* case).

In July 1997, Tull and Montwillo entered into a partnership to jointly create and distribute dolls that did not violate the terms of the Mattel settlement. Greenberg Moving Decl. Ex. 2 (Partnership Agreement). The Partnership Agreement, signed July 16, 1997, states that Tull "will be primarily responsible for the financial investment of startup costs, and upkeep until the business shows a profit. Mr. Tull is also responsible for bookkeeping, sales, and distribution." *Id.*

With respect to Montwillo, the Partnership Agreement provides that he "will be primarily responsible for Art Direction, Design, and Advertising of the product line. This would include such things as: corporate identification, product design, package design, web site design and maintenance, and print advertising." *Id.*

Section 2.7 of the Operating Agreement states, "The Managing Members shall be as follows:

**Paul Montwillo** – Manager in charge of Art Direction, Design and Advertising of

product line, including but not limited to, corporate identification, product design, packaging, web site design, web site maintenance and print advertising.
**William Tull** – Manager in charge of Administration, business affairs, accounting, distribution, sales and manufacturing." Greenberg Moving Decl. Ex. A to Ex. 10 at 8.

During the years of the Arsenic and Apple Pie Partnership and later during the Arsenic and Apple Pie LLC, Montwillo and Tull designed, developed and marketed three Trailer Trash Dollmodels: "Trailer Trash Doll," "Blonde Drag Queen," and "Redhead Drag Queen." Montwillo and Tull also developed a pre-production prototype of a "Talking Pregnant Trailer Trash Doll," and began development of a Male Mullet Doll  It is undisputed that all dolls were manufactured, developed, financed and distributed by Arsenic. Montwillo Depo. 70:18-71:7; Tull Moving Decl. ¶ 10. It is also undisputed that Montwillo was actively involved in the design and artwork of the cardboard package in which each doll was sold; on the back of each box, there was a copyright notice on behalf of Arsenic & Apple Pie. Montwillo Depo. 41:17-21; 67:9-68:6; 70:11-17;Greenberg Moving Decl. Ex. 3.

AAP was not profitable; from its inception in 1999 until its dissolution in 2004, AAP lost moneyevery year except in 2000, when it showed a profit of $6,140. Tull Opposition Decl. ¶ 14 (stating yearly net losses for AAP ranged from $2,096 to $31,662).

Tull states that on or about March 10, 2003, he learned that Montwillo had filed a Voluntary Petition in bankruptcy court in March of 2002. Montwillo Moving Decl. Ex. C; Greenberg Moving Decl. Ex. 4 (petition); Tull Opposition Decl. ¶¶ 12-13. Schedule B of Montwillo's Petition listed his membership interest in AAP as the most significant asset that he owned. Greenberg Moving Decl. Ex. On Schedule B, "Personal Property," Montwillo listed his interest in Arsenic & Apple Pie LLC, valued at $6000.00. Greenberg Moving Decl. Ex. 4.
4.4 However, Montwillo stated on the Petition that he did not own any "patents, copyrights, and other intellectual property." *Id.*

In response to learning about Montwillo's bankruptcy Petition, Tull invoked Section 8.3 of the Operating Agreement, which provides:

"8.3 On the happening of any of the following events (Triggering Events) with respect to

a Member, the Company and the other Members shall have the option to purchase all or any portion of the Membership Interest in the Company of such member (Selling Member) at the price and on the terms provided in Section 8.7 of this Agreement:

. . .

(b) the bankruptcy of a Member;

. . .

Each Member agrees to promptly give Notice of a Triggering Event to all other Members." Greenberg Moving Decl. Ex. A to Ex. 10 at 24.

By letter dated April 7, 2003, Tull's attorney informed Montwillo that due to Montwillo's bankruptcy filing, Montwillo's membership interest in AAP was subject to repurchase, and that Tull had determined that Montwillo's membership interest had a fair market value of $1. Montwillo Moving Decl. Ex. C. In a letter dated May 2, 2003, Montwillo rejected Tull's $1 offer, stated that he had repeatedly informed Tull of his intention to file for bankruptcy and that he had promptly notified Tull of the bankruptcy petition. Montwillo Moving Decl. Ex. D; *see also id.* ¶ 15 (stating that Tull never told him that he intended to dissolve company upon Montwillo's bankruptcy filing). Montwillo also stated that he believed that the fair market value of his interest in the company was $16,000, and that the two men had previously discussed and agreed on that amount. *Id.*

Montwillo and Tull then engaged in negotiations over the value of Montwillo's share, and exchanged drafts of an "Agreement For Purchase of Membership Interest and Doll Proprietary Rights." *Id.* Ex. E. The draft agreement, which appears to have been drafted by Tull's attorney, states, *inter alia*,

"Included within the terms of the sale of Membership Interest contemplated by the Agreement and subject to the terms and conditions of the same, are any intellectual rights, claims, property interests, proprietary claims or other intellectual property rights to two doll concepts which Seller [Montwillo] has previously conceived and developed, identified for the purposes of the agreement as the:

(1) "Pregnant" doll

(2) "Mullet" doll

. . .

Buyer shall receive Seller's entire 50% managing membership Interest in Arsenic & Apple Pie, LLC. The sale and purchase of said membership interest shall include, without limitation, all property rights, assets, inventory, profits, bonuses, commissions, salaries or other forms of distribution or compensation associated with said membership interest, as well as all claims and rights under leases, contracts copyrights, service marks, trademarks, trade names, trade secrets, and licenses held or asserted by the aforementioned company.

Buyer shall also receive physical possession of and all property and intellectual property rights to the "Pregnant" and "Mullet" dolls developed by Seller.

. . .

SELLER HEREBY WARRANTS TO BUYER WITH RESPECT TO THE MEMBERSHIP INTEREST AND DOLL PROPRIETARY RIGHTS THAT GOOD AND VALID TITLE EXISTS AND IS HEREBY TRANSFERRED TO BUYER AND BUYER ALONE. . . .

*Id.* Ex. C."

Montwillo and Tull never signed the agreement, and in June 2004, Tull initiated the dissolution and windup of AAP. AAP was formally dissolved on July 12, 2004. Tull Opposition Decl. ¶ 13. According to Tull, at the time of the dissolution, AAP's tangible assets consisted primarily of unsold doll inventory with a book value of $35,763. *Id.* ¶ 14. AAP had outstanding liabilities of $88,283, primarily consisting of unpaid loans owed to Tull. *Id.* As provided by the terms of the Operating Agreement, AAP liquidated its assets and offered them for sale to the highest bidder. *Id.* There were no bids or offers, and the debts of AAP were paid in order of priority, with third party vendors paid first. *Id.* After satisfaction of AAP's third party debts, there was still an additional $70,000 in unpaid loans.

Tull states that he "elected to receive the remaining doll inventory and the intellectual property rights to all five doll designs and concepts in satisfaction of my loans to Arsenic." *Id.*

Tull also states that "[w]ith no assets remaining, neither Montwillo nor I received anything in consideration of our member interests in Arsenic upon dissolution." *Id.*

On July 15, 2004, Tull sold defendant Daniel Gibby (Tull's domestic partner) the left-over "Trailer Trash" doll inventory and the intellectual property rights to the dolls and designs. *Id.* ¶ 15. According to Tull,

> "I believe Gibby then transferred the dolls and the intellectual rights to the dolls to [defendant] Gibby Novelties, LLC, a company he had just formed. Gibby Novelties, LLC has since sold off the existing trailer trash doll inventory, barely breaking even. It also further developed and produced two new talking dolls, roughly based on the two abandoned doll concepts acquired from Arsenic, vis-a-vis Tull and Gibby, but with vast differences so as to be entirely distinct and distinguishable.

*Id.* ¶ 15.

In July of 2004, unbeknownst to Tull, Montwillo filed copyright registrations with the Copyright Office for the five Trailer trash dolls and concepts. On July 2, 2004, Montwillo filed registrations for the two undeveloped doll concepts, "Talking Pregnant Trailer Trash Doll" and "Male Mullet Trailer Trash Doll." Greenberg Moving Decl. Ex. 5 & 6. On July 13, 2004, Montwillo submitted registrations for "Trailer Trash Doll," "Redhead Drag Queen," and "Blonde Drag Queen." *Id.* Ex. 7-9.

On July 13, 2004, Montwillo also sent a letter by certified mail to Tull's attorney, stating that Montwillo did not agree to the dissolution of AAP, and stating that he owned the copyrights to the five doll designs. *Id.* Ex. 10. Montwillo's letter offered to give exclusive license to the five designs for $10,000 each. *Id.* Montwillo testified in his deposition that his July 13, 2004 letter was intended to send notice to AAP that AAP was violating his copyrights. Montwillo Depo. 107:18-25.

**(B) Disputed Facts and Factual Issues –**
    a. In the fall of 1998, Tull and Montwillo converted the partnership into a limited liability company, and registered it with the State of California as Arsenic & Apple Pie, L.L.C. ("AAP"). At some time soon thereafter, the two men, with the

assistance of Tull's attorney, David Wong, entered into negotiations over the company's Operating Agreement. The parties dispute the nature of these negotiations. Montwillo claims that during the negotiations he removed from the Operating Agreement any language that would transfer his rights to the intellectual property of his dolls to AAP. Montwillo Moving Decl. ¶ 4. In contrast, Tull states that "[i]n March of 1999, I received back the signed Operating Agreement from Montwillo, with no additional changes, additions or deletions. Specifically Montwillo did not ask, nor would I have agreed, to remove, alter or insert any language from or into the Operating Agreement that would have given Montwillo the intellectual property rights to the Trailer Trash doll line. It was the clear understanding of both of us that any intellectual property rights to the dolls that may have existed would be the property of Arsenic & Apple Pie, LLC." Tull Opposition Decl. ¶ 7.

In an effort to buttress his copyright claims, Montwillo asserts that he began creating the Trailer Trash dolls prior to signing the LLC agreement in 1999, and as support has submitted correspondence and other documents, such as invoices, dating as early as August 1997. However, Montwillo and Tull entered into the AAP Partnership Agreement in July 1997, so Montwillo's contention is unavailing.

b. Montwillo and Tull are in dispute regarding who created the doll designs. Montwillo claims that he is the sole creator of the designs. Tull disputes this claim, noting that he contributed design ideas and concepts as well. Press releases authored by Montwillo from 1999 state that both Montwillo and Tull created the designs at issue.

c. There is a dispute, relevant to Defendants' statute of limitations defense, as to the date Plaintiff knew of the dissolution of AAP and the sale and transfer of the doll inventory. If Plaintiff knew of this dissolution and sale prior to August 1,

2004, then the filing of this action on August 1, 2008 is barred by the three-year statute of limitations applicable to copyright infringement claims.

    d. Defendants argue that the facts show that the parties intended for AAP to own the dolls and doll designs, and that to the extent plaintiff ever owned any intellectual property rights he implicitly assigned them and/or waived his rights in various ways. Defendants argue that plaintiff voluntarily agreed to contribute any doll designs he may have had in exchange for a share in the partnership, and later the LLC. Defendants emphasize the fact that plaintiff designed the doll packages which identified AAP as the copyright owner, and also that plaintiff denied owning any copyrights in his 2002 bankruptcy petition.

The Court, in its Order regarding the cross-motions for summary judgment, found that there are issues of fact regarding whether plaintiff granted an implied nonexclusive license. As an initial matter, the Court found that defendants have sufficiently raised the defense of an implied license in the answer by pleading that plaintiff transferred his rights (to the extent he owned the copyrights) to the partnership and LLC, and that plaintiff, by his conduct, waived his rights he may have against defendants. Nonexclusive licenses may be implied from conduct. *See Oddo v. Ries*, 743 F.2d 630, 634 (9th Cir. 1984). "When the totality of the parties' conduct indicates an intent to grant such permission, the result is a nonexclusive license." 3 Nimmer § 10.03[A][7; *see also Nelson-Salabes, Inc. v. Morningside Dev., LLC*, 284 F.3d 505, 516 (4th Cir. 2002) (discussing factors to consider in determining existence of an implied license). The Court found that there are numerous issues of fact regarding the parties' conduct and whether plaintiff intended to grant a nonexclusive license to the partnership, and to Tull.

### (3) Disputed Legal Issues

a. Does the statute of limitations bar Plaintiff's claim of copyright infringement?

17 U.S.C.A. § 507(b) provides, in pertinent part, that no civil action for copyright infringement shall be maintained unless it is commenced within three years after the claim accrued.

A cause of action for **copyright infringement** accrues when one has knowledge of a violation or is chargeable with such knowledge. *Wood v. Santa Barbara Chambers of Commerce, Inc.,* 507 F.Supp. 1128, 1135 (D.Nev.1980), *Polar Bear Prods., Inc. v. Timex Corp.,* 384 F.3d 700, 706 (9th Cir.2004). Section 507(b) is clear on its face. The statute bars recovery on any claim for damages that accrued more than three years before commencement of suit. *Stone v. Williams,* 970 F.2d 1043, 1049-50 (2nd Cir.1992), *cert. denied,* 508 U.S. 906, 113 S.Ct. 2331, 124 L.Ed.2d 243 (1993); *Hoste v. Radio Corp. of America,* 654 F.2d 11 (6th Cir.1981); *Mount v. Book-of-the-Month Club, Inc.,* 555 F.2d 1108, 1110-11 (2nd Cir.1977); *Kregos v. Associated Press,* 795 F.Supp. 1325, 1330 (S.D.N.Y.1992); *Hoey* 716 F.Supp. at 223-24; *Gaste v. Kaiserman,* 669 F.Supp. 583, 584 (S.D.N.Y.1987).

Defendants submit that the evidence at trial will establish that Plaintiff knew of the dissolution and sale of the assets of the LLC prior to August 1, 2004; consequently the filing of this action on August 1, 2008 is barred by the three-year statute of limitations applicable to copyright infringement claims.

  b. Did Plaintiff, by his conduct, abandon and waive any claims to copyright in the doll designs at issue? *See Oddo v. Ries,* 743 F.2d 630, 634 (9th Cir. 1984). "When the totality of the parties' conduct indicates an intent to grant such permission, the result is a nonexclusive license." 3 Nimmer § 10.03[A][7; *see also Nelson-Salabes, Inc. v. Morningside Dev., LLC,* 284 F.3d 505, 516 (4th Cir. 2002) (discussing factors to consider in determining existence of an implied license).

**4. Trial Preparation – Due to the failure of Plaintiff to timely provide their draft PTC Statement, only Defendants' trial preparation materials are listed herein.**

  (A) Witnesses to be Called:

   1. William Tull: He will testify regarding the creation of the business relationship between he and Plaintiff; and the actions and in-actions of Plaintiff which support the waiver and

abandonment defense; and the costs and related damages he has incurred which support his counter-claim.

      2. Alan Matacola: Accountant for the AAP LLC – he will testify regarding the financial history of the LLC.

      3. Daniel Gibby: He will testify regarding the involvement of Gibby Novelties in the acquisition of the doll designs and inventory at issue, and as to the absence of infringing activity by he and his company.

(B) Defendants' Exhibits, Schedules and Summaries

( Since Plaintiff has failed to identify any exhibits, schedules or summaries, Defendants' Exhibits are numbered starting at 101)

1. Stipulated Injunction with Mattel
2. Complaint
3. Answer
4. Counter-Claim
5. Answer to Counter-Claim
6. Deposition Transcript of Plaintiff Montwillo
7. Deposition Transcript of Defendant Tull
8. Arsenic & Apple Pie Partnership Agreement
9. Arsenic & Apple Pie, LLC Operating Agreement
10. Arsenic & Apple Pie Press Releases
    a.    June 2, 1999
    b.    June 2, 1999
11. Arsenic & Apple Pie Press Release dated June 8, 1999
12. Trailer Trash Doll and package, 1st Edition (1999)
13. Trailer Trash Doll and package, 2nd Edition (2003)
14. Project Description Sheet and related notes

15. Bankruptcy Petition and Schedules of Montwillo (2002)

16. Yearly financial statements of Arsenic & Apple Pie, LLC (1999-2004)

    a. 1999

    b. 2000

    c. 2001

    d. 2002

    e. 2003

    f. 2004

17. Montwillo Schedule K-1 (2004)

18. Documents re. Dissolution and Winding Up of Arsenic & Apple Pie

    a. Letter of June 23, 2004

    b. Letter of July 3, 2004

    c. Letter of July 20, 2004

    d. Certificate of Dissolution

    e. Agreement to Release, Cancel and Terminate Business Loans

    f. Bill of Sale of Assets of Arsenic & Apple Pie, LLC

    g. Bill of Sale to Daniel Gibby

19. Copyright Registrations

    a. Trailer Trash Doll

    b. Blonde Drag Queen Doll

    c. Redhead Drag Queen Doll

    d. Talking Pregnant Trailer Trash Doll

    e. Trailer Trash Boy Doll

20. Montwillo letter of July 13, 2004

(C) Trial – Plaintiff has requested a jury trial. Plaintiff has not, as of 6/23, identified any proposed instructions nor supplied Defendants' Counsel with copies of any

proposed voir dire questions, jury instructions and verdict forms. Defendants are unable to identify whether they have any objections to those materials.

(D) Estimate of Trial Time – if this remains a jury case, no more than 4 days. If it is a court trial, two days.

(E) Use of Discovery Responses – Defendants intend to present excerpts of the deposition of Paul Montwillo, as well as documents he has produced.

(F) Further Discovery or Motions – none from defense. Plaintiff has filed five motions in limine.

**5. Trial Alternatives and Options**

    a. Settlement Discussion: A settlement conference has been scheduled for Monday, June 23rd at 2:00 p.m. before Judge Larson.

    b. Consent to Trial Before a Magistrate Judge: Not feasible and not consented to by Defendants

    c. Amendments and Dismissals: None.

    d. Bifurcation, Separate Trial of Issues: Not feasible or desired.

Dated: June 23, 08

LAW OFFICES OF DAVID Y. WONG

_____

Attorneys for Defendants William Tull, Daniel Gibby and Gibby Novelties, LLC